# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No: 9:18-cv-80748

| | |
|---|---|
| DANIEL HALL, BURFORD CAPITAL LLC, and DUNDROD INVESTMENTS LTD., <br><br> Plaintiffs, <br><br> vs. <br><br> HARRY SARGEANT, III, <br><br> Defendant. | <br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES

Plaintiffs Daniel Hall, Burford Capital LLC ("Burford Capital"), and Dundrod Investments Ltd. ("Dundrod"), by and through their attorneys, hereby file this Complaint for declaratory judgment, injunctive relief, and damages against Defendant Harry Sargeant, III ("HS3" or "Defendant"), and state as follows:

### PRELIMINARY STATEMENT

1.     This action stems from the baseless lawsuit that HS3 pursued in this Court against Mr. Hall in *Harry Sargeant, III v. Maroil Trading, Inc., et al.*, Civ. No. 17-81070, which was assigned to District Judge Beth Bloom and Magistrate Judge Bruce Reinhart. That lawsuit is referred to herein as the "Related Federal Action," and all docket numbers herein refer to that action. HS3 first brought claims against Mr. Hall by joining him as an additional defendant in his Second Amended Complaint ("SAC"), dated February 20, 2018. *See* Dkt. 93. The SAC alleged that Mr. Hall conspired to violate the Computer Fraud and Abuse Act ("CFAA") and

1

Florida state law by agreeing that his co-defendants – Daniel Sargeant, Latin American Investments Limited ("LAIL"), and Andrew Preston (LAIL's UK counsel) – would obtain unauthorized access to a computer server maintained by the Sargeant Family Businesses (the "Sargeant Server") in order to obtain certain personally sensitive materials that HS3 had left behind on the Sargeant Server when he separated from the family businesses in 2012 (the "HS3 Material"). The SAC alleged that Mr. Hall's co-defendants obtained the materials from the Sargeant Server on October 6, 2016 and October 28, 2016.

2.  On May 30, 2018, Magistrate Judge Reinhart issued a Report and Recommendation to Judge Bloom that Mr. Hall's Motion to Dismiss the SAC be granted under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. 191 ("R&R"). Judge Reinhart recommended dismissal of Mr. Hall for three principal reasons: (1) that HS3's allegations failed to state a claim that Mr. Hall's co-defendants violated the CFAA or the parallel Florida Computer Abuse and Data Recovery Act ("CADRA"); (2) that the SAC contained no plausible, non-conclusory allegations that Mr. Hall knew in advance or agreed to any unlawful actions by his co-defendants; and (3) the SAC contained inadequate factual allegations that the HS3 Material was publicly disclosed. *See id.* at 10-31.

3.  After the issuance of the R&R, Mr. Preston, joined by Mr. Hall and the other defendants, requested a stay of discovery pending resolution of any objections to the R&R. HS3 opposed that motion, insisting that discovery proceed even though Judge Reinhart was recommending that Mr. Hall be dismissed from the case. In denying the stay motion, Judge Reinhart authorized HS3 to pursue limited discovery to support his claims, but the scope of that discovery was far narrower than HS3 had sought. In addition, Judge Reinhart authorized Mr.

Hall and his co-defendants to seek discovery from HS3, including discovery relating to HS3's reputation, which he had put directly at issue in his SAC. *See* Dkt. 194 at 4.

4. Under Federal Rule of Civil Procedure 72, HS3 had until June 13, 2018, to object to the R&R. Rather than object, however, on June 4, 2018, HS3 abruptly dismissed his claims voluntarily, in what appears to be a procedural gambit to shop for a more favorable forum. *See* Dkt. 196. HS3's voluntary dismissal is without prejudice and leaves Mr. Hall facing the real, ongoing, and concrete threat that HS3 will re-assert these or similar claims against Mr. Hall – and possibly Burford Capital and/or Dundrod – presumably in a different forum that allows him to evade Judge Reinhart's motion-to-dismiss and discovery rulings.

