# Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-81070-CIV-BLOOM/REINHART

HARRY SARGEANT, III,

              Plaintiff,

vs.

MAROIL TRADING INC.,
SEA PIONEER SHIPPING CORPORATION,
WILMER RUPERTI PEDROMO,
DANIEL SARGEANT,
DANIEL HALL, and
ANDREW PRESTON

              Defendants.

and

LATIN AMERICAN INVESTMENTS, LTD.,

              Intervenor.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS'
## MOTIONS TO DISMISS (DE 129, 131, 142)

The Second Amended Complaint ("SAC") (DE 93) alleges eight causes of action against

Defendants Daniel Sargeant, Latin American Investments, Ltd. ("LAIL"), Daniel Hall, and

Andrew Preston, as follows:

| Count | Claim | Defendant(s) |
|---|---|---|
| I | Computer Fraud and Abuse Act (CFAA), 18 U.S.C. §§ 1030(a)(2)(C), (g) | LAIL, Daniel Sargeant |
| II | Conspiracy to Violate the CFAA, 18 U.S.C. §§ 1030(b), (g) | All Defendants |
| III | Stored Communications Act, 18 U.S.C. §§ 2701, 2707 | LAIL, Daniel Sargeant |
| IV | Florida Computer Abuse and Data Recovery Act (CADRA), Florida Statutes 668.801 | LAIL, Daniel Sargeant |
| V | Breach of Contract | LAIL, Daniel Sargeant |
| VI | Invasion of Privacy (Intrusion) | LAIL, Daniel Sargeant |
| VII | Invasion of Privacy (Public Disclosure of Private Facts) | LAIL, Daniel Sargeant |
| VIII | Civil Conspiracy | All Defendants |

Before the undersigned for decision, based on an Order of Referral from the district court (DE 146), are motions by all Defendants to Dismiss the SAC.  *See* DE 129 (Defendant Preston); DE 131 (Defendant Hall); DE 142 (Defendants LAIL and Daniel Sargeant).  The Court has reviewed the respective motions, the Plaintiff's Response to each motion, and the Movants' replies.  The Court heard argument on May 21, 2018, and issued an oral ruling from the bench. This Report and Recommendation formalizes and expands on the Court's oral pronouncement on May 21, 2018.  For the reasons stated herein, the undersigned **RECOMMENDS** that:

1.      Defendant Andrew Preston's Motion to Dismiss Counts II and VIII (DE 129) be **GRANTED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted and, alternatively, for lack of personal jurisdiction.

2.      Defendant Daniel Hall's Motion to Dismiss Counts II and VIII (DE 131) be **GRANTED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted.

3.     Defendants LAIL and Daniel Sargeant's Motion to Dismiss (DE 142) be **GRANTED IN PART WITHOUT PREJUDICE** (as to Counts I, II, III, IV, VII and VIII) for failure to state a claim upon which relief can be granted and **DENIED IN PART** (as to Counts V and VI).

## I.     LEGAL STANDARDS

### A.  Motion to Dismiss for Failure to State a Claim - Rule 12(b)(6)

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy the Rule 8 pleading requirements, a complaint must provide the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly,* 550 U.S. at 570); *see also Am. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1288-90 (11th Cir. 2010).

In *Iqbal,* the Supreme Court approved a two-part process for evaluating a motion to dismiss under Rule 12(b)(6):

[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 556 U.S. 662, 679 (2009).

### B. Motion to Dismiss for Lack of Personal Jurisdiction - Rule 12(b)(2)

Where, as here, subject matter jurisdiction is based on a federal question arising under a statute that is silent regarding service of process, the Federal Rules of Civil Procedure require the Court to look to the state long-arm statute in order to determine the existence of personal jurisdiction. *Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 626–27 (11th Cir. 1996). *See* Fed. R. Civ. P. 4(k)(1) ("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant: (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."). Even assuming personal jurisdiction over a non-resident defendant is proper under the state long-arm statute, the Court must make an independent assessment whether exercising this jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Keim v. ADF MidAtlantic, LLC*, 199 F. Supp. 3d 1362, 1367 (S.D. Fla. 2016) (J. Marra). Both prongs must be satisfied for the court to have personal jurisdiction over the defendant. *Id*.

The plaintiff bears the initial burden of "alleg[ing] sufficient facts to make out a prima facie case of jurisdiction" over the nonresident defendant. *Posner v. Essex Ins. Co*., 178 F.3d 1209, 1214 (11th Cir. 1999). If the plaintiff sufficiently alleges a prima facie case of jurisdiction, the defendant must raise "through affidavits, documents or testimony, a meritorious challenge to personal jurisdiction." *Internet Solutions Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009) (quoting *Sculptchair,* 94 F.3d at 627). "If the defendant does so, 'the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents.'" *Id.* (quoting *Sculptchair,*

4

94 F.3d at 627). The court must accept the facts alleged in the complaint as true to the extent they are uncontroverted by the defendant's affidavits. *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). Where the plaintiff's evidence and defendant's evidence conflict, all reasonable inferences must be construed in favor of the plaintiff. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

## II. <u>ANALYSIS OF THE SECOND AMENDED COMPLAINT</u>

As instructed by *Twombly* and *Iqbal*, the Court will first separate the SAC's factual assertions from its conclusory statements. For purposes of this Motion, the Court accepts all well-pled factual allegations in the Second Amended Complaint as true and evaluates all plausible inferences derived from those facts in favor of the Plaintiff. *See Chaparro v. Carnival Corp.,* 693 F.3d 1333, 1337 (11th Cir. 2012); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC,* 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009) ("On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true."). All paragraph citations (noted as "¶" or "¶¶") are references to the numbered paragraphs in the SAC.

### A. <u>Facts</u>

The SAC alleges that the Defendants accessed Plaintiff's former corporate email account without proper authorization, downloaded materials that were then traded for other materials of value to the Defendants, and thereafter used the newly-obtained materials to negotiate a $30,000,000 litigation settlement with a third party. As relevant to the issues before the Court, the SAC makes the following factual allegations that are entitled to the assumption of truth:

LAIL is a company owned by members of the Sargeant family, including Defendant Daniel Sargeant. ¶ 3. Plaintiff formerly was a 25% owner of LAIL. *Id.* At all relevant times,

Daniel Sargeant "owned, controlled, and/or managed numerous Sargeant Family owned businesses, including LAIL." ¶ 4. Defendant Preston is a UK citizen and solicitor who has served as legal counsel to LAIL and other Sargeant Family businesses. ¶ 6.

From in or about 1990 through 2012, Plaintiff, Daniel Sargeant, and other Sargeant family members "owned, operated, and were employed by" a number Sargeant-family-owned business entities engaged in the sale, transport, and distribution of asphalt and related petroleum products and materials, and operating in interstate and foreign commerce ("the Sargeant Family Businesses"). ¶¶ 17, 18. LAIL was one of these business entities. ¶ 17.

The Sargeant Family Businesses "maintained" a computer server ("the Sargeant Server") at an office in Boca Raton, Florida. ¶ 19. Plaintiff "maintained and utilized his own email account on the Sargeant Server, denominated as hsargeant@sargeant.net" (the "HS3 Email Account"). ¶ 21. "The HS3 Email Account was password protected and [Plaintiff] did not provide the password associated with the HS3 Email Account to any of the Defendants or their representatives or agents." *Id.* "Access to the Sargeant Server was also password protected." ¶ 21.[1] Even though Plaintiff ceased to be affiliated with the Sargeant Family Businesses in 2012, *see* ¶ 17, his email account continued to exist on the Sargeant Server. Contained within the email account were 478 items comprising business information, business and personal communications, documents, Microsoft email files, and personal sensitive photographs and

---

[1] Notably, as discussed below, the SAC is silent about who had the password for the Sargeant Server.

videos ("HS3 Materials"). ¶ 22. The HS3 Materials were all either emails or email attachments. SAC Exhibit A.[2] Some were unrelated to the Sargeant Family Businesses. ¶ 23-24.

Plaintiff "never explicitly or implicitly authorized" any of the Defendants to access the email account or the Sargeant Server. ¶ 25. The Sargeant Family Businesses had no official or unofficial policies or procedures authorizing the Defendants, or anyone else, to access the email account or to access or obtain the HS3 Materials. ¶ 26.

In April 2015, Plaintiff, LAIL, and Daniel Sargeant entered into a written contract for the purposes of resolving certain litigation among them. ¶ 80. The settlement agreement contained a non-disparagement clause that prohibited the parties from making statements, releasing documents, or otherwise taking action that would disparage the other. ¶ 81 and Exhibit B. The settlement agreement also terminated Plaintiff's ownership interest in LAIL and the other Sargeant Family Businesses. Ex. B at §7.1

In or about August 2016, Defendant Hall advised the other Defendants that he had certain information ("the Ruperti Material") that would be of great value to the other Defendants in their efforts to collect money from a third party. ¶ 29. Hall had obtained the Ruperti Material from a separate litigation between one of his other clients (Sovcomflot) and Ruperti. The Ruperti Material was subject to a non-disclosure agreement between Sovcomflot and Ruperti. ¶ 30.

Simultaneously, Hall was working as an investigator for a different client who was trying to collect a multi-million dollar judgment from Plaintiff. ¶ 31. As part of those efforts, Hall was seeking information that could be used to "leverage and/or extort [Plaintiff] into a payment or settlement." ¶ 31.

---

[2] In ruling on a 12(b)(6) motion, the Court may consider attachments that are incorporated into the operative complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

On or about October 6, 2016, Hall provided a portion of the Ruperti Material to Daniel Sargeant, LAIL, and Preston.  ¶ 35.  On or about October 6, 2016, and again on or about October 28, 2016, Daniel Sargent and LAIL accessed the Sargeant Server and the HS3 Email Account, and obtained the HS3 Material.  ¶ 36.[3]  On or about October 28, 2016, Daniel Sargent and LAIL traded the HS3 Material to Hall for the remainder of the Ruperti Material.  ¶ 37.

On or about March 1, 2017, Daniel Sargeant, LAIL, and Preston filed a lawsuit in the UK on behalf of LAIL against Maroil and SPSC ("the London Litigation").  ¶ 38.  At or about the same time, Preston "utilized and incorporated the Ruperti Materials . . . into a filing in the London Litigation."  ¶ 113.  In May 2017, Hall met with the other Defendants in London.  Hall asked to share in the proceeds of the London Litigation, in part because he and his firm could be exposed to liability for violating the NDA by providing the Ruperti Materials in exchange for the HS3 Materials.  ¶ 39.  Later in May 2017, "Preston, on behalf of himself, [Daniel Sargeant] and LAIL . . . indicated a willingness to consider providing Hall a portion of any recovery" in the London Litigation.  ¶ 40.  "On or about July 26, 2017, Preston, on behalf of himself, [Daniel Sargeant] and LAIL, again communicated with Hall to advise that if a substantial recovery were made in the London Litigation then [Daniel Sargeant] would be happy to sit down with Hall to discuss some form of a success fee."  ¶ 41.  "Preston expressly averred under oath that the Ruperti Material provided the evidence essential to the successful assertion of the claims advanced in the London Litigation."  ¶ 42.  LAIL recovered in excess of $30,000,000 in the London Litigation.  *Id.*

---

[3] Paragraph 36 of the SAC alleges that Daniel Sargeant and LAIL "unlawfully" accessed the server and email account.  As discussed more fully below, that term is a bare legal conclusion that is not entitled to the assumption of truth.  The balance of Paragraph 36 is a proper assertion of fact.

### B. **Factually Unsupported Conclusions**

Interspersed with these factual averments, the SAC includes conclusory statements that advocate its conspiracy theory, but are not supported by specific facts. For example, Paragraph 27 of the SAC states:

> In or about August 2016, the Defendants devised a scheme whereby they agreed together to, unlawfully and without authorization, access the HS3 Email Account, and to, unlawfully and without authorization and/or in excess of any authorization, access the Sargeant Server, obtain the HS3 Material, and exchange the HS3 Material for certain other illicit and confidential materials to advance their own individual and mutual interests. The profit minded Defendants intentionally agreed to exploit this unauthorized and unlawful access to such materials to reap financial gain.

Paragraph 33 of the SAC states:

> In or about August 2016, the Defendants agreed together that [Daniel Sargeant] and LAIL would unlawfully access the HS3 Email Account, obtain the HS3 Material, and provide the HS3 Material to Hall. In exchange, the Defendants agreed together that Hall would access the Ruperti Material, disregard the settlement and the NDA between Sovcomflot and Ruperti applicable to the Ruperti Material, and provide the Ruperti Material to [Daniel Sargeant], LAIL, and Preston, for Preston to use in litigation between LAIL and the Ruperti Parties.

Paragraph 34 states:

> [Daniel Sargeant], LAIL, and Preston knew they had no authorization to access
> the HS3 Email Account and lacked authorization or exceeded any authorization
> they had to access the Sargeant Server, and no authorization to obtain the HS3
> Material and/or provide same to Hall. [Daniel Sargeant], LAIL, and Preston also
> knew, or later became aware, that Hall would violate the Sovcomflot settlement
> and NDA in order to access and provide to them the Ruperti Material in
> exchange for the HS3 Material.

These portions of the SAC are not entitled to the assumption of truth. Conclusory allegations that a party "knew of, condoned, and willfully and maliciously agreed to" take certain actions are "nothing more than a 'formulaic recitation of the elements'" of one or more of the causes of action alleged in the SAC. *See Iqbal,* 556 U.S. at 680-81. Similarly, a summary assertion that parties entered into an unlawful conspiratorial agreement is a "'legal conclusion' and, as such, [is] not entitled to the assumption of truth." *Id.* at 680 (citing and quoting *Twombly).* Other portions of the SAC also are mere legal conclusions and speculation about the Defendants' state of mind, without sufficient factual support. *See* ¶ 28 ("Defendants intended for their scheme to result in harm inside Florida"); ¶ 32 ("Hall also knew [Daniel Sargeant], LAIL, and Preston could unlawfully access the HS3 Material"); ¶ 111 ("Upon information and belief, Hall on or about October 28, 2016, and thereafter further publicized the HS3 Material to others within Burford, and to an unknown number of other persons, through electronic and/or other means.").

## III.  MOTIONS TO DISMISS UNDER RULE 12(b)(6)

### A.  Counts I and II (CFAA)

Count I requires proof that a Defendant "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access, and thereby obtain[ed] . . . information from a

protected computer," 18 U.S.C. §§ 1030(a)(2)(C), (g), and that the Plaintiff thereby suffered damage or loss of at least $5,000.00. *Hamilton Grp. Funding, Inc. v. Basel*, No. 16-61145-CIV, 2018 WL 1788161, at *5 (S.D. Fla. Apr. 12, 2018) (J. Zloch) (citing 18 U.S.C. § 1030(g)). Count II requires proof that the Defendants agreed to commit a violation of Section 1030(a)(2)(C) with each defendant knowing of the illegality of the plan and intending to further it, and that an overt act in furtherance of the conspiracy occurred. *See* Eleventh Circuit Pattern Jury Instructions, (Criminal Cases) (2016), Offense Instruction 13.1, "General Conspiracy Charge," 18 U.S.C. § 371.

All Defendants assert that the SAC fails to properly allege that the HS3 Email Account was accessed without proper authorization;[4] they also all allege that the SAC fails to plead a statutorily cognizable loss. Hall and Preston allege that, assuming *arguendo* proper authorization was lacking, there are insufficient factual allegations to establish a plausible claim that they knew of the lack of proper authorization. LAIL and Daniel Sargeant assert that Plaintiff, as a former employee, cannot bring a claim under the CFAA because he abandoned any rights he formerly had in the HS3 Materials. Solely as to Count II, all Defendants assert there are insufficient factual allegations to establish a plausible claim that a conspiratorial agreement existed.

Plaintiff responds that the factual averments, including the allegation of a statutorily-cognizable loss, are sufficient to state a claim against all Defendants on all counts. Plaintiff further asserts that *United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010) and *United States*

---

[4] The Court recognizes that the CFAA prohibits two mutually exclusive actions: (1) accessing a protected computer without authorization or (2) accessing a protected computer with authorization but exceeding the scope of the authorized access. The SAC alleges, in the alternative, that the Defendants did not have authorization and/or exceeded any authorized access. For ease of discussion, the Court will use the phrase "without proper authorization" to capture both concepts.

*v. John*, 597 F.3d 263 (5th Cir. 2010) establish a legal rule that a CFAA defendant cannot be authorized to obtain information from a protected computer if that information is to be used for an illegal purpose. Extrapolating from *Rodriguez,* Plaintiff argues that this Court must apply an expansive definition of the CFAA and that the cases from outside the Eleventh Circuit cited by Defendants are inconsistent with this Circuit's broad reading of the statute.

### 1. *Without Proper Authorization*

One element of the CFAA violations alleged in Counts I and II is that the Defendant accessed the protected computer without proper authorization. *See* 18 U.S.C. § 1030(a)(2)(C); *accord P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC.,* 428 F.3d 504, 508 (3d Cir. 2005) (one element of related CFAA provision is that defendant accessed protected computer "without authorization or by exceeding such authorization as was granted."). Defendants say that, by definition, the owner of a computer controls access to that computer and can authorize it to any extent the owner deems appropriate. In short, they argue that the owner of a computer cannot hack himself.

As a preliminary matter, the Court notes that "ownership" *vel non* of the server is not dispositive. The CFAA speaks of "authorization" to access a protected computer and/or exceeding "authorized" access to that computer. Numerous situations exist where a non-owner has legal power to grant, deny, or limit access to a location or an item. *See, e.g., Byrd v. United States*, No. 16-1371, 2018 WL 2186175, at *3 (U.S. May 14, 2018) (person in "lawful possession and control" of a rental car had authority to exclude others); *United States v. Willis*, 759 F.2d 1486, 1498 (11th Cir. 1985) (hotel guest could consent to search of rented room). As such, the baseline inquiry under the CFAA is not who owns legal title to the protected computer; it is who has the legal power to grant, deny, or limit access to that computer. Of course, that

person can voluntarily agree to limit their rights over the computer or over the data on the computer. *See* Microsoft Services Agreement (May 1, 2018), ¶ 2, https://www.microsoft.com/en-us/servicesagreement ("2. Your Content. Many of our Services allow you to store or share Your Content or receive material from others. We don't claim ownership of Your Content. Your Content remains Your Content and you are responsible for it."); Google Terms of Service (October 25, 2017) https://policies.google.com/terms ("Some of our Services allow you to upload, submit, store, send or receive content. You retain ownership of any intellectual property rights that you hold in that content. In short, what belongs to you stays yours."); *accord, e.g., Stoner v. State of California,* 376 U.S. 483, 489 (1964) (hotel management cannot authorize search of guest's room). Therefore, under the CFAA, the person who can "authorize" access to the protected computer is the person who retains dominion and control over that computer and/or the relevant information contained on that computer.

      a.  <u>The SAC fails to allege that Defendants acted without proper authorization</u>

Applying those principles to the instant case, Plaintiff must plead sufficient facts to establish a plausible claim that Defendants accessed the Sargeant Server and obtained the HS3 Material without obtaining authorization from someone who retained the legal right to grant that authorization. Put differently, Plaintiff must plead facts to establish a plausible claim that no person who could have granted proper authorization did, in fact, grant proper authorization. The SAC fails to do so.

The SAC does not identify how the Defendants allegedly accessed the Sargeant Server or the HS3 Material, including which person(s) facilitated access and the means by which access was accomplished. Most importantly, the SAC does not allege who had dominion and control over the Sargeant Server, including who had the password. In the absence of these facts, the

SAC lacks a necessary predicate to establishing a plausible claim that access was not properly authorized.  Additionally, in large part because this necessary predicate is missing, the SAC does not allege sufficient facts to exclude the existence of a third party whose rights in the Sargeant Server and the HS3 Material were superior to the Plaintiff's rights, and who therefore could have authorized the Defendants' actions.

By way of example, the SAC fails to plead sufficient facts to exclude that the Sargeant Family Businesses could have given the Defendants proper authority to access the Sargeant Server and the HS3 Material.  It alleges that the Sergeant Family Businesses "maintained" the password-protected Sergeant Server in October 2016.  The common understanding of an entity "maintaining" a server would include that entity having the technological ability (i.e. the password) and the legal right to access the server.[5]  The SAC lacks any facts to negate this common understanding.  *See Iqbal,* 556 U.S. at 679 (evaluating the sufficiency of a complaint is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). The SAC also implies that Sargeant Family Businesses had the authority to impose policies regarding who could access the server or any data on the server, including the HS3 Materials.[6]  Similarly, although the SAC alleges that Plaintiff's email account was password protected, it concedes that the email was hosted on a company server using a company domain name.  There is no factual allegation that the Sargeant Family Businesses (as the entity "maintaining" the server and providing the email account) did not have a means to override the

---

[5] Webster's Third New International Dictionary (unabridged) defines "maintain" as "to keep in a state of repair, efficiency, or validity: preserve from failure or decline."

[6] Paragraph 26 of the SAC asserts that the Sargeant Family Businesses "had no official or unofficial policies or procedures authorizing the Defendants, or anyone else, to access the HS3 Email Account or to access or obtain the HS3 Materials contained in the HS3 Email Account or on the Sargeant Server."  This assertion seemingly concedes the Sargeant Family Businesses had the legal right to set and enforce such policies if it wanted to do so.

Plaintiff's email account's password, such as an administrative password.  Finally, the SAC alleges that Daniel Sargeant was a co-owner of the Sargeant Family Businesses.  Considering all these facts together, the SAC does not establish a plausible claim that excludes the Sargeant Family Businesses having properly authorized Defendants to access the Sargeant Server and the HS3 Material.

Plaintiff asserts that the SAC's ambiguity about (1) who exercised dominion and control of the Sergeant Server and (2) how the Defendants accessed the server and the HS3 Material are issues of fact that cannot be resolved on a 12(b)(6) motion.  Plaintiff contends that "[t]he ownership of the Sargeant Server, and indeed, the detailed nature of any purported authorization is a matter of factual dispute inappropriate for resolution on a motion to dismiss."  DE 170 at 4. The Court disagrees.  Under *Iqbal* and *Twombly,* the Plaintiff has the burden to allege facts in the complaint that establish a plausible claim for relief, which includes a plausible claim that every element of the cause of action is satisfied.  In order to plead a CFAA violation, the SAC must allege facts that would create a plausible claim that the Defendants' actions were not properly authorized.  One way to do so would be to identify the universe of people who properly could authorize access, then plead facts demonstrating that none granted authorization to the Defendants.  Or, the Plaintiff could identify the person(s) through whom the Defendant(s) accessed the protected computer and the HS3 Material, then allege facts establishing that the person(s) did not have a legal right to grant the access.  Or, the Plaintiff could allege facts establishing that Plaintiff was given rights to control access to the server or the HS3 Material that were superior to the rights of all others who had authority over the server and its data.  The SAC includes none of these facts.

Instead, the SAC attempts to create a plausible claim that the Defendants lacked authorization to access the HS3 Materials by alleging that the Plaintiff never gave Defendants permission, ¶ 25, and that the Sargeant Family Businesses had no policy that would have authorized the Defendants' actions.  ¶ 26.   These assertions fall short.  The SAC does not plead that in October 2016 the Plaintiff had the legal right to limit access to the information contained on the Sargeant Server; so, his failure to grant permission is not dispositive.  More importantly, the SAC does not allege that any then-existing rights the Plaintiff had in the HS3 Material were *superior* to those of all other third parties who could have given proper authorization.  *See United States v. Smith,* 353 F. App'x 229, 230 (11th Cir. 2009) (Consent to search may be provided by a third party who possesses common authority over the premises).  At best, the SAC alleges that Plaintiff's email account had a password, but it does not allege that in October 2016 no third party had the right to override that password.

> b.  <u>*United States v. Rodriguez* does not apply</u>

Plaintiff puts great reliance on *United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010) and *United States v. John*, 597 F.3d 263 (5th Cir. 2010).  Plaintiff argues that *Rodriguez* and *John* stand for the proposition that a person (including Defendants here) can never be authorized to access a protected computer for an illegal purpose, because no one can be "authorized" to access a computer in order to obtain information that will be used to commit a crime.  At the oral argument, Plaintiff more fully articulated this theory. He argued that even a person with dominion and control over a protected computer may not exercise that power to access information on the computer if the person's intention is to use the information to commit a crime.  DE 190 at 56-58, 60.

Although *Rodriguez* has been much criticized, it remains controlling precedent for this Court. *See EarthCam, Inc. v. OxBlue Corp.,* 703 Fed. Appx. 803, 808 & n.2 (11th Cir. 2017); *Hamilton Group Funding,* 2018 WL 1788161 at *9-10. Because Plaintiff's argument turns on *Rodriguez,* and because the Court disagrees with Plaintiff's reading of *Rodriguez,* the Court will closely analyze that case and explain its disagreement.

*Rodriguez* was a prosecution under the criminal provision of the CFAA. The Eleventh Circuit summarized the relevant facts as follows:

> From 1995 to 2009, Roberto Rodriguez worked as a TeleService representative for the Social Security Administration. Rodriguez's duties included answering questions of the general public about social security benefits over the telephone. As a part of his duties, Rodriguez had access to Administration databases that contained sensitive personal information, including any person's social security number, address, date of birth, father's name, mother's maiden name, amount and type of social security benefit received, and annual income.
>
> The Administration established a policy that prohibits an employee from obtaining information from its databases without a business reason. The Administration informed its TeleService employees about its policy through mandatory training sessions, notices posted in the office, and a banner that appeared on every computer screen daily. The Administration also required TeleService employees annually to sign acknowledgment forms after receiving the policies in writing. The Administration warned employees that they faced criminal penalties if they violated policies on unauthorized use of databases. From 2006 to 2008, Rodriguez refused to sign the acknowledgment forms. He asked a supervisor rhetorically, "Why give the government rope to hang me?" To monitor access and prevent unauthorized use, the Administration issued unique personal identification numbers and passwords to each TeleService employee and reviewed usage of the databases.
>
> In August 2008, the Administration flagged Rodriguez's personal identification number for suspicious activity. Administration records established that Rodriguez had accessed the personal records of 17 different individuals for nonbusiness reasons. The Administration informed Rodriguez that it was conducting a criminal investigation into his use of the databases, but Rodriguez continued his unauthorized use. None of the 17 victims knew that Rodriguez had obtained their personal information without authorization until investigators informed them of his actions.

*United States v. Rodriguez,* 628 F.3d 1258, 1260 (11th Cir. 2010).

On appeal, Rodriguez argued that he had not violated the CFAA "because he accessed only databases that he was authorized to use as a TeleService representative." *Id.* at 1263. The Eleventh Circuit rejected this argument. It noted, "[t]he policy of the [Social Security] Administration is that use of databases to obtain personal information is authorized only when done for business reasons. Rodriguez conceded at trial that his access of the victims' personal information was not in furtherance of his duties as a TeleService representative and that 'he did access things that were unauthorized.' In the light of this record, the plain language of the Act forecloses any argument that Rodriguez did not exceed his authorized access." *Id.*

The Eleventh Circuit distinguished two cases upon which Rodriguez's appeal relied. The first, *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009), involved an employee of a residential addiction treatment center who had "emailed documents that he was authorized to obtain to his personal email account. The treatment center argued that Brekka obtained the documents he emailed without authorization because he later used them for his own personal interests. The treatment center had no policy prohibiting employees from emailing company documents to personal email accounts, and there was no dispute that Brekka had been authorized to obtain the documents or to send the emails while he was employed." *Rodriguez,* 628 F.3d at 1263 (citation omitted). The Eleventh Circuit distinguished *Brekka* from *Rodriguez* "because the Administration told Rodriguez that he was not authorized to obtain personal information for nonbusiness reasons." *Id.*

The second case discussed (and distinguished) in *Rodriguez* was the Fifth Circuit's decision in *John,* 597 F.3d 263 (5th Cir. 2010). As summarized by the Eleventh Circuit in *Rodriguez:*

18

The Fifth Circuit held that use of information may constitute "exceeding authorized access," if the use is criminal. John, an employee of Citigroup, was authorized to use her employer's computers and to view and print account information. John used the information to incur fraudulent charges. The Fifth Circuit observed that "John was authorized to view and print all of the information that she accessed," but concluded that "authorization" as used in the Act, "may encompass limits placed on the *use* of information obtained by permitted access to a computer system and data available on that system" if the use is in furtherance of a crime. Rodriguez erroneously argues that he cannot be convicted under the Act because his use of the information was not criminal. The problem with Rodriguez's argument is that his use of information is irrelevant if he obtained the information without authorization or as a result of exceeding authorized access. Rodriguez exceeded his authorized access and violated the Act when he obtained personal information for a nonbusiness reason.

*Rodriguez*, 628 F.3d 1258, 1263 (11th Cir. 2010) (citations omitted) (emphasis in original). A

closer analysis of the *John* opinion gives further context for these statements in *Rodriguez.* The

*John* court framed the issue before it as:

whether "authorized access" or "authorization" may encompass limits placed on the *use* of information obtained by permitted access to a computer system and data available on that system. We conclude that it may, at least when the user knows or reasonably should know that he or she is not authorized to access a computer and information obtainable from that access in furtherance of or to perpetrate a crime.

To give but one example, an employer may "authorize" employees to utilize computers for any lawful purpose but not for unlawful purposes and only in furtherance of the employer's business.

597 F.3d at 271 (emphasis in original). The Fifth Circuit then held, "Access to a computer and

data that can be obtained from that access may be exceeded *if the purposes for which access has*

*been given are exceeded.* In other words, John's access to Citigroup's data was confined. She

was not authorized to access that information for any and all purposes but for limited purposes."

*Id.* at 272 (emphasis added).

The Court disagrees with Plaintiff's position that *Rodriguez* holds that a person always "exceeds authorized access" if the material being accessed will be used to commit a crime.[7] The above-quoted passages from R*odriguez* and *John*, along with the plain text of the CFAA, establish the following legal principles: (1) the person with control over the protected computer can limit the use for which the information on the computer may be accessed or used, (2) one such limitation could be, but need not be, that properly accessed information not be used to commit a crime, and (3) if the person with control imposes such a limitation on use, then a person who accesses the protected computer for the purpose of exceeding that use limitation "exceeds authorized access" under the CFAA,  *see EarthCam, Inc.* 703 F. App'x at 808 ("Although it is not entirely clear, one of the lessons from *Rodriguez* may be that a person exceeds authorized access if he or she uses the access in a way that contravenes any policy or term of use governing the computer in question."); *United States v. Nosal*, 676 F.3d 854, 862 (9th Cir. 2012) (en banc) (describing *Rodriguez* and *John* as "decisions of our sister circuits that interpret   the CFAA broadly   to   cover violations of   corporate computer use   restrictions or violations of a duty of loyalty."). The actual use of the accessed information may be circumstantial evidence of an intent to exceed authorized access where a relevant limitation on

---

[7] As the Court explained at the oral argument,

> I believe what *Rodriguez* says is that an employer can have an internal policy that limits the use to which an employee makes of information. And if . . . an employee is allowed, as they were in *Rodriguez*, to access certain information for certain purposes but not for other purposes, and they access it for one of the unapproved purposes, then they had exceeded authorization. But I believe *Rodriguez* stands for the proposition that that all relates to internal policies within the company. It does not relate to any subsequent use of the information to commit a separate crime or whether the motivation to obtain the information was to commit a crime.

*See* Transcript (DE 190) at 114-115.

use exists. As discussed below, if proper authorization existed to obtain information in the first instance, the subsequent use of that information, by itself, does not independently create liability under Section 1030(a)(2)(C).[8]

These cases do not stand for the proposition (asserted by Plaintiff) that, as a matter of law, the person with control over a protected computer can never authorize the information on that computer to be accessed for use in a crime. These cases do, however, affirm that the person with control over the protected computer has the ultimate power to impose, modify, or rescind any limitation on the use of information on that computer; they also retain the legal right to authorize third parties to access the protected computer.

### c. Whether Plaintiff abandoned his rights is a factual question

As an alternative ground for dismissing the CFAA claims, Defendants argue that Plaintiff abandoned any rights he had in the HS3 Materials when he disassociated from the Sargeant Family Businesses in 2012. Defendants rely on *Owen v. Cigna,* 188 F. Supp. 3d 790, 793 (N.D. Ill. 2016). Defendants argue that *Owen* holds, as a matter of first impression, that a former employee cannot assert a CFAA claim for materials that were left on the employer's email server. To date, no court in the Eleventh Circuit has adopted *Owen.*

In *Owen,* an employee used her work computer to access personal emails that were stored on an internet-based server.[9] In response to a CFAA claim, the employer argued that it could not exceed its authority to access the computer because the computer belonged to the employer "--

---

[8] Conceivably, authorizing access knowing that a person will use the accessed information for a criminal purpose, or using materials obtained through authorized access for a criminal purpose, could create some other cause of action, but no such claim is before this Court.

[9] The opinion noted that the complaint did not explain "precisely how Defendants used her former work computer to access her personal emails." *Id.* at 791

not to Owen -- and Owen, who had left the company, was no longer using it." *Id.* at 793.  In granting the employer's motion to dismiss the CFAA count with prejudice, the court said, "[n]one of Owen's allegations suggests that she retained any authority to grant or deny anyone permission to access her former work computer after she left PCI." *Id.*

The Court does not read *Owen* to stand for a blanket rule that a former employee can never retain rights in materials stored on the former employer's computer.  Rather, *Owen* suggests that there could be situations where a former employee retains authority to grant or deny access to a former work computer.  Thus, whether an employer can properly authorize access to a former employee's materials on the employer's computer is a factual question.

The SAC fails to state a claim that any Defendant accessed the Sargeant Server without authorization or that they exceeded authorized access with regard to the HS3 Materials.  On this basis, Counts I and II should be dismissed as to all Defendants.  *See PNC Mortg. v. Superior Mortg. Corp.*, No. CIV.A. 09-5084, 2012 WL 627995, at *4 (E.D. Pa. Feb. 27, 2012) ("[b]ecause Plaintiff fails to state a claim under the CFAA, Plaintiff also fails to state a claim for conspiracy to violate the CFAA").[10]

### 2.  *Loss under the CFAA*

The CFAA violation alleged in Counts I and II requires that the Plaintiff "incurs a minimum 'loss' of $5,000 as a result of the defendant's violation of the CFAA." *Brown Jordan International, Inc. v. Carmicle,* 846 F.3d 1167, 1173 (11th Cir. 2017).  As relevant here, the CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to

---

[10] Because the plain text of the CFAA and binding Eleventh Circuit precedent interpreting that text compel this conclusion, the Court cannot consider Plaintiff's argument that Defendants' "extraordinary CFAA interpretation would countenance the owner of any computer system to utilize under all circumstances all information contained on that system for any purpose, however unlawful, with no consequence at all under the CFAA." DE 171 at 5.  Even assuming Plaintiff to be correct, that is a concern for the legislative branch to address.

an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense."  18 U.S.C. 1030(e)(11).  This category of loss incorporates "direct costs of responding to the violation."  *Brown Jordan,* 846 F.3d at 1174.

Defendants assert that the SAC fails to adequately plead CFAA damages.  Paragraph 51 of the SAC alleges that Plaintiff "suffered 'damage' and/or 'loss' under the CFAA, in an amount exceeding $5,000 [which] . . . includes the cost of reasonably investigating and otherwise responding to the CFAA violations (including the hiring of a forensic computer analyst to conduct investigation and analysis)."  ¶ 51.  Count II contains an identical allegation.  ¶ 61.  The SAC must allege facts plausibly showing that the costs incurred for forensic computer analysis were a reasonable cost arising from the alleged unlawful accessing of the HS3 Material.  Given that the SAC does not allege that Plaintiff had access to the Sargeant Server in 2016, it is not clear what forensic computer services Plaintiff would have needed as a result of his emails being accessed on that server, or how those services would have been related to the alleged CFAA violation.  As such, the allegations in Paragraphs 51 and 61 do not plead sufficient facts to establish a plausible claim that the forensic computer services were a "reasonable cost."

As an alternative, Defendants argue that Plaintiff cannot be a "victim" for purposes of the CFAA loss provision because he is not the owner of the protected computer.  The Ninth Circuit has held that a person may assert a CFAA claim even if he does not own, operate, or maintain the relevant server.  "The civil remedy extends to any person who suffers damage . . . Individuals other than the computer's owner may be proximately harmed by unauthorized access, particularly if they have rights to data stored on it." *Theofel v. Farey–Jones,* 359 F.3d 1066, 1078 (9th Cir. 2004) (emphasis omitted).  Thus, whether Plaintiff qualifies as a "victim" under 18 U.S.C. 1030(e)(11) appears to be a factual question.

### 3.  Use of the HS3 Materials

The SAC alleges that "Defendants agreed together that [Daniel Sargeant] and LAIL would [1] unlawfully access the HS3 Email Account, [2] obtain the HS3 Material, and [3] provide the HS3 Material to Hall" in exchange for the Ruperti Materials which "was of great value to [Daniel Sargeant]/LAIL in advancing [the London] litigation."  ¶¶ 33, 40.  The alleged post-acquisition dissemination of the HS3 Materials is not an independent basis for liability under 18 U.S.C. § 1030(a)(2)(C).  A violation of that statute is complete when the protected computer is accessed without proper authorization or when information on that computer is obtained or altered.

By its plain terms, Section 1030(a)(2)(C) prohibits accessing a protected computer without authorization, or accessing a protected computer with authorization but using that access to "obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  Section 1030(a)(2)(C) speaks only to accessing, obtaining, or altering information on a protected computer; it says nothing about prohibiting the subsequent dissemination or use of that information.  That Congress did not intend to extend liability under Section 1030(a)(2)(C) to improper use of information is reinforced by the fact that the neighboring provision of the CFAA specifically prohibits communicating, delivering, or transmitting sensitive Government information that was obtained without proper authorization. *See* 18 U.S.C. § 1030(a)(1).  Thus, when it wanted to do so, Congress knew how to prohibit the use of information obtained without proper authorization.  For these reasons, the Court concludes that a CFAA violation is completed when the perpetrator accesses a protected computer without authorization or exceeds authorized access to that computer.  *See United States v. Pacchioli,* 718

F.3d 1294, 1300 (11th Cir. 2013) ("[O]rdinarily, an offense is 'complete' when all the elements of the crime have been satisfied.").

### 4. *Hall and Preston*

In addition to the reasons stated above, Count II should be dismissed as to Hall and Preston because the SAC fails to allege sufficient facts to establish that Hall or Preston had prior knowledge that the HS3 Materials were to be obtained without proper authorization. To join a conspiracy, a person must have knowledge of the illegal objective of the agreement and must intend to further that objective. Therefore, to survive Preston and Hall's Motions to Dismiss Count II, Plaintiff must have pled a plausible claim that Preston and Hall knew *in advance* that the HS3 Material was obtained without proper authorization, and that Preston and Hall intended to help achieve that objective.[11] The SAC fails to do so.

Shorn of its conclusory statements, the SAC is bereft of facts supporting a plausible conclusion that Hall conspired to violate the CFAA. The SAC alleges that (1) Hall told the other Defendants he had the Ruperti Materials and was willing to trade them for information that could be used to help collect the judgment from Plaintiff, ¶¶ 29-31, (2) Hall knew that the other Defendants could obtain the HS3 Materials, ¶ 32,[12] (3) Hall ultimately traded the Ruperti Materials for the HS3 Materials, ¶¶ 35, 37, and (4) thereafter, Hall negotiated with the other Defendants for a payment. ¶¶ 39-41. These allegations fall short of establishing a plausible

---

[11] As discussed above, any violation of Section 1030(a)(2)(C) would have ended when the HS3 Material was acquired; any corresponding conspiracy would have achieved its objective, and therefore ended, at the same time. *See United States v. Knowles,* 66 F.3d 1146, 1155 (11th Cir. 1995) ("A conspiracy ends after 'the central purposes of a conspiracy have been attained.'") (quoting and citing *Grunewald v. United States,* 353 U.S. 391, 401-02 (1957).

[12] Although Paragraph 32 does not contain facts establishing *how* Hall had this knowledge, when it is linked with other allegations in the SAC, there exists a plausible claim that prior to October 2016 Hall knew that Daniel Sargeant and LAIL could obtain the HS3 Materials.

claim that Hall agreed to obtain the HS3 Materials without proper authorization or that he knew that the HS3 materials would be obtained without proper authorization. Without this agreement or knowledge, Hall cannot be part of the conspiracy alleged in Count II.

Similarly, the SAC fails to allege sufficient facts to establish a plausible claim that Preston conspired to violate the CFAA. The SAC alleges (1) Preston was an attorney for LAIL, ¶ 6, (2) in August 2016, Preston learned that Hall had access to the Ruperti Materials, which had great value to Preston and his clients, ¶ 29, (3) Preston used the Ruperti Material in furtherance of the London Litigation, ¶¶ 38, 42, and (4) Preston negotiated with Hall for a payment related to Hall's providing the HS3 Materials to the other Defendants. ¶¶ 39-41. These allegations fail to establish a plausible claim that Preston knew that the Sargeant Server existed, let alone that he knew how the HS3 Materials were to be obtained, knew that acquisition was to be without proper authorization, or agreed to obtain the materials without proper authorization. Based on the factual allegations in the SAC, Preston cannot be part of the conspiracy alleged in Count II.

### B. Count III (Stored Communications Act)

The Stored Communications Act (SCA) provides that

> whoever (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains . . . a wire or electronic communication while it is in electronic storage [violates the SCA].

18 U.S.C. § 2701(a). In addition to being a criminal statute, the SCA provides a private civil right of action. 18 U.S.C. § 2707(a).

Defendants do not dispute that the Sargeant Server is a "facility" within the meaning of the SCA. Although "[t]he word facility is not defined by the SCA . . . [t]he general consensus of case law considering facilities under the SCA is that servers containing information qualify as facilities, and that the purpose of the SCA was to prevent 'hacking' into such facilities." *Brown*

*Jordan Int'l, Inc. v. Carmicle,* No. 0:14-CV-60629, 2014 WL 11350232, at *4 (S.D. Fla. Aug. 29, 2014) (citations omitted) (J. Rosenberg).

LAIL and Daniel Sargeant argue that Count III must be dismissed because the SAC (1) fails to plead a necessary element – lack of authorization by the electronic communications service provider and (2) fails to plead cognizable damages.  In support of their first argument, Defendants cite *Fraser v. Nationwide,* 352 F.3d 107 (3rd Cir. 2003) and *Joseph v. Carnes,* 108 F. Supp. 3d 613, 616 (N.D. Ill. 2015) for the proposition that a private employer who provides electronic communications services to its employees cannot violate the Stored Communications Act because, by definition, that employer (as the electronic communications provider) can authorize whatever access it desires.  Plaintiff responds that *Rodriguez* and *John* apply to the Stored Communications Act in the same way that they apply to the CFAA -- even the provider of electronic communications service cannot authorize an unlawful act.

For the same reasons that the CFAA claims fail to properly plead that the Defendants acted without proper authorization, Count III also fails to plead a plausible claim that the Sargeant Server and the HS3 Materials were accessed without proper authorization.  Here, again, the Court rejects Plaintiff's interpretation of the *Rodriguez* and *John* cases.  Both cases arise under the CFAA.  They do not limit the plain text of the Stored Communications Act, which exempts conduct authorized "by the person or entity providing a wire or electronic communication service."  18 U.S.C. § 2701(c)(1).  Plaintiff has not identified any other reported decision that has adopted Plaintiff's interpretation of the Stored Communications Act.

## C. Count IV (CADRA)

Florida's Computer Abuse and Data Recovery Act ("CADRA") provides in relevant part:

A person who knowingly and with intent to cause harm or loss [o]btains information from a protected computer without authorization and, as a result,

27

causes harm or loss . . . is liable . . . in a civil action to the . . . owner of information stored in the protected computer who uses the information in connection with the operation of a business.

Fla. Stat. Ann. § 668.803 (West). Defendants' arguments challenging the CADRA claim parallel their arguments against the CFAA claims. They assert that the CADRA claim must be dismissed because it fails to properly plead that the Defendants acted without proper authorization and because no cognizable loss exists. The Court agrees that Count IV should be dismissed without prejudice for the reasons stated above relating to Count I.

### D. Count V (Breach of Contract)

LAIL and Daniel Sargeant argue that Plaintiff has failed to plead damages with specificity. The District Court previously found that damages for breach of contract were properly pled, which is now the law of the case. DE 87 at 27-28. The Motion to Dismiss Count V should be denied.

### E. Count VI (Invasion of Privacy by Intrusion)

Florida's common law tort of invasion of privacy by intrusion protects against physical or electronic intrusion into one's private quarters; "[t]he intrusion to which this refers is into a 'place' in which there is a reasonable expectation of privacy." *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003). LAIL and Daniel Sargeant argue that Plaintiff had no continuing expectation of privacy in the HS3 Material, and that he has failed to plead damages with specificity. The SAC pleads sufficient facts to establish a plausible claim that Plaintiff retained some privacy interest in the HS3 Materials.[13] As with Count V, it also sufficiently pleads damages. The full extent of that privacy interest, and the legal implications arising from it, are

---

[13] Although Plaintiff may have retained *some* privacy interest in the HS3 Materials for purposes of a Florida tort claim, for the reasons discussed above, the SAC fails to plead sufficient facts to establish a plausible claim that any such interest was superior to all others who exercised dominion and control over the Sergeant Server and the HS3 Material.

not properly resolved through a Motion to Dismiss. The Motion to Dismiss Count VI should be denied.

**F. <u>Count VII (Invasion of Privacy by Public Disclosure of Private Facts)</u>**

Florida's tort of invasion of privacy by public disclosure of private facts protects against the dissemination of truthful private information which a reasonable person would find objectionable. *Id.* "The elements can be summarized as 1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern." *Cape Publications, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989).

The sole non-speculative, non-conclusory factual allegation relating to dissemination of the HS3 Material is that on or about October 28, 2016, Daniel Sargeant and LAIL provided the HS3 Material to Hall. ¶ 37. The SAC then summarily alleges that this information was publicized to "an unknown number of other persons through electronic and/or other means," ¶ 100, and that "[u]pon information and belief" Hall further publicized it to unidentified others within his company and "to an unknown number of other persons through electronic and/or other means." ¶ 101. These latter allegations are not entitled to the assumption of truth.

There is no allegation that the named defendants in Count VII – LAIL and Daniel Sargeant – disclosed the HS3 Material to anyone other than Hall. Moreover, the SAC fails to allege sufficient facts to create a plausible claim that the HS3 Material was disseminated to the "public," as required. *See Bilbrey v. Myers*, 91 So. 3d 887, 889 (Fla. Dist. Ct. App. 2012) (where complaint alleged that defendant published assertions about plaintiff's homosexuality to members of plaintiff's church, court held the complaint "did not establish enough publicity to make [defendant's] conduct actionable"). Therefore, Count VII should be dismissed without prejudice.

## G. **Count VIII (Civil Conspiracy)**

Count VIII alleges a multiple object civil conspiracy by all Defendants. The alleged objects of the conspiracy are (1) to invade Plaintiff's privacy by intrusion, (2) to invade Plaintiff's privacy by public disclosure of private facts, and (3) to violate CADRA. ¶ 107. The alleged manner and means of the conspiracy was to obtain, use, and publicize the HS3 Material. ¶ 107.

The elements of a civil conspiracy are: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Charles v. Fla. Foreclosure Placement Ctr., LLC,* 988 So. 2d 1157, 1159–60 (Fla. Dist. Ct. App. 2008) (*cited in United Technologies Corp v. Mazer,* 556 F.3d at 1271). Notably, a civil conspiracy under Florida law cannot exist without a completed predicate offense. *See Gateway Inv'rs, LLC v. Innovest Cappital, Inc*., 402 F. App'x 459, 461 (11th Cir. 2010) (where the underlying Florida claim is "non-actionable, there can be no conspiracy with respect thereto"); *cf.*, *e.g., Iannelli v. United States,* 420 U.S. 770, 777 (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.").

Because the Court finds that the SAC fails to properly plead a violation of CADRA or of invasion of privacy by publication, the Motion to Dismiss should be granted as to all Defendants for those objects of the conspiracy.[14] In contrast, because the Court finds that the SAC properly

---

[14] Defendants note that CADRA, unlike the CFAA, lacks its own conspiracy provision. Defendants therefore argued that the Florida legislature purposely omitted a conspiracy provision from CADRA, and that the civil conspiracy statute cannot be used to fill this gap. Because the Court finds that Plaintiff has not sufficiently pled a conspiracy under CADRA, the Court declines to reach the issue of whether the Florida civil conspiracy statute supports a conspiracy to violate CADRA. That analysis in the first instance should be undertaken by the Florida

alleges an invasion of privacy by intrusion against LAIL and Daniel Sargeant, the Motion to Dismiss that object of Count VIII against them should be denied.

The remaining issue is whether the SAC properly pleads a claim of civil conspiracy against Hall and Preston for invasion of privacy by intrusion. As noted above, the SAC fails to allege facts sufficient to create a plausible claim that Hall or Preston was aware of the source from which the HS3 Materials were to be obtained. As such, the SAC fails to properly plead that they conspired to obtain these materials from a location in which they knew Plaintiff had a reasonable expectation of privacy. Count VIII should be dismissed in full as to them.

## IV. <u>MOTION TO DISMISS UNDER RULE 12(b)(2)</u>

Preston was personally served with the SAC on February 26, 2018. DE 97. Therefore, this Court has personal jurisdiction over Preston if he is "subject to the jurisdiction of a court of general jurisdiction in [Florida]." Fed. R. Civ. P. 4(k)(1)(A). The SAC asserts that Florida's long-arm statute, Florida Statutes Section 48.193, applies to Preston because *inter alia*, "as set forth herein, Preston conspired with the other Defendants to commit a tort and violate federal and Florida law in Florida (*i.e.,* the violation of CFAA and CADRA and invasion of [Plaintiff]'s privacy), resulting in harm in Florida, and one or more overt acts in furtherance of the conspiracy were committed within this judicial district in Florida." ¶ 14.

For the reasons stated above, the SAC fails to contain sufficient factual averments to establish a plausible claim that Preston participated in a conspiracy to violate CFAA or that he conspired to violate CADRA, or to invade Plaintiff's privacy. Therefore, because the SAC fails

---

courts, not this federal court, until the Plaintiff files a complaint that otherwise properly pleads a CADRA conspiracy.

to allege a *prima facie* case that Preston participated in a predicate offense under the Florida long-arm statute, it fails to establish this Court's personal jurisdiction over Preston.

At oral argument, the Plaintiff agreed that if the Court found that the SAC failed to plead a *prima facie* basis for personal jurisdiction over Preston the Court need not reach the question whether the record outside the four corners of the SAC supported personal jurisdiction. Similarly, because the SAC fails to establish statutory long-arm jurisdiction, the Court does not address whether the due process clause would permit it to exercise personal jurisdiction over Preston.

## V.  IMPROPER JOINDER

Defendants Daniel Sargeant, Preston, and Hall argue that their joinder in the SAC was untimely under the Court's scheduling order.  Because the Court recommends dismissal of the SAC with leave to amend, it does not reach this argument.

## VI. RECOMMENDATION

The undersigned **RECOMMENDS** that:

1.      Defendant Andrew Preston's Motion to Dismiss Counts II and VIII (DE 129) be **GRANTED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted and, alternatively, for lack of personal jurisdiction.

2.      Defendant Daniel Hall's Motion to Dismiss Counts II and VIII (DE 131) be **GRANTED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted.

3.      Defendants LAIL and Daniel Sargeant's Motion to Dismiss (DE 142) be **GRANTED IN PART WITHOUT PREJUDICE** (as to Counts I, II, III, IV, VII and VIII) for

failure to state a claim upon which relief can be granted and **DENIED IN PART** (as to Counts V and VI).

    4.      Plaintiff be given until **June 21, 2018**, to file a Third Amended Complaint.

## <u>NOTICE OF RIGHT TO OBJECT</u>

    A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Beth Bloom, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

    **DONE AND SUBMITTED** in Chambers this 30th day of May, 2018, at West Palm Beach in the Southern District of Florida.

_____
BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE