UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: 9:18-CV-80748-Bloom/Reinhart

DANIEL HALL, et al.,

                    Plaintiffs,
v.

HARRY SARGEANT, III,

                    Defendant.
_____/

## ORDER GRANTING PLAINITFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS WITH PREJUDICE (DE 72)

In 1971, MIT-trained electrical engineer Ray Tomlinson sent the world's first email. http://www.guinnessworldrecords.com/news/60at60/2015/8/1971-first-ever-email-392973. Just under a half century later, emails are ubiquitous. In 2018, more than 280 billion emails per day were sent worldwide, to over 3.8 billion email accounts. https://www.lifewire.com/how-many-emails-are-sent-every-day-1171210. And yet, very few people understand how email works.

An email message is nothing more than a digital file containing text and (sometimes) embedded images, photos, or videos. Each such file has a filename followed by an extension representing the format in which the file is saved (e.g., "filename.extension"). Depending on the software used to create the email, the digital file will have a different extension. For example, .msg and .eml are common extensions for emails created using Microsoft Outlook and Apple Mail.

A person composes an email message using software known as "the mail client." The mail client can be installed on a computer or other device, such as a smartphone or tablet; it can also reside online and be accessed via the World Wide Web (so-called "webmail"). Common mail clients are Microsoft Outlook, Gmail, Apple Mail, and Mozilla Thunderbird. https://zapier.com/blog/best-email-app/. The message created using the mail client may include text and embedded items such as images, photos, or videos. Other pre-existing files can be attached to the message.

The sender must include an email address for the recipient. This address is usually two sets of text divided by the "@" symbol (e.g. abcdef@xyz.ext). The information to the left of the "@" is the recipient's username; the information to the right of the "@" is the domain name where the email is to be delivered. https://www.lifewire.com/elements-of-email-address-1166413. The domain name corresponds to a particular server on the Internet, which has a unique Internet Protocol ("IP") address. Servers known as Domain Name System (DNS) servers contain the pairings of which servers correspond to which IP addresses.

When the person hits "send," the outgoing message first goes to a computer server that has been configured to process email ("a mail server") using the Simple Mail Transfer Protocol ("SMTP").[1] The SMTP server reads the outgoing domain address, then consults a DNS server to obtain the IP address corresponding to the mail server linked to the recipient's domain. That incoming mail server is called the Mail Transfer Agent ("MTA").[2] For example, the DNS server

---

[1] This discussion of how email is transmitted is taken primarily from https://www.howtogeek.com/56002/htg-explains-how-does-email-work/.

[2] An email provider may have multiple SMTP servers and multiple MTA servers.

would tell the SMTP server that "xyz.ext" receives its mail at an MTA whose IP address is 123.123.123.0.

The SMTP server then sends the email message and any attachments to the MTA, which uses either a Post Office Protocol (POP) or an Internet Message Access Protocol (IMAP) to send the email to the recipient's inbox on the incoming mail server.[3]  What arrives in the inbox is the same digital file (including attachments) that left the SMTP server. The recipient uses his own mail client to access the inbox on the MTA server. Depending on the manner in which the recipient accesses the inbox, the message may be downloaded to the recipient's computer or device, may remain on the server so it can be accessed there again, or both. Mail clients aggregate individual email message files into larger files, which can be stored on a hard drive or server. These files often have the extension .mbox, .pst, or .ost. *See* https://www.ibidinfo.com/what-is/mbox-file.html; https://www.webopedia.com/TERM/P/personal_storage_table_pst.html.

So, an email account is nothing more than a location on a server or hard drive where digital files are stored. In that respect, it is no different from any other folder on a computer, and the files stored there are no different from any other file stored on a computer. Like any other digital files, they can be saved to a digital storage medium (e.g., USB drive, hard disk drive, CD-Rom, DVD) or be converted to tangible medium by being printed out. The same is true for photos or videos appended to an email.

---

[3] The major difference between POP an IMAP protocols is that the IMAP protocol automatically syncs the email client, the server, and any other email clients linked to the email account on the server.

With that background, we turn to the matter at hand, which presents, *inter alia,* the question of whether an email account or an individual digital file is a "place" for purposes of the Florida tort of invasion of privacy by intrusion.

## **PROCEDURAL HISTORY**

Before the Court is Plaintiff Daniel Hall's Motion to Dismiss Amended Counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). DE 72. Plaintiffs brought this action seeking a declaratory judgment of nonliability to Defendant Harry Sargeant III ("Harry Sargeant") and alleging claims for breach of contract and malicious prosecution. DE 1. Harry Sargeant filed three counterclaims against Hall for invasion of privacy by intrusion, conversion, and civil conspiracy. DE 68. Hall filed the instant motion to dismiss the counterclaims, which this Court orally granted with prejudice during a hearing on March 6, 2019. DE 122.[4] This Order serves to memorialize that decision. In addition to the Complaint, the Amended Counterclaims, and the Motion to Dismiss, the Court has reviewed Harry Sargeant's response (DE 91) and Hall's reply. DE 101. The Court held oral argument on the motion on February 26, 2019.

The allegations in the Amended Counterclaims arise against the backdrop of prior state court litigation involving Harry Sargeant, that was settled. Harry Sargeant later filed an action in this Court against Hall and others — *Harry Sargeant, III v. Maroil Trading, Inc., et al*., Case No. 17-CV-81070-Bloom/Reinhart ("the prior federal action") — which Harry Sargeant voluntarily dismissed after the undersigned issued a Report and Recommendation ("the R&R") recommending that the Second Amended Complaint ("SAC") in that action (DE 93) be dismissed without

---

[4] The parties consented to have the undersigned resolve the pending motion to dismiss by final disposition. DE 103.

prejudice. This Court has previously detailed the history of the state court litigation and the parties' relationship, much of which is undisputed. DE 41. Rather than repeat that history here, the Court will provide a brief summary.

In 2008, Mohammed Al-Saleh sued Harry Sargeant and in July 2011, following a trial, a Florida state court jury awarded Al-Saleh a judgment against Harry Sargeant for approximately $30 million. Plaintiffs assisted Al-Saleh in funding the litigation and in collecting on the judgment by investigating and tracing Harry Sargeant's assets.

In October 2016, Al-Saleh and Harry Sargeant entered into a settlement agreement whereby Al-Saleh would accept a lesser payment in exchange for Harry Sargeant's agreement to stop trying to prevent collection of the Florida Judgment. Releases were executed and incorporated into the settlement agreement. Harry Sargeant released, *inter alia,* Plaintiffs Burford and Dunrod, as well as "all persons or entities for whose acts or omissions the foregoing would or could be derivatively or vicariously liable or to whom the foregoing could or would owe indemnification." At issue in the instant action is whether Hall was a released party under the settlement agreement. According to Plaintiffs, a "key part of the agreement was that [Harry Sargeant] would again be liable for the full amount owed if he resumed litigation" against the released parties.

Thereafter, Harry Sargeant filed the SAC in the prior federal action alleging that Hall had conspired to unlawfully access a computer server maintained by Harry Sargeant's former employer and obtained personally sensitive electronic materials that Harry Sargeant had left behind ("the HS3 Material").[5] The SAC alleged that Hall conspired to violate the Computer Fraud and Abuse

---

[5] The SAC defined the "HS3 Material" as "*inter alia,* 478 items comprising business information, business and personal communications, documents, Microsoft email files, and personal sensitive photographs and videos." SAC at ¶ 22. Attached as Exhibit A to the SAC was a list of the items, consisting of 278 .msg Outlook message files, 93 JPEG photographs, 70 text documents, 30

Act (CFAA), the Florida Computer Abuse and Data Recovery Act (CADRA), and to invade Harry Sargeant's privacy by intrusion and publication of private facts.

Hall moved to dismiss the SAC. The R&R recommended that the claims against Hall be dismissed without prejudice for Harry Sargeant's failure to allege sufficient facts to support the claims. With regard to the claim that Hall conspired to invade Harry Sargeants privacy by intrusion, the Court held, "[T]he SAC fails to allege facts sufficient to create a plausible claim that Hall or [co-defendant Andrew] Preston was aware of the source from which the HS3 Materials were to be obtained." DE 191 in the prior federal action at 31.

Rather than object to the R&R, Harry Sargeant dismissed his claims voluntarily and without prejudice; he then initiated a state court action that again alleged Hall invaded Harry Sargeant's privacy by publishing the HS3 materials and conspired to do so. DE 21-1 at ¶¶ 77-85, 93-101.[6] Before Harry Sargeant filed the state court action, however, Hall filed the instant case. DE 1. This Court declined to abstain. DE 41 at 9-13. The state court action was stayed pending the outcome of this lawsuit. At that point, Harry Sargeant filed the Amended Counterclaims, which assert claims for invasion of privacy by intrusion, conversion, and conspiracy claims.

---

movies, 5 Internet HTML documents, 1 pdf document, and 1 ISO file. The Amended Counterclaim defines "HS3 Material" as a batch of salacious information and material provided by Daniel Sargeant to Daniel Hall on or about October 28, 2016. ¶ 40. The Amended Counterclaim further alleges, "The HS3 Material contained at least 478 separate business, personal, and confidential items belonging to and relating to [Harry Sargeant]." ¶ 45. Any distinction between these two definitions is immaterial to the Court's ruling, so the Court will use the term "HS3 Material" to refer to whatever information was provided to Hall by Daniel Sargeant on or about October 28, 2016.

[6] In the state court complaint, Harry Sargeant alleged a violation of CADRA and invasion of privacy by intrusion against other defendants. DE 21-1 at ¶¶ 68-76, 86-92.

## Motion to Dismiss Standard

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy the Rule 8 pleading requirements, a claim must provide the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *See Swierkiewicz v. Sorema N.A.,* 534 U. S. 506, 512 (2002). While a claim "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal,* 556 U. S. 662, 678 (2009) (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). Nor can a claim rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U. S. at 678 (*quoting Twombly*, 550 U. S. at 557 (alteration in original)).

On a motion to dismiss under Rule 12(b)(6), the Court must view the well-pled factual allegations in a claim in the light most favorable to the non-moving party. *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Viewed in that manner, the factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the claim are true (even if doubtful in fact). *Twombly*, 550 U. S. at 555 (citations omitted). The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 570. In addition, "courts may infer from factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct that plaintiff would ask the court to infer." *Am. Dental Assoc. v. Cigna Corp.*, 605 F. 3d 1283, 1290 (11th Cir. 2010) (citing *Iqbal,* 556 U. S. at 682). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of 'entitlement to relief.'"  *Iqbal,* 556 U. S. at 678 (quoting *Twombly,* 550 U. S. at

557). When evaluating a motion to dismiss under Rule 12(b)(6):

> [A] court considering a motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than conclusions, are not entitled to the
> assumption of truth. While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations. When there are well-
> pleaded factual allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 556 U. S. at 679. Factually unsupported allegations based "on information and belief" are

not entitled to the assumption of truth. *See Scott v. Experian Info. Sols., Inc*., 2018 WL 3360754,

at *6 (S.D. Fla. June 29, 2018) (J. Altonaga) ("Conclusory allegations made upon information and

belief are not entitled to a presumption of truth, and allegations stated upon information and belief

that do not contain any factual support fail to meet the *Twombly* standard.").

## FACTS ALLEGED IN THE AMENDED COUNTERCLAIMS

Similar to the SAC in the prior action, the Amended Counterclaims in this action allege

that "Hall intentionally organized, directed, and participated in an illegal and tortious conspiracy

against Harry Sargeant to invade and convert Harry Sargeant's private and confidential business

and personal information and material." ¶ 23.[7]  In the Amended Counterclaims Harry Sargeant

explains the alleged conspiracy as follows:

Harry Sargeant, along with his brother Daniel Sargeant and other family members, had an

ownership interest in certain family businesses. ¶ 6.[8]  In conducting their operations, the family

---

[7]  All paragraph citations (noted as "¶" or "¶¶") are references to the numbered paragraphs in the
Amended Counterclaim. DE 68.

[8]  For purposes of this Motion, the Court accepts all well-pled factual allegations in the Amended
Counterclaim, and all attachments thereto, as true and evaluates all plausible inferences derived
from those facts in favor of the Harry Sargeant. *See Chaparro v. Carnival Corp*., 693 F.3d 1333,
1337 (11th Cir. 20112); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d

businesses used a computer server (the "Sargeant Server"), owned by Sargeant Marine, Inc. ¶ 7. Daniel Sargeant was not an owner of Sargeant Marine or the Sargeant Server. *Id.*

Harry Sargeant owned and used an email account with the address hsargeantjr@sargeant.net ("the HS3 Email Account") on the Sargeant Server for his work-related emails, for his personal emails, and for his business endeavors separate from the family businesses. ¶¶ 8, 9, 14.[9] The HS3 Email Account contained Harry Sargeant's private and confidential business and personal information. ¶ 9. The HS3 Email Account was password protected, and Harry Sargeant did not provide the password to Hall, Daniel Sargeant, or the Sargeant Family. ¶ 10. Harry Sargeant never authorized Hall, Daniel Sargeant, or the Sargeant Family to access the HS3 Email Account, or to obtain any information or material from that email account. ¶ 11. Only Sargeant Marine could grant permission to access the Sargeant Server for lawful purposes and only Harry Sargeant could authorize another person to access the HS3 Email Account. ¶¶ 12, 14. The only person to whom Harry Sargeant had granted access to the HS3 Email Account was the system administrator and this access was granted on a limited basis for the purpose of performing maintenance, repairs, or software patches. ¶ 15. [10]

---

1349, 1353 (S.D. Fla. 2009) ("On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true.").

[9] The Court disregards the legal conclusion that Harry Sargeant "owned" and "controlled access" (¶ 14) to the HS3 Email Account because there are no facts alleged to support this claim, and because it is contradicted by other factual allegations in the Amended Counterclaim. *Iqbal*, 556 U.S. at 679 (statements in pleadings that are "no more than [legal] conclusions, are not entitled to the assumption of truth").

[10] The assertion that Sargeant Marine could only grant permission to access the Sargeant Server "for lawful purposes" is a legal conclusion based on Harry Sargeant's interpretation of *United States v. Rodriguez,* 628 F.3d 1258 (11th Cir. 2010). As a legal conclusion, it is not entitled to the

In January 2013, Harry Sargeant's brothers and father ousted Harry Sargeant from the family businesses and denied Harry Sargeant further access to the Sargeant Server or the HS3 Email Account. ¶ 17. In or about February 2013, Harry Sargeant asked the system administrator about access to the HS3 Email Account and was told: (a) that the HS3 Email Account had been disconnected; (b) that all the associated information and data in the HS3 Email Account had been "cut off from the root;" and (c) that no information or data from the HS3 Email Account could or would be provided to Harry Sargeant.[11] ¶ 18. Harry Sargeant relied upon these representations and concluded that the email account, including the information and material within it, had been destroyed. ¶ 19.

During 2014 through 2015, both Daniel Sargeant and Hall were investigating Wilmer Ruperti due to his involvement in two separate lawsuits. ¶¶ 26, 27. Hall's investigation was related

---

assumption of truth. Moreover, the Court previously found Harry Sargeant's interpretation of *Rodriguez* to be incorrect. *See* DE 191 in Case No. 17-cv-81070 at 16-21.

Likewise, the assertion that only Harry Sargeant could authorize another person to access the HS3 Email Account is not entitled to the assumption of truth. "Determining whether a complaint states a plausible claim . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. In light of the totality of the facts in the Amended Counterclaim, it defies common sense for Harry Sargeant to claim that he alone controlled access to the HS3 Email Account and the HS3 Material. That account was provided to Harry Sargeant by a corporation of which he was not a controlling owner, it carried a corporate email domain, was housed on a server owned by a corporate third party, and Harry Sargeant was aware that a system administrator existed and had the technological capability to access the account. While Harry Sargeant may have told the system administrator only to access the account for limited purposes, the facts in the Amended Counterclaim do not establish that Harry Sargeant had the power to bind the system administrator's actions. In any event, the Amended Counterclaim reveal that even if Harry Sargeant controlled access to the HS3 Email Account at one time, that control ceased to exist in January 2013 when he was ousted from the company (¶ 18). In sum, the Amended Counterclaim fail to plead a plausible claim that Harry Sargeant had control over the HS3 Email Account at any time relevant to this lawsuit.

[11] Computers (including servers) store files in a hierarchical set of directories and sub-directories. The highest-level directory is called the "root." *See* https://techterms.com/definition/root.

to his efforts to collect on a judgment one of his clients (Novoship (UK) Limited) had against Ruperti. Daniel Sargeant's investigation stemmed from his concern that Ruperti, who was assigned to act as a lead negotiator for a Sargeant family business in another lawsuit, may have misappropriated the settlement proceeds for himself. *Id.* As part of his investigation, Hall came into possession of numerous confidential documents pertaining to Ruperti's finances. ¶ 28. However, in 2016, Ruperti settled the Novoship Case, and as part of the settlement, Novoship executed a nondisclosure agreement (the "NDA"), which prevented disclosure by Novoship of Ruperti's private business and financial information. ¶ 29.

In connection with Plaintiffs' judgment collection efforts in the Al-Saleh lawsuit referenced above, in November 2014, Hall began investigating Harry Sargeant. ¶ 30. On January 13, 2015, Hall met with Daniel Sargeant in London. At this meeting, Daniel Sargeant advised Hall that: (a) he possessed certain compromising information concerning Harry Sargeant; (b) the compromising information he had concerning Harry Sargeant was obtained from the HS3 Email Account; (c) Harry Sargeant was unaware that Daniel Sargeant had access to this information; (d) Harry Sargeant had been told the HS3 Email Account had been deleted; and (e) Daniel Sargeant had the ability to access the HS3 Email Account even though he did not have Harry Sargeant's permission. ¶ 31.

During this January 13, 2015 meeting, Hall proposed to Daniel Sargeant the potential for mutually beneficial exchanges of information. ¶ 32. On or about January 23, 2015, Daniel Sargeant agreed to Hall's proposal to exchange mutually beneficial information and provided a sampling of private, sensitive information to Hall, which Daniel Sargeant had obtained from the HS3 Email Account. ¶ 33.

In August 2016, Hall contacted Daniel Sargeant to further discuss trading confidential and private information. ¶ 39. Hall requested that Daniel Sargeant provide him with the salacious, confidential, private and personal information that Daniel Sargeant previously informed Hall was available from the HS3 Email Account. *Id.* Hall knew from his prior conversations with Daniel Sargeant that the information came from the HS3 Email Account and that Harry Sargeant did not authorize Daniel Sargeant to obtain such information and material. *Id.*

The information and material that Daniel Sargeant provided to Hall occurred in two batches. Daniel Sargeant provided the first batch referenced above to Hall on January 23, 2015, and provided the second, more salacious batch (the HS3 Material) on or about October 28, 2016. In exchange for the HS3 Material, Hall offered to provide to Daniel Sargeant certain financial and other information that Hall had obtained regarding Ruperti from Hall's investigative work on the Novoship Case. ¶¶ 41, 50. Daniel Sargeant wanted the Ruperti Material from Hall, because it would aid Daniel Sargeant in pursuing claims against Ruperti for misappropriation of the settlement proceeds. ¶ 42. Hall knew through his work on the Novoship Case that the Ruperti Material was subject to various confidentiality restrictions. ¶43. Nevertheless, Hall traded the Ruperti Material to Daniel Sargeant in exchange for the HS3 Material, thereby causing Novoship to breach the NDA with Ruperti. ¶¶ 29, 44.

On October 28, 2016, Hall and Daniel Sargeant met again in London. At this meeting, Hall provided to Daniel Sargeant the Ruperti Material, and Daniel Sargeant provided to Hall the HS3 Material. Notably, Hall obtained the HS3 Material from Daniel Sargeant, without informing Harry Sargeant, on the same day that Harry Sargeant executed certain releases that were conditions of the Al-Saleh Settlement. ¶ 51.

# LEGAL CLAIMS

*Hall's Arguments*

Hall contends that the factual allegations in Amended Counterclaims are speculative and are insufficient to support a claim for relief. Specifically, Hall argues that Harry Sargeant's "descriptions of supposed conversations between Dan Hall and Dan Sargeant in two meetings, January of 2015 and August of 2016 . . . should not be credited as true because they are just inventions of supposed conversations." T. 65:24 – 66:9. *See* ¶¶ 31-33, 39.[12]

As for the merits of the Amended Counterclaims, Hall argues that the invasion of privacy count must be dismissed because there are insufficient factual allegations to support a plausible finding that Hall actually accessed the HS3 Email Account or induced anyone else to do so. Moreover, Hall argues that the HS3 Email Account and individual email files cannot constitute private quarters as defined by the Florida Supreme Court because the email account is neither a physical place, nor one in which Harry Sargeant maintained any reasonable expectation of privacy, since he could only access it through his former employer's computer server.

Regarding the conversion counterclaim, Hall argues that the pleading fails to establish a plausible claim that he wrongfully deprived Harry Sargeant of his property. At most, Hall argues, the pleading alleges that Hall received the HS3 Material from Daniel Sargeant, which does not satisfy a showing of conversion.

Finally, Hall contends that Harry Sargeant's claim for civil conspiracy (based on the alleged invasion and conversion) must be dismissed because Harry Sargeant has failed to properly plead the underlying substantive causes of action.

---

[12] The transcript of the February 26, 2019 oral argument on the motion to dismiss counterclaims is at DE 115.

*Harry Sargeant's Arguments*

During the oral argument on the motion, Harry Sargeant's counsel acknowledged that the Florida Supreme Court requires an invasion of privacy to be an intrusion into one's private quarters, which "has to be a place over which there is an expectation of privacy." T. 76:5-6. In encouraging the Court to adopt a more expansive view of the word "place," defense counsel argued that Harry Sargeant's "e-mail account is the place. It is a virtual place [that includes] the account itself, and the individual emails . . . as well as everything in there [including] the attachments to the emails." T. 77:14-18; 78:11-12. Defense counsel emphasized that "there is no Florida state court case that squarely addresses [whether] the place [can] be a virtual place." T. 76:18-20.

Defense counsel argued that "every time the [HS3] e-mail account is accessed or every time someone opens an e-mail or looks at this material, that is a brand new invasion of privacy" (T. 75:5-7; 78:12-13), and that there is a constitutionally protected expectation of privacy in e-mails. T. 79:14-15; 81:14-18.

In his opposition to the motion to dismiss, Harry Sargeant claimed that he "had the right to possess the HS3 Material" (DE 91 at 13), and that Hall engaged in conversion when he knowingly came into possession of the HS3 Material. T. 88:10-13; 89:3-4. Harry Sargeant asserts that the count for civil conspiracy should survive because the underlying torts are actionable.

## DISCUSSION

As a threshold matter, the Court finds that the factual allegations in the Amended Counterclaims related to the January 2015 and August 2016 meetings between Hall and Daniel Sargeant satisfy the pleading requirements of Rule 8, *Iqbal*, and *Twombly*. Although Hall argues that the factual allegations in Paragraph 31 regarding Hall's alleged meeting with Daniel Sargeant in January 2015 are "wholly speculative" (DE 72 at 9), the Court finds them to be sufficiently

factual. Harry Sargeant is not obligated to reveal his source for these allegations at the pleading stage and the Court is obligated to accept those facts as true.

*Invasion of Privacy by Intrusion*

Count One of the Amended Counterclaims alleges that "[b]y repeatedly offering to trade and ultimately trading the Ruperti Material for the HS3 Material, Hall induced, and was the substantial cause for, Daniel Sargeant to access the HS3 Email Account, obtain the HS3 Material, and provide the HS3 Material to Hall." ¶ 74. It further alleges, "Hall's actions of inducing and/or substantially causing Daniel Sargeant to obtain the HS3 Material from the HS3 Email Account without Harry Sargeant's authorization, and provide it to Hall, constitutes an unauthorized intrusion by Hall into a private, electronic place. Moreover, Hall's subsequent obtaining, possessing, and viewing of the HS3 Material also constitutes an unauthorized intrusion by Hall into a private, electronic place." ¶ 77.

Invasion of privacy by intrusion requires "physically or electronically intruding into one's private quarters." *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003). "An intrusion claim has three elements. First, there must be a private quarter. Second, there must be some physical or electronic intrusion into that private quarter. Third, the intrusion must be highly offensive to a reasonable person." *Celestine v. Capital One*, No. 17-20237-CIV, 2017 WL 2838185, at *3 (S.D. Fla. June 30, 2017) (J. Scola) (quoting *Stasiak v. Kingswood Co-op, Inc*., 2012 WL 527537, at *1 (M.D. Fla. Feb. 17, 2012)). The alleged intrusion must be "into a 'place' in which there is a reasonable expectation of privacy." *Spilfogel v. Fox Broad. Co.,* 433 F. App'x 724, 726 (11th Cir. 2011) (quoting *Ginsber*g, 863 So.2d at 162). In Florida, the tort of invasion of privacy by intrusion has traditionally applied to physical locations. *See Spilfogel v. Fox Broad. Co*., No. 09-CV-80813, 2010 WL 11504189, at *5 (S.D. Fla. May 4, 2010) (J. Ryskamp)

("Invasion of privacy by intrusion is a claim for the intentional trespass or intrusion upon physical solitude, such as by breaking into the plaintiff's home or peeking into her window"), *aff'd*, 433 F. App'x 724 (11th Cir. 2011); *Guin v. City of Riviera Beach*, 388 So.2d 604, 606 (Fla. Dist. Ct. App. 1980) (Florida law encompasses an "intrusion upon plaintiff's physical solitude or seclusion, as by invading plaintiff's home, or other quarters, or an illegal search of his shopping bag in a store").

Harry Sargeant's first theory of recovery is that Hall caused or induced Daniel Sargeant to access the Sargeant Server to obtain the HS3 Material. Assuming without deciding that a physical computer server is a sufficient "place" for purposes of this tort, the Court holds that the Amended Counterclaim does not create a plausible inference that Hall induced or caused Daniel Sargeant to access the HS3 Email Account to obtain the HS3 Material. Therefore, Hall cannot be held legally responsible for Daniel Sargeant's actions, even if those actions violated Harry Sargeant's rights.

The relevant allegations in the Amended Counterclaims relating to the acquisition of the HS3 Material establish the following facts. In January 2015, Hall met with Daniel Sargeant. Hall was told that Daniel Sargeant already possessed certain compromising information about Harry Sargeant that had been obtained from the HS3 Email Account on the Sargeant Server, and that Daniel Sargeant could access the HS3 Email Account in the future, even though he did not have Harry Sargeant's permission. ¶ 31. It does not allege in what format or on what storage medium Daniel Sargeant had the material, when that material was obtained from the Sargeant Server, or by whom it was obtained. In August 2016, Hall contacted Daniel Sargeant and asked "that Daniel Sargeant provide him with the salacious, confidential, private and personal information that Daniel Sargeant previously informed Hall *was available from* the HS3 Email Account." ¶ 39 (emphasis added). On or about October 28, 2016, Daniel Sargeant provided the HS3 Material to Hall. ¶ 40. These allegations fall short of creating a plausible inference that Daniel Sargeant accessed the

email account between January 2015 and October 28, 2016. It does not negate the equally plausible inference that Daniel Sargent (or someone else) had obtained the HS3 Material from the Sargeant Server before Hall's involvement and that it had been saved prior to October 2016 somewhere other than on the Sargeant Server. *See Hayden v. Broward Cty*., 2013 WL 4786486, at *8 (S.D. Fla. Sept. 6, 2013) (J. Rosenbaum) (where "two equally plausible bases . . . exist, one of which would require dismissal of the Complaint, Plaintiff has failed to 'raise a right to relief above the speculative level,' and, therefore, his Complaint must be dismissed") (quoting *Twombly*, 550 U.S. at 555). The Amended Counterclaims fail to state a plausible claim that Hall invaded Harry Sargeant's privacy by accessing, or causing another to access, the HS3 Email Account.

Alternatively, even if Hall caused or induced another to access the HS3 Email Account on the Sargeant Server in 2015 or 2016, Harry Sargeant no longer had a reasonable expectation of privacy in that account by that time. Harry Sargeant was told by the system administrator for the Sargeant Server in February 2013 that the HS3 Email Account had been "cut off from the root" and that "no information or data from the HS3 Email Account could *or would* be provided" to Harry Sargeant. ¶ 18 (emphasis added). Having been given this information by the system administrator, Harry Sargeant was on notice that he no longer had any rights to the email account nor would he be given access to the Sargeant Server or the information from the HS3 Email Account. Therefore, as of February 2013, Harry Sargeant could not reasonably have believed that he retained any rights (let alone a right to privacy) in the email account or the server.

Harry Sargeant's remaining theory of recovery is that Hall invaded Harry Sargeant's privacy by viewing the HS3 Material after acquiring it. It is Harry Sargeant's theory that "every time the [HS3] e-mail account is accessed or every time someone opens an e-mail or looks at this material, that is a brand new invasion of privacy" (T. 75:5-7; 78:12-13). As discussed above, a

received email file that is saved to a server or downloaded to some other storage medium is no different from any other digital file. Therefore, Harry Sargeant advocates a rule that any digital file can be the kind of "place" or "private quarter" that can be the basis for an invasion of privacy by intrusion.

The Court declines to adopt this approach. Here, Florida state law supplies the substantive law, and the Florida Supreme Court in *Ginsberg* has defined what constitutes invasion of privacy by intrusion.[13] This Court is bound by that interpretation. *Cote v. R.J. Reynolds Tobacco Co*., 909 F.3d 1094, 1107 (11th Cir. 2018) ("In interpreting Florida law, we look first to precedent from the Florida Supreme Court. If there is no such precedent, we adhere to decisions of Florida's intermediate appellate courts absent some persuasive indication that the Florida Supreme Court "would decide the issue otherwise.") (quoting *Winn–Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir. 2014)). Notably, Florida courts have not adopted a broader common law definition of invasion of privacy by intrusion that other state courts have. *C.f., e.g., Shulman v. Grp. W Prods., Inc*., 18 Cal. 4th 200, 232, 955 P.2d 469, 490 (Cal. 1998) ("To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted *access to data* about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or *data source*.") (emphasis added).

The Court holds that neither the HS3 Email Account nor the individual digital files containing the emails and attachments is the kind of "private quarter" or "place" that can be the

_____

[13] The Amended Counterclaim asserts that it is brought pursuant to the Court's supplemental jurisdiction. ¶ 3. It further alleges that Harry Sargeant is a citizen of Florida and that Hall is a citizen of the United Kingdom. ¶¶ 1, 2. As such, standing alone, the Amended Counterclaim could invoke the Court's diversity jurisdiction. Therefore, this Court must apply Florida substantive law.

basis for invasion of privacy by intrusion under Florida law. Other federal courts considering this issue have concluded that Florida's tort does not extend to non-physical places. *See Celestine*, 2017 WL 2838185, at *3 (court declined to find that accessing a credit report constitutes an intrusion into a "place"); *Watts v. City of Hollywood, Florida*, 146 F. Supp. 3d 1254, 1267 (S.D. Fla. 2015) (Altonaga, J.) (accessing driver's license information from a state database is not an intrusion into a "place"); *Bradley v. City of St. Cloud*, 2013 WL 3270403 (M.D. Fla. June 26, 2013) (accessing medical records is not an intrusion into private quarters). Harry Sargeant relies on *Stirling Int'l Realty, Inc. v. Soderstrom*, 2015 WL 403318, at *6 (M.D. Fla. Jan. 28, 2015) where the court found that factual allegations regarding the unauthorized access of the plaintiff's email account were sufficient to support an invasion of privacy claim. The issue for decision in *Soderstrom* was what a reasonable person would consider a highly offensive intrusion. The court did not discuss whether an individual's emails constitute a protected "place." As such, *Soderstrom* has no precedential value here.

Harry Sargeant's reliance on the Restatement (Second) of Torts § 652B (1977), for the more expansive definition of intrusion as "one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns" is unpersuasive. This argument was rejected in *Oppenheim v. I.C. Sys., Inc*., 695 F. Supp. 2d 1303, 1308-09, n.2 (M.D. Fla.), *aff'd*, 627 F.3d 833 (11th Cir. 2010), which noted that *Ginsberg's* definition of intrusion as "physically or electronically intruding into one's private quarters," 863 So.2d at 162, is significantly narrower than the Restatement's. Regardless, § 652B has not been adopted in Florida. Likewise, the cases Harry Sargeant cites as having "cited § 652B favorably" pre-date the Florida Supreme Court's decision in *Ginsberg*. DE 91 at n.5.

As with the HS3 Email Account, Harry Sargeant has not pled a plausible claim that he retained a reasonable expectation of privacy in the digital files containing the individual emails and attachments. Even if Harry Sargeant could establish that a digital file constitutes a "virtual place" and even assuming he once had an expectation of privacy in a server owned by Sargeant Marine, he has failed to plead a plausible claim that by 2015 he retained any reasonable expectation of privacy in the email files and attachments which he left on that server. The Amended Counterclaims do not plead that Harry Sargeant could access his work email remotely, even prior to January 2013, which creates a reasonable inference that he could only access it by being physically present at the Sargeant family business headquarters. Regardless, once Harry Sargeant was terminated from his employment, he no longer had access to that account and did not have the authority to exclude Sargeant Marine, or anyone else, from accessing his email account. Based on these facts, Harry Sargeant did not have a reasonable expectation of privacy in his old work email account.

The Court disagrees with Harry Sargeant's reliance on *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), which extended Fourth Amendment protection to emails stored on the server of a third-party electronic communication service providers. *Id.* at 285-87 (holding that the reasonable expectation of privacy for communication via telephone and postal mail, as recognized by the Supreme Court extends to emails stored with third parties) (citing *Katz v. United States*, 389 U.S. 347, 352 (1967), and *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). First, *Warshak* involved government intrusion into an email account operated by an Internet service provider, as opposed to here, where access to Harry Sargeant's work email account was controlled by the company that owned the server. Second, as discussed above, the Amended Counterclaim fails to plead a plausible claim that the HS3 Material remained in electronic storage at the relevant times.

Third, *Warshak* only addressed the question of whether, for fourth amendment purposes, a constitutionally-sufficient expectation of privacy existed. It did not resolve the question of whether the service provider's server was a protected "private quarter" under Florida law.

*Conversion*

Conversion is defined as "an act of dominion wrongfully asserted over, and inconsistent with, another's possessory rights in personal property." *Joseph v. Chanin*, 940 So. 2d 483, 486 (Fla. Dist. Ct. App. 2006) (quoting *Goodwin v. Alexatos*, 584 So.2d 1007, 1011 (Fla. Dist. Ct. App. 1991)). *See also Envases Venezolanos, S.A. v. Collazo*, 559 So.2d 651, 652 (Fla. Dist. Ct. App. 1990) (conversion "constitutes the exercise of wrongful dominion and control over the property to the detriment of the rights of the actual owner").

For purposes of this motion, the Court will assume that the HS3 Material is the kind of personal property that is capable of being converted. *See Warshall v. Price*, 629 So. 2d 903, 904 (Fla. Dist. Ct. App. 1993) (cause of action for conversion properly pled where former employee took a copy of a patient list from plaintiff's computer and used it to generate fees from those patients). *See also Nealy v. Ross*, 249 So.2d 522, 523 (Fla. Dist. Ct. App. 1971) (conversion "does not necessarily require a total deprivation of ownership or possession"). "Conversion is an appropriate cause of action even if the specific property "converted" has no actual value." *Warshall*, 629 So.2d at 904 (citing *Tourismart of America, Inc. v. Gonzales*, 498 So.2d 469, 470 n. 2 (Fla. Dist. Ct. App. 1986)).

Harry Sargeant incorrectly argues that the Amended Counterclaims "allege[] sufficient facts to establish that [he] had the right to possess the HS3 Material." DE 91 at 13. Although Paragraph 83 of the Amended Counterclaim alleges "[Harry Sargeant] owns and has the right to possess the HS3 Material," that legal conclusion is not entitled to the assumption of truth. *See*

notes 9, 10, *supra*. The Amended Counterclaim states that Sargeant Marine owned the server and controlled access to the server. *See* ¶ 12. It does not allege any facts to create a plausible inference that Harry Sargeant's rights to access the server were greater than Sargeant Marine's right to exclude him. In or about February 2013, following Harry Sargeant's ouster from the family businesses, the system administrator for the Sargeant Server informed him that he could not have access to the HS3 Email Account. ¶ 18. These factual allegations establish that Harry Sargeant was stripped of any possessory interest he may have once had in the email account and the HS3 Material two years before the alleged Hall conversion occurred. Thus, Harry Sargeant's argument that his right to possess the HS3 Material was somehow superior to Hall's at the time of the alleged conversion in October 2016 is belied by the facts alleged in the Amended Counterclaim.

In any event, the Court rejects Harry Sargeant's argument that Hall can be liable for conversion for mere possession of the HS3 Material. Rather, conversion claims are properly pled against those who committed the allegedly "unauthorized act" that deprived Harry Sargeant of the HS3 Material. *See Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1291 (11th Cir. 2001) ("conversion is 'an unauthorized act which deprives another of his property permanently or for an indefinite time.'") (quoting *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd*., 450 So.2d 1157, 1160–61 (Fla. Dist. Ct. App. 1984)). Based on the Amended Counterclaims, that unauthorized act occurred, if at all, when Daniel Sargeant (or someone else) obtained information from the HS3 Email Account without authorization from Harry Sargeant. ¶¶ 34, 39. Despite Harry Sargeant's attempt to characterize Hall's subsequent receipt of copies of those digital files as the unauthorized act, Harry Sargeant fails to cite legal authority to support such a proposition, and this

Court finds that holding Hall liable for conversion on this theory would be inconsistent with the common law definition of conversion.[14]

*Opportunity to Amend*

The final issue is whether Harry Sargeant should be afforded an opportunity to file a second Amended Counterclaim. The Court concludes that he should not.

Harry Sargeant has had multiple opportunities to assert claims against Hall arising from Hall's acquisition and disposition of the HS3 Material. In the SAC, Harry Sargeant alleged that Hall conspired with Daniel Sargeant and others to obtain the HS3 Material in violation of the CFAA and in violation of Harry Sargeant's right to privacy. This Court recommended dismissing those claims without prejudice and provided a detailed Report and Recommendation enumerating the factual and legal shortcomings in the SAC. In his initial Counterclaims Harry Sargeant accused Hall of invading his privacy by both intrusion and publication, civil conspiracy and unjust enrichment. DE 54. Faced with Hall's initial motion to dismiss the counterclaim (DE 63), Harry Sargeant withdrew his claims for invasion of privacy by publication and unjust enrichment. In the Amended Counterclaims, Harry Sargeant again alleged that Hall invaded his privacy by intrusion and conspired to do so. He also added a new claim for conversion. Again, the facts alleged in support of those claims are insufficient. Moreover, Harry Sargeant's primary theory of invasion of privacy by intrusion (which is different from the theory he asserted in the SAC) fails as a matter of law. Likewise, Harry Sargeant's theory of conversion fails as a matter of law. These legal insufficiencies cannot be cured by amendment. Harry Sargeant would have to articulate a different

---

[14]   Given the Court's conclusion that neither of the substantive counterclaims survive scrutiny under Rule 12(b)(6), the conspiracy count must also be dismissed. *See Espana Informatica, S.A. v. Top Cargo, Inc.,* No. 08-20276-CIV, 2008 WL 11331683, at *12 (S.D. Fla. Apr. 28, 2008) (J. Ungaro) ("because Plaintiffs have not alleged an actionable tort or wrong underlying the civil conspiracy claim, the Court finds that the civil conspiracy claim should be dismissed").

tort theory. Or, he would have to allege facts establishing that Daniel Sargeant (or someone acting in concert with Hall and with Hall's knowledge) accessed the Sargeant Server and obtained the HS3 Material after his January 2015 meeting with Hall, and at a time when Harry Sargeant retained rights to that material. Harry Sargeant has already been given multiple chances to assert a valid theory, or to assert the necessary facts related to the acquisition and dissemination of the HS3 Material, and has failed to do so. This case has been pending since June 6, 2018. Discovery is scheduled to close in approximately 60 days. The case is scheduled for trial in less than six months.

The Court may dismiss a complaint with prejudice and "may refuse leave to amend when there have been repeated failures to cure deficiencies by amendments previously allowed." *Esmailzadegan v. Ventura Greens at Emerald Dunes Condo. Ass'n, Inc*., No. 9:17-CV-81040, 2018 WL 4409979, at *2 (S.D. Fla. Aug. 20, 2018) (J. Rosenberg) (court denied leave to amend where plaintiffs were "on notice of the same deficiencies in their pleadings in two previous motions to dismiss . . . [and] in an earlier order . . . [nevertheless] [p]laintiffs still have not stated a federal claim, despite being on notice of what needed to be corrected in their pleadings") (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). *See also EcoMed, LLC v. Asahi Kasei Medical Co., Ltd.,* No. 0:17-CV-61360, 2018 WL 6620467, at *2 (S.D. Fla. Nov. 28, 2018) (J. Rosenberg) (court dismissed pleading with prejudice where plaintiffs were already afforded the opportunity to amend in this case (which was an amendment stemming from plaintiffs' prior litigation), and court found that further amendment would be futile and would also impose unfair prejudice on the defendant).

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Dismiss the Counterclaims (DE 72) is **GRANTED WITH PREJUDICE.**

**DONE and ORDERED** in Chambers at West Palm Beach in the Southern District of Florida, this 26th day of March, 2019.

_____
BRUCE REINHART
U.S. MAGISTRATE JUDGE