# EXHIBIT K

Case 9:18-cv-80748-RKA   Document 203-11   Entered on FLSD Docket 05/06/2019   Page 1 of 11

IN THE HIGH COURT OF JUSTICE                                  Claim No: [          ]

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

BETWEEN:-

      (1)    MAROIL TRADING, INC
      (2)    SEA PIONEER SHIPPING CORPORATION

<b>Claimants</b>

-and-

      (1)    CALLY SHIPHOLDINGS INC
      (2)    VITAL SHIPPING CORPORATION
      (3)    DAINFORD NAVIGATION INC
      (4)    TAMARA SHIPHOLDINGS SA
      (5)    TUSCANY MARITIME SA
      (6)    NOVOSHIP (UK) LIMITED

<b>Defendants</b>

---

**PARTICULARS OF CLAIM**

---

**(A)  PARTIES**

1. The Claimants are companies incorporated under the laws of Panama. The ultimate beneficial owner of the Claimants is Wilmer Jose Ruperti Perdomo, who is known as Wilmer Ruperti and is a businessman.

2. The First to Fifth Defendants are companies incorporated under the laws of Liberia and the Sixth Defendant is a company incorporated in England and Wales with company number 02682464 and whose registered office is at 3 More London Riverside, London SE1 2AQ.

**(B)   THE SETTLEMENT AGREEMENT**

3.  The Defendants brought various legal actions against the Claimants, Mr Ruperti and a company known as PMI Trading, Inc ("PMI"), incorporated under the laws of Panama. Such proceedings comprised:-

    (1)   proceedings brought in the Commercial Court of the High Court of England and Wales under claim number 2006 Folio 1267 (the "London Proceedings");

    (2)   proceedings brought in the Miami-Dade County Circuit Court in Miami, Florida, United States of America (the "Florida Proceedings"); and

    (3)   a criminal complaint brought in Switzerland under reference P/24644/2014 (the "Swiss Proceedings").

4.  During the course of the Swiss Proceedings, the Defendants had been given copies by the Swiss public prosecutor of the following documents (together, the "Swiss Proceedings Documents"):-

    (a)   an agreement between PDVSA Petroleo SA ("PDVSA"), the Claimants and others dated 22 December 2014 with respect to various claims and known as the "Payment Agreement";

    (b)   an agreement between Commerzbank AG, a German bank, and the Second Claimant dated 10 February 2015 and known as the "Commission Agreement";

    (c)   a letter dated 12 February 2015 from Canonica Vaticos de Preux and Associates, a Swiss law firm representing the First Claimant, to Sparkasse Schwyz AG ("Sparkasse"), a Swiss bank, which enclosed a copy of the Payment Agreement (the "Canonica Letter"); and

    (d)   bank statements from Sparkasse relating to the First Claimant dated February and March 2015 (the "Sparkasse Bank Statements").

5.  All such actions between the parties were compromised under the terms of an agreement made by way of deed dated 26 September 2016 and made between

the Defendants on the one hand and the Claimants, Mr Ruperti and PMI on the other (the "Settlement Agreement").

6. The Settlement Agreement contained the following terms amongst others:-

> "7.2 *The Novoship Companies* [i.e. the Defendants] *acknowledge that they, including their advisors, lawyers and investigators, have obtained information during the course of the London Proceedings, the Florida Proceedings and the Swiss Proceedings concerning the Ruperti Parties* [i.e. the Claimants, Mr Ruperti and PMI] *and the Released Parties* [defined at Clause 4.1 as being the Ruperti Parties, including their family members, affiliates, agents, attorneys, advisors, representatives, employees or other related persons], *which is private and sensitive, including personal, financial and business information (the "Sensitive Information").*
>
> 7.3 *The Novoship Companies undertake that they, their servants, agents, advisers and investigators will keep all the Sensitive Information confidential and will not use or disclose Sensitive Information without the prior written consent of Mr Ruperti save to the extent required by law.*"

7. The Swiss Proceedings Documents were Sensitive Information within the meaning of the Settlement Agreement and the Defendants were accordingly contractually obliged to keep the Swiss Proceedings Documents confidential and not use or disclose them without the prior written consent of Mr Ruperti or the extent required by law.

8. The Claimants will refer to the terms of the Settlement Agreement at trial for its full meaning and effect.

(C) **BREACH OF THE SETTLEMENT AGREEMENT**

9. In breach of the Defendants' obligations under the Settlement Agreement as pleaded above, in or around October 2016, the Defendants (or one or more of them) and/or a person falling within the scope of Clause 7.3 of the Settlement Agreement (i.e. one of the Defendants' "servants, agents, advisers or

3

investigators") disclosed the Swiss Proceedings Documents to a third party without the prior written consent of Mr Ruperti and without being under any legal obligation to do so.

## PARTICULARS

(a) On or around 13 January 2015, a Mr Daniel Sargeant ("Mr Sargeant"), a shareholder and director of Latin American Investments Limited ("LAIL"), a company incorporated in the Isle of Man but owned or controlled by various members of the Sargeant family in the United States of America, met a Mr Daniel Hall who was at the time employed and/or retained by a private investigation agency called Focus Intelligence Limited ("Focus"). Mr Hall informed Mr Sargeant that Focus was acting on behalf of Mr Mohamed Al-Saleh and his lawyer, Mr Ed Davis, who was attempting to trace the assets of Mr Harry Sargeant III, the brother of Mr Sargeant, in relation to a Florida judgment. Mr Sargeant was further informed that Focus was acting on behalf of "Novoship", which is understood to mean the Defendants, in respect of legal action against Mr Ruperti.

(b) Accordingly, it is understood and alleged that Mr Hall and/or Focus were retained as servants, agents, advisers and/or investigators by the Defendants (or one or more of them) within the meaning of Clause 7.3 of the Settlement Agreement.

(c) During August 2016, Mr Hall indicated to Mr Sargeant that he had some material relating to Mr Ruperti that might be of interest to Mr Sargeant and/or LAIL. Mr Hall sought, in exchange, material relating to Mr Harry Sargeant III.

(d) On or around 6 October 2016, Mr Sargeant met Mr Hall in London and Mr Hall gave him the Payment Agreement, the Canonica Letter, the Sparkasse Bank Statements and further documents which purported to describe the activities of Mr Ruperti.

(e) It is inferred that the material referred to in the previous sub-paragraph provided by Mr Hall to Mr Sargeant (and at least the Payment

4

Agreement, the Canonica Letter and the Sparkasse Bank Statements) came from the Swiss Proceedings and was therefore Sensitive Information within the meaning of Clause 7.2 of the Settlement Agreement.

(f) Following that meeting, Mr Sargeant provided video material of a sexual nature relating to Mr Harry Sargeant III to Mr Hall.

(g) On or around 28 October 2016, Mr Sargeant met Mr Hall in London and provided him with further documents, including the Commission Agreement.

(h) It is again inferred that the material referred to in the previous sub-paragraph provided by Mr Hall to Mr Sargeant (and at least the Commission Agreement) came from the Swiss Proceedings and was therefore Sensitive Information within the meaning of Clause 7.2 of the Settlement Agreement.

10. The Claimants reserve their position in respect of the Defendants' conduct in connection with, and knowledge of, the matters described above, including in respect of any conduct or knowledge which might give rise to further causes of action against them.

### (D)   CAUSATION, LOSS AND DAMAGE

11. In reliance upon the Swiss Proceedings Documents, LAIL brought proceedings against the Claimants in the Commercial Court of the High Court of Justice under claim number CL-2017-000130 (the "Commercial Court Proceedings").

12. The Commercial Court Proceedings commenced with an *ex parte* application by LAIL for *inter alia* a worldwide freezing injunction (the "LAIL Freezing Injunction") against the Claimants which was granted by Mr Justice Blair on 3 March 2017, in the sum of in excess of US$ 60million.

13. The Claimants subsequently agreed to tender security in lieu of the LAIL Freezing Injunction, in the form of monies held in accounts in the First Claimant's name with Sparkasse and also Gonet & Cie SA.

14. On 17 May 2017, the Claimants served their Defence in the Commercial Court Proceedings.

15. On 18 May 2017, Oceanic Transport Shipping Est ("OTS") issued further proceedings against the Claimants in connection with the same underlying matters as the Commercial Court Proceedings were concerned with, also in reliance upon the Swiss Proceedings Documents (and further references below to the "Commercial Court Proceedings" shall be taken to include these further proceedings). As part of these further proceedings, OTS also obtained a worldwide freezing injunction against the Claimants on 9 May 2017, in the sum of US$ 23 million.

16. Following various further procedural steps in the Commercial Court Proceedings, those proceedings were ultimately settled by way of a Settlement Deed dated 17 November 2017 (the "LAIL / OTS Settlement Deed").

17. By the LAIL / OTS Settlement Deed, *inter alia* the First Claimant agreed to pay LAIL, OTS and related entities the sum of US$ 30million, in three tranches:-

    (a) US$ 8 million within seven business days of the satisfaction of certain conditions precedent, which included the sealing of a consent order permitting the transfer of these monies by the First Claimant (the "First Payment");

    (b) US$ 11 million by 29 June 2018 (the "Second Payment"); and

    (c) US$ 11 million by 28 September 2018 (the "Third Payment").

18. The First Claimant has made the First Payment. The First Claimant, due to serious concerns that it has subsequently developed as to the circumstances in which the Commercial Court Proceedings were commenced and pursued (as described more fully in a letter from the First Claimant's solicitors, Charles Fussell & Co LLP, to LAIL's solicitors, Clyde & Co LLP, dated 26 June 2018) has not made the Second or Third Payments. However, the English Court has made orders requiring the First Claimant to make the Second and Third Payments.

19. The Claimants have also incurred substantial costs in participating in the Commercial Court Proceedings, in the approximate sum of £1.5 million.

20. Had the Defendants not breached the Settlement Agreement as pleaded above, the Commercial Court Proceedings would not have been brought and LAIL and/or OTS would not have obtained freezing injunctions against the Claimants, and the LAIL / OTS Settlement Deed would not have been entered into.

21. Accordingly, the Defendants' breach of the Settlement Agreement has caused the First Claimant to suffer a loss in the sum of the First, Second and Third Payments (i.e. US$ 30 million). The First Claimant seeks and is entitled to damages from the Defendants in that sum, alternatively damages in the sum of the First Payment (which has been paid by the First Claimant) and an indemnity in respect of the Second and Third Payments.

22. The Defendants' breach of the Settlement Agreement has further caused the Claimants to incur the costs referred to above, in the sum of approximately £1.5 million. The Claimants therefore seek and are entitled to damages from the Defendants in that sum.

23. Further and/or alternatively, as a result of the bringing of the Commercial Court Proceedings and the obtaining by LAIL and OTS of worldwide freezing injunctions against the Claimants (the first of which was subsequently substituted by security) the First Claimant ("Maroil") has suffered further losses for which the Defendants are liable to compensate it in damages. In particular:-

    (1) On 9 November 2016 Maroil signed agreements with Petroleos De Venezuela SA ("PDVSA") to ship green delayed petroleum coke ("Petcoke") from Petro San Felix in Venezuela in a minimum amount of 12 million metric tonnes for a fixed term of 5 years (the "Petcoke Supply Agreement").

    (2) The fact that the Petcoke Supply Agreement had been awarded to Maroil was well publicised in the shipping press and would have been known to the Defendants.

(3) As part of the contractual arrangements between Maroil and PDVSA, Maroil was required to build, at its expense, the necessary facilities to ship the Petcoke from Petro San Felix in Venezuela (the "Petcoke Development Agreement").

(4) By the time the Commercial Court Proceedings had commenced, Maroil had, pursuant to its obligations under the Petcoke Development Agreement, incurred expenditure of around US$ 30 million, out of total expenditure of around US$ 138 million which it was anticipated would be necessary to allow Maroil to comply with such obligations.

(5) The way the Petcoke Supply Agreement was structured meant that Maroil could not commence making profits under the Agreement unless and until it had completed the infrastructure required to undertake the shipping of Petcoke from Venezuela. Furthermore, the Petcoke Supply Agreement was for a fixed term of 5 years meaning that any delay in the completion of the infrastructure would reduce the length of time over which Maroil would be able to ship Petcoke from Petro San Felix and thereby make a profit.

(6) As a result of the Commercial Court Proceedings and in particular the worldwide freezing injunctions obtained by LAIL and subsequently OTS, Maroil's cash reserves required for investment in the Petcoke project were immobilised.

(7) This meant that Maroil was unable to complete the construction of the necessary infrastructure to enable it to fulfil its contractual obligations to PDVSA and start generating revenue under the Petcoke Supply Agreement, and it was only able to resume doing so after the LAIL / OTS Settlement Deed had been concluded.

(8) Following the LAIL / OTS Settlement Deed, Maroil was able to free up sufficient capital to fulfil its contractual obligations under the Petcoke Development Agreement and thereby commence shipping Petcoke from Venezuela.

(9) However, as noted above, the Proceedings caused a significant delay to the Petcoke project as a whole, which Maroil estimates as approximately 8 to 9 months. This in turn has shortened the period in which Maroil will be able to generate profits from the Petcoke project, owing to the fixed term nature of the Petcoke Supply Agreement.

(10) As a result of the delay Maroil estimates that it will have lost the opportunity to ship approximately 30 to 40 shipments of Petcoke.

(11) Maroil's loss of profits attributable to the delay (and therefore attributable to the Defendants' breaches of contract) are to be calculated by reference to a pricing formula contained within the Petcoke Supply Agreement.

(12) To date Maroil has shipped 3 shipments of Petcoke pursuant to a separate agreement with PDVSA relating to the supply of Petcoke at an average profit per shipment of US$ 1.5 million. Maroil estimates that the average profit that it will make under the Petcoke Supply Agreement will also be US$ 1.5 million per shipment.

(13) Maroil therefore estimates that its loss of profits on the Petcoke Supply Agreement is between US$45 million to US$60 million, which the Defendants are liable to pay to Maroil as damages.

(14) Furthermore, Maroil has incurred increased costs and penalties in respect of the Petcoke Development Agreement owing to Maroil's inability to pay sub-contractors in respect of construction work, currently estimated at between USD 500,000 and 800,000. Further details of the loss and damage suffered by Maroil in respect of the Petcoke Development Project will be provided in due course.

### (E) MEASURE OF DAMAGES

24. The Claimants' primary case is that they are entitled to damages as claimed above. To the extent necessary, the Claimants will aver in the alternative that (i) they are entitled to damages for the lost chance of the Commercial Court

Proceedings not being pursued and/or the worldwide freezing injunctions not being obtained by LAIL and/or OTS, and (ii) the prospects of the Commercial Court Proceedings not being pursued and/or of the worldwide freezing injunctions not being obtained were formidable.

### (F) INTEREST

25. The Claimants claim and are entitled to interest on such sums as the Court thinks fit at such rate and for such periods as the Court shall think just, pursuant to Section 35A of the Senior Courts Act 1981.

AND THE CLAIMANTS CLAIM

1. Damages as aforesaid;

2. Interest as aforesaid; and

3. Costs

**DANIEL SAOUL**

**STATEMENT OF TRUTH**

The Claimants believe that the facts stated in these Particulars of Claim are true. I am duly authorised by the Claimants to sign this statement on their behalf.

*[signature]*

**Signed:** ..............................................................

**SIMON PATRICK WINTER, SOLICITOR, PARTNER, CHARLES FUSSELL & CO LLP, SOLICITORS FOR THE CLAIMANTS**

**Dated: 21 December 2018**