**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 18-cv-80748-ALTMAN/Reinhart**

DANIEL HALL,
BURFORD CAPITAL LLC, and
DUNDROD INVESTMENTS LTD.,

      Plaintiffs,

      v.

HARRY SARGEANT, III,

      Defendant.

_____/

**HARRY SARGEANT III'S MOTION FOR SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

I.    Introduction ............................................................................................................. 1

II.   Procedural Posture and Factual Background ......................................................... 2

III.  Legal Standard ...................................................................................................... 2

IV.   ARGUMENT .......................................................................................................... 2

     A.    Plaintiffs Cannot Establish a Breach of the Settlement or Release. ...................... 2

          1.    HS3 Fully Performed Pursuant to the Clear Language of the Settlement Agreement, Precluding Subsequent Breach ................................................. 3

          2.    The Alleged Breach of Release Cannot Independently Support Plaintiffs' Breach of Contract Claim. ........................................................................... 4

          3.    There is No Evidence Supporting the Plaintiffs' Claims That the Release is a Covenant Not to Sue. ................................................................................ 5

          4.    Hall Is Not a Releasee Under the Operative Release. ................................ 7

          5.    Hall's Conduct Was Outside the Course and Scope of His Employment, Precluding Vicarious Liability Claims. ...................................................... 8

          6.    Plaintiffs' Material Omission Fraudulently Induced HS3 to Sign the Release. ..................................................................................................... 12

          7.    Burford US and Hall Are Not Entitled to Seek Their Attorneys' Fees Under The Settlement Agreement .................................................................... 14

     B.    Hall Cannot Establish Malicious Prosecution Under Florida Law. ...................... 16

          1.    There Was No Bona Fide Termination of the Original Proceeding in Favor of Hall ......................................................................................................... 17

          2.    HS3 Had Probable Cause for the Claims and Allegations in the SAC ..... 20

               a.    Probable Cause for Any Claims in the Original Proceeding Is Sufficient to Defeat a Malicious Prosecution Claim ..................... 22

               b.    HS3 Had Probable Cause for the SAC's Claims and Allegations Because He Had a Reasonable Belief They Were Valid at the Time. ................................................................................................ 22

                    i.    CFAA Conspiracy ............................................................. 23

    ii.  Conspiracy to Violate CADRA ........................................ 25

    iii.  Conspiracy to Invade Privacy ........................................... 26

  3.  There is No Evidence of Malice by HS3 .................................................. 28

  4.  There is No Evidence that Would Allow a Reasonable Factfinder to Conclude that Hall Has Suffered Damages. ............................................. 29

V. Conclusion ..................................................................................................... 30

VI. REQUEST FOR HEARING ................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*ADT LLC v. Sec. Networks, LLC*,
   No. 12-81120-CV, 2018 WL 1795451 (S.D. Fla. Mar. 6, 2018).............................................15

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................................2

*Bechuck v. Home Depot U.S.A., Inc.*,
   814 F.3d 287 (5th Cir. 2016) ...............................................................................................18

*BHL Boresight, Inc. v. Geo-Steering Sols., Inc.*,
   No. 4:15-CV-00627, 2016 WL 8648927 (S.D. Tex. Mar. 29, 2016), *modified
   on reconsideration*, 2017 WL 1177966 (S.D. Tex. Mar. 29, 2017) .......................................24

*Boudinot v. Shrader*,
   2013 WL 1481226 (S.D.N.Y. April 10, 2013) .........................................................................4

*Brown v. Toscano*,
   630 F. Supp. 2d 1342 (S.D. Fla. 2008) ................................................................................17

*Bukuras v. Mueller Grp.*,
   LLC, 592 F.3d 255 (1st Cir. 2010) ........................................................................................4

*Burns v. GCC Beverages, Inc.*,
   502 So. 2d 1217 (S.D. Fla. 1986) ...................................................................................18, 26

*Chang v. JPMorgan Chase Bank, N.A.*,
   845 F.3d 1087 (11th Cir. 2017) ...........................................................................................14

*First Time Videos, LLC v. Oppold*,
   559 F. App'x 931 (11th Cir. 2014) .......................................................................................18

*Fisher v. Geico Indem. Co.*,
   No. 12-23851-CIV, 2013 WL 12091096 (S.D. Fla. July 23, 2013) .......................................13

*Gill v. Kostroff*,
   82 F. Supp. 2d 1354 (M.D. Fla. 2000) ................................................................................21

*Global Policy Partners, LLC v. Yessin*,
   686 F. Supp. 2d 631 (E.D. Va. 2009) ...................................................................................25

*Hamilton Grp. Funding, Inc. v. Basel*,
   311 F. Supp. 3d 1307 (S.D. Fla. 2018) ................................................................................24

*Isbell v. Allstate Ins. Co.*,
   418 F.3d 788 (7th Cir. 2005) ..........................................................................4

*Kettel v. Phillips*,
   No. 14-81310-CIV, 2018 WL 3699340 (S.D. Fla. May 17, 2018)..........................................15

*Kossler v. Crisanti*,
   564 F.3d 181 (3d Cir. 2009).........................................................................20

*Leasetec Corp. v. Orient Sys., Inc.*,
   85 F. Supp. 2d 1310 (S.D. Fla. 1999) .................................................................14

*Mahoney v. DeNuzzio*,
   No. 13-11501, 2014 WL 347624 (D. Mass. Jan. 29, 2014)....................................................24

*Mee Indus. v. Dow Chem. Co.*,
   608 F.3d 1202 (11th Cir. 2010) ....................................................................17, 21

*Melford v. Kahane and Assocs.*,
   371 F. Supp. 3d 1116 (S.D. Fla. 2019) ...............................................................21

*Pelletier v. Estes Groves, Inc.*,
   No. 16-14499-CIV, 2018 WL 4208328 (S.D. Fla. Mar. 28, 2018) ........................................17

*Schuman v. Microchip Technology Incorporated*,
   372 F.Supp. 3d 1054 (N.D. Cal. 2019) ................................................................6

*Scott v. Harris*,
   550 U.S. 372 (2007)....................................................................................9

*St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*,
   347 F. Supp. 3d 1047 (M.D. Fla. 2018)................................................................25

*Stewart v. Booker T. Washington Ins.*,
   232 F.3d 844 (11th Cir. 2000) ........................................................................5

*Stirling Int'l Realty, Inc. v. Soderstrom*,
   No. 14-1109, 2015 WL 403318 (M.D. Fla. Jan. 28, 2015)...................................................26

*Ward v. Casual Rest. Concepts Inc.*,
   No. 10-2640, 2011 WL 2600511 (M.D. Fla. June 29, 2011).................................................27

*Ware v. United States*,
   971 F. Supp. 1442 (M.D. Fla. 1997) ..................................................................29

**State Cases**

*Alamo Rent-A-Car, Inc. v. Mancusi*,
   632 So. 2d 1352 (Fla. 1994)..........................................................................16

*Allstate Ins. Co. v. Ginsberg*,
   863 So. 2d 156 (Fla. 2003)..................................................................................4, 19, 27

*Alterra Healthcare Corp. v. Campbell*,
   78 So. 3d 595 (Fla. 2d DCA 2011) ...............................................................................28

*Atlantic Coast Line R. Co. v. Boone*,
   85 So. 2d 834 (Fla. 1956)...............................................................................................5

*Bank of New York Mellon v. Mestre*,
   159 So. 3d 953 (Fla. 5th DCA 2015) ...........................................................................15

*Bennett v. Godfather's Pizza, Inc.*,
   570 So. 2d 1351 (Fla. 3d DCA 1990) .............................................................................7

*Burlington & Rockenbach, P.A. v. Law Office of E. Clay Parker*,
   160 So. 3d 955 (Fla. 5th DCA 2015) .............................................................................3

*Butler v. Yusem*,
   44 So. 3d 102 (Fla. 2010)..............................................................................................13

*Cent. Fla. Machinery Co., Inc. v. Williams*,
   424 So. 2d 201 (Fla. 2d DCA 1983) .............................................................................16

*Civix Sunrise, GC, L.L.C. v. Sunrise Rd. Maint. Ass'n, Inc.*,
   997 So. 2d 433 (Fla. Dist. Ct. App. 2008) ....................................................................16

*Cohen v. Amerifirst Bank*,
   537 So. 2d 1108 (Fla. 3d DCA 1989) ...........................................................................22

*Durkin v. Davis*,
   814 So. 2d 1246 (Fla. 2d DCA 2002) ...........................................................................28

*Endacott v. Int'l Hospitality, Inc.*,
   910 So. 2d 915 (Fla. 3d DCA 2005) .............................................................................22

*Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*,
   253 So. 2d 744 (Fla. 4th DCA 1971) .............................................................................6

*HFC Collection Ctr., Inc. v. Alexander*,
   190 So. 3d 1114 (Fla. 5th DCA 2016) ..........................................................................15

*Howard v. Crawford & Co.*,
   384 So. 2d 1326 (Fla. Dist. Ct. App. 1980) ..................................................................13

*Jenkins v. Eckerd Corp.*,
   913 So. 2d 43 (Fla. 1st DCA 2005) ............................................................................3, 5

*Jones v. State Farm Mut. Auto. Ins. Co.*,
   578 So. 2d 783 (Fla. 1st DCA 1991) ...................................................................18

*Joseph H. Held & Assocs., Inc. v. Wolff*,
   39 S.W.3d 59 (Mo. Ct. App. 2001)......................................................................22

*Kaye v. Wilson-Gaskins*,
   135 A.3d 892 (Md. Ct. Spec. App. 2016) ..............................................................4

*May v. Fundament*,
   444 So. 2d 1171 (Fla. 4th DCA 1984) .................................................................20

*Med. Ctr. Health Plan v. Brick*,
   572 So. 2d 548 (Fla. 1st DCA 1990) .....................................................................3

*Moity v. Bodin*,
   489 So. 2d 474 (La. Ct. App. 1986)......................................................................22

*Morgan Int'l Realty, Inc. v. Dade Underwriters Ins. Agency, Inc.*,
   617 So. 2d 455 (Fla. 3d DCA 1993) ....................................................................28

*Novastar Mortg., Inc. v. Strassburger*,
   855 So. 2d 130 (Fla. 4th DCA 2003) ...................................................................15

*Packaging Corp. of Am. v. DeRycke*,
   49 So. 3d 286 (Fla. 2d DCA 2010) ......................................................................30

*Pollo Operations, Inc. v. Tripp*,
   906 So. 2d 1101 (Fla. 3d DCA 2005) ..................................................................30

*Raimi v. Furlong*,
   702 So. 2d 1273 (Fla. 3d DCA 1997) ..................................................................27

*Sargeant, III v. Maroil Trading, Inc., et al.*,
   Case No. 17-CV-81070-Bloom/Reinhart........................................................ *passim*

*Totale, Inc. v. Smith*,
   877 So. 2d 813 (Fla. Dist. Ct. App. 2004) ...........................................................14

*Travelers Ins. Co. v. Horton*,
   366 So. 2d 1204 (Fla. 3rd DCA 1979)..................................................................12

*Union Oil of Calif. Amsco Div. v. Watson*,
   468 So. 2d 349 (Fla. Dist. Ct. App. 1985) ...........................................................17

**Federal Statutes**

18 U.S.C.
   § 1030(b)................................................................................................................25

CFAA and the Stored Communications Act.............................................................23

Fed. R. Civ. P. Rule 56 .........................................................................................1

Fed. R. Civ. P. 56(a) ............................................................................................2

Local Rule 7.1(b)(2)............................................................................................30

Local Rule 56.1...................................................................................................1

**State Statutes**

Fla. Stat.
    § 57.105.........................................................................................................21
    § 668.803.......................................................................................................25
    § 784.049(1)(a) ..............................................................................................26
    § 810.145 (2018)..............................................................................................8
    § 934.03(1)(c)-(d) (2018)..................................................................................8

Rule 41............................................................................................................18

Rule 41(a)(1).....................................................................................................18

Defendant, Harry Sargeant, III, ("Defendant" or "HS3"), through his undersigned counsel and pursuant to Rule 56, Fed. R. Civ. P., Local Rule 56.1, and this Court's orders regarding scheduling [ECF Nos. 199, 243], hereby moves for summary judgment with respect to the claims of Plaintiffs Daniel Hall ("Hall"), Burford Capital LLC ("Burford US"), and Dundrod Investments Ltd. ("Dundrod") (collectively, "Plaintiffs").  HS3 states the following in support:

## I.      INTRODUCTION

The undisputed facts establish that in October 2016, an unsupervised Hall assembled the confidential documents of his employer, Burford Capital (UK), Ltd.'s ("Burford UK") client Novoship,[1] and exchanged them for HS3's private sex videos and photographs.  Hall did so even though a settlement between his client Mohammad Al-Saleh ("Al-Saleh") and HS3 had been finalized and executed, and those settling parties were engaged in good faith, cooperative efforts to implement their accord.

Hall never notified Novoship, Al-Saleh, Al-Saleh's counsel, HS3 or Hall's employer, Burford UK, of his conduct.  The only person at Burford US with knowledge of Hall's illicit trade was Aviva Will, a longtime colleague of  Burford group CEO Christopher Bogart and a Managing Director of Burford US.  Hall transmitted the HS3 sex videos and photographs to Will via Will's personal email address, and the pair joked together as they viewed the material.  What's worse, Hall arranged and executed his illicit trade and transmitted HS3's sex videos and photographs at the exact time he and Will were actively engaged in negotiating the very release Plaintiffs now assert forms the basis of their claims against HS3.

In late 2017, HS3 first learned of Hall's misdeeds and, after investigation, sought redress against Hall in February 2018.  Yet now, even though HS3 was the obvious victim of Hall's reckless and rogue conduct, Plaintiffs seek herein to hold HS3 liable for "breach" of an inapplicable release, and for taking action against Hall to recover his private materials.  However, as developed herein, Plaintiffs' claims lack any legal or factual basis, and HS3 is entitled to summary judgment in his favor as a matter of law.

---

[1] As developed herein, Hall's conduct exposed Burford UK to Novoship's $75 million claim for damages. *See Maroil Trading, Inc. v. Cally Shipholdings, et al.*, Claim No. CL-2018-000824; Def. Ex. 36 to Burford US Dep., ¶¶ 21, 23(13).

## II.  PROCEDURAL POSTURE AND FACTUAL BACKGROUND

Plaintiffs filed the instant action on June 8, 2018.  The Complaint raised claims for declaratory relief, breach of contract, and malicious prosecution.  *See* Compl, [ECF No. 1, ¶¶ 47-50, 53-58, 60-66].  This Court subsequently dismissed the claim for declaratory relief as moot. *See* [ECF No. 186, 187].  A detailed description of the factual background and procedural posture of this action is included in HS3's Statement of Undisputed Material Facts ("SMF"), which is incorporated herein by reference and is being filed simultaneously with this Motion.

## III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material facts" are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

## IV.  ARGUMENT

### A.      Plaintiffs Cannot Establish a Breach of the Settlement or Release.

Plaintiffs' breach of "release" claim fails as a matter of law for numerous reasons.  First, the clear and unambiguous language of the settlement executed between HS3 and Al-Saleh on October 4, 2016 (the "Settlement") confirms that HS3 had "fully performed" his obligations under the Settlement as of January 10, 2017.  Because a fully performed agreement cannot possibly be breached, Plaintiffs cannot establish their claim for breach of the Settlement.

Second, HS3's filing of an action against Hall cannot support a breach of contract claim on the basis of the release executed by HS3 and effective October 28, 2016 (the "Release"), because complete performance is tendered upon the Release's effective date and may not be breached through actions post-delivery.  Because HS3's Release was effectuated as of and from October 28, 2016, HS3's subsequent filing of his action against Hall cannot constitute a "breach" of the Release.

Third, the plain and unambiguous language of the Release establishes it is just that, a release, not a covenant not to sue.  As such, Plaintiffs cannot establish "breach" of the Release through extrinsic evidence or through application of legal principles governing executory

covenants not to sue.  This is especially so here, since language that might have been construed as a covenant not to sue was ***removed*** from the Settlement to eliminate any continuing or executory obligations following full performance by HS3.

Fourth, Hall and his employer, Burford UK, are not parties to the Settlement or Release, and Hall does not fall within the scope of the definition of "Releasees."  Hall and Burford UK are separate and distinct from Burford US and Dundrod, the actual named parties in the Release.  Moreover, while Hall was himself involved in the drafting of the language of the Release, and could easily been included as a "Releasee," the Parties to the Settlement chose not to so include him.

Fifth, setting aside Hall's status as an employee of a distinct corporate entity, Burford UK, Plaintiffs cannot show Hall's conduct could or would give rise to any vicarious liability on the part of Burford US or Dundrod.  Hall's solicitation, obtaining and dissemination of HS3's sex videos and photographs was obviously and admittedly beyond the scope of his employment with Burford UK.

Finally, the clear and unambiguous language of the Settlement does not allow non-parties to the contract, such as Hall, to recover attorneys' fees (Hall's only claim of damages).  Moreover, as Hall has not even incurred any attorneys' fees, he lacks any cognizable damages for the alleged "breach" of the Release.

## 1.  HS3 Fully Performed the Settlement Agreement.

To prevail in a cause of action for breach of contract under Florida law, Plaintiffs must present evidence that establishes: "1) a valid contract; 2) a material breach of the contract; and 3) damages." *Burlington & Rockenbach, P.A. v. Law Office of E. Clay Parker*, 160 So.3d 955, 960 (Fla. 5th DCA 2015) (internal citation omitted).  A material breach is the failure to "perform a duty that goes to the essence of the contract and is of such significance that it relieves the injured party from further performance of its contractual duties." *Id.* Under Florida law, "a party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract." *Med. Ctr. Health Plan v. Brick*, 572 So.2d 548, 551 (Fla. 1st DCA 1990) (internal citation omitted).  "It is a fundamental rule of contract interpretation that a contract which is clear, complete, and unambiguous does not require judicial construction."  *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 50 (Fla. 1st DCA 2005) (citing cases).

Here, the amendment to the Settlement unquestionably provides that the SA Parties, including HS3, fully performed their obligations:

> **Section 5.   Full Performance Pursuant to the Settlement Agreement.**  Except as provided below regarding the DR Property, Al-Saleh agrees that upon receipt of the Remaining Settlement Amount the SA Parties will have fully performed their obligations pursuant to the Settlement Agreement and no Actionable Event will have occurred.

SMF ¶ 32 (*citing* Def. Ex. 3 at § 5).  Further, it is undisputed that as of January 10, 2017, HS3 paid, and Al-Saleh received, the Remaining Settlement Amount. SMF ¶ 33 (*citing* HS3 Decl., Def. Ex. 83A at ¶ 32).  Thus, as of January 10, 2017, all of the Settlement's signatories expressly agreed the Settlement had been fully performed, precluding any subsequent claim for material breach. Moreover, as HS3 fully performed and no Actionable Events occurred, HS3's subsequent filing of the Second Amended Complaint ("SAC") cannot give rise to any claim for breach or for damages based upon the occurrence of an Actionable Event or otherwise.

### 2.   There Is No Claim For Breach of Release.

A release is not an executory promise.  "A release is an affirmative defense; it does not supply a defendant with an independent claim for breach of contract." *See e.g. Bukuras v. Mueller Grp*., LLC, 592 F.3d 255, 266 (1st Cir. 2010) *see also Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 797 (7th Cir. 2005) ("The Release does not result in breach upon the filing of a suit. Instead, it provides [defendant] with an effective affirmative defense should a claim be raised."); *Boudinot v. Shrader*, 2013 WL 1481226, *8 (S.D.N.Y. April 10, 2013) ("this Court finds more persuasive the view of the First Circuit, which held that '[a] release is an affirmative defense; it does not supply a defendant with an independent claim for breach of contract.'").

A release can be breached only through non-delivery; a release cannot be breached after delivery.  *See Kaye v. Wilson-Gaskins*, 135 A.3d 892, 904 (Md. Ct. Spec. App. 2016) ("a release cannot be breached because complete performance is tendered at the moment release is effectuated.").

Here, full performance of the Release occurred upon the effective date of delivery, October 28, 2016.  The unambiguous terms of the Release include no language imposing any continuing or executory commitment on HS3 (or anyone else for that matter).  "A release is an outright cancellation or discharge of the entire obligation as to one or all of the alleged joint wrongdoers. A covenant not to sue recognizes that the obligation or liability continues but the injured party

4

agrees not to assert any rights grounded thereon against a particular covenantee." *Atlantic Coast Line R. Co. v. Boone*, 85 So. 2d 834, 843 (Fla. 1956). In other words, a release constitutes a waiver or surrender of a claim and is fully performed once tendered. Restatement (Second) of Contracts § 284 (1981) (a release is a "discharge" and "takes effect on delivery"). In contrast, a covenant not to sue establishes an executory commitment not to take *future* action. Restatement (Second) of Contracts § 284 cmt. a. (1981).

Here, the plain language of the Release does not include a covenant not to sue. Simply stated, the Release is, as its title states in bold and underlined font, a "RELEASE." SMF ¶ 38-39 (*citing* Def. Ex. 4 at 3, 6, 8). Further, the Release does not contain any terms that create ambiguity as to the terms or construction of the Release. Therefore, extrinsic evidence may not be considered in construing the Release. *See, e.g., Jenkins* 913 So. 2d at 52 ("if a contract provision is 'clear and unambiguous,' a court may not consider extrinsic or 'parol' evidence to change the plain meaning set forth in the contract").

### 3. There is No Evidence Supporting the Plaintiffs' Claims That the Release is a Covenant Not to Sue.

Even if the Court were to consider extrinsic evidence, there is no evidence in the record that provides a legal basis to establish the Settlement parties' intent to create a covenant not to sue. Indeed, the only evidence of intent contravenes Plaintiffs' assertions.

Plaintiffs' purported evidence that the Release constitutes a covenant not to sue consists of (1) prior drafts of the Settlement that show the *removal* of such operative language; and (2) the baseless "understanding" of Burford US, which was not a party to the Settlement and had no authority to approve final language. SMF ¶ 28; *see also* <u>A-2</u>[2] Def. Ex. 78 at 65:1-66:7, 87:10-88:7.

Non-party Burford US and Dundrod's bare and self-serving allegation of their understanding, without establishing personal knowledge of the intent of the parties—HS3, MAN, and Al-Saleh—is wholly irrelevant and inadequate to defeat a motion for summary judgment. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000) (plaintiff's bare and self-serving allegation where she had no personal knowledge was inadequate to defeat defendant's summary judgment motion). Indeed, Burford US cannot establish personal knowledge of the

---

[2] "<u>A-##</u>" corresponds to the ECF attachment number, for the attachments to the SMF, while "Def. Ex. ##" is the exhibit number used in connection with deposition testimony. Each document cited herein has both an "<u>A-##</u>" reference and a "Def. Ex. ##" reference.

parties' intent as Burford US's corporate representative testified that Burford US and Dundrod did not participate in the settlement process and did not have control over the final language included in the Settlement or Release, but merely reviewed some drafts and made suggestions. SMF ¶17 (*citing* Def. Ex. 78 at 65:1-15, 66:25-67:7, 111:15-19).

Second, the final Release nowhere includes language indicating that it is a covenant not to sue. In fact, Al-Saleh *removed* language that would arguably support Plaintiffs' position. SMF ¶ 28; *compare* Def. Ex. 10 § 12 *with* Def. Ex. 11 § 12.  Under Florida law, where a contract "is simply silent as to a particular matter, that is, its language neither expressly nor by reasonable implication indicates that the parties intended to contract with respect to the matter, the court should not, under the guise of construction, impose contractual rights and duties on the parties which they themselves omitted." *Gulf Cities Gas Corp. v. Tangelo Park Serv. Co*., 253 So. 2d 744, 748 (Fla. 4th DCA 1971) (internal citation omitted); *see also Schuman v. Microchip Technology Incorporated*, 372 F. Supp. 3d 1054, 1060 (N.D. Cal. 2019) ("Had Defendants wanted to bar Plaintiffs from bringing suit, they could have added such a term to the agreement. But they did not. Because Plaintiffs never agreed not to sue Defendants, they have not violated any term of the Plan by doing so.").

Here, the evidence establishes that language which could arguably be construed as a covenant not to sue was actually *removed* by Al-Saleh during the drafting process, evidencing the parties' intent to *not* include a covenant not to sue as a matter of law. *See id; see also* SMF ¶ 28 (*citing* Def. Ex. 78 at 99:25-100:7, 110:22-111:4); Def. Exs. 9 at § 12, 10 at § 12, 11 at § 12, 12 at § 12 13 at § 13 and 14 at § 13.  Specifically, the language deleted by Al-Saleh's counsel during the drafting process provided: "Any of the SA Parties defaults in the performance of this Agreement or the provision of any of the Settlement Documents *or any of the SA Release Parties defaults in the performance of the releases* signed subject to Section 16 below."  *See* SMF ¶ 28 (*citing* Def. Ex. 78 at 95:8-96:15; Def. Ex. 10 at 16) (emphasis added).  This language was removed to eliminate any continuing or executory obligations under the Settlement following full performance by HS3 and MAN.  SMF ¶ 28 (*citing* Def. Ex. 83A ¶ 28; Def. Ex. 93A ¶ 4).  Moreover, Al Saleh himself stated in the Settlement that HS3 fully performed his obligations under the Settlement and that no Actionable Events occurred.  SMF ¶ 32 (*citing* Def. Ex. 3 § 5).  This affirms that no continuing or executory obligations remained.

Non-party Plaintiffs' attempt to weave together disparate parts of the Settlement in support of their formulation cannot contravene the clear intent of the actual Parties.  Such attempts to cherry-pick contract terms and then interpret them out of context, without any support from an actual party to the Settlement, is simply "after-the-fact" lawyering, not record evidence of the parties' intent.  Indeed, Plaintiffs cannot point to any operative rule of contract interpretation that would provide any support for this approach.

### 4.   Hall Is Not a Releasee.

The Release defines "Releasees" as "(a) Al-Saleh, (b) Burford [US]; and (c) Dundrod [], and all persons or entities for whose acts or omissions the foregoing would or could be vicariously liable or to whom the foregoing could or would owe indemnification."  SMF ¶ 39 (*citing* Def. Ex. 4 at 3-4).  Hall does not even arguably fall within the scope of this definition.

Hall is not a party to the Settlement and is not named in the Release.  Hall is not an employee of Burford US or Dundrod. *See* SMF ¶ 3 (*citing* Def. Ex. 81 at 34-36).  Hall is an employee of Burford UK.  *Id.* (*citing* Def. Ex. 78 at 220-233, 247-256; Def. Ex. 81 at 34-36; Def. Ex. 8).   Burford UK is not a party to the Settlement and is not named in the Release.  *See* SMF ¶¶ 16, 39 (*citing* Def. Ex. 4 at 3-4).  Burford UK is an entity separate and distinct from Burford US and Dundrod.  SMF ¶ 5 (*citing* Def. Ex. 78 at 33-39, 44-46, 51-52, 122-125; Def. Exs. 56, 56A, 56B, 56C).

Plaintiffs' theory appears to be that actions by an employee of a separate, distinct entity (here Burford UK) somehow give rise to vicarious liability on the part of another, separate corporation (here Burford US or Dundrod).  But Florida law does not impose any such liability.

Florida law allows that an "***employer*** may be vicariously liable to third parties under the principle of *respondeat superior* for damages and injuries caused by ***its employee's*** negligent acts which are committed within the scope and course of his employment."  *Bennett v. Godfather's Pizza, Inc.*, 570 So. 2d 1351, 1353-54 (Fla. 3d DCA 1990) (emphasis added).  But the undisputed record establishes that neither Burford US nor Dundrod are Hall's "employer."  SMF ¶ 3 (*citing* Def. Ex. 78 at 220-233, 247-256; Def. Ex. 81 at 34-36; Def. Ex. 8).  Hall is employed by Burford UK.  *Id.*

Further, Plaintiffs cannot establish a relationship between Burford US and Burford UK that would support imputation of one's employee's actions to the other. *See* SMF ¶¶ 156-157 (*citing* Def. Ex. 104 ¶¶ 7, 32-35; Def. Ex. 106, ¶¶ 30-37).  Indeed, the only document arguably displaying

7

privity between Burford US and Burford UK (the Services and Management Agreement ("SMA") (Def. Ex. 57, 57A) expressly precludes an employee of Burford UK to be considered an employee or agent of Burford US for any purpose: "3.4 Nothing in this Agreement intends to, or is deemed to, establish or constitute a partnership between the Parties nor constitute any Party the agent, employee or representative of another party for any purpose."  SMF ¶ 157 (*citing* Def. Ex. 57, 57A, § 3.4).  Further the SMA does not "assume or create any obligation or responsibility" between any of the parties to the agreement. *Id.* at § 3.6*; see Reynolds Am., Inc. v. Gero*, 56 So. 3d 117, 120 (Fla. Dist. Ct. App. 2011) (noting that, "in order to establish an agency relationship . . . between sister subsidiaries," one entity must exert "'a high and very significant' level of control" over the other) (citation omitted).  Because Plaintiffs have failed to establish any corporate relationship that would support imputation of Burford UK's employee Hall to Burford US, Hall's actions cannot be imputed to Burford US.

Here, a Releasee is one who could make three persons or entities liable for his acts: Al-Saleh, Burford US, and Dundrod. *See* SMF ¶ 18 (*citing* Def. Ex. 2 § 2).  Burford UK is not in this group.  Thus, Al-Saleh, Burford US, and Dundrod cannot be liable for torts committed by Hall while performing work as an employee of Burford UK (even assuming that Hall's conduct was within the course and scope of his work for Al-Saleh or Burford UK, which it was not).[3]

### 5. Hall's Conduct Was Outside the Course and Scope of His Employment, Precluding Vicarious Liability Claims.

HS3's claims against Hall relate to conduct outside of the course and scope of his legitimate work on the Al-Saleh case, defeating any vicarious liability or indemnity claim Hall could possibly assert.  Hall's actions in soliciting, obtaining, and disseminating HS3's sex videos and photographs were criminal[4] and, as even Burford US admitted, lacked any legitimate business or judgment

---

[3] Al-Saleh separately contracted with Hall's former company, Focus Intelligence, Ltd. ("Focus") to conduct investigative services. SMF ¶ 7 (*citing* Def. Ex. 81 at 40-44, 57-59, 64-64, 134-135; Def. Ex. 58 at 1-3). Shortly after, Focus was acquired by Burford UK, who hired Hall as a full-time employee.  SMF ¶ 4 (*citing* Def. Ex. 1C ¶ 21; Def. Ex. 78 at 53-55; Def. Ex. 81 at 16, 26-28, 34-40; Def. Exs. 72A, 72C).  Concurrently, Dundrod stood to benefit from a successful recovery on the Al-Saleh judgment through a separate contract with Al-Saleh as that income would pass up from Dundrod to Burford's parent. SMF ¶ 10 (*citing* Def. Ex. 1C ¶ 17; Def. Ex. 27; Def. Ex. 78 at 152-157).

[4] *See* Fla. Stat. §§ 812.014, .019(1), (2018) (theft, dealing in stolen property); Fla. Stat. § 934.03(1)(c)-(d), (2018) (use and disclosure of illegally intercepted oral communications); § 810.145, Fla. Stat. (2018) (video voyeurism).

enforcement purpose. SMF ¶ 105 (*citing* Def. Ex. 78 at 172:1-5) ("Q.  Would you have authorized Mr. Hall to receive photos and sex videos alone? A. Absolutely not. Q. Why not? A. Because they would have no use to us.").

Further, Hall's claim that he sought, obtained and/or disseminated the HS3 Material for judgment enforcement purposes is not only uncorroborated, but it is also blatantly contradicted by the record.  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (holding that a court should not adopt a party's version of the facts at summary judgment when it is "blatantly contradicted by the record").

First, Plaintiffs' have not and cannot point to any evidence that corroborates Hall's fantastic, and convenient, assertion that his acts were done in furtherance of Al-Saleh's interests. There is not a single corroborating communication, nor any testimony from Al Saleh or anyone else, that even hints at the legitimacy of Hall's conduct.

Next, the undisputed record establishes that Hall had absolutely no legitimate purpose for his illicit pursuit of HS3's sex videos and photographs.  That undisputed record establishes:

1.   Al Saleh had already finalized and executed the Settlement with HS3 and they were actively working together to implement its terms.  SMF at ¶¶ 35-36 (*citing* Def. Exs. 20-26, 28; Def. Ex. 81 at 98:4-10, 241-249, 452-456, 391:4-392:2; Def. Ex. 78 at 169:12-170:8.).

2.   The Settlement contained a forbearance clause. SMF ¶ 20 (*citing* Def. Ex. 2 § 10; Def. Ex. 78 at 168:1-20.  The Settlement also created an obligation of good faith and fair dealing such that neither side was to act adverse to the interests of the other.  *See e.g. Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999) ("'[A] party's good-faith cooperation is an implied condition precedent to performance of a contract; where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing himself of his own wrong doing.'") (citation omitted); *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218, 1225 (S.D. Fla. 2013 ) ("The covenant [of good faith and fair dealing] ensures that neither party will do anything that will injure the right of the other party to receive the benefits of the contract.")  Hall cannot possibly have been acting consistent with these obligations.

3.  Al Saleh and his lawyers were never told of Hall's illicit exchange, either at the time or later.  SMF at ¶¶ 42, 95-98 (*citing* Def. Ex. 78 at 175-178; Def. Ex. 117, ¶ 7).  Hall cannot possibly have been acting on behalf of an unaware Al-Saleh.

4.  Hall's acts to solicit, obtain and disseminate HS3's sex videos and photographs after the Settlement had been finalized and executed could in fact have jeopardized the Settlement and derailed Al-Saleh's interests in resolution.  Indeed, had HS3 been contemporaneously aware of Hall's conduct, he would not have executed the Release, and would have pursued available remedies for breach of the Settlement.  SMF ¶ 129 (*citing* Def. Ex. 83A ¶ 36); *see also* <u>A-13</u>, Def. Ex. 93A ¶12.

5.  Other than Hall's subordinates, no one at Burford US, Burford UK or Dundrod had any knowledge of Hall's conduct except Aviva Will. SMF at ¶¶ 100;  (*citing* Def. Ex. 81 at 227:24-228:20, 468:2-469:12; Def. Ex. 82 at 138-139; Def. Ex. 78 at 171, 207:16-208:9).  Moreover, Will's participation and knowledge had nothing to do with any business on behalf of Al Saleh, Burford US, Burford UK and/or Dundrod. SMF ¶ 122 (*citing* Def. Ex. 30, Def. Ex. 78 at 165:14-166:1, 191-195, 198-202).   Rather, Will received and viewed HS3's sex videos and photographs on her ***personal*** email, and shared jokes with Hall about the material.  *Id.*  (*citing* Def. Ex. 30; Def. Ex. 78 at 198-199).  Such conduct is hardly "official" or in furtherance of any interest of Al-Saleh.  Tellingly, there is not a single communication between Hall and Will relating to the purported interests of Al Saleh or even asset recovery in general.

6.  Hall and Will viewed and joked about HS3's sex videos and photographs at the exact same time they were both engaged in the negotiation of the very Release Plaintiffs' now assert forms the basis for their claims. SMF at ¶ 101 (*citing* Def. Exs. 23, 25, 26, 30, 31, 32; Def. Ex. 78 at 170:22-171:7;[5] Def. Ex. 81 at 452-457).  Indeed, the undisputed record establishes that Al Saleh's counsel delayed approval of the form of the Release until after Hall had obtained the HS3 sex videos and photographs and transmitted them to Will and others. SMF at ¶ 102 (*citing* Def. Ex. 28); <u>A-2</u> Def. Ex. 78 at 170:22-171:7.

7.  Burford US's corporate representative testified that Hall's soliciting, obtaining and disseminating the HS3 sex videos and photographs served no business purpose.  SMF at

---

[5] HS3 was not able to question Hall at his deposition on these documents because Plaintiffs produced them after Hall's deposition.

¶¶ 105-107 (*citing* Def. Ex. 78 at 27, 165, 167, 172:1-5, 193-194, 218-219).  Indeed, that witness confirmed the only possible use of such materials would be unlawful (i.e., for extortion). SMF at ¶ 108 (*citing* Def. Ex. 78 at 218-219).

8.  Hall specifically instructed his subordinate, Bianca Beam, to keep the materials he obtained from his illicit exchange off of NetDocs, Burford UK's official record-keeping platform. SMF at ¶ 123 (*citing* Def. Ex. 82 at 142, 164, 200-202, 222).  There would be no reason for this instruction had Hall's motives truly been asset recovery and legitimate.

9.  Hall placed some of the HS3 sex videos on his personal cell phone, and used same to show others the content. SMF at ¶ 121(*citing* Def. Ex. 78 at 24-28; Def. Ex. 82 at 143-148; Def. Ex. 81 at 114-118, 442).

10. Hall sent HS3's salacious photograph to his college friends. SMF at ¶ 119 (*citing* Def. Ex. 32A; Def. Ex. 81 at 114-118).

11. Dan Sargeant and Annette Perez both testified that Hall specifically requested and wanted the HS3 sex videos and photographs. SMF at ¶ 87 (*citing* Def. Ex. 85 at 45, 63, 71; Def. Ex. 79 at 184, 188-189, 191-192; Def. Ex. 34; Def. Ex. 62 ¶ 153; Def. Ex. 83 at 143-144, 148).  Neither mentioned Hall referencing any asset recovery motive or purpose.

12. Andrew Preston described, under oath, Hall's pursuit of material "of a sensitive and personal nature" about HS3. SMF at ¶ 135 (*citing* Def. Ex. 62 ¶ 153; Def. Ex. 93 at 21-22, 40-42, 45-46).  Preston makes no mention at any time of Hall's asset recovery or business motive or purpose.

13. Any information Hall would have obtained from Dan Sargeant during the exchange other than the sex videos and photographs would either (a) already have been provided by Dan Sargeant's counsel in 2015, or (b) be at the time more than three and one half years old, rendering it of no value for legitimate asset recovery purposes.  SMF at ¶¶ 68, 71, 73 109 (*citing* Def. Ex. 59 Def. Ex. 61 at 2).

14. To obtain the HS3 sex videos and photographs, Hall procured confidential documents from Burford UK client Novoship and traded those documents for the HS3 sex videos.  ¶¶ 76-84 (*citing* Def. Ex. 81 at 217, 238-240, 245-330; Def. Ex. 82 at 67-68, 154-156; Def. Ex. 85 at 45, 51-62; Def. Ex. 62 ¶ 148; Def. Ex. 29; Def. Ex. 101). Hall never informed Novoship of his actions or anyone else at Burford UK save his subordinates.  SMF at ¶ 79 (*citing* Def. Ex. 81 at 320-325; Def. Exs. 33, 36A, 36B; Def. Ex. 82 at 153-156).  Moreover,

Hall's actions in this regard have now exposed Burford UK to potential liability in excess of $75 million.  SMF ¶ 112 (*citing* Def. Ex. 36, ¶¶ 21,23(13); Def. Ex. 36A; Def. Ex. 36B, ¶¶ 17.2-17.3).  Irrespective of the outcome of the Novoship proceedings, at a minimum the Novoship claims establish Hall's actions were not authorized.

15. Hall's unauthorized procurement of the confidential documents of Burford UK client Novoship and the exchange of same for the HS3 sex videos and photographs constituted a breach of his employment contract with Burford UK as such actions (1) were a breach of confidence under English law[6], (2) were a breach of the UK Financial Conduct Authority Principles 1 and 6, (3) were in breach of Burford UK's Data Protection Policy, and (4) were acts that has brought Burford UK into disrepute. *See* SMF ¶ 103-104 (*citing* Def. Ex. 105 at ¶ 15-18).

### 6. Plaintiffs' Material Omission Fraudulently Induced HS3 to Sign the Release.

To the extent the Court concludes that Hall's conduct somehow falls within the scope of the Settlement and Release, HS3's consent to such Release was quite obviously procured by fraud. Indeed, had HS3 been at all aware that Hall was soliciting, obtaining and disseminating HS3's sex videos and photographs after execution of the Settlement, during the cooperative implementation and forbearance period, and while the Release upon which Plaintiffs' now rely was being actively negotiated by Will, he would have never signed the Release. SMF ¶ 129 (*citing* Def. Ex. 83A ¶ 36); *see also A-13*, Def. Ex. 93A at ¶12.

The Settlement provided (*see* Settlement, Def. Ex. 2 at §10) and Burford US represented to HS3 that no further judgment enforcement activities were ongoing at the time the Settlement and Release were being negotiated.  SMF ¶ 128 (*citing* Def. Ex. 78 at 70-73, 167; Def. Ex. 81 at 90-97).  If in fact Hall was actively seeking HS3's sex tapes, photographs and other information as part of his effort to collect on the Al-Saleh judgment, this statement was a fraudulent misrepresentation. *See* SMF ¶¶ 128-129; *A-1* Def. Ex. 81 at 96:23-98:3.  HS3 would never have agreed to release claims against Hall and Burford US if he had known they were engaged in

---

[6] While the Settlement provides for application of Florida law as to all issues and disputes (including as to questions regarding vicarious liability and indemnity), Hall's relationship with his employer, Burford UK, is governed by his contract of employment, which provides for application of English law. SMF ¶ 3 (*citing* Def. Ex. 78 at 222-223; *A-3*, (Def. Ex. 8) at cl. 23).

tortious conduct at the same time they were negotiating the Release with HS3.  SMF ¶ 129 (*citing* Def. Ex. 83A ¶ 36).

Under Florida law, "[t]he validity and effect of a settlement and release are governed by contract law." *Travelers Ins. Co. v. Horton*, 366 So.2d 1204, 1205 (Fla. 3rd DCA 1979) (citation omitted).  Florida law further recognizes fraudulent misrepresentation claims during settlement negotiations.  *See, e.g.*, *Fisher v. Geico Indem. Co.*, No. 12-23851-CIV, 2013 WL 12091096, at *4 (S.D. Fla. July 23, 2013); *Howard v. Crawford & Co.*, 384 So. 2d 1326, 1328 (Fla. Dist. Ct. App. 1980).  Under Florida law, fraudulent misrepresentation has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985)).

If Hall was in fact acting on behalf of Al Saleh (which HS3 disputes), then Al Saleh's statement to HS3, set forth in the Settlement, that he would not engage in any further judgment enforcement activities was a misrepresentation of material fact, satisfying the first element of fraudulent misrepresentation.[7]  (*See* Burford US Dep. at 72:1-5, 167:8-20; Hall Dep. at 92:17-24). Moreover, Aviva Will's concealment of Hall's conduct constituted a material omission.

Burford US, through Aviva Will, had contemporaneous knowledge of Hall's conduct.  *See Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017) ("Under Florida law, knowledge an agent or employee acquires within the scope of her authority generally may be

---

[7] The Plaintiffs also seek an injunction from the Court barring HS3 from bringing claims against them. Injunctive relief, however, sounds in equity and is subject to equitable defenses. Most salient here is the doctrine of "unclean hands," which "requires the litigant to act 'fairly and without fraud or deceit as to the controversy in issue.'" *Jeffrey O. v. City of Boca Raton*, 511 F. Supp. 2d 1339, 1360 (S.D. Fla. 2007) (*quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814 (1945)); *see also Hensel v. Aurilio*, 417 So. 2d 1035, 1038 (Fla. 4th DCA 1982) (holding that a showing of "[u]nscrupulous practices, overreaching, concealment, trickery or other unconscientious conduct are sufficient to bar relief") (*citing* 22 Fla. Jur. 2d Equity § 50)."To prevail, [unclean hands] requires that the defendant demonstrate wrongdoing on the part of the plaintiff and that the defendant suffered injury from the wrongdoing.*" Elof Hansson Paper & Bd., Inc. v. Caldera*, 2012 WL 12865853, at *6 (S.D. Fla. Apr. 26, 2012) (*citing Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993)). Here, Hall's conduct in this matter is indisputably unscrupulous, and as is clear from the other claims in this litigation, HS3 suffered damage as a result. The Plaintiffs are thus not entitled to the aid of the Court's equitable powers, and no injunction should issue.

imputed to her principal or employer.") (citations omitted).  As a result, Burford US knew that Hall was seeking, obtaining and disseminating HS3's confidential information following finalization and execution of the Settlement, in breach of the forbearance clause, and at the exact same time of the negotiation of the terms of the Release.  Thus, if Hall was in fact acting on behalf of Al Saleh (which HS3 disputes), then there was knowledge of the falsity of the representations and omissions.  Note also, Burford US failed to disclose the material facts surrounding Hall's conduct to HS3, of which Aviva Will was aware, even though it actively sought to benefit from the Settlement and from execution of the Release.

As to the third element, it is uncontested that Burford US was named specifically in the Release, and there is no question that Burford US thus wanted HS3 to execute the Release in its favor. This is sufficient to satisfy the "intent to induce" element of a fraud under Florida law.  *See Leasetec Corp. v. Orient Sys., Inc.*, 85 F. Supp. 2d 1310, 1322 (S.D. Fla. 1999) (holding intent element is satisfied where inducing party has offered a contract to the induced party, as all parties to a contract "want[] their deals to close"). Moreover, if Hall was in fact acting on behalf of Al Saleh (which HS3 disputes), Al Saleh certainly wanted to induce HS3's continued cooperation and his execution of the Release.

Fourth, to the extent that HS3's claims against Hall are somehow barred by the Settlement and Release, HS3 has been injured by the fraud, as he cannot otherwise recover for Hall's wrongful conduct.  The loss of these claims is sufficient to show damages under Florida's "flexibility theory" of damages.  *See Totale, Inc. v. Smith*, 877 So. 2d 813, 815 (Fla. Dist. Ct. App. 2004) (noting that, under Florida law, damages in an action for fraudulent representation may be measured either by "the difference between the actual value of the property and its value had the alleged facts regarding it been true" or the "the difference between the purchase price and the real or actual value of the property").

### 7.  Burford US and Hall Are Not Entitled to Seek Their Attorneys' Fees Under The Settlement Agreement

Burford US and Hall have sought attorneys' fees in this matter on the theory that HS3 has resumed litigation, and thus breached the Settlement.  Neither Burford US nor Hall, however, are parties to the Settlement.  As a result, they cannot seek fees under Section 36, which provides that only "the non-breaching Party" can seek fees.  *See* Settlement, ECF No. 1-1 at 24, § 36.  This is a defined term in the Settlement, and it very clearly excludes Burford US, Dundrod and Hall.

Under Section 36 of the Settlement, "the breaching Party agrees that in the event of legal action or other proceeding arising in, under, or in connection with (including but not limited to any alleged breach, default, claim, misrepresentation, or declaratory relief regarding) this Agreement, the non-breaching Party shall be entitled to recover its reasonable Attorneys' Fees and Costs." *Id.*

The term "Party" is further defined in the Settlement in the prefatory clause at the very outset of that document:

> "THIS SETTLEMENT AGREEMENT (the "Agreement"), effective as of October 4, 2016 (the "Effective Date"), is made by and among Mohammad Anwar Farid Al-Saleh ("Al-Saleh"), on the one hand, and Harry Sargeant, III ("Sargeant") and Mustafa Abu-Naba'a ("Abu-Naba'a") (collectively "the SA Parties"), on the other hand, ***who collectively shall be referred to throughout as the "Parties" and each, individually, as "Party."***

(Emphasis added). *Id.* at 2.

With this definition in mind, the only individuals or entities who could be a "breaching Party" or a "non-breaching Party" under Section 36 are Al-Saleh, MAN, or HS3. Thus even if HS3 had breached the Settlement Agreement—which he did not—Section 36 entitles only *Al-Saleh* to seek his attorneys' fees and costs from HS3, not Burford US or Hall.

Florida law fully supports this conclusion. It is axiomatic that a stranger to a contract cannot rely on that contract to recover attorneys' fees. *See, e.g.*, *Bank of New York Mellon v. Mestre*, 159 So.3d 953 (Fla. 5th DCA 2015) (holding that mortgage could not serve as basis for award of attorneys' fees to person who was not party to mortgage); *Novastar Mortg., Inc. v. Strassburger*, 855 So.2d 130, 131 (Fla. 4th DCA 2003) (same); *HFC Collection Ctr., Inc. v. Alexander*, 190 So. 3d 1114, 1117 (Fla. 5th DCA 2016) (holding that cardholder prevailing in suit against debt collection firm could not recover attorneys' fees under the credit card agreement where the debt collector had been adjudicated a stranger to that agreement).

Indeed, this Court has so held in cases arising from settlement agreements. *See, e.g., ADT LLC v. Sec. Networks, LLC*, No. 12-81120-CV, 2018 WL 1795451, at *5 (S.D. Fla. Mar. 6, 2018) (noting that "[u]nder Florida contract law, an adjudicated stranger to a contract may not invoke the contract's fee-shifting provisions" and collecting cases) (citations omitted); *see also Kettel v. Phillips*, No. 14-81310-CIV, 2018 WL 3699340, at *1 (S.D. Fla. May 17, 2018) (recommending denial of a motion by a non-party to reopen a closed case to enforce a settlement agreement) *report and recommendation adopted*, No. 14-81310-CIV, 2018 WL 3699300 (S.D. Fla. June 1, 2018).

Nor are Burford US or Hall entitled to invoke the fee shifting provisions of the Settlement by virtue of their supposed status as "third-party beneficiaries" of the contract. As an initial matter,

they are not named as such anywhere in the Settlement.  But, even if they had been, the failure of Section to 36 to specifically mention their entitlement to fees is fatal under Florida law.  *See Civix Sunrise, GC, L.L.C. v. Sunrise Rd. Maint. Ass'n, Inc.*, 997 So. 2d 433, 435 (Fla. Dist. Ct. App. 2008) (holding that third-party beneficiaries named in a contract could not invoke the contract's attorney fee provision, because they were not mentioned in the attorney fee provision itself). Moreover, the Settlement contained a "No Third Party Beneficiary" clause (Section 22), stating, "Nothing provided in this Agreement is intended, or shall be construed, to confer upon or give any person other than the Parties to this Agreement . . . the Burford Entities, and their respective heirs, personal representatives, legal representatives, successors and assigns, any rights or remedies under or by reason of this Agreement."  SMF ¶ 22 (*citing* Settlement, Def. Ex. 2 at § 22).  Burford UK and Hall are not heirs, personal representatives, legal representatives, successors, or assigns of the "Burford Entities," which are Burford US and Dundrod.

In sum, because Burford US and Hall are strangers to the Settlement, and because third parties may generally not invoke the attorney fee provisions of an agreement, Burford US and Hall have no claim for attorney fees, and thus no cognizable claim for damages .

### B.    Hall Cannot Establish Malicious Prosecution Under Florida Law.

Actions for malicious prosecution are "not generally favored" in Florida.  *Cent. Fla. Machinery Co., Inc. v. Williams*, 424 So.2d 201, 202 (Fla. 2d DCA 1983).  Hall's[8] malicious prosecution claim fails because he cannot satisfy four of the requisite elements: (1) there was no "bona fide termination" of Case 9:17-cv-81070 (the "Original Proceeding") in favor of Hall because HS3's voluntary dismissal of the SAC did not at all suggest Hall's innocence; (2) HS3 had probable cause for asserting all the allegations in the SAC, and probable cause for any one of his claims is sufficient; (3) there is no evidence of malice by HS3; and (4) Hall suffered no damages as a result of the original proceeding. *See Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994) (citations omitted).  The failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution.  *Id.*[9]

---

[8] Plaintiff Burford Capital's claim for malicious prosecution claim was dismissed.  *See* ECF No. 41, R&R at 1, 17-19, 22-23.

[9] Additionally, "'acting on the advice of counsel is a complete defense to an action for malicious prosecution either of civil or criminal actions.' . . . ."  *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1218 (11th Cir. 2010) (applying Florida law) (citations omitted).  However, the Court denied

### 1.  There Was No Bona Fide Termination in Favor of Hall[10]

A complaint that is voluntarily withdrawn can only constitute a "bona fide termination . . . in favor of the present plaintiff" if the dismissal "is of such a nature as to indicate the innocence of the accused."  *Union Oil of Calif. Amsco Div. v. Watson*, 468 So.2d 349, 354 (Fla. Dist. Ct. App. 1985) (citations omitted).[11]  By contrast, "[w]here dismissal is on technical grounds, for procedural reasons, or any other reason not inconsistent with the guilt of the accused, it does not constitute a favorable termination."  *Id.*  It is undisputed that HS3 dismissed the SAC so that he could re-file his remaining claims (which were state claims) in state court, further to the direction of this Court, and he has continued to pursue those claims in state court.  Furthermore, there has not been any "termination" at all, at least with respect to HS3's invasion of privacy claim against Hall, since HS3 maintains that his claim is valid (*see, e.g.*, ECF No. 203, HS3's motion for reconsideration).  Indeed, HS3 intends to appeal this Court's dismissal of his claim with prejudice to the Eleventh Circuit, so it cannot be said that the claim "terminated" in Hall's favor.

The undisputed facts thus show that HS3's voluntary dismissal of the SAC is not a bona fide termination of the original proceeding in favor of Hall.[12]

---

HS3's Expedited Motion to Amend Answer and Add Affirmative Defense, which would have raised advice of counsel as an affirmative defense.  *See* ECF No. 289 at 4.  Still, as HS3 stated in that motion, "[t]here is some authority to support the notion that advice of counsel is not actually an affirmative defense.  *Brown v. Toscano*, 630 F. Supp. 2d 1342, 1349-50 (S.D. Fla. 2008) ('Although courts have frequently referred to 'advice of counsel' as an affirmative defense, they have done so without analysis of whether it is a genuine affirmative defense that must be pled in a defendant's answer.')."  At the June 28, 2019 hearing, this Court specifically withheld ruling on "whether as a matter of law [advice of counsel is] an appropriate defense to negate the elements of the plaintiffs' claims.  I'm assuming that's going to be the subject of a later motion, either dispositive motion or a motion in limine."  ECF No. 284 at 15:5-9.

[10] While the Court denied HS3's motion to dismiss Hall's malicious prosecution claim, *see* ECF No. 41 at 19-22, HS3 can re-argue that the bona fide termination element is not satisfied "upon a more developed record" at summary judgment.  *Pelletier v. Estes Groves, Inc.*, No. 16-14499-CIV, 2018 WL 4208328, at *9 (S.D. Fla. Mar. 28, 2018).

[11] In *Union Oil*, the court found no termination in favor of the malicious prosecution plaintiff where the prior plaintiff voluntarily dismissed its action against the sole shareholder of a company to proceed against the company, concluding that the dismissal was not inconsistent with wrongdoing on the shareholder's part.  *Id.* at 355.

[12] Evidence acquired by HS3 after he filed the SAC that supports his invasion of privacy claim also defeats Hall's malicious prosecution claim.  "The tort of malicious prosecution is premised on the right of an individual to be protected from **unjustifiable** litigation or unwarranted criminal

The bona fide termination inquiry focuses on the merits of the original proceeding, and terminations based solely on technical or procedural factors—such as claims being barred by a release—are insufficient.  *See Jones v. State Farm Mut. Auto. Ins. Co.*, 578 So. 2d 783, 786 (Fla. 1st DCA 1991) (holding that trial court's dismissal of personal injury case based on release of claims under a release, but not the "underlying merits" of the negligence allegations, "does not amount to a favorable termination on the merits sufficient to support a malicious prosecution action").  Thus, Hall's allegation that HS3's claims against Hall in the SAC "were released claims," *see* Compl. ECF No. 1, ¶ 61, is insufficient to support the bona fide termination element as a matter of law.  Moreover, the effect of a Rule 41(a)(1) dismissal is that it is as if the federal action had never been brought.  *Bechuck v. Home Depot U.S.A., Inc.,* 814 F.3d 287, 293 (5th Cir. 2016) ("[T]he effect of a Rule 41(a)(1) dismissal is to put the plaintiff in a legal position as if he had never brought the first suit.") (citations omitted).[13]  HS3's voluntary dismissal of the SAC is therefore precisely the sort of dismissal on technical or procedural grounds that is unrelated to the merits.

In his Report and Recommendation (R&R) on HS3's motion to dismiss in this action (ECF No. 41), Judge Reinhart noted that he found in the R&R in the original proceeding (Case 9:17-cv-81070, ECF No. 191) "that the SAC did not plead sufficient facts to create a plausible claim that Hall was liable for any of the claims against him," and that HS3 voluntarily dismissed the SAC rather than re-allege all claims (including under the CFAA) against Hall.  ECF No. 41 at 20.  Judge Reinhart also noted that the "State Court Action does not re-allege that Hall participated in the CFAA conspiracy."  *Id.*  On these facts, viewed in a light most favorable to Hall, Judge Reinhart

---

prosecution."  *Burns v. GCC Beverages, Inc.*, 502 So.2d 1217, 1219 (S.D. Fla. 1986) (emphasis added).  "Guilt-in-fact" is a "complete bar to an action for malicious prosecution even if the plaintiff proves his or her prima facie case, including damages."  *Ware*, 971 F. Supp. at 1474.  Thus, "evidence that tends to show the plaintiff's actual guilt, including evidence acquired after a bona fide termination of the original proceeding," is admissible to defend against a malicious prosecution claim.  *Id.*  Therefore, Hall's "guilt in fact" to the allegations and claims in the SAC, established by the evidence HS3 has obtained in discovery, forecloses Hall's malicious prosecution claim.  (*See, e.g.*, SMF ¶¶ 67-100; 118-122.).  Here, the record is replete with evidence that what HS3 alleged in the SAC in fact happened.  (*See, e.g.*, SMF ¶¶ 67-130.)

[13] A Rule 41 dismissal also does not render the defendant in the original proceeding a "prevailing party" eligible for attorney's fees under fee-shifting statutes.  *See First Time Videos, LLC v. Oppold,* 559 F. App'x 931, 932 (11th Cir. 2014).

concluded that "the voluntary dismissal should be treated as a bona fide termination on the merits" and raises a "plausible inference" that HS3 dismissed the SAC "because there were not sufficient facts to support the causes of action against Hall, especially the CFAA claim." *Id.*

However, Hall has no evidence to dispute that HS3 voluntarily dismissed the SAC, on the advice of his counsel, in order to avoid spending resources on objecting to the R&R, and to ensure that any doubt over whether HS3 could state a claim under federal law would not jeopardize his state law claims. SMF ¶¶ 148-149 (*citing* Def. Ex. 93 at 10-15)    HS3 wanted to move his case along in the most efficient manner to get to a resolution and get the HS3 Material back. *Id.*    HS3's attorneys advised HS3 that his federal court lawsuit against Hall and the other defendants would be delayed due to disputes over not factual matters, but the legal interpretation of the relevant federal statutes, and that filing a lawsuit alleging only Florida law claims in state court would likely lead to a quicker resolution. SMF ¶ 148-150; *see Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004) (per curiam). (The Eleventh Circuit "encourage[s] district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.'"). While HS3 is not familiar with the legal reasoning behind this strategy, after consulting with his attorneys he proceeded to file a state court lawsuit, which contained state law claims that HS3 previously asserted in the SAC. SMF ¶¶ 133, 143 (*citing* Def. Ex. 83 at 49; Def. Ex. 93 at 172-173). Indeed, counsel for HS3 has been transparent about this throughout this litigation and in the Original Proceeding.[14] While Hall might speculate that HS3's voluntary, dismissal of the SAC was somehow related to Hall's "innocence" under the CFAA or otherwise, Hall has no evidence to support this assertion. Moreover, as discussed below, HS3 in fact had probable cause for bringing the CFAA claim against Hall, so his voluntary dismissal of the SAC was unrelated to the

---

[14] *See* Case 9:17-cv-81070, ECF No. 213 at 20:15-18 ("Your Honor, it seemed abundantly clear that you told us, in Mr. Coleman's words, take your marbles and leave. You may have a claim in state court, but I don't think you're going to find one here under these two statutes [CFAA and the Stored Communications Act]); *id.* at 23:1-6 ("Mr. Sargeant is just trying to get redress. And so if we were only going to amend and file state law claims, we did not see any point in coming here only to have them do what I know they would do, which is cite the Eleventh Circuit case that we all agreed on, saying that, well, there's no supplemental jurisdiction under the circumstances" [if the federal law claims were dismissed]); *see also* Case No. 18-cv-80748, ECF No. 40 at 7:13-8:1 ("we took the direction of the Court . . . revealed to us in your written report and recommendation, to discuss that with our client, that there was no point in utilizing this Court's energies to go through [and file an objection]. . . . We dismissed to avoid wasting the Court['s] and client['s] resources.").

merits of the CFAA and other claims in the SAC.  Hall has not disputed that HS3 voluntarily dismissed the SAC in order to litigate in state court, but instead spins that decision as forum shopping.  *See, e.g.*, Compl. ECF No. 1 at ¶ 4 (dismissal "appears to be a procedural gambit to shop for a more favorable forum"); Critchlow Report ¶ 11 ("Plaintiffs suspected that HS3's voluntary dismissal was an attempt to shop for a more favorable forum.").  Accordingly, HS3's voluntary dismissal of the SAC does not establish a bona fide termination of the Original Proceeding in Hall's favor.

Indeed at most, there was only a "partial termination" in favor of Hall, which is insufficient to establish malicious prosecution since the ***entire lawsuit*** must have terminated in favor of Hall. Thus, even if this Court finds that HS3's voluntary dismissal of the SAC was a favorable termination on the merits with respect to one or more claims—such as the CFAA claim—the dismissal still does not constitute a bona fide termination of the Original Proceeding in favor of Hall because HS3 re-alleged civil conspiracy against Hall in his state court complaint within three weeks of the dismissal.  SMF ¶¶ 148-151. Specifically, HS3 alleged in his complaint in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida that Hall and other defendants participated in a conspiracy to invade HS3's privacy and violate CADRA (SMF ¶ 151 (*citing* Def. Ex. 123 ¶ 96)), just like in the SAC (¶ 107).  This is inconsistent with a bona fide termination in favor of Hall on the conspiracy claims.  Accordingly, Hall is unable to establish a termination of the entire Original Proceeding in his favor, and his malicious prosecution claim fails. *See May v. Fundament*, 444 So. 2d 1171, 1171-72 (Fla. 4th DCA 1984) ("[I]f a multi-counted complaint contains one count that has not been filed maliciously, then a malicious prosecution action cannot lie against that complaint . . . Had there been two separate causes of action brought out of materially different factual origins, it perhaps would be a different ball game."); *Kossler v. Crisanti*, 564 F.3d 181, 188 (3d Cir. 2009) ("Therefore, the favorable termination of some but not all individual charges does not necessarily establish the favorable termination of the criminal proceeding as a whole.").

## 2.  HS3 Had Probable Cause for the Claims and Allegations in the SAC

The "standard for establishing probable cause in a civil action is extremely low and easily satisfied." *Gill v. Kostroff,* 82 F. Supp. 2d 1354, 1364 (M.D. Fla. 2000).[15]  Lack of probable cause

---

[15] "What facts and circumstances amount to probable cause is a pure question of law."  *Melford v. Kahane and Assocs.*, 371 F. Supp. 3d 1116, 1125 (S.D. Fla. 2019) (quoting *City of Pensacola v.*

is akin to a ***frivolous*** lawsuit.  In *Central Florida Machine Company, Inc. v. Williams*, 424 So. 2d 201 (Fla. 2d DCA 1983), the court indicated that the same standard as that adopted to test frivolous lawsuits and the award of attorneys' fees pursuant to Fla. Stat. § 57.105 should govern whether suits are filed without probable cause in the context of malicious prosecution claims.  "What facts and circumstances amount to probable cause is a pure question of law."  *Melford v. Kahane and Assocs.*, 371 F. Supp. 3d 1116, 1125 (S.D. Fla. 2019) (quoting *City of Pensacola v. Owens*, 369 So. 2d 328, 330 (Fla. 1979)).  "Probable cause in the context of a civil suit is measured by a lesser standard than in a criminal suit."  *Wright*, 446 So. 2d at 1166.  A lack of probable cause is not met where there is a close question of law.  *Id.* (quoting W. Prosser, *Law of Torts* § 120, at 854-855 (4th ed. 1971)).The record herein establishes HS3's claims and allegations in the SAC plainly were not frivolous.  *See, e.g.*, SMF ¶¶ 131-147.  During the proceedings over the SAC, Plaintiffs never alleged that HS3's allegations were frivolous.  *See* Transcript of May 21, 2018 Hearing, Case 9:17-cv-81070, ECF No. 190.  Moreover, Judge Reinhart stated at the hearing that he would provide HS3 an opportunity to amend the SAC, stating "It's my general rule that unless there is a significant legal impediment, I will give you a shot to try to plead that, yes. . . . I am inclined to recommend that Judge Rosenberg give leave to amend because I think that's only fair."  *Id.* at 93:25-94:6.  Judge Reinhart did not observe any "significant legal impediment" in the SAC, and stated that he we would allow HS3 to amend his specific claims against Hall.  *Id.* at 94:14-15 ("I will certainly give you leave to amend if you want to try.").  Thus, in the R&R on the SAC, Judge Reinhart recommended dismissal without prejudice (*see* Case 9:17-cv-81070, ECF No. 191), which is inconsistent with the claims in the SAC being frivolous or lacking probable cause.

"Probable cause, particularly in a civil suit, is not a high bar to meet."  *Mee Indus.,* 608 F.3d at 1218; *see also id.* ("In most circumstances, we would continue to expect malicious prosecution plaintiffs to have a difficult time establishing lack of probable cause.").  HS3 satisfies the "extremely low" probable cause standard for two reasons: (1) he had probable cause for at least one of his claims against Hall (even if this Court found that one or more lacked probable cause); and (2) he had sufficient grounds to allege all of his claims in the SAC against Hall in any event.

---

*Owens*, 369 So. 2d 328, 330 (Fla. 1979)).  "Probable cause in the context of a civil suit is measured by a lesser standard than in a criminal suit."  *Wright*, 446 So. 2d at 1166.  A lack of probable cause is not met where there is a close question of law.  *Id.* (quoting W. Prosser, *Law of Torts* § 120, at 854-855 (4th ed. 1971)).

**a. *Probable Cause for Any Claims in the Original Proceeding Is Sufficient to Defeat a Malicious Prosecution Claim.***

First, the probable cause standard focuses on whether ***any*** of the claims in the Original Proceeding were made in good faith, not whether there is probable cause for all claims. Malicious prosecution claims fail where there is probable cause to assert at least one claim in a lawsuit. *See, e.g.*, *Endacott v. Int'l Hospitality, Inc.*, 910 So. 2d 915, 923 (Fla. 3d DCA 2005) ("However, there can be no claim for malicious prosecution where at least part of the counterclaim for breach of fiduciary duty was asserted with probable cause.").[16] In other words, it is sufficient that HS3 had probable cause for ***any*** of his counts, such as conspiracy to invade privacy, against Hall, even if he lacked probable cause to assert CFAA and CADRA claims (which HS3 denies).

**b. *HS3 Had Probable Cause for the SAC's Claims and Allegations Because He Had a Reasonable Belief They Were Valid at the Time.***

Second, HS3 easily satisfies the probable cause standard based on the undisputed facts regarding what he (and his attorneys) knew about Hall's conduct at the time they filed the SAC. "To establish probable cause, it is not necessary to show that the instigator of a lawsuit was certain of the outcome of the proceeding, but rather that he had a ***reasonable belief***, based on facts and circumstances known to him, in the validity of the claim." *Wright*, 446 So. 2d at 1166 (citations omitted) (emphasis added). "[I]n instigating an action against the plaintiff, the defendants need only show that they had a reasonable belief that the claim was valid based on the facts and circumstances known to them. . . . The defendants need not be certain of the outcome of the underlying proceeding to have probable cause for bringing the counterclaim." *Endacott*, 910 So. 2d at 922 (internal citations omitted); *see also Cohen v. Amerifirst Bank*, 537 So. 2d 1108, 1110 (Fla. 3d DCA 1989) ("To have probable cause to commence or continue an action does not mean that the plaintiff will, or must, ultimately prevail, but only that his commencement or continuance is of an arguably valid cause of action."). Thus, the fact that this Court ultimately recommended dismissing HS3's claims in the SAC and later dismissed HS3's counterclaim against Hall has no

---

[16] *See also Joseph H. Held & Assocs., Inc. v. Wolff*, 39 S.W.3d 59, 63 (Mo. Ct. App. 2001) ("To make a submissible case for malicious prosecution, the plaintiff must prove lack of probable cause for the *entire* proceeding.") (emphasis in the original) (citation omitted); *Moity v. Bodin*, 489 So. 2d 474, 475-76 (La. Ct. App. 1986) (rejecting malicious prosecution claim over lack of probable cause for allegations regarding validity of contract because the argument "does not deal with the remainder of the allegations in that litigation upon which there was substantial evidence").

bearing on the probable cause analysis.  Instead, HS3 must show only that he had a reasonable basis for alleging his claims against Hall under the SAC based on the facts known to him at the time.

The undisputed facts in this case show that HS3 had a reasonable belief and non-frivolous grounds for alleging his CFAA, CADRA conspiracy, and conspiracy to invade privacy claims against Hall in the SAC.  HS3's sources for the allegations in the SAC included the following: (1) Andrew Preston's affidavit dated February 24, 2017 and attachments; (2) HS3's conversations with and documents provided by Patrick Mooney (SMF ¶ 136);(3) HS3's conversation with Fahad Al Tamimi and Wilmer Ruperti in fall 2017(SMF ¶ 138); (4) documents produced by LAIL (Bates Nos. HS3_0013187 through HS3_0013263) (SMF ¶ 139); and (5) documents produced by Maroil and Sea Pioneer.[17] *See* SMF ¶¶ 144; *see also, e.g.*, HS3 Dep. at 200-237.  These numerous sources were sufficient for HS3 to form a reasonable belief that his allegations and claims in the SAC against Hall were valid, and he therefore had probable cause to assert them in the SAC. *See e.g.* SMF ¶¶ 147-148; (*citing* Def. Ex. 108 at 6-10 ("In the instant matter, a review of the materials, including the Patrick Mooney Affidavit and the Mooney and HS3 Deposition transcripts, makes it clear that HS3 and his counsel conducted a thorough investigation, gathered evidence and continued to investigate the matter after suit was filed…. HS3 himself also conducted a substantial factual investigation prior to the filing of the Second Amended Complaint, which substantiated the basis for his claims.")).

### i.   CFAA Conspiracy

HS3 had factual and legal support for his CFAA conspiracy claim against Hall in the SAC, which justified his reasonable belief that the claim was valid.  In the SAC, HS3 alleged that Hall unlawfully conspired to violate the CFAA.  SAC ¶¶ 53-62.  As set forth in the expert report of Shawn Tuma SMF ¶ 150 (*citing* Def. Ex. 107 at 38-39), HS3's CFAA and CADRA claims against

---

[17] Plaintiffs contend that the metadata indicates that the documents in the LAIL production were originally copied on August 28, 2013, however, this metadata does not exclude later access, as Plaintiffs' own forensic expert acknowledged, McGowan Dep. at 52:22-53:6*; see e.g. SMF ¶147-148* (*citing* Def. Ex. 108 at 9-10); Def. Ex. 93 at 103 ("we also know that [metadata] means nothing, unless you do a forensic [examination] –even your expert testified to that.  It's irrelevant . . . unless you perform a forensic examination of the server to actually determine, you know, who accessed it, when they accessed it); Def. Ex. 83 A .

Hall had a reasonable basis in law and fact, which was not frivolous, even though Judge Reinhart ultimately concluded that the SAC failed to state a claim against Hall.

Four elements are required to establish a CFAA claim: (1) a defendant intentionally accessed a protected computer, (2) without authorization or exceeding authorized access, and the defendant, (3) thereby obtained information, and (4) the plaintiff thereby suffered damage or loss of at least $5,000.00. *Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307, 1313 (S.D. Fla. 2018) (citing 18 U.S.C. § 1030(g)).

First, Hall does not dispute that the Sargeant Server is a protected computer. Additionally, the HS3 Email Account itself constitutes a protected computer, like online email accounts which are considered to be owned by the user of the account. *See, e.g.*, *Mahoney v. DeNuzzio*, No. 13-11501, 2014 WL 347624, at *5 (D. Mass. Jan. 29, 2014) (allegation that Yahoo! and Facebook are protected computers stated a CFAA claim). Moreover, the USB Drive, which contained the HS3 Email Account (Hall Dep. at 221:7-22), also constitutes a protected computer. *See BHL Boresight, Inc. v. Geo-Steering Sols., Inc.*, No. 4:15-CV-00627, 2016 WL 8648927, at *14 (S.D. Tex. Mar. 29, 2016) ("by alleging the bitlocks are USB devices . . . the Court can infer they provide data storage functions, potentially bringing them within the ambit of the definition of a computer" under the CFAA), *modified on reconsideration*, 2017 WL 1177966 (S.D. Tex. Mar. 29, 2017). HS3 had a reasonable belief that Hall obtained the HS3 Material from the HS3 Email Account when he filed the SAC. (SMF ¶ 148.)

Second, "access" to the protected computer occurred, notwithstanding Judge Reinhart's conclusion that HS3 lacked any "rights" in the Sargeant Server, because Hall induced Daniel Sargeant to access the HS3 Email Account. SMF ¶¶ 82, 84 (*citing* Def. Ex. 29.) Further, it is undisputed that HS3 was a co-owner of the Sargeant Family Businesses. SMF ¶ 46 (*citing* Def. Ex. 83A ¶ 3). There is ample authority to support the proposition that one "owner" does not have unfettered authority to access to an email account where the co-owner uses the account like it is his own and restricts access to others, such as by keeping it password protected as HS3 did (SMF ¶ 56 (*citing* Def. Ex. 83A ¶ 16; Def. Ex. 92 at 69-70)), at least where no policies allow the owner such access. *See, e.g* SMF ¶¶ 49, 52 (*citing* Def. Ex. 83A at ¶¶ 8, 12-13; Def. Ex. 84 at 80; Def. Ex. 85 at 371-372; Def. Ex. 83 at 77-78, 254-255; Def. Ex. 92 at 23, 38, 49, 69-70); *Global Policy*

*Partners, LLC v. Yessin*, 686 F. Supp. 2d 631 (E.D. Va. 2009).[18]  HS3 had a reasonable belief that Hall induced Daniel Sargeant to access the HS3 Email Account when he filed the SAC. SMF ¶¶ 135-140, 144-145 (*citing* Def. Ex. 83 at 220, 224-226; Def. Ex. 37 ¶¶ 13, 15; Def. Ex. 37A at 28-35, 36-41; Def. Ex. 93 at 15-31, 24-28, 58-78, 161-174).

Third, Hall does not dispute that he "obtained information" from the HS3 Email Account. (*See, e.g.*, SMF ¶¶ 88, 90, 92 (*citing* Def. Ex. 77; Def. Ex. 81 at 83-94, 101-110, 200-202; 219-221, 395-396).  HS3 had a reasonable belief that Hall obtained information from the HS3 Email Account when he filed the SAC.  SMF ¶¶ 147, 150 (*citing* Def. Ex. 108 at 9-10; Def. Ex. 107 at 10, 38-39).

Fourth, HS3's allegations regarding hiring a forensic computer analyst are sufficient to satisfy the loss element under the CFAA.  *See St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047 (M.D. Fla. 2018).  The CFAA makes it a criminal offense for anyone who "conspires to commit or attempts to commit an offense" in violation of the statute.  18 U.S.C. § 1030(b).  Therefore, HS3 was justified in alleging the underlying CFAA violation as well as Hall's participation in a conspiracy to violate the CFAA.  When he filed the SAC, HS3 had a reasonable belief that he incurred a sufficient loss under CFAA, by hiring a forensic computer analyst as well as attorneys to perform investigative and response work.  SMF ¶ 141 (*citing* Def. Ex. 93 at 93-94; ECF No. 141-5, at ¶¶ 12-14; Def. Ex. 87 at 87-96); *see also NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1065-66 (S.D. Iowa 2009).

### ii.        *Conspiracy to Violate CADRA*

HS3's allegation that Hall participated in a conspiracy to violate CADRA (SAC ¶¶ 106-118), has factual and legal support justifying HS3's reasonable belief that the claim was valid.  As discussed in Shawn Tuma's expert report (SMF ¶ 150 (*citing* Def. Ex. 107 at 10), CADRA is intended to have a broader application than the CFAA.  *See id.* (emphasizing that "CADRA be liberally construed to protect owners, operators, and lessees of a protected computer from harm or losses caused by the unauthorized access to the protected computer").  Under CADRA, a person is liable to the owner, operator, or lessee of a protected computer (or information stored in the protected computer used in connection with the operation of a business) if they: (1) knowingly and with the intent to cause harm or loss; (2) obtain information from a protected computer without

---

[18] SMF ¶ 49.

authorization; and (3) as a result, cause harm or loss.  Fla. Stat. § 668.803.  For the reasons set forth above, Hall's participation in a conspiracy to violate the CFAA also amounts a conspiracy to violate CADRA, and HS3 was therefore justified in alleging his conspiracy claim in the SAC.  *See* SMF ¶ 150 (*citing* Def. Ex. 107 at 10, 38-39).  HS3 therefore had a reasonable belief that Hall conspired to violate CADRA by knowingly obtaining the HS3 Material from the HS3 Email Account without authorization, causing harm to HS3.  (*See id.*)

### iii.    Conspiracy to Invade Privacy

HS3 had ample factual and legal support to justify his reasonable belief that his conspiracy to invade privacy claim against Hall was valid when he filed the SAC.[19]  In short, with respect to the underlying invasion of privacy, the evidence available to HS3 before he filed the SAC[20] showed that Hall unlawfully traded Burford UK client Novoship's confidential information for HS3's sex videos and photographs ***after*** the Settlement was finalized and executed.  SMF ¶ 72; Def. Ex. 29; Def. Ex. 81 at 84-101.  Hall was the catalyst and a procuring cause for this exchange, and for the viewing, retention and dissemination of HS3's sex videos and photographs.  SMF ¶ 82; Def. Ex. 29.

To state a claim for invasion of privacy by intrusion under Florida law, a plaintiff "must show that the defendant [1] physically or electronically intruded [2] into his private quarters or affairs and [3] that this intrusion would be highly offensive to a reasonable person."  *Stirling Int'l Realty, Inc. v. Soderstrom,* No. 14-1109, 2015 WL 403318, at *6 (M.D. Fla. Jan. 28, 2015).  Florida law recognizes torts for invasion of privacy, including "intrusion—physically or ***electronically*** intruding into one's private quarters."  *Allstate Ins. Co. v. Ginsberg,* 863 So. 2d 156, 162 (Fla. 2003) (emphasis added).  Florida law plainly recognizes individuals' right to privacy in emails and

---

[19] For the reasons explained in detail in HS3's memorandum in response to Hall's motion to dismiss HS3's amended counterclaim (ECF No. 91), motion for reconsideration (ECF No. 203) and reply in support of HS3's motion for reconsideration (ECF No. 231), HS3's conspiracy to invade privacy claim against Hall was not only made in good faith with probable cause, but the claim is also valid.

[20] Note again, evidence acquired by HS3 after he filed the SAC that supports his invasion of privacy claim also defeats Hall's malicious prosecution claim.  *Burns v. GCC Beverages, Inc.*, 502 So.2d 1217, 1219 (S.D. Fla. 1986); *Ware*, 971 F. Supp. at 1474 ( "evidence acquired after a bona fide termination of the original proceeding," is admissible to defend against a malicious prosecution claim).  Here such evidence supports fully all of the factual assertions HS3 made in the SAC.

other electronic materials. *See, e.g., Ward v. Casual Rest. Concepts Inc.,* No. 10-2640, 2011 WL 2600511, at *4 (M.D. Fla. June 29, 2011) (defendant took phone and "searched through its contents" sufficient to plead invasion of privacy based on electronic "intrusion"). Indeed, the Florida legislature has recognized that sexually explicit images and videos carry a reasonable expectation of privacy, which further reflects the indisputable and reasonable expectation of privacy that individuals have in such materials. *See* Fla. Stat. § 784.049(1)(a)("A person depicted in a sexually explicit image taken with the person's consent has a reasonable expectation that the image will remain private."). HS3 therefore had sufficient factual and legal support for his underlying invasion of privacy claim—premised on the intrusion into the HS3 Email Account, access of private and sensitive materials including photographs and sex videos, all in a highly offensive manner—based on the information and documents available to him when he filed the SAC. *See, e.g.*, SMF ¶¶ 135-141.

To state a claim for civil conspiracy, a plaintiff needs to allege: "[1] an agreement between two or more parties, [2] to do an unlawful act or to do a lawful act by unlawful means, [3] the doing of some overt act in pursuance of the conspiracy, and [4] damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong,* 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997). There was abundant evidence available to HS3 when he filed the SAC indicating that Hall and Daniel Sargeant entered into an agreement to engage in unlawful acts, that Hall knew his agreements with Daniel Sargeant were unlawful, and that Hall committed overt acts in furtherance of the conspiracy—including trading the Ruperti Material for the HS3 Material—which damaged HS3. *See, e.g.*, SMF ¶¶ 135-141. Accordingly, HS3 had a reasonable belief that Hall conspired to invade his privacy, in violation of Florida law, when he filed the SAC.

In short, it cannot be disputed that HS3 had information and documents through multiple sources available to him prior to February 20, 2018, which demonstrate that he had probable cause for asserting his claims in the SAC against Hall. (*See, e.g.*, SMF ¶¶ 135-140, 145).[21]    HS3's

---

[21] For example, the factual basis for HS3's allegation that "[o]n or about October 28, 2016, DSargeant and LAIL provided the HS3 Material to Hall in exchange for the remainder of the Ruperti Material," (SMF ¶ 147; Def. Ex. 5¶ 37), includes the following: First, Preston's affidavit, which provides that Daniel Sargeant was given the Ruperti Material on "6 and 28 October 2016" and that after Hall repeatedly asked for "personal material relating to" HS3, Daniel Sargeant "made arrangements to provide that material to" Hall, and that such material was "of a sensitive personal nature." *See* SMF ¶87; Def. Ex. 62 at¶ 154. Second, HS3's conversations with Patrick Mooney, who confirmed that Daniel Sargeant had access to the HS3 Email Account on the Sargeant Server

counsel conducted a thorough investigation into the facts and circumstances giving rise to the allegations in the SAC, as well as thorough legal research into the claims asserted against Hall in the SAC.  SMF ¶¶ 136, 144-145 (*citing* Def. Ex. 83 at 220, 224-226; Def. Ex. 37 ¶¶ 13, 15; Def. Ex. 37A at 28-35, 36-41; Def. Ex. 93 at 15-31, 24-28, 58-78, 161-174).  Accordingly, by any measure, HS3 and his attorneys had probable cause for the claims and allegations against Hall in the SAC, and Hall's malicious prosecution claim fails.

### 3.   There is No Evidence of Malice by HS3

The fifth element, malice, is intertwined with the probable cause element.  *See Durkin v. Davis*, 814 So.2d 1246, 1248-49 (Fla. 2d DCA 2002) (noting that malice "may be inferred from, among other things, a lack of probable cause, gross negligence, or great indifference to persons, property, or the rights of others.").  Malice by the defendant may be one of two kinds: (1) actual or subjective malice, sometimes called "malice in fact"; or (2) "legal malice," which "may be inferred from circumstances, such as the want of probable cause, even though actual malice or corrupt design is not shown."  *Morgan Int'l Realty, Inc. v. Dade Underwriters Ins. Agency, Inc.*, 617 So. 2d 455 (Fla. 3d DCA 1993); *see also Alterra Healthcare Corp. v. Campbell*, 78 So. 3d 595 (Fla. 2d DCA 2011).

Hall alleges "actual malice" based on the Al-Saleh judgment and HS3's purported "anger" over the Wall Street Journal article.  Compl. [ECF No. 1 at ¶ 62].  Hall alleges legal malice premised on his Settlement and Release arguments.  *Id.* ¶ 63.  Because HS3 had probable cause for his claims against Hall in the SAC, Hall cannot show "legal malice" in making those claims for the reasons set forth above.  Hall's legal malice argument based on the Settlement and Release fails because HS3 did not breach any contract by initiating a lawsuit against Hall, particularly since there was no covenant not to sue, as explained above.

With respect to "actual malice" or "malice in fact," there is no evidence that HS3 filed his lawsuit out of malice toward Hall, and HS3 denies any such allegation.  SMF ¶ 153 (*citing* Def.

---

and had told Hall of his ability to access the account and its contents. SMF ¶ 141, 144-145. Third, discovery produced by LAIL confirmed that LAIL had provided sensitive salacious material to Hall. SMF ¶ 147.  Additionally, HS3 discussed with Fahad Al Tamimi and Wilmer Ruperti with counsel in New York in the fall of 2017 regarding the fact that Daniel Sargeant had access to the HS3 Email Account and that salacious material from that account was traded to Daniel Hall. SMF ¶¶ 141, 146. This and other support for HS3's allegations in the SAC are detailed in the SMF. *See e.g.* SMF ¶¶ 141-154.

Ex. 83A ¶ 49; Def. Ex. 83 at 274.)  Contrary to Hall's allegations about the Al-Saleh judgment, HS3 repeatedly testified during his deposition that he has no animosity toward Al-Saleh over the judgment against him and was eager to reach a settlement with him rather than continue with protracted litigation.  *See, e.g.*, *id.*  Also, HS3 denies that he initiated legal action against Hall because of the Wall Street Journal article.  SMF ¶ 154 (*citing* Def. Ex. 83A ¶ 52).  Hall has no other evidence of "actual malice" by HS3.  Accordingly, there is no evidence of malice, and HS3 is entitled to summary judgment on Hall's malicious prosecution claim.

### 4. There is No Evidence that Would Allow a Reasonable Factfinder to Conclude that Hall Has Suffered Damages.

Hall cannot establish that he suffered damages as a result of the Original Proceeding.  In malicious prosecution actions, "the plaintiff may recover all damages that are the natural and probable consequences of the action complained of."  *Ware v. United States*, 971 F. Supp. 1442, 1470-71 (M.D. Fla. 1997) (quoting Florida Jur. 2d, False Imprisonment § 39 (1995)).  However, "[t]he damages must be certain and proximate and not uncertain, contingent or speculative."  *Id.* at 1471.  But, there are no damages where the plaintiff does not pay for an attorney.  *See id.* (plaintiff who was appointed an attorney to defend against federal drug charges did not have out-of-pocket expenses for attorney's fees).  Because Hall has not incurred any fees—all of which have been voluntarily incurred by Burford US—he cannot establish a malicious prosecution claim against HS3.

In the Complaint, Hall alleges that he "suffered damages as a result of HS3's unlawful conduct, including but not limited to attorneys' fees and costs, in an amount to be determined," but this is not specific to Hall.  Compl. ¶ 65.[22]  Plaintiffs have confirmed in discovery that Burford US has covered all of Hall's legal expenses, and they have not produced any agreement or other evidence suggesting that Burford US was obligated to indemnify Hall.  *See* SMF ¶ 156 (citing Def. Ex. 104 ¶¶ 7, 32-35; Def. Ex. 106 ¶¶ 30-37).[23]  This is true for both the Original Proceeding as well as this case.  (*Id.*)

---

[22] Hall does not allege suffering harm to his reputation on account of HS3 filing the SAC.  This is noteworthy because "[i]n Florida, the gravamen of an action for malicious prosecution is injury to character."  *Ware*, 971 F. Supp. at 1472 (citing *Cate v. Oldham*, 450 So. 2d 224, 227 (Fla. 1984)).

[23] HS3 had no reason to believe that Burford would need to indemnify Hall given that it is apparent that Hall acted outside of the scope of his employment in accessing and trading for sexually explicit images and videos of HS3, when there was no business reason for him to obtain such material in

While there are certain exceptions to the general rule that plaintiffs are not permitted to recover for losses that they have not personally sustained, no such exception applies here. For example, Florida's collateral source rule "simply is not applicable if the plaintiff has incurred no expense, obligation, or liability in obtaining the services for which he seeks compensation. . . . In that scenario, permitting a plaintiff to recover expenses she is not obligated to pay provides an undeserved and unnecessary windfall to the plaintiff." *Pollo Operations, Inc. v. Tripp*, 906 So. 2d 1101, 1104 (Fla. 3d DCA 2005) (internal citations and quotation marks omitted); *see also Packaging Corp. of Am. v. DeRycke*, 49 So. 3d 286, 294 (Fla. 2d DCA 2010) (reversing award for attorney's fees and costs where the plaintiff was already compensated for alleged losses, and emphasizing that "[t]o allow double recovery would be a windfall" for the plaintiff). Accordingly, it is undisputed that Hall has suffered no damages—having paid no attorneys' fees or costs related to the SAC or this action—and HS3 is entitled to summary judgment as to damages.

In sum, because Hall cannot establish four of the six elements—bona fide termination of the Original Proceeding in his favor, an absence of probable cause for the SAC allegations, malice by HS3, and damages to Hall—his malicious prosecution claim under Florida law fails and HS3 is entitled to summary judgment.

## V.  CONCLUSION

On the basis of the forgoing, HS3 respectfully requests that this Court grant the motion for summary judgment and dismiss all of Plaintiffs' remaining claims and causes of action with prejudice.

## VI.   REQUEST FOR HEARING

HS3, by and through his undersigned counsel and pursuant to Local Rule 7.1(b)(2), respectfully requests that oral argument be held on the Motion for Summary Judgment. HS3 respectfully submits that given the legal issues raised in this Motion, and the importance of this Motion to the determination of this case, the Court's decision-making process would be significantly aided by oral argument. HS3 estimates that two hours will be necessary for argument.

---

connection with judgment enforcement efforts. (*See* Burford Dep. at 72:1-5, 167:8-20; Hall Dep. at 92:17-24; *see also* Beam Dep. at 146:22-147:21.) HS3 confirmed during his deposition that he did not believe Burford was involved in the dispute given that Hall was a rogue actor. (HS3 Dep. at 274:4-12.) HS3 also did not know who was funding Al-Saleh's litigation; for all he knew, it could have been some "rich Jordanian businessman." (HS3 Dep. at 43:22-44:11.)

Dated:  August 19, 2019

Respectfully submitted,

Ryon M. McCabe
Fla. Bar No. 9075
rmccabe@mccaberabin.com
Adam T. Rabin
Fla. Bar No. 985635
arabin@mccaberabin.com
Lauren E. Johnson
Fla. Bar No. 112027
ljohnson@mccaberabin.com
**MCCABE RABIN, P.A.**
1601 Forum Pl Ste. 201
West Palm Beach, FL 33401-8102
Office: 561-659-7878

*/s/  Melissa B. Coffey*

Christopher M. Kise
Fla. Bar No. 855545
Melissa B. Coffey
Fla. Bar No. 84090
Kathryn T. Williams
Fla. Bar. No. 112191
Joshua M. Hawkes
Fla. Bar No. 112539
**FOLEY & LARDNER LLP**
106 East College Avenue, Suite 900
Tallahassee, FL 32301-7732
Tel: (850) 222-6100
Fax: (850) 561-6475
Email: ckise@foley.com
Email: mcoffey@foley.com
Email: jhawkes@foley.com

Gregory W. Coleman
Florida Bar No. 846831
gcoleman@lawclc.com
**CRITTON, LUTTIER & COLEMAN, LLP**
303 Banyan Blvd., Suite 400
West Palm Beach, FL 33401
Telephone: (561) 842-2820
Facsimile: (561) 844-6929
*Counsel for Defendant Harry Sargeant, III*

31

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, I served the foregoing document electronically via the CM/ECF system on all parties identified on the attached Service List.

By: */s/ Joshua M. Hawkes*
Joshua M. Hawkes

## SERVICE LIST

Derek T. Ho
dho@kellogghansen.com
Andrew E. Goldsmith
agoldsmith@kellogghansen.com
Jan E. Messerschmidt
jmesserschmidt@kellogghansen.com
Christine A. Bonomo
cbonomo@kellogghansen.com
Minsuk Han
mhan@kellogghansen.com
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK: P.L.L.C**
1615 M Street, N.W., Suite 400
Washington, DC 20036

Samuel A. Danon
sdanon@HuntonAK.com
mplantada@huntonak.com
Armando Cordoves, Jr
acordoves@huntonak.com,
avaldes@huntonak.com
**HUNTON ANDREWS KURTH LLP**
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2510
Facsimile: (305) 810-2460
*Attorneys for Plaintiffs*

4811-0905-9230.25