**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 18-cv-80748-ALTMAN/Reinhart**

DANIEL HALL,
BURFORD CAPITAL LLC, and
DUNDROD INVESTMENTS LTD.,

      Plaintiffs,

      v.

HARRY SARGEANT, III,

      Defendant.
_____/

**DEFENDANT HARRY SARGEANT III'S**
**<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Defendant, Harry Sargeant, III, ("HS3"), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56, and Local Rule 56.1, respectfully submits the following Statement of Undisputed Material Facts in support of his Motion for Summary Judgment:

## General Background

1.      HS3 is a citizen and resident of Palm Beach County, Florida, United States of America.  Complaint ("Compl."), ECF No. 1, ¶ 11.

2.      Daniel Hall ("Hall") is a citizen and resident of the United Kingdom ("UK"), and trained as a UK solicitor.  Compl. ¶ 8; *A-1*,[1] (Def. Ex. 81) at 9-25.

3.      Hall is an employee of Burford Capital (UK), Ltd. ("Burford UK") pursuant to a contract of employment dated January 1, 2015.  *A-2*, (Def. Ex. 78) at 18-20; 220-233, 247-256; *A-1*, (Def. Ex. 81) at 34-36; *A-3*, (Def. Ex. 8).  Hall's relationship with Burford UK is governed by his employment contract, which provides that English law applies.  *A-2*, (Def. Ex. 78) at 222-223; *A-3*, (Def. Ex. 8) at cl. 23.

4.      Hall is formerly an owner and/or director of Focus Intelligence, Ltd. ("Focus"), a firm acquired by Burford UK in or about January 2015.  Compl. ¶ 21; *A-2*, (Def. Ex. 78) at 53-55; *A-1*, (Def. Ex. 81) at 16, 26-28, 34-40; *A-4*, (Def. Ex. 72A), *A-5*, (Def. Ex. 72C).

5.      Burford UK is an entity separate from Plaintiff Burford Capital, LLC ("Burford US").  *A-2*, (Def. Ex. 78) at 33-39, 44-46, 51-52, 122-125; *A-6–A-9*, (Def. Exs. 56, 56A, 56B, 56C) (various organization charts).  While Burford UK and Burford US share a common parent, they are otherwise wholly distinct legal entities.  *Id.*

6.      Dundrod is a special purpose entity created solely to invest in the Mohammad Al-Saleh ("Al-Saleh") litigation claim against HS3 and others.  *A-2*, (Def. Ex. 78) at 37-38, 49.

7.      Al-Saleh retained Focus on September 25, 2014, before the purchase by Burford UK, to investigate assets of HS3 and the other judgment debtors of Al-Saleh.  *A-1*, (Def. Ex. 81) at 40-44, 57-59, 64-65, 133-138; *A-10*, (Def. Ex. 58) at 1-3.

## Settlement and Release

8.      HS3, Mustafa Abu-Naba'a ("MAN"), and Al-Saleh were partners in an oil-trading venture through Department of Defense ("DOD") contracts obtained by Florida-registered,

---

[1] "*A-##*" corresponds to the ECF attachment number hereto, while "Def. Ex. ##" is the exhibit number used in connection with documents and deposition testimony.

International Oil Trading Company, LLC ("IOTC").  Compl. ¶ 16; *A-11*, (Def. Ex. 2).

9.      In 2008, Al-Saleh sued HS3, MAN, and IOTC in the Florida Circuit Court in and for Palm Beach County.  Al-Saleh alleged that HS3 unlawfully diverted profits from IOTC contracts with the DOD away from Al-Saleh.  Compl. ¶ 16; *A-11*, (Def. Ex. 2).

10.     In October 2010, Dundrod entered into an agreement with Al-Saleh to provide litigation funding to assist Al-Saleh in his litigation against HS3.  Compl. ¶ 17; *A-2*, (Def. Ex. 78) at 152-157.

11.     On July 27, 2011, a Florida state court jury ruled in favor of Al-Saleh (the "Judgments").  Compl. ¶ 18; *A-11*, (Def. Ex. 2).

12.     In September 2016, Al-Saleh, HS3, MAN and IOTC discussed settlement of the Judgments and other disputes between those parties, which ultimately resulted in a settlement. *A-13*, (Def. Ex. 93A) ¶ 3.

13.     On October 4, 2016, HS3 and Al-Saleh entered into a comprehensive, written settlement agreement to settle their outstanding litigation (the "Settlement").  *A-11*, (Def. Ex. 2).

14.     HS3 and MAN's attorneys worked on their behalf in negotiating and drafting the Settlement and Release to resolve their dispute with Al-Saleh.  *A-13*, (Def. Ex. 93A) ¶ 3; *A-14*, (Def. Ex. 83) at 35.

15.     On Al-Saleh's behalf, Greg Grossman was the principal negotiator and drafter of the settlement terms.  *A-2*, (Def. Ex. 78) at 61-69; *A-15*, (Def. Ex. 118) ¶ 3.

16.     The only parties to the Settlement were HS3, MAN, and Al-Saleh.  "THIS SETTLEMENT AGREEMENT (the "Agreement"), effective as of October 4, 2016 (the "Effective Date"), is made by and among Mohammad Anwar Farid Al-Saleh ("Al-Saleh"), on the one hand, and Harry Sargeant, III ("Sargeant") and Mustafa Abu-Naba'a ("Abu-Naba'a") (collectively "the SA Parties"), on the other hand, who collectively shall be referred to throughout as the "Parties" and each, individually, as "Party.")  *A-11*, (Def. Ex. 2) at 1. Burford US was not a party to the Settlement. Dundrod was not a party to the Settlement.  Hall was not a party to the Settlement.

17.     Burford US, Dundrod, and Hall were not actively involved in the negotiation and drafting of the Settlement; all final decisions as to the text of the Settlement were made by the parties, HS3, MAN, and Al-Saleh, with their respective counsel.  *A-2*, (Def. Ex. 78) at 63-66.

18.     Also as part of the Settlement, HS3 was required to execute and deliver a release to Al-Saleh as part of the Settlement (the "Release"), and the terms of the Release were to be

negotiated within 10 days of the Settlement was finalized and executed.  *A-11*, (Def. Ex. 2) §2. HS3 executed a release of claims against Al-Saleh, Burford US, and Dundrod, with an effective date of October 28, 2016.  *A-16*, (Def. Ex. 4).

19.     The Settlement specified a large initial payment of $20,000,000.00 and then payments over time, with a final payment in June 2017.  *A-11*, (Def. Ex. 2) §§ 4.1, 4.2.  The total payment agreed under the Settlement was $33,000,000.00.  *A-11*, (Def. Ex. 2) § 4.

20.     The Settlement included a forbearance clause while payments were being made that required the Al-Saleh to refrain from taking any action to collect on the Judgments being settled in the Settlement.  *A-11*, (Def. Ex. 2) at § 10.

21.     To recover attorney's fees under the Settlement, the claimant is required to be a non-breaching "Party" as defined in the Settlement, and "Party" is defined only as HS3, MAN, and Al-Saleh.  *A-11*, (Def. Ex. 2) at intro, § 36.

22.     The Settlement contained a "No Third Party Beneficiary" clause that stated "Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person other than the Parties to this Agreement, the SA Release Parties, Deborah Sargeant individually, Sargeant TBE, IOTC USA, [Burford US and Dundrod], and their respective heirs, personal representatives, legal representatives, successors and assigns, any rights or remedies under or by reason of this Agreement."  *A-11*, (Def. Ex. 2) § 22.  Neither Hall nor Burford UK are listed as third-party beneficiaries.  *Id*.

23.     Florida law applies in construing the Settlement and "any and all claims, defenses, disputes, or controversies arising out of or related to" the Settlement or the relationship of the parties to the Settlement.  *A-11*, (Def. Ex. 2) § 34.

24.     The Settlement contained a merger clause that "supersedes all prior agreements, understandings, negotiations and discussions, both written and oral, among the Parties hereto with respect to the subject matter of" the Settlement.  *A-11*, (Def. Ex. 2) § 27.

25.     Immediately following execution of the Settlement, HS3 MAN, and Al-Saleh and their respective attorneys began cooperating to implement the terms of the Settlement, such as to secure the $20,000,000.00 initial payment and completion of the numerous ancillary documents required by the Settlement.  *A-12*, (Def. Ex. 83A) ¶ 30; *A-13*, (Def. Ex. 93A) ¶ 3.

26.     The Settlement set forth criteria that would qualify as breach of the Settlement by HS3 or MAN, and defined those criteria as "Actionable Events."  *A-11*, (Def. Ex. 2) at § 13.  The

Settlement set forth the occurrence of any one or more of the following as an Actionable Event:

(a) Any representation or warranty made by the SA Parties or any of the SA Release Parties in this Agreement or any of the Settlement Documents, other than in connection with Section 9.2, proves to be incorrect in any material respect; or

(b) Any of the SA Parties or any of the SA Release Parties defaults in the performance of this Agreement, other than Section 9.2, or the provision of any of the Settlement Documents; or

(c) Any payment due under this Agreement or any of the Settlement Documents, whether the Initial Payment or any Periodic Payment, is not paid when due;

(d) Other than IOTC USA, any of the SA Parties or any non-natural entities who are SA Release Parties commences a voluntary case under the United States Bankruptcy Code, or petitions or files for relief under any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts including an assignment for the benefit of creditors;

(e) Notwithstanding the above, the SA Parties may cure any late payment by adding to the amount of the payment 10% per annum simple interest for each day the payment is late, provided the SA Parties make the payment no later than the tenth (10th) day after the due date. If any late payment is made in accordance with this cure provision, then no Actionable Event has occurred.

*A-11*, (Def. Ex. 2) § 13.

27.  Suing on released claims or a breach of the Release was not listed as an Actionable Event. *A-11*, (Def. Ex. 2) § 13.

28.  The following language was removed by Al-Saleh's counsel from the definition of Actionable Event: "Any of the SA Parties defaults in the performance of this Agreement or the provision of any of the Settlement Documents or any of the SA Release Parties defaults in the performance of the releases signed subject to Section 16 below." *Compare A-18*, (Def. Ex. 10 § 12 *with A-18* (Def. Ex. 11) § 12; *A-2*, (Def. Ex. 78) at 92-101.  This language was removed to eliminate any continuing or executory obligations under the Settlement following full performance by HS3 and MAN.  *A-12*, (Def. Ex. 83A) ¶ 28; *A-13*, (Def. Ex. 93A) ¶ 4.

29.  There was no further discussion or communication regarding this language, and it never reappeared in any future Settlement draft or in the final, executed Settlement. *A-2*, (Def. Ex. 78) at 92-112; *A-11*, *A-17–A-26*, (Def. Exs. 2, 9-18).

30.  If an Actionable Event was triggered, the Settlement provided four specific remedies:  (1) HS3 and MAN would remain liable for the full amount of the Judgments plus costs; the forbearance period would terminate; Al-Saleh could exercise "all of his rights and remedies" on the security provided under the Settlement (various mortgages and stock pledges); and Al-Saleh

could exercise all of his rights on various stipulations and consent judgments drafted for litigations then pending in Texas, Bahamas, Delaware, and the UK. *A-11*, (Def. Ex. 2) § 14. The remedies specified in Settlement paragraph 14 applied only upon the occurrence of an Actionable Event during the pendency of the Settlement. *A-11*, (Def. Ex. 2) § 14.

31.     If HS3 and MAN fully performed their obligations under the Settlement and no Actionable Event occurred during the pendency of the Settlement, all pending litigation would be dismissed, satisfactions of judgment would be recorded in the various recording offices where Judgments had initially been recorded, and all security provided under the Settlement would be released by Al-Saleh. *A-11*, (Def. Ex. 2) §§ 15-16.

32.     An amendment to the Settlement ("Amendment") was executed between Al-Saleh, MAN, and HS3 on January 9, 2017. *A-27*, (Def. Ex. 3). In the Amendment, Al-Saleh expressly acknowledges that provided that HS3 fully performed his obligations pursuant to the Settlement and that no Actionable Event occurred: "**Section 5.   Full Performance Pursuant to the Settlement Agreement.** Except as provided below regarding the DR Property, Al-Saleh agrees that upon receipt of the Remaining Settlement Amount the SA Parties will have fully performed their obligations pursuant to the Settlement Agreement and no Actionable Event will have occurred." *A-27*, (Def. Ex. 3) § 5.

33.     As of January 10, 2017, HS3 and MAN fully performed their obligations under the Settlement and Release, including full payment of the settlement. *A-1*, (Def. Ex. 81) at 97-101; *A-12*, (Def. Ex. 83A) ¶ 32; *A-14*, (Def. Ex. 83) at 32-33, 245.

34.     The Judgments at issue in the Settlement have been recorded as satisfied. *A-13*, (Def. Ex. 93A) ¶ 8; *A-28*, (Def. Ex. 69) (composite exhibit of 14 separate satisfactions of judgment filed in varying jurisdictions). The litigations pending at the time of the Settlement have all been dismissed with prejudice. *A-13*, (Def. Ex. 93A) ¶ 9; *A-29*, (Def. Ex. 70) (composite exhibit of eight dismissal stipulations/orders of then-pending litigation). Al-Saleh released the security that he held while awaiting payment under the Settlement. *A-13*, (Def. Ex. 93A) ¶ 10.

35.     The Release was negotiated from October 5, 2016 to October 21, 2016. *A-30–A-36*, (Def. Exs. 20–26). HS3's edits to the Release were completed by October 10, 2016. *A-31*, (Def. Ex. 21), *A-37*, (Def. Ex. 28).

36.     Hall was aware and informed about the negotiations of the Release. *A-1*, (Def. Ex. 81) at 241-249, 452-469; *A-33*, (Def. Ex. 23), *A-36*, (Def. Ex. 26). However, Hall was at that same

5

time actively seeking, obtaining, and disseminating the HS3 Material.  *See infra*, ¶¶ 72–102.

37.     The Settlement did not contain an express covenant not to sue.  *A-11*, (Def. Ex. 2).

38.     There is no express covenant or promise not to sue on released claims in the Release. *A-16*, (Def. Ex. 4).

39.     HS3 did not release any claims against Hall or Burford UK.  *A-16*, (Def. Ex. 4).

40.     The Complaint alleges that the Release containing a promise not to sue was a "critical" component of the Settlement.  Compl. ¶ 23.  However, there is no admissible evidence that a covenant not to sue was critical, key provision, or central provision to the Settlement.  There is no evidence that it was even discussed or even a request from any of the Parties to the Settlement. Al-Saleh and his attorneys are not offering any evidence as to Al-Saleh's intent in the Settlement or Release, citing privilege. *A-15*, (Def. Ex. 118) ¶¶ 8-9.

41.     Hall did not request from permission from Al-Saleh or his counsel and Al-Saleh and his counsel were never notified or made aware of Hall's actions in exchanging the HS3 Material.  *A-2*, (Def. Ex. 78) at 175-178; *A-38*, (Def. Ex. 117) ¶ 7; *A-15*, (Def. Ex. 118) ¶ 13.

42.     Neither Burford UK nor Burford US were aware that Hall was attempting to acquire the HS3 Material.  *A-2*, (Def. Ex. 78) at 171-174; *A-1*, (Def. Ex. 81) at 463-469.

43.     Neither Burford UK nor Burford US were aware that Hall was planning on giving, and later gave, the Ruperti Material to Daniel Sargeant ("Dan S.").  *A-2*, (Def. Ex. 78) at 201-218; *A-1*, (Def. Ex. 81) at 266-267.

44.     [Intentionally omitted.]

45.     Several months prior to the negotiation of this Settlement, Al-Saleh and his attorneys received and reviewed the Trigeant Settlement Agreement as part of their collection efforts against HS3, and that Trigeant Settlement Agreement contains an express covenant not to sue.  Def. Ex. 7; *A-15*, (Def. Ex. 118) ¶ 10.  Still, no attempt was made by Al-Saleh or his attorneys to include a covenant not to sue in the Settlement or Release.

### Sargeant Family Businesses and HS3 Email Account

46.     From approximately 1990 through 2012, HS3 owned and was involved with his brothers Dan S. and James Sargeant and their father Harry Sargeant, Jr. ("Senior") (collectively the "Sargeant Family") in a number of family business entities engaged in the sale, transport, and distribution of asphalt and related petroleum products (the "Sargeant Family Businesses"), including Sargeant Marine, Inc. ("Sargeant Marine").  *A-12*, (Def. Ex. 83A) ¶ 3.

47.     The Sargeant Family Businesses were separate companies, each incorporated and legally distinct from Sargeant Marine. *A-12*, (Def. Ex. 83A) ¶ 5. HS3 was treated as co-owner for all of the Sargeant Family Businesses, and ran a large portion of the business interests. *A-39*, (Def. Ex. 80) at 34-35; *A-14*, (Def. Ex. 83) at 57-58, 65-67, 71.

48.     Sargeant Marine owned a computer server (the "Sargeant Server") located at 3020 North Military Trail, #100, Boca Raton, Florida, which contained the HS3 Email Account (where HS3 kept the HS3 Material, defined below, in addition to his other confidential business and personal information). *A-40*, (Def. Ex. 92) at 54; *A-12*, (Def. Ex. 83A) ¶ 4.

49.     The Sargeant Family Businesses were informally family-run businesses, and did not have formal or informal policies or procedures associated with access to or use of the Sargeant Server or email accounts on the Sargeant Server. *A-41*, Def. Ex. 84 at 80 ("this isn't Exxon, this company. This is Sargeant Marine, a little family business owned by me and my wife."); *A-42*, Def. Ex. 85 at 372 ("We're just a mom-and-pop business. We're not Exxon."); *A-14*, (Def. Ex. 83) at 77-78 ("at Sargeant . . . we're not Exxon, . . . it was a very entrepreneurial type business"); *A-43*, HS4 Decl. ¶ 10; *A-44*, Rahman Decl. ¶¶ 10-11.

50.     HS3 owned and used an email account on the Sargeant Server, with the following email address: hsargeantjr@sargeant.net (the "HS3 Email Account"). *A-12*, (Def. Ex. 83A) ¶ 6; *A-14*, (Def. Ex. 83) at 254-255.

51.     HS3 owned and controlled access to the HS3 Email Account, and only he could authorize another person to access the account.   *A-12*, (Def. Ex. 83A) ¶ 7.

52.     The HS3 Email Account was treated as HS3's personal property the entire time he was associated with the Sargeant Family Businesses. *A-12*, (Def. Ex. 83A) ¶ 8; *A-14*, (Def. Ex. 83) at 254-255; *A-42*, (Def. Ex. 85) at 371 ("I couldn't really enforce that policy on Harry"); *A-40*, (Def. Ex. 92) at 23, 38, 49 (HS3 treated as Rivas' boss), at 69-70 ("Q. Are there policies that limit access to those, to the E-Mail accounts on the E-Mail server? A. Limit access to the user only.").

53.     HS3 never authorized anyone to access the HS3 Email Account without HS3's permission before HS3's ouster. *A-12*, (Def. Ex. 83A) ¶ 11.

54.     HS3 did not authorize Dan S. to, and Dan S. did not access, the HS3 Email Account without HS3's permission while HS3 was at the Sargeant Family Businesses. *A-12*, (Def. Ex. 83A) ¶ 11; *A-42*, (Def. Ex. 85) at 291-292.

55.     James Sargeant also did not access the HS3 Email Account without HS3's

permission while HS3 was at the Sargeant Family Businesses. *A-39*, (Def. Ex. 80) at 39.

56.     The HS3 Email Account was password protected, and there were no policies (official or unofficial, written or unwritten) authorizing anyone aside from the owner (HS3) to access the account, besides the system administrator, who could only access it on a limited basis for the purpose of performing maintenance, repairs, or software patches. *A-12*, (Def. Ex. 83A) ¶¶ 16-17; *A-40*, (Def. Ex. 92) at 69-70.

57.     HS3 used the HS3 Email Account for his work-related emails for the Sargeant Family Businesses, for his personal emails, and for his separate business endeavors from the Sargeant Family Businesses. *A-12*, (Def. Ex. 83A) ¶ 9; *A-42*, (Def. Ex. 85) at 371.

58.     In addition to employees of the Sargeant Family Businesses using the Sargeant Server for their individual email accounts, many family members and friends used the Sargeant Server for sargeant.net email accounts including Dan S.'s wife, Dan S.'s children, HS3's wife, and HS3's two children, one of whom was a minor. *A-14*, (Def. Ex. 83) at 162-163, 172-173.

59.     The HS3 Email Account contained HS3's private and confidential business and personal information, including certain personal communications, documents, Microsoft Outlook email files, and photographs and videos (the "HS3 Material"). The personal information contained within the HS3 Material included extremely sensitive videos and photographs of intimate activity and private, consensual relations involving HS3 and others. *A-12*, (Def. Ex. 83A) ¶ 26.

60.     The business information contained within the HS3 Material included details and communications regarding HS3's private business ventures, unrelated to the Sargeant Family Businesses. This business information included links to prototype operations of a new steam generator system that one of HS3's businesses was developing, trade articles, and updates on global business operations from employees of HS3's various separate businesses. *A-14*, (Def. Ex. 83) at 122.

61.     In or about February 2013, after litigation ensued, the Sargeant Family unlawfully ousted HS3 from the Sargeant Family Businesses premises. *A-12*, (Def. Ex. 83A) ¶ 19.

62.     After HS3 was ousted from the Sargeant Family Businesses, HS3 asked Daniel Rivas ("Rivas") about access to the HS3 Email Account. Rivas told HS3: (a) that the HS3 Email Account had been disconnected; (b) that all the associated information and data in the HS3 Email Account had been "cut off from the root;" and (c) that no information or data from the HS3 Email Account could or would be provided. *A-12*, (Def. Ex. 83A) ¶ 21; *A-14*, (Def. Ex. 83) at 162-164;

*A-40*, (Def. Ex. 91).

63.    HS3 trusted Rivas as an IT professional and as a friend.  *A-12*, (Def. Ex. 83A) ¶ 18; *A-40*, (Def. Ex. 92) at 38, 49.

64.    Senior also told HS3 that the HS3 Email Account was destroyed at or about the time of HS3's ouster.  *A-12*, (Def. Ex. 83A) ¶ 22; *A-14*, (Def. Ex. 83) at 170.

65.    HS3 relied upon these representations and concluded reasonably that the HS3 Email Account, including the HS3 Material and other information and material within the HS3 Email Account, had been destroyed.  *A-12*, (Def. Ex. 83A) ¶ 23.

66.    These representations were false, and HS3 later learned that the HS3 Email Account had not been destroyed and the HS3 Email Account had been accessed and the HS3 Material had been copied and disseminated.  *A-12*, (Def. Ex. 83A) ¶ 24; *see*, *infra*, ¶¶ 110-111.

### Exchange of the HS3 Material

67.    In January 2015, Hall met with Dan S., who advised Hall of the following: (a) Dan S. possessed certain compromising information concerning HS3; (b) the compromising information he had concerning HS3 was obtained from the HS3 Email Account; (c) HS3 was unaware that Dan S. had access to this information; (d) HS3 had been told the HS3 Email Account had been deleted; and (e) Dan S. had the ability to access the HS3 Email Account even though he did not have HS3's permission.  *A-46*, (Def. Ex. 37) ¶ 13; *A-47*, (Def. Ex. 37A) at 28-35; *A-48*, (Def. Ex. 59) at 5; *A-49*, (Def. Ex. 62) ¶ 151; *A-1*, (Def. Ex. 81) at 150-203.

68.    Hall also discussed during this meeting HS3 and the dispute between HS3 and other members of the Sargeant Family.  *A-1*, (Def. Ex. 81) at 150-161.  The existence of pictures and sex videos depicting HS3 was also discussed at the meeting.  *Id.* at 167-174.

69.    After this meeting, Dan S. provided material from the HS3 Email Account through his attorney Charles Lichtman ("Lichtman").  *A-46*, (Def. Ex. 37) ¶ 15; *A-50*, (Def. Ex. 61).

70.    Hall confirmed that he received this first "batch" of emails from the HS3 Email Account from Lichtman in January 2015, and that it did not contain private photographs or sex videos of HS3.  *A-1*, (Def. Ex. 81) at 200-201.

71.    Lichtman specifically noted he was providing to Hall "all emails of any nature . . . relevant to anything Harry was doing in business" and that this first batch does not include HS3's "purely personal and frankly inappropriate emails, pictures, and videos. As I mentioned before, while it is tempting to provide you that material, I see no upside for you, me or my clients in doing

so." *A-50*, (Def. Ex. 61) at 2.

72.     In October 2016, after the Al-Saleh Settlement was finalized and executed, Hall again requested information from HS3's Email Account.  *A-51*, (Def. Ex. 29); *A-1*, (Def. Ex. 81) at 84-101.  Hall bypassed Al-Saleh's and Dan S.'s lawyers and requested this information directly from Dan S.  *A-51*, (Def. Ex. 29); *A-38*, (Def. Ex. 117) ¶7; *A-15*, (Def. Ex. 118) ¶ 13; *A-1*, (Def. Ex. 81) at 163-166, 207-212.

73.     In October 2016, the information contained in the HS3 Email Account was more than three-and-a-half years' old, and more than 20 months after Lichtman provided "all emails of any nature . . . relevant to anything Harry was doing in business."  *A-50*, (Def. Ex. 61) at 2.

74.     Annette Perez and Dan S. confirmed that Hall knew that the HS3 Email Account contained explicit videos and photographs depicting HS3.  *See infra*, ¶¶ 87-84.

75.     At the time Hall made this request, Dan S. was pursuing claims against Wilmer Ruperti ("Ruperti") and Ruperti's companies on behalf of Latin American Investments, Ltd. ("LAIL").  *A-49*, (Def. Ex. 62).

76.     Hall possessed confidential documents related to the finances of Ruperti, one of LAIL's joint venture partners, as part of judgment enforcement efforts on behalf of Novoship (UK) Limited ("Novoship"), one of his clients that was also acquired by Burford UK.  *A-1*, (Def. Ex. 81) 137-153, 217, 238-240, 245-330; *A-52*, (Def. Ex. 82) at 156; *A-42*, (Def. Ex. 85) at 45, 51-52; *A-53*, (Def. Ex. 72); *A-54*, (Def Ex. 72B).  Some of the Ruperti Materials were attached to Andrew Preston's ("Preston") affidavit.  *A-49*, (Def. Ex. 62) ¶ 122.

77.     Dan S. wanted the Ruperti Material from Hall, because it would aid Dan S. and LAIL in pursuing claims against Ruperti.  *A-52*, (Def. Ex. 82) at 67-68, 154-156; *A-42*, (Def. Ex. 85) at 52-62; *A-1*, (Def. Ex. 81) at 161-163; *A-49*, (Def. Ex. 62) ¶ 148.

78.     The Ruperti Material was subject to various confidentiality restrictions. *A-55*, (Def. Ex. 33); *A-56*, (Ex. 36A); *A-57*, (Ex. 36B).

79.     Hall did not inform or seek permission from anybody at Novoship that he was going to give Ruperti Material to Dan S.  Hall ignored any duties to his client Novoship, and accessed and traded the Ruperti Material to Dan S. in exchange for the HS3 Material.  *A-1*, (Def. Ex. 81) at 315-327; *A-55*, (Def. Ex. 33); *A-56*, (Ex. 36A); *A-57*, (Ex. 36B); *A-52*, (Def. Ex. 82) at 153-156.

80.     Hall and Burford UK's defense in the UK Novoship litigation is that the Ruperti Material is in the public record (*A-58*, (Def. Ex. 36C)), but Hall admitted that he did not check if

it was in the public record when he disclosed it to Dan S.  *A-1*, (Def. Ex. 81) at 274-287.

81.     Hall did not seek permission from or notify any of his superiors at Burford UK to offer or provide the Ruperti Material to Dan S.  *A-1*, (Def. Ex. 81) at 226-229, 265-267.

82.     In text messages between Hall and Dan S. beginning in August 2016 and continuing into October 2016, Dan S. repeatedly asked for the Ruperti Material, while Hall requested a "usb stick"—a flash drive which contained the HS3 Material (the "USB Drive")—that Dan S. arranged to provide Hall.  *A-51*, (Def. Ex. 29).

83.     On August 17, 2016, Hall requested that his analyst pull the "Wilmer stuff" (*i.e.* the Ruperti Material) for "Dan S," because Hall was "keen to chase him today if poss."  *A-59*, (Def. Ex. 101).

84.     On August 19, 2016, Hall texts Dan S. proposing the exchange of the Ruperti Material for the HS3 Material: "I've some Wilmer Stuff for you. And I'd love the other stuff we discussed."  *A-51*, (Def. Ex. 29).

85.     Hall and Dan S. then set up a meeting, with Hall stating "I'd like a usb stick from your good self as well."  *A-51*, (Def. Ex. 29).

86.     The information obtained from the HS3 Email Account that Hall received in January 2015 did not include HS3's private photographs or sex videos.  *A-50*, (Def. Ex. 61) at 2. However, the USB Drive Hall requested and obtained in October 2016 included HS3's private photographs or sex videos.  *A-52*, (Def. Ex. 82) at 141-143, 153; *A-42*, (Def. Ex. 85) at 45, 63, 71; *A-1*, (Def. Ex. 81) at 83-94, 101-110, 200-202; 219-221.

87.     Hall specifically and only wanted the HS3 sex videos and photographs.  *A-42*, (Def. Ex. 85) at 45, 63, 71; *A-60*, (Def. Ex. 79) at 188-189; *A-61*, (Def. Ex. 34) (Dan S. "was prepared to live with the consequences of [Hall] using that information in the public domain."); *A-49*, (Def. Ex. 62) ¶153 ("Mr Hall maintained his request for copies of the personal material relating to Mr Harry Sargeant III." Dan S. "made arrangements to provide that material to Mr Hall which, [Dan S.] informs me, is of a sensitive personal nature"); *A-52*, (Def. Ex. 82) at 153; *A-60*, (Def. Ex. 79) at 184, 191-192.

88.     Hall received a "USB stick" that contained "salacious photographs" and videos of HS3 from HS3's "historic e-mail server," and he viewed and transmitted/disseminated, by electronic and other means, those photographs and sex videos.  *A-1*, (Def. Ex. 81) at 83-94, 101-110, 200-202; 219-221, 409-426; *A-48*, (Def. Ex. 59); *A-62*, (Def. Ex. 30); *A-63*, (Def. Ex. 31); *A-*

*64*, (Def. Ex. 32); *A-65*, (Def. Ex. 32A); *A-66*, (Def. Ex. 32B); *A-67*, (Def. Ex. 100); *A-52*, (Def. Ex. 82) at 143-144, 148.

89.     Dan S. instructed Perez to give Hall the USB Drive.  *A-42*, (Def. Ex. 85) at 46.  Hall admitted receiving the USB Drive from Annette Perez ("Perez"), who worked for Dan S. (and other Sargeant family members at the time). *A-1*, (Def. Ex. 81) at 85-87.

90.     Hall knew from his communications with Dan S. and Perez that the USB Drive would contain HS3's private photographs and sex videos before he obtained it.  *A-68*, (Def. Ex. 77); *A-1*, (Def. Ex. 81) 395-409.  Prior to delivery of the USB Drive, Perez told Hall, "Made a copy for you to keep. It's pretty nasty. Lol," to which Hall replies, "Thanks. I literally can't wait to see it." *A-68*, (Def. Ex. 77).

91.     Hall met Perez at a restaurant in Miami on October 14, 2016, and Perez gave the USB Drive to Hall.  *A-68*, (Def. Ex. 77); *A-1*, (Def. Ex. 81) at 86-90; 101-103, 391-409.

92.     Hall requested and obtained the HS3 Material after the Settlement was finalized and executed and during the forbearance period. *A-51*, Def. Ex. 29), *A-68*, (Def. Ex. 77); *A-1*, (Def. Ex. 81) at 88-90, 395-396.

93.     James Sargeant was not involved in obtaining the HS3 Material from the HS3 Email Account/Sargeant Server and providing it to Hall.  *A-60*, (Def. Ex. 79) at 155-156.

94.     In October 2016, Perez received the USB Drive containing the HS3 Email Account, including the HS3 Material, from Daniel Rivas.  *A-60*, (Def. Ex. 79) at 124, 128, 202.  At that time, Perez and Rivas watched the sex videos before she provided the USB Drive to Hall.  *A-60*, (Def. Ex. 79) at 185-188.

95.     Al-Saleh had no knowledge of Hall requesting or obtaining the HS3 Material.  *A-38*, (Def. Ex. 117) ¶ 7; *A-15*, (Def. Ex. 118) ¶ 13; *A-2*, (Def. Ex. 78) at 176-177.

96.     Al-Saleh's lawyers had no knowledge of Hall obtaining or disseminating the HS3 Material.  *A-38*, (Def. Ex. 117) ¶ 7; *A-15*, (Def. Ex. 118) ¶ 13; *A-2*, (Def. Ex. 78) at 176-177.

97.     Neither Al-Saleh nor his lawyers requested that Hall obtain or disseminate the HS3 Material.  *A-38*, (Def. Ex. 117) ¶ 7; *A-15*, (Def. Ex. 118) ¶ 13; *A-2*, (Def. Ex. 78) at 176-177.

98.     Al-Saleh and/or his lawyers did not learn that Hall had obtained and/or disseminated the HS3 Material until HS3 filed the SAC.  *A-38*, (Def. Ex. 117) ¶ 7; *A-15*, (Def. Ex. 118) ¶ 13; *A-2*, (Def. Ex. 78) at 176-177.

99.     Hall never advised HS3 that he obtained or disseminated the HS3 Material.  *A-12*,

(Def. Ex. 83A) ¶ 35; *A-1*, (Def. Ex. 81) at 186-187.

100.    Only Hall's subordinates had contemporaneous knowledge that Hall requested and obtained the HS3 Material.  *A-52*, (Def. Ex. 82) at 138-139; *A-1*, (Def. Ex. 81) at 468-469. Otherwise no one else at Burford UK, Burford US, or Dundrod, was aware that Hall requested obtained or disseminated the HS3 Material.  *A-2*, (Def. Ex. 78) at 171.  After he requested and obtained the HS3 Material, Hall then transmitted the sex videos and photographs to Aviva Will, a senior executive and managing director in Burford US with authority to bind Burford US. *A-2*, (Def. Ex. 78) at 6-11, 13-14.  Will received and viewed the HS3 sex videos and photographs on October 21, 2016. *A-2*, (Def. Ex. 78) at 25, 164-165, 170-171.

101.    At the time Will received and viewed the HS3 sex videos and photographs, Hall and Will were actively engaged in the negotiation of the Release.  *A-33*, (Def. Ex. 23); *A-35*, (Def. Ex. 25); *A-36*, (Def. Ex. 26); *A-62*, (Def. Ex. 30); *A-63*, (Def. Ex. 31); *A-64*, (Def. Ex. 32); *A-1*, (Def. Ex. 81) at 60-64, 452-462; *A-2*, (Def. Ex. 78) at 170-171.

102.    Al-Saleh's lawyer did not agree to the form of the Releases until October 21, 2016, the day that Hall forwarded Will sex tapes and sensitive photographs involving HS3 and after she had viewed them.  *A-37*, (Def. Ex. 28) (attaching chart showing that the Release was first provided by Al-Saleh's lawyers on 10/5/2016, HS3 and MAN's lawyers provided edits on 10/10/2016, and Al-Saleh's lawyers agreed as to form on 10/21/2016).

103.    The HS3 Material constitutes personal data under the UK's 1998 Data Protection Act ("DPA") and obtaining, disclosing, or procuring personal data is a criminal violation of the DPA.  *A-69*, (Def. Ex. 105) ¶ 19.

104.    Further, Hall's exchange of the Ruperti Material for the HS3 Material was a violation of employment contract, with the potential bringing his employer, Burford UK into disrepute, and justifying summary dismissal.  *A-69*, (Def. Ex. 105) ¶¶ 14-18, 20.

105.    Hall's actions in obtaining the highly sensitive photographs and sex videos in the HS3 Material lacked any legitimate judgment enforcement purpose.  *A-2*, (Def. Ex. 78) at 172 ("Q. Would you have authorized Hall to receive photos and sex videos alone? A. Absolutely not. Q. Why not? A. Because they would have no use to us."); *A-1*, (Def. Ex. 81) at 106-113, 124-128 (Hall shared HS3's private photographs and sex videos because he found them "funny," "amusing," "strange sense of humor," "notable," "remarkable"); *A-2*, (Def. Ex. 78) at 165 (Hall was being "silly"); *A-2*, (Def. Ex. 78) at 27 ("something like that, that is not a business [purpose]");

*A-2*, (Def. Ex. 78) at 193-194 ("perhaps a little childish on his part").

106.    HS3's private photographs and sex videos were irrelevant to asset recovery or other legitimate purpose.  *A-1*, (Def. Ex. 81) at 92.

107.    Those materials were not useful for asset tracing or any legitimate purpose.  *A-2*, (Def. Ex. 78) at 167; *A-1*, (Def. Ex. 81) at 92; *A-52*, (Def. Ex. 82) at 146-147.

108.    The only potential purpose for the HS3 Material would be for extortion. *A-2*, (Def. Ex. 78) at 218-219; *A-1*, (Def. Ex. 81) at 68-83.

109.    The Sargeant Server was the source of the HS3 Email Account and the HS3 Material in 2015 and 2016.  *See, e.g.*, *A-2*, (Def. Ex. 78) at 178-187 (acknowledging that the HS3 Material and HS3 Email Account are on the Sargeant Server and would be accessed for Hall from that server and Burford US and Dundrod were not aware of this access); *A-48*, (Def. Ex. 59) (memorandum from former Burford UK employee of meeting between Hall and Sargeant Family stating that the Sargeant Family has HS3 email on their server dating back several years and Al-Saleh was to obtain access to those emails); *A-50*, (Def. Ex. 61) at 2 (referencing HS3's "emails that we pulled out of the system"); *A-60*, (Def. Ex. 79) at 124 (statement that she believed Rivas obtained the HS3 Material from the Sargeant Server and gave it to her in October 2016).

110.    In or about the Fall of 2017, HS3 first learned through conversations with Fahad Al-Tamimi that Hall obtained sensitive materials from the HS3 Email Account, including private photographs and sex videos, from Daniel Sargeant, when he learned about Preston's affidavit.  *A-12*, (Def. Ex. 83A) ¶ 37.

111.    On or about January 25, 2018, HS3 first learned that the email account was not destroyed, that Dan S. kept it and accessed it, and that the material was provided.  *A-12*, (Def. Ex. 83A) ¶ 40.

### Ruperti/Novoship Proceedings

112.    Ruperti sued Novoship, Burford UK's client, and related entities, in a claim pending in the High Court of Justice in London (Claim No. CL-2018-000824) ("UK Proceeding"). Def. Ex. 36.  Novoship answered and filed a third-party complaint against Hall and Burford UK on March 14, 2019.  *A-56*, (Ex. 36A); *A-57*, (Ex. 36B).

113.    In the UK Proceeding, Novoship (together with related entities) is seeking to invalidate an October 2017 settlement between Hall/Burford UK and Novoship, whose confidences Hall abused based on Hall's illicit exchange of the Ruperti Material.  *A-57*, (Def. Ex.

36B).

114.    Novoship was Hall's source for the Ruperti Material. *A-1*, (Def. Ex. 81) at 355-356.

115.    Hall unlawfully misused the Ruperti Material in exchanging it for the HS3 Material. Hall's disclosure of the Ruperti Material in exchange for the HS3 Material was a breach of confidence and unlawful. *A-57*, (Def. Ex. 36B) ¶ 26.

116.    Novoship later requested from Burford UK a warranty representing that the Ruperti Material had not previously been disclosed, other than pursuant to the Novoship engagement. Burford UK refused to provide this warranty. *A-57*, (Def. Ex. 36B) ¶ 27; *A-55*, (Def. Ex. 33).

117.    Hall faced internal criticism at Burford UK for his conduct in connection with the exchange of the Ruperti Material for the HS3 Material. *A-61*, (Def. Ex. 34); *A-70*, (Def. Ex. 35); *A-42*, (Def. Ex. 85) at 220-222.

### Dissemination of the HS3 Material

118.    Within hours of receiving the USB Drive on October 14, 2016, Hall emailed his analysts in London attaching two pictures of HS3 and Jane Doe 1 with the description: "Look what I have.... Ho ho ho. A 'viewing' is probably worth having back in London....." *A-67*, (Def. Ex. 100).

119.    On October 16, 2016, Hall shared via WhatsApp a picture of Jane Doe 1[2] holding a sex toy to two college friends—James Gilbert and Daniel Tonkyn, not employees of Burford US, Burford (UK), Dundrod or any other affiliated entity—who were with him when he met Perez in Miami. *A-65*, (Def. Ex. 32A); *A-1*, (Def. Ex. 81) at 114-118.

120.    On October 17, 2016, Hall forwarded the Jane Doe 1 sex-toy picture to Alex MacInnes-Ostrouch ("AMO"), a Burford UK colleague, trading jokes about Jane Doe 1 and also referencing the sex tapes. *A-66*, (Def. Ex. 32B) (Hall remarked that the "Harry sex tapes are hilarious," and promised to "...show [] the rest of Friday. I'm not sending over email.").

121.    On October 21, 2016, upon Hall's return to London, he conducted a viewing of an HS3 sex video with AMO, Ben Dinolt ("Dinolt"), and Bianca Beam ("Beam"). *A-2*, (Def. Ex. 78) at 23-28; *A-52*, (Def. Ex. 82) at 143-148; *A-1*, (Def. Ex. 81) at 114-118, 442.

122.    Also on October 21, 2016, Hall sent HS3 photographs and sex videos to Aviva Will ("Will"). *A-64*, (Def. Ex. 32); *A-2*, (Def. Ex. 78) at 191-195.  At Hall's request, Will provided her

---

[2] "Jane Doe 1" refers to an individual whose name has been redacted in these proceedings as it is completely unrelated to the merits of this case.

personal email, and Hall forwarded her three sex videos and three photos (*A-62*, (Def Ex. 30); *A-2*, (Def. Ex. 78) at 198-199), suggesting Will should "grab a glass of wine and treat [her]self to the 5min of video." *A-63*, (Def. Ex. 31); *A-2*, (Def. Ex. 78) at 199-202.

123.   Hall instructed Beam to keep the HS3 Material off of "NetDocs"—an online document storage platform that Burford UK utilized for official business purposes.  *A-52*, (Def. Ex. 82) at 142, 164, 200-202, 222.

124.   Hall did not utilize any of the HS3 Material.  *A-1*, (Def. Ex. 81) at 74-88, 98-133, 426-445.

125.   The only review of any of the material was performed by Beam, as directed by Hall, and limited to the .msg files, *i.e.*, 297[3] emails between HS3 and two women, some attaching pictures and videos. *A-52*, (Def. Ex. 82) at 141, 203-206.

126.   Burford US confirmed that five individuals within Burford UK and Burford US—Hall, Will, Beam, Dinolt, and AMO—received the HS3 Material. *A-2*, (Def. Ex. 78) at 22-24.

127.   Will became aware that Hall obtained and disseminated the HS3 Material after the Settlement was finalized and executed, during the forbearance period, and while the Release was being negotiated. *A-31*, (Def. Ex. 21); *A-62*, (Def. Ex. 30); *A-63*, (Def. Ex. 31); *A-37*, (Def. Ex. 28); *A-2*, (Def. Ex. 78) at 164-171.

128.   Burford US represented to HS3 that no further judgment collection activities were ongoing during the forbearance period and while the Release were being negotiated.  *A-2*, (Def. Ex. 78) at 70-73, 167; *A-1*, (Def. Ex. 81) at 90-97.

129.   Had HS3 known of Hall's illicit conduct, including obtaining and disseminating the HS3 Material, he would not have executed the Release, and would have pursued available remedies for breach of the Settlement *A-12*, (Def. Ex. 83A) ¶ 36.

130.   Neither Burford US nor Will informed HS3 that Hall obtained and or disseminated the HS3 Material at any time.  *A-2*, (Def. Ex. 78) at 175.

### The Second Amended Complaint

131.   The Second Amended Complaint ("SAC") in Case 9:17-cv-81070 was filed on February 20, 2018.  *A-71*, (Def. Ex. 5).

132.   The substance of the factual allegations were all accurate to the best of HS3's

---

[3] HS3 received only 278 of the 297 emails in the LAIL production.

knowledge.  *A-12*, (Def. Ex. 83A) ¶ 49.

133.    HS3 reviewed the SAC, but relied on his attorneys' advice in asserting the claims in the SAC.  HS3 is not a lawyer and relies on his attorneys' advice in all legal matters.  *A-12*, (Def. Ex. 83A) ¶ 43; *A-14*, (Def. Ex. 83) at 49.

134.    HS3's attorneys reviewed the claims in the SAC in advance of filing it.  The factual allegations were all accurate to the best of their knowledge, and the legal claims all had a basis in law and fact that was not frivolous.  *A-72*, (Def. Ex. 93) at 5, 15-31, 161-174.

135.    The Preston affidavit confirmed that Hall requested sensitive material relating to HS3 and that Dan S. arranged to provide that material to Hall, and that Hall obtained the material from Dan S. in October 2016.  *A-49*, (Def. Ex. 62) ¶153; *A-72*, (Def. Ex. 93) at 21-22, 40-46.

136.    HS3 and his attorneys had several conversations with Patrick Mooney ("Mooney") before he filed the SAC.  In these conversations, Mooney confirmed, among other things, that Dan S. had access to the HS3 Email Account on the Sargeant Server and had told Hall of his ability to access the account and its contents.  Mooney also provided emails and other documents to HS3's attorneys confirming the facts he relayed during these conversations.  *A-14*, (Def. Ex. 83) at 220, 224-226; *A-46*, (Def. Ex. 37) ¶¶ 13, 15; *A-47*, (Def. Ex. 37A) at 28-35, 36-41; *A-72*, (Def. Ex. 93) at 24-28, 58-78.

137.    Mooney also testified that Dan S. made clear that Hall knew that Dan S. had the ability to access the HS3 Email Account, and Hall knew that the HS3 Email Account contained HS3's "highly explicit intimate videos and photographs."  *A-47*, (Def. Ex. 37A) at 41.  HS3 later learned through the above facts that Hall did know that Dan S. was to obtain the sex videos and personal photographs from the HS3 Email Account.  *Supra*, ¶¶ 110–111.

138.    HS3 had a conversation with Fahad Al Tamimi and Ruperti with counsel in New York in the fall of 2017, and Tamimi confirmed the fact that Dan S. had access to sensitive material from HS3's email account and traded that material.  *A-14*, (Def. Ex. 83) at 204; *A-72*, (Def. Ex. 93) at 15-21, 44-45.

139.    LAIL produced documents to HS3 before the SAC was filed, including the LAIL production of the HS3 Material, which included 478 documents (278 emails and 200 attachments) between HS3 and two women.  *A-71*, (Def Ex. 5) at 28.  Lichtman confirmed that the 278 emails in the LAIL production of the HS3 Material were taken from the Sargeant Server.  *A-72*, (Def. Ex. 93) at 78-87.  The LAIL production of the HS3 Material was represented to be what Dan S. gave

Hall in October 2016 and was only the 278 .msg files between HS3 and two women. *A-71*, (Def Ex. 5 at 28); *A-72*, (Def. Ex. 93) at 28-31, 97-99.

140.   LAIL also produced emails between Dan S., Preston, and Hall from May to July 2017. *A-61*, (Def. Ex. 34), *A-70*, (Def. Ex. 35). These summer 2017 emails confirmed that the defendants in the SAC had met and discussed the exchange including the possibility of an indemnity for Hall and Hall's use of the HS3 Material in the public domain. *A-61*, (Def. Ex. 34), *A-70*, (Def. Ex. 35).

141.   HS3 through his attorneys were aware of and reviewed the LAIL production metadata. Some of the emails in the LAIL production had a last modified date of August 28, 2013. This was not conclusive as to the date of access and could, for example, have been the date the emails were put into an archive onto the server, a flash drive, or other media, and later accessed from the archive. The only way to determine the actual access and transfer dates would be a forensic examination of the server or other device from which the materials were obtained. *A-72*, (Def. Ex. 93) at 93-94; ECF No. 141-5, at ¶¶ 12-14; *A-73*, (Def. Ex. 87) at 87-96.

142.   The HS3 Material that Hall actually received had the same metadata for "last modified date" but included October 14, 2016 as file creation date, indicating it had been copied to the USB Drive on October 14, 2016. *A-74*, (Def. Ex. 103); *A-1*, (Def. Ex. 81) at 221.

143.   HS3 is not a lawyer, and HS3 relies on the advice of his attorneys for all legal matters. *A-14*, (Def. Ex. 83) at 49; *A-72*, (Def. Ex. 93) at 172-173.

144.   In preparing the SAC, HS3's attorneys conducted a factual investigation and legal research in making the allegations and claims in the SAC. HS3's attorneys had numerous discussions with HS3, Mooney, and others, and reviewed many documents, including, without limitation, Preston's affidavit, information and documents provided by Mooney, documents produced by Maroil and Sea Pioneer, and documents produced by LAIL, including the HS3 Material. *A-72*, (Def. Ex. 93) at 15-31, 161-174.

145.   Before filing the SAC, HS3's attorneys had several conversations with Mooney. In these conversations, Mooney confirmed, among other things, that Dan S. had told him that certain compromising information Dan S. had concerning HS3 was from HS3's former email account, that Dan S. also told Hall that HS3 was unaware that Dan S. had accessed this information because HS3 had been told the account had been deleted, and that Dan S. had the ability to access HS3's email account even though he did not have HS3's permission. *A-72*, (Def. Ex. 93) at 24-28, 58-78.

146.     HS3 did not sue Burford US, Dundrod, or Al-Saleh, the only persons named in the Release. *A-71*, (Def. Ex. 5); ECF No. 21-1; ECF No. 54; ECF No. 68.

147.     The SAC alleged that the HS3 Email Account was accessed on or about October 6 and October 28, 2016. *A-71*, (Def. Ex. 5) ¶¶ 35-37.  The actual date of the access was October 14, 2016.  *Supra*, ¶¶ 91, 118, 142.  HS3 had a reasonable basis in fact to make these claims. *A-75*, (Def. Ex. 108 at 9-10).

148.     HS3 voluntarily dismissed the SAC on June 4, 2018 in order to proceed with his lawsuit in state court. *A-72*, (Def. Ex. 93) at 9-15; ECF No. 9 (Plaintiffs' Mtn. for TRO to prevent HS3 from filing in state court); ECF No. 9-1 (Affidavit of Derek Ho stating "In my judgment, HS3's voluntary dismissal of the [SAC] ***does not reflect HS3's abandonment of his claims against Mr. Hall***") (emphasis added); *A-75*, (Def. Ex. 108) at 7 (opining bona fide termination not met).

149.     HS3's attorneys, voluntarily dismissed the SAC and re-filed HS3's claims in state court to avoid spending resources on objecting to the Report and Recommendation, and to ensure that any doubt over whether HS3 could state a claim under federal law would not jeopardize his state law claims. *A-72*, (Def. Ex. 93) at 10-15.[4]

150.     HS3's Computer Fraud and Abuse Act ("CFAA") and Computer Abuse and Data Recovery Act ("CADRA") claims against Hall had a reasonable basis in law and fact. *A-76*, (Def. Ex. 107) at 38-39.  With respect to CADRA, it was intended to have broader application than CFAA. *Id.* at 10.

151.     HS3 filed his state court complaint on June 21, 2018 in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.  [ECF No. 21-1]

152.     During the pendency of the SAC, Hall never alleged that HS3's allegations were

---

[4]  This fact has been consistent throughout this litigation. *See* Case 9:17-cv-81070, Docket Entry No. 213 at 20 ("Your Honor, it seemed abundantly clear that you told us, in Mr. Coleman's words, take your marbles and leave. You may have a claim in state court, but I don't think you're going to find one here under these two [federal] statutes); *id.* at 23 ("Mr. Sargeant is just trying to get redress. And so if we were only going to amend and file state law claims, we did not see any point in coming here only to have them do what I know they would do, which is cite the Eleventh Circuit case that we all agreed on, saying that, well, there's no supplemental jurisdiction under the circumstances" [if the federal law claims were dismissed]); *see also* Case No. 18-cv-80748, ECF No. 40 at 7-8 ("we took the direction of the Court . . . revealed to us in your written report and recommendation, to discuss that with our client, that there was no point in utilizing this Court's energies to go through [and file an objection]. . . . We dismissed to avoid wasting the Court['s] and client resources.").

frivolous.  Case 9:17-cv-81070, Docket Entries No. 129 (Hall's Mtn. to Dismiss); No. 183 (Reply ISO Mtn. to Dismiss); No. 190 (Hrg. on Mtn. to Dismiss).

153.    HS3 did not file the SAC against Hall out of malice.  Rather, HS3 sought redress for Hall's seeking, obtaining, viewing, and dissemination of the HS3 Material.  *A-1*, (Def. Ex. 81) at 474-478; *A-12*, (Def. Ex. 83A) ¶ 51; *A-14*, (Def. Ex. 83) at 274.

154.    The November 7, 2017, Wall Street Journal article, had nothing to do with HS3's decision to initiate a lawsuit based on Hall's conduct.  *A-1*, (Def. Ex. 81) at 469-474; *A-12*, (Def. Ex. 83A) ¶ 52.

155.    Hall has no damages related to the filing of the SAC or this lawsuit.  Burford US covered all of Hall's legal expenses in relation to the SAC.  *A-77*, (Def Ex. 121) at RFA No. 15 ("Hall further states that Burford Capital LLC paid the attorneys' fees and costs on behalf of Hall, Burford [US], and Dundrod."); *A-77*, (Def Ex. 121) at RFP No. 2 (referring to documents produced or to be produced by Plaintiffs regarding "payments it has made to any service provider concerning the SAC" as well as the State Action and Current Action, and indicating that no similar documents showing payments by Hall exist); ECF No. 40 at 49 ("Burford [US] bears those costs because it's paying for the fees").

156.    Hall is not a person whose acts or omissions Burford US, Dundrod, or Al-Saleh would or could be derivatively or vicariously liable or to whom Burford US, Dundrod, or Al-Saleh could or would owe indemnification.  *A-78*, (Def. Ex. 104) ¶¶ 7, 32-35; *A-79*, (Def. Ex. 106) ¶¶ 30-37.

157.    The Services and Management Agreement ("SMA") between Burford US and Burford UK and others precludes an employment relationship between the respective employees between the parties to the SMA:  "Nothing in this Agreement intends to, or is deemed to, establish or constitute a partnership between the Parties nor constitute any Party the agent, employee or representative of another party for any purpose." *A-80*, (Def. Ex. 57); *A-81*, (Def. Ex. 57A), § 3.4. The parties to the SMA confirm that they are each "acting on its own behalf and not for the benefit of any other person." *Id.* § 3.5. Further, the SMA provides that does not "assume or create any obligation or responsibility, express or implied" between any of the parties to the agreement and that the SMA should not be construed as granting the parties "any right or authority to bind the other Party in any way or manner whatsoever." *Id.* § 3.6. *A-78*, Def. Ex. 104 ¶¶ 7, 32-35; *A-79*, Def. Ex. 106 ¶¶ 30-37.

Dated:  August 19, 2019                          Respectfully submitted,


Ryon M. McCabe                           */s/   Melissa B. Coffey*
Fla. Bar No. 9075
rmccabe@mccaberabin.com                  Christopher M. Kise
Adam T. Rabin                            Fla. Bar No. 855545
Fla. Bar No. 985635                      Melissa B. Coffey
arabin@mccaberabin.com                   Fla. Bar No. 84090
Lauren E. Johnson                        Kathryn T. Williams
Fla. Bar No. 112027                      Fla. Bar. No. 112191
ljohnson@mccaberabin.com                 Joshua M. Hawkes
**MCCABE RABIN, P.A**.                   Fla. Bar No. 112539
1601 Forum Pl Ste. 201                   **FOLEY & LARDNER LLP**
West Palm Beach, FL 33401-8102           106 East College Avenue, Suite 900
Office: 561-659-7878                      Tallahassee, FL 32301-7732
                                         Tel: (850) 222-6100
                                         Fax: (850) 561-6475
                                         Email: ckise@foley.com
                                         Email: mcoffey@foley.com
                                         Email: jhawkes@foley.com

                                         Gregory W. Coleman
                                         Florida Bar No. 846831
                                         gcoleman@lawclc.com
                                         **CRITTON, LUTTIER & COLEMAN, LLP**
                                         303 Banyan Blvd., Suite 400
                                         West Palm Beach, FL 33401
                                         Telephone: (561) 842-2820
                                         Facsimile: (561) 844-6929
                                         *Counsel for Defendant Harry Sargeant, III*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, I served the foregoing document electronically via the CM/ECF system on all parties identified on the attached Service List.

By: */s/   Joshua M. Hawkes*
Joshua M. Hawkes

## SERVICE LIST

Derek T. Ho
dho@kellogghansen.com
Andrew E. Goldsmith
agoldsmith@kellogghansen.com
Jan E. Messerschmidt
jmesserschmidt@kellogghansen.com
Christine A. Bonomo
cbonomo@kellogghansen.com
Minsuk Han
mhan@kellogghansen.com
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK: P.L.L.C**
1615 M Street, N.W., Suite 400
Washington, DC 20036

Samuel A. Danon
sdanon@HuntonAK.com
mplantada@huntonak.com
Armando Cordoves, Jr
acordoves@huntonak.com,
avaldes@huntonak.com
**HUNTON ANDREWS KURTH LLP**
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2510
Facsimile: (305) 810-2460
*Attorneys for Plaintiffs*