5. Not only did the allegations that *were* in the SAC fail to state a claim, but HS3's SAC *omitted* allegations that would have revealed a clear-cut affirmative defense on the part of Mr. Hall. Effective October 28, 2016, as part of a global settlement between HS3 and Mohammed Al-Saleh (whose litigation against HS3 was assisted by Mr. Hall and Burford Capital), HS3 executed a full and complete release of Burford Capital, Dundrod, and those working on their behalf (including Mr. Hall) with respect to all claims based on conduct occurring on or before that date. Because HS3's SAC did not reference the Settlement Agreement and Release, and the litigation never progressed past the Rule 12 stage, Mr. Hall never had an opportunity to assert his affirmative defense of release or counterclaim of breach of contract. But, as set forth below, the Settlement Agreement and Release constitutes a full and complete defense to the claims asserted by HS3 against Mr. Hall in the Related Federal Action.

6. To avoid the expense associated with further protracted litigation regarding HS3's baseless claims, and to facilitate the expeditious resolution of Mr. Hall's clear-cut affirmative defense to such claims, Plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, that

Mr. Hall is not liable to HS3 for the claims asserted in the SAC because (1) those claims are barred by the Settlement Agreement and Release and (2) Mr. Hall did not conspire to violate the CFAA or Florida law. Plaintiffs also seek an order, pursuant to 28 U.S.C. § 2202, permanently enjoining HS3 from re-asserting those baseless claims in any court.

7. Not only is the Release executed by HS3 a complete defense to any future claim, but HS3's filing of the SAC in the Related Federal Action constituted a breach of the Settlement Agreement and Release. At the time of the settlement, HS3 owed Mr. Al-Saleh more than $39 million in final, non-appealable judgments, which were accruing interest at a rate of more than $4,000 per day. Mr. Al-Saleh and those working on his behalf spent more than $8 million over more than five years trying to enforce the judgments. In exchange for HS3 giving up his campaign of evasion, Mr. Al-Saleh agreed to accept approximately $33 million spread over several payments. But a key part of the agreement was that HS3 would again be liable for the full amount owed if he resumed litigation. Accordingly, HS3's breach of the Settlement Agreement by filing the SAC triggers liquidated damages of at least $13.8 million, plus attorneys' fees and costs. Moreover, HS3's filing of the SAC against Mr. Hall constitutes malicious prosecution. Accordingly, in addition to declaratory and injunctive relief barring HS3 from refiling his claims, Plaintiffs seek damages for HS3's contract breach and tortious conduct. Those damages include the attorneys' fees and other costs incurred defending Mr. Hall against HS3's baseless and contractually-barred claims.

## PARTIES, JURISDICTION, AND VENUE

8. Plaintiff Daniel Hall is a citizen and resident of the United Kingdom ("U.K.").

9. Plaintiff Burford Capital LLC is a Delaware limited liability company. Its only member is Burford Capital Holdings (UK) Limited ("Burford Capital Holdings"), which is registered in the U.K.

10. Plaintiff Dundrod Investments Ltd. is a Guernsey registered company.

11. Defendant Harry Sargeant, III is a citizen of Florida and a resident of Palm Beach County, Florida.

12. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, because there exists an actual controversy arising under a federal statute (the CFAA), and because all claims under state law form part of the same case or controversy.

13. Because an actual controversy within the Court's jurisdiction exists, this Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occurred in this District.

15. This Court has personal jurisdiction over Defendant because he resides and is domiciled in Palm Beach County, Florida.

## STATEMENT OF FACTS

### A. Mr. Al-Saleh's Litigation Against HS3

16. In 2008, Mr. Al-Saleh sued HS3 and others in the Florida Circuit Court in and for Palm Beach County. Mr. Al-Saleh and HS3 were partners in a Florida-registered oil trading business, International Oil Trading Company ("IOTC"), which provided fuel to the U.S. Department of Defense ("DOD") during the Iraq war. Mr. Al-Saleh alleged that HS3 unlawfully diverted profits from IOTC's oil contract with the DOD away from Mr. Al-Saleh.

17. In October 2010, Dundrod entered into an agreement with Mr. Al-Saleh to provide litigation funding to assist Mr. Al-Saleh in his litigation against HS3. In addition, Dundrod's affiliate, Burford Capital, provided consulting advice to Mr. Al-Saleh and his counsel.

18. On July 27, 2011, following a trial, a Florida state court jury awarded Mr. Al-Saleh a $28.8 million judgment (and a judgment for costs and pre-judgment interest) against HS3 (the "Florida Judgment"). A Florida appeals court upheld the verdict in May 2013. The Florida Supreme Court also affirmed the verdict, exhausting HS3's avenues for appeal.

19. Notwithstanding the final, valid, and enforceable Florida Judgment, HS3 steadfastly refused to pay. Moreover, Mr. Al-Saleh found that HS3 had undertaken numerous steps designed to conceal the location of his assets and avoid execution of the Florida Judgment upon those assets. For example, two days before the jury's decision, HS3 transferred the ownership of a Texas refinery from Florida to Texas. HS3's efforts to avoid the Florida Judgment required Mr. Al-Saleh and his counsel to pursue asset recovery and judgment enforcement efforts against HS3 across the U.S. and in multiple jurisdictions across the globe, including in the U.S. Bankruptcy Court for this District. *See In re International Oil Trading Co.*, Case No.: 15-21596-EPK (S.D. Fla. Bankr.) (Kimball, Bankr. J.).

20. In 2014, Mr. Al-Saleh's counsel retained Mr. Hall, who was then a principal of Focus Intelligence Ltd. ("Focus"), an asset-tracing and corporate investigations firm in the U.K. Mr. Hall and Focus were retained to conduct investigative work on behalf of Mr. Al-Saleh to locate HS3's assets and assist in efforts to execute the Florida Judgment upon those assets.

21. In 2015, an affiliate of Burford Capital LLC acquired Focus. From that point forward, Mr. Hall, who was previously unaffiliated with Burford Capital, acted not only on behalf of Mr. Al-Saleh, by whom he was originally retained in 2014, but also on behalf of Burford Capital and Dundrod, in providing assistance to Mr. Al-Saleh and his counsel in pursuing enforcement of the Florida Judgment.

### B. The Settlement Agreement and Release

22. On October 4, 2016, after protracted litigation in multiple jurisdictions, HS3 entered into a comprehensive settlement agreement with Mr. Al-Saleh ("Original Settlement Agreement"). At the time, as set forth in the agreement, HS3 owed Mr. Al-Saleh $39,635,590.22 in final, non-appealable judgments, which were accruing interest at a rate of $4,196.97 per day. *See* Ex. A, Recital E. Mr. Al-Saleh and those working on his behalf had spent more than $8 million since the July 2011 jury verdict trying to enforce the judgments. *See id*. Recitals C, F. In exchange for HS3 giving up his campaign of evasion, Mr. Al-Saleh agreed to accept approximately $33 million, a significant discount compared to the total amount of the judgments, spread over several payments.

23. Critically, however, the Original Settlement Agreement called for HS3 to execute a release in favor of Burford Capital, Dundrod, and Mr. Al-Saleh within 10 business days, and provided that those releases were incorporated as part of the Original Settlement Agreement. *See*

7

*id.* § 2.1. If HS3 breached those releases, and resumed litigation, he would again owe Mr. Al-Saleh the full amount of the Florida Judgment. *See id.* § 14.

24. The parties amended the Original Settlement Agreement effective January 6, 2017. *See* Ex. B ("Amendment to Settlement Agreement" or "Amendment" and, together with the Original Settlement Agreement, the "Settlement Agreement"). The Amendment reduced HS3's total payment obligation by $190,000 in exchange for payment of the full outstanding amount by January 10, 2017. *See id.* §§ 1.1, 1.2. It also provided that the parties would complete the exchange of the releases required by § 2.1 of the Original Settlement Agreement by January 9, 2017. *See id.* § 3.

25. On January 9, 2017, HS3 delivered a release in favor of Mr. Al-Saleh, Burford Capital, and Dundrod, as well as "all persons or entities for whose acts or omissions the foregoing would or could be derivatively or vicariously liable or to whom the foregoing could or would owe indemnification." Ex. C (the "Release"). The Release specifies that it is "intended to be contractual in nature" – that is, to prohibit HS3 as a matter of contract from suing any of the released parties on released claims. *Id.*

26. The Release, which bears an effective date as of October 28, 2016, covers all claims "known or unknown, fixed or contingent, accrued or un-accrued, liquidated or unliquidated" that HS3 "ever had or now has, upon, by reason of, arising out of, or in connection with any matter, cause, or thing whatsoever, including, but not limited to, any matter, cause, or thing whatsoever relating to the relationship between RELEASORS and RELEASEES, from the beginning of the world to the date hereof." *Id.* The Release specifies that it is to be "broadly construed in favor of the RELEASEES." *Id.*

27.     The Settlement Agreement made Burford Capital, Dundrod, and Mr. Al-Saleh, as well as their personal representatives and legal representatives (including Mr. Hall), third-party beneficiaries entitled to enforce the agreement.  *See* Settlement Agreement § 22.

28.     In short, the Settlement Agreement and Release give Burford Capital, Dundrod, and any persons working on their behalf (including Mr. Hall) a claim for breach of contract if HS3 sues them based on any conduct occurring on or before October 28, 2016.

29.     Effective January 12, 2017, Mr. Al-Saleh executed an assignment of the Florida Judgment to Dundrod.

      C.      **HS3 Breaches the Settlement Agreement and Release**

30.     HS3's SAC in the Related Federal Action breached the Settlement Agreement and Release by claiming that Mr. Hall violated the CFAA and Florida state law through alleged conspiracies that ended on or before October 28, 2016, the effective date of the Release.

31.     Specifically, according to the allegations of the SAC, which is attached hereto as Exhibit D, HS3 was engaged in a business relationship with other members of his family, including his brothers, Daniel Sargeant and James Sargeant, and his father Harry Sargeant, Jr. (collectively, the "Sargeant Family"), from 1990 through 2012.  *See* SAC ¶ 17.  The Sargeant Family owned and operated a number of for-profit businesses involved in the sale, transport, and distribution of asphalt and other petroleum products (collectively, the "Sargeant Family Businesses").  *See id*.  The Sargeant Family Businesses maintained a computer server – the Sargeant Server – in Boca Raton, Florida, and used that server to conduct their business operations.  *See id*. ¶ 19.

32.     In 2012, HS3 had a falling out with his family and cut ties with the Sargeant Family Businesses.  *See id*. ¶¶ 17, 31.  Apparently, however, HS3 did not remove certain

9

personal and business information – the HS3 Material – that he had stored in an allegedly password-protected email account on the Sargeant Server (the "HS3 Email Account"). *See id*. ¶¶ 21-24, 36.

33. The SAC further alleged that, "[a]s part of" Mr. Hall's work on behalf of Mr. Al-Saleh, Mr. Hall "sought information regarding HS3 that Burford could use to leverage and/or extort HS3 into a payment or settlement." *Id*. ¶ 31. Mr. Hall therefore allegedly agreed with Daniel Sargeant and others in August 2016 that Daniel Sargeant "would unlawfully access the HS3 Email Account, obtain the HS3 Material, and provide the HS3 Material to Hall." *Id*. ¶ 33.

34. Finally, the SAC alleged that, in furtherance of that agreement, on October 6, 2016 and October 28, 2016, Daniel Sargeant accessed the Sargeant Server and the HS3 Email Account and obtained the HS3 Material. *See id*. ¶ 36. The SAC also alleged that on October 28, 2016, Daniel Sargeant and LAIL disclosed the HS3 Material to Mr. Hall "and an unknown number of other persons." *See id*. ¶¶ 100-01.

35. Based on these allegations, the SAC asserted claims against Mr. Hall for (1) conspiracy to violate the CFAA, 18 U.S.C. § 1030(a)(2)(C), and (2) civil conspiracy under Florida law to violate Florida's CADRA, Fla. Stat. § 668.801 *et seq*., and to invade HS3's privacy. *See* SAC ¶¶ 54, 107.

36. On May 30, 2018, Magistrate Judge Reinhart issued the R&R, recommending that both claims against Mr. Hall be dismissed (along with most of the other claims in the SAC against other defendants). The R&R, which is attached hereto as Exhibit E, concluded that, based on the allegations of the SAC, any CFAA violation "would have ended when the HS3 Material was acquired" and "any corresponding conspiracy would have achieved its objective, and therefore ended, at the same time." R&R, Dkt. 191 at 25 n.11. Given that the SAC itself

alleged that Mr. Hall's co-defendants obtained the HS3 Material on or before October 28, 2016, any CFAA claims against Mr. Hall are clearly covered by the Release.

37. The alleged CADRA conspiracy and the alleged conspiracy to invade HS3's privacy, like the alleged CFAA conspiracy, were complete on October 28, 2016.  The SAC alleged that Mr. Hall and others had obtained and publicized the HS3 Material by that date, thus achieving the alleged objectives of the conspiracy.  All of the allegations in the SAC against Mr. Hall thus are covered by the plain terms of the Release.

### D. Mr. Hall Is Not Liable To HS3

38. In addition to violating the Settlement Agreement and Release, HS3's claims against Mr. Hall in the SAC were (and are) baseless.  In fact, HS3 lacked probable cause to assert them against Mr. Hall.

39. First, Daniel Sargeant and LAIL could not have violated the CFAA or CADRA by accessing the Sargeant Server because, as HS3 himself alleges in the SAC, the Sargeant Family Businesses (one of which was LAIL) owned the Sargeant Server.  Daniel Sargeant, as the owner of those businesses, could not have accessed the Sargeant Server without or in excess of authorization, as required for violations of both CFAA and CADRA.

40. Moreover, HS3 had abandoned the HS3 Material and any reasonable expectation of privacy in it by leaving it on the Sargeant Server when he separated from the Sargeant Family Businesses more than four years before Daniel Sargeant's allegedly improper access.

41. Second, even assuming hypothetically that Daniel Sargeant and LAIL did violate the CFAA or CADRA in obtaining the HS3 Material, Mr. Hall was not aware they would do so and thus did not agree to violate those statutes.  Mr. Hall, who was an outsider to the Sargeant Family Businesses, had no knowledge of where the HS3 Material was stored, what technological

steps were required to obtain it, and who within the Sargeant Family Businesses had the requisite authorization needed to take those steps. He therefore lacked the requisite knowledge and mental state to agree to violate CFAA or CADRA.

42. Third, Mr. Hall is not liable to HS3 for conspiring to invade his privacy. Because Daniel Sargeant and LAIL owned the Sargeant Server, and because HS3 abandoned the HS3 Material there, HS3 could not have had the reasonable expectation of privacy required for a claim for invasion of privacy by intrusion. Mr. Hall also did not conspire to invade HS3's privacy by public disclosure of private facts because conspiracy under Florida law requires a completed predicate offense, and Mr. Hall, Daniel Sargeant, LAIL, and Mr. Preston did not disclose the HS3 Material to a sufficient number of people to constitute public disclosure.

**E.     HS3 Brought Baseless Claims Out of Malice Toward Mr. Hall and Burford Capital**

43. HS3 brought the SAC against Mr. Hall, even though his claims were without probable cause for the multiple reasons given above, because he desired to harm Mr. Hall and Burford, both financially and reputationally. HS3, angry at losing a highly-publicized lawsuit and being forced to pay nearly $33 million to Mr. Al-Saleh and Burford Capital, harbored deep-seated ill will toward Burford Capital and Mr. Hall. The SAC itself described the litigation as a "bitter, global feud" between HS3, Mr. Al-Saleh and Mr. Hall. SAC ¶ 31. HS3's bitterness toward Mr. Hall and Burford Capital did not end with the Settlement Agreement and Release.

44. In fact, HS3's bitterness toward Mr. Hall and Burford Capital intensified after the *Wall Street Journal* published an article on November 7, 2017, entitled *Jet-Set Debt Collectors Join a Lucrative Game: Hunting the Superrich*. *See* Ex. F. The article profiled Mr. Hall by chronicling his efforts to chase HS3's assets across the globe. It also highlighted HS3's lavish lifestyle, his legal maneuvers to hide and protect his assets around the globe, and his efforts to

evade legal process to avoid execution of the Florida Judgment. Approximately three months after the article's publication, after the deadline for joinder of parties had already passed, HS3 filed the SAC naming Mr. Hall. HS3 filed the SAC notwithstanding the lack of probable cause for his claims, in retaliation against Mr. Hall and Burford Capital for their role in assisting Mr. Al-Saleh his acrimonious litigation against HS3. As a result, Mr. Hall and Burford Capital were forced yet again to spend time and money responding to HS3's baseless and abusive litigation tactics.

## COUNT I:
## DECLARATORY JUDGMENT
## (ON BEHALF OF ALL PLAINTIFFS)

45. Plaintiffs incorporate by reference the preceding allegations.

46. As alleged above, HS3 sued Mr. Hall in the Related Federal Action by joining him in the SAC. Although HS3 voluntarily dismissed the SAC, that dismissal was without prejudice. Mr. Hall therefore is subject to an ongoing, real, and concrete threat that the claims will be refiled.

47. Mr. Hall is entitled to a declaratory judgment of nonliability to HS3. First, HS3's claims against Mr. Hall in the Related Federal Action are barred by the Settlement Agreement and Release. Second, Mr. Hall is not liable to HS3 because (1) there was no underlying violation of the CFAA or Florida state law; (2) Mr. Hall did not knowingly agree with his co-defendants to violate the CFAA or Florida state law; and (3) Mr. Hall did not knowingly agree with his co-defendants to invade HS3's privacy.

48. Plaintiffs Burford Capital and Dundrod have standing to seek a declaration of nonliability to HS3. Burford Capital and Dundrod are also releasees and third-party beneficiaries entitled to enforce the Settlement Agreement and Release. There is an actual controversy

between Burford Capital, Dundrod, and HS3 because Burford Capital and Dundrod are at risk of being held vicariously liable if Mr. Hall is found liable to HS3.  Moreover, the breach of contract claim asserted by Burford Capital and Dundrod against HS3 (*see* Count II) creates an actual controversy between the parties as to whether the claims in the Related Federal Action are covered by the Settlement Agreement and Release.

49. Plaintiffs are therefore entitled to a declaration under 28 U.S.C. § 2201 that the claims in the SAC against Mr. Hall are barred by the Settlement Agreement and Release, that the conduct alleged in the SAC does not give rise to liability to HS3, and that HS3 is barred from again bringing those claims against Plaintiffs.

50. Plaintiffs are also entitled under 28 U.S.C. § 2202 to preliminary and permanent injunctive relief prohibiting HS3 from bringing the baseless claims in the Related Federal Action against any of the Plaintiffs in violation of the Settlement Agreement and Release.

## COUNT II:
## BREACH OF CONTRACT
## (ON BEHALF OF ALL PLAINTIFFS)

51. Plaintiffs incorporate by reference the preceding allegations.

52. As alleged above, HS3's claims against Mr. Hall in the Related Federal Action are barred by the Settlement Agreement and Release.

53. HS3's filing of the SAC in the Related Federal Action constituted a breach of the Settlement Agreement and Release.

54. Plaintiffs are third-party beneficiaries under § 22 of the Settlement Agreement and entitled to assert a claim for breach of the same.

55. HS3's breach is an Actionable Event under § 13 of the Settlement Agreement. Therefore, HS3 is liable under § 14 of the Settlement Agreement in an amount to be determined, but at least $13.8 million.

56. Alternatively, HS3 is liable for damages, including compensatory damages, caused by his breach of the Settlement Agreement and Release.

57. As a result of his breach, HS3 is also liable under § 36 of the Settlement Agreement for Plaintiffs' reasonable attorneys' fees and costs, in an amount to be determined.

58. Plaintiffs are also entitled to preliminary and permanent injunctive relief prohibiting HS3 from bringing the claims in the Related Federal Action against any of the Plaintiffs in violation of the Settlement Agreement and Release.

## COUNT III:
## MALICIOUS PROSECUTION
## (ON BEHALF OF DANIEL HALL AND BURFORD CAPITAL)

59. Plaintiffs incorporate by reference the preceding allegations.

60. HS3 caused the SAC in the Related Federal Action to be filed against Mr. Hall.

61. HS3 lacked probable cause for asserting claims against Mr. Hall in the Related Federal Action. HS3 knew that the claims against Mr. Hall in the Related Federal Action were barred by the Settlement Agreement and Release. HS3 personally executed the Settlement Agreement and Release on or around January 9, 2017, with advice of competent counsel, and HS3 had knowledge of its contents. HS3 knew – or reasonably should have known – that the claims against Mr. Hall in the Related Federal Action were released claims. HS3 also lacked probable cause to believe that Mr. Hall knew about or agreed to participate in any violations of federal or Florida law by his co-defendants.

62. HS3 acted with actual malice by prosecuting the Related Federal Action against Mr. Hall.  HS3 brought the SAC against Mr. Hall in retaliation against – and with animosity toward – Mr. Hall and Burford Capital, because of their role in assisting Mr. Al-Saleh in enforcing the Florida Judgment and because of his anger at the *Wall Street Journal's* unflattering coverage of him in the article about Mr. Hall.  Because of that animosity and ill will, HS3 sought to do harm to Mr. Hall and Burford Capital for harm's sake.

63. HS3 also acted with legal malice by prosecuting the Related Federal Action, which may be inferred from the lack of probable cause underlying the Related Federal Action and HS3's gross negligence to the rights of Mr. Hall and Burford Capital.  Among other things, as set forth above, HS3's claims were plainly barred by the Settlement Agreement and Release.

64. The voluntary dismissal of the Related Federal Action was a bona fide termination of the action in favor of Mr. Hall.  HS3 voluntarily dismissed his claims against Mr. Hall only after Magistrate Judge Reinhart issued the R&R in the Related Federal Action recommending that both claims against Mr. Hall be dismissed because of the absence of plausible, non-conclusory allegations supporting those claims.  Alternatively, the declaratory and injunctive relief sought herein will, once granted, constitute bona fide termination of the Related Federal Action in favor of Mr. Hall.

65. Plaintiffs suffered damages as a result of HS3's unlawful conduct, including but not limited to attorneys' fees and costs, in an amount to be determined.

66. Plaintiffs are also entitled to preliminary and permanent injunctive relief prohibiting HS3 from bringing the claims in the Related Federal Action against any of the Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1. A declaration and judgment pursuant to 28 U.S.C. § 2201 that Plaintiffs are not liable to HS3 for any of the transactions or occurrences alleged in the Related Federal Action because:

    a. HS3's claims are barred by the Settlement Agreement and Release; and

    b. Mr. Hall did not conspire to violate the CFAA or Florida law.

2. An order permanently enjoining HS3 from refiling the claims in the Related Federal Action, or any other claims based on events that occurred on or before October 28, 2016, against Plaintiffs.

3. Damages in an amount to be determined.

4. Attorneys' fees and costs.

5. Punitive damages.

6. Such further relief as the Court deems just and equitable.

Dated: June 8, 2018

Respectfully submitted,

By: */s/ Samuel A. Danon*
Samuel A. Danon
Fla. Bar No. 0892671
sdanon@HuntonAK.com
Armando Cordoves, Jr.
Fla. Bar No. 112425
acordoves@HuntonAK.com
**HUNTON ANDREWS KURTH LLP**
Sabadell Financial Center
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2510
Facsimile: (305) 810-2460


Derek T. Ho
Andrew E. Goldsmith
**KELLOGG, HANSEN, TODD, FIGEL
 & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
dho@kellogghansen.com
agoldsmith@kellogghansen.com


*Attorneys for Plaintiffs*