# Defendant's Exhibit 83:

# Excerpts of Deposition of Harry Sargeant, III ("HS3")

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
             Case No: 9:18-cv-80748-ALTMAN/Reinhart
 3

 4    DANIEL HALL, BURFORD        )
      CAPITAL LLC, and DUNDROD    )
 5    INVESTMENTS LTD.,           )
                                  )
 6               Plaintiffs,      )
                                  )
 7           vs.                  )
                                  )
 8    HARRY SARGEANT, III,        )
                                  )
 9               Defendant.       )

10

11       VIDEOTAPED DEPOSITION OF HARRY SARGEANT, III

12                 (Taken by Plaintiffs)

13                    July 9, 2019

14
                      10:05 a.m.
15

16

17

18

19                    Suite 3000
                  One Atlantic Center
20         1201 West Peachtree Street, N.W.
                  Atlanta, Georgia
21

22

23

24
      Reported by:  F. Renee Finkley, RPR, RMR, CRR, CLR,
25    CCR-B-2289
```

```
 1                     APPEARANCES OF COUNSEL

 2    On behalf of the Plaintiffs Daniel Hall, Burford
      Capital LLC, and Dundrod Investments, Ltd.:
 3
            DEREK HO, Esq.
 4          MINSUK HAN, Esq.
            Kellogg, Hansen, Todd, Figel & Frederick, PLLC
 5          Sumner Square
            1615 M Street, N.W.
 6          Suite 400
            Washington, D.C.  20036
 7          (202) 326-7900
            dho@kellogghansen.com
 8          mhan@kellogghansen.com

 9               and

10          SAMUEL A. DANON, Esq.
            Hunton, Andrews, Kurth, LLP
11          1111 Brickell Avenue
            Suite 2500
12          Miami, Florida  33131
            (305) 810-2510
13          sdanon@huntonak.com


14
      On behalf of the Defendant:
15
            GREGORY W. COLEMAN, Esq.
16          Critton, Luttier & Coleman, LLP
            303 Banyan Boulevard
17          Suite 400
            West Palm Beach, Florida  33401
18          (561) 842-2820
            gcoleman@lawclc.com
19
                 and
20
            CHRISTOPHER M. KISE, Esq.
21          MELISSA B. COFFEY, Esq.
            JOSHUA M. HAWKES, Esq.
22          Foley & Lardner, LLP
            106 East College Avenue
23          Tallahassee, Florida  32310
            (850) 222-6100
24          ckise@foley.com
            mcoffey@foley.com
25          jhawkes@foley.com
```

```
 1                APPEARANCES OF COUNSEL (continued)

 2

    On behalf of the Defendant:
 3
             RYON M. McCABE, Esq.
 4           McCabe Rabin, P.A.
             Centurion Tower
 5           1601 Forum Place
             Suite 201
 6           West Palm Beach, Florida  33401
             (561) 659-7878
 7           rmccabe@mccaberabin.com

 8

    Also Present:
 9
             LEQENTEZ BROWN, Videographer
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         CONTENTS

2     THE WITNESS:  HARRY SARGEANT, III

3     EXAMINATION                                              Page

4          By Mr. Ho                                            12

5

6              CONFIDENTIAL SESSION -                           11

7

8                          EXHIBITS

9
      Exhibit          Description                             Page
10

11    Exhibit 29      Settlement agreement                     33

12    Exhibit 30      E-mail exchange between
                      H. Sargeant, III and
13                    H. Sargeant, IV,
                      May 20-21, 2015                          41
14
      Exhibit 31      Complaint filed by
15                    H. Sargeant, III                         47

16    Exhibit 32      Statement by H. Sargeant, III
                      on Sargeant Marine and
17                    Brazilian Car Wash Probe,
                      August 19, 2017                          60
18
      Exhibit 33      Trigeant Petroleum company
19                    policy regarding voice mail,
                      electronic mail, Internet
20                    access, and computer systems  106

21    Exhibit 34      Trigeant Petroleum welcome
                      document regarding IT/MIS
22                    department                              109

23    Exhibit 35      Company policy regarding
                      voice mail, electronic mail,
24                    Internet access and computer
                      systems                                 111
25

Harry Sargeant III
July 09, 2019
5

```
 1                    EXHIBITS (Continued)

 2     Exhibit         Description                  Page

 3
       Exhibit 36      E-mail exchange regarding wire
 4                     transfer to account at
                       Barclays Bank                 131
 5
       Exhibit 37      Document containing e-mail from
 6                     Jane Doe 2 to H. Sargeant, III,
                       April 15th, 2010              134
 7
       Exhibit 38      E-mail string obtained from
 8                     Gulfstream Police Department  193

 9     Exhibit 39      Defendant's answers to
                       plaintiffs' second set of
10                     interrogatories              214

11     Exhibit 40      Preston affidavit            219

12     Exhibit 41      Cover e-mail with letter from
                       Grossman to Coffey           241
13
       Exhibit 42      Letter from Coffey to
14                     Sandoval with attachment     245

15     Exhibit 43      Amendment to settlement
                       agreement                    250
16
       Exhibit 44      Answer, defenses, and
17                     counterclaim,
                       December 3rd, 2018           251
18

19

20

21

22

23

24

25
```

```
 1    Mr. Al-Saleh anymore.  He's -- he's not -- he's not a

 2    problem with me.  He's -- you know, he's -- if I saw

 3    Mr. Al-Saleh walking down the street tomorrow,

 4    I -- I'd ask him if I could -- you know, if we could

 5    go sit down and have a meal together.

 6           I have zero animosity towards

 7    Mr. Al-Saleh.  Every -- once Mr. Al-Saleh was paid in

 8    full, I was happy he was paid.  I was happy for him.

 9    And like he said in his little press release, you

10    know, against all odds, you know, he beat -- you

11    know, he won.  It's good for him.  That's business.

12    I mean, you know, people have business disputes,

13    Mr. Ho, and there's no animosity when you have to pay

14    somebody.  I'm sorry.

15        Q.    Sir, that's not -- that's not my question.

16    My question is, do you recall that he filed

17    proceedings against you in state court to try to --

18        A.    I don't -- I don't remember.

19        Q.    Sir, if you could --

20        A.    It's out of my mind.  I remember when you

21    asked me the question last time.

22        Q.    So you don't recall?

23        A.    No, sir.

24        Q.    Do you recall him filing a lawsuit against

25    you in Texas, in order to enforce the judgment?
```

```
 1        A.    I know there was some activity in Texas,

 2   but I really don't recall.

 3        Q.    You don't recall anything besides some

 4   activity in Texas?

 5        A.    I told you already, Mr. Al-Saleh was

 6   completely paid.  And I have zero animosity.  And

 7   that chapter is over in my book.

 8        Q.    Do you recall Mr. Al-Saleh filing a

 9   lawsuit against you in the Bahamas, in order to try

10   to enforce the judgment against you?

11        A.    Yeah, I remember there was some activity

12   in the Bahamas as well.  I don't remember exactly

13   what it was.

14              (Plaintiffs' Exhibit 29 was marked

15        for identification.)

16        Q.    (By Mr. Ho)  Mr. Sargeant, I'm handing you

17   what's been marked as Plaintiffs' Exhibit 29.  It's a

18   multipage document.  The first page bears the Bates

19   number BUR_1166.  Do you recognize this document?

20        A.    No, sir.

21        Q.    Well, let me ask you to turn to page 3 of

22   the document with the Bates number 1168.  Do you

23   recognize this part of the document?

24        A.    No, I don't really recognize it.  Let's

25   see -- I could read it and figure it out, if you want
```

```
 1    Florida State Court.  Do you see that?

 2         A.    I'll have to read it.  Where do you want

 3    me to start reading?

 4         Q.    It's recital H.  And then it goes all the

 5    way to recital JJ.

 6         A.    Okay.  I'll read those for you.

 7         Q.    My question is simply, does that refresh

 8    your recollection as to lawsuits that were filed

 9    against you by Mr. Al-Saleh?

10         A.    Not really.  I'll have to read it.  I

11    start where?  I'm sorry.

12         Q.    Recital H?

13         A.    H, okay.  Okay.  You wanted me to read

14    through JJ?

15         Q.    Yep.  Do you recall -- does that refresh

16    your recollection about any of the lawsuits that

17    Mr. Al-Saleh filed against you to enforce the Florida

18    State Court judgment?

19         A.    Not --

20               MR. COLEMAN:  Object to the form.

21               THE WITNESS:  Not really.

22         Q.    (By Mr. Ho)  Does it refresh your

23    recollection at all about anything?

24         A.    My lawyers handled all this.  The only

25    thing I ever got involved with was the first case.
```

```
 1                MR. COLEMAN:  Object to the form.

 2                THE WITNESS:  Like I said, when it comes

 3        to legal matters, I'm not a lawyer.  I rely on

 4        the advice of my counsel.  That's what you pay

 5        them for.  And they would have -- you know, the

 6        document was a complaint, and they brought it.

 7        Q.    (By Mr. Ho)  Let me direct your attention

 8   to page 6 of the complaint, paragraph 28.  The first

 9   sentence of that paragraph says, "the judgment

10   enforcement process took over five years, as Al-Saleh

11   and Burford waged a blood feud against HS3."  Do you

12   see that?

13        A.    Where are you at now?

14                MR. COLEMAN:  Paragraph 28.

15        Q.    (By Mr. Ho)  Paragraph 28.

16                MR. COLEMAN:  Page 6.

17        Q.    (By Mr. Ho)  Page 6, first sentence.

18        A.    Can I read it, please?

19        Q.    Sure.

20        A.    Yes, I see that.

21        Q.    What's your understanding of what the

22   word -- term "blood feud" means?

23        A.    Blood feud.  I guess it's a -- I'm not

24   sure.

25        Q.    Have you ever heard the term before?
```

```
 1        Q.    (By Mr. Ho)  At some point, did you become

 2   an employee?

 3        A.    I did become an employee of Sargeant

 4   Marine, yes.

 5        Q.    And when did you leave Sargeant Marine?

 6        A.    Early -- the big dispute happened, I

 7   believe -- you know, it came to a head, with the

 8   litigation flying sometime in 2013.  I think I left

 9   there February of 2013.

10        Q.    When you say you left in February of 2013,

11   does that mean that after February of 2013, you were

12   no longer an employee of Sargeant Marine, Inc.?

13        A.    Well, it's difficult to say, because at

14   that time, in 2013, you know, a lot had evolved

15   between 1987 and 2013.  So Sargeant Marine was never

16   really a source of income for me.  I was a part owner

17   in numerous Sargeant companies, lots of them.

18              And, you know, we all ran in the same

19   office.  And even though we had this dispute, and you

20   know, I was no longer using a Sargeant Marine e-mail

21   account, I was still an owner in various other

22   companies that were involved, and actually, you know,

23   used the office and those servers.  And I was an

24   owner in those companies all the way up 'til -- and

25   then, of course, I had my own private companies also.
```

1    But they had no -- the family had no ownership, but

2    also used those offices and those servers.

3              And then in 2015, when we had the

4    settlement agreement, that -- that would have been

5    sort of the major unwinding of me from any of the

6    family businesses.

7         Q.    I want to try to focus on Sargeant Marine,

8    Inc., in particular, at the moment.  So I think

9    you've testified that, at some point after the late

10   '80s, you became an employee of Sargeant Marine,

11   Inc., correct?

12        A.    That's correct.

13        Q.    So you drew a paycheck from Sargeant

14   Marine, Inc.?

15        A.    Very small paycheck.

16        Q.    At some point after that, did you stop

17   drawing a paycheck from Sargeant Marine, Inc.?

18        A.    Yeah.  I don't remember if it was -- I may

19   have stopped drawing a paycheck even before the

20   dispute, I don't remember exactly.  It was such an

21   insignificant amount of money in the relative scheme

22   of -- of my business enterprises, that it wasn't

23   really something relevant.  I think it was more for

24   the health care.

25        Q.    So when you say it may have been even

```
 1                THE WITNESS:  Yes.  Yes, sorry about that.

 2                MR. COLEMAN:  It's all right.

 3                THE WITNESS:  Sorry.

 4         Q.    (By Mr. Ho)  So the first company in the

 5    first paragraph there says, Trigeant Holdings

 6    Limited.  Do you see that?

 7         A.    Trigeant Holdings Limited, yes.

 8         Q.    What involvement, if any, have you had

 9    with Trigeant Holdings Limited?

10                MR. COLEMAN:  Object to the form.

11                THE WITNESS:  I mean, it -- you know, it

12           owned the -- I don't -- I don't remember exactly

13           what my involvement was.  I mean, it

14           was -- Trigeant Holdings ultimately was involved

15           with a company that had a refinery in Corpus

16           Christi.

17         Q.    (By Mr. Ho)  Were you an owner or part

18    owner of Trigeant Holdings Limited?

19         A.    I believe I was, yes.

20         Q.    And what was your ownership interest?

21         A.    I think it was approximately 25 percent.

22    It got a little squirrelly, 'cause there was an

23    outside owner at one time.  And we took him out.  But

24    basically, I think I had 25 percent.

25         Q.    Were you an employee?
```

1      A.   I don't remember if I ever got a paycheck

2   from there, like as an employee.

3      Q.   Were you an officer?

4      A.   Here again, I -- I don't remember.

5      Q.   What about Trigeant, LLC, what was your

6   involvement with that company?

7      A.   Here again, just looking at these, you

8   know, one owned the other one.  The other one owned

9   another one.  But at the end of the day, they -- they

10  still all revolved around the refinery in Corpus

11  Christi, as far as I know.  As I remember.

12     Q.   Do you know if you had an ownership

13  interest in Trigeant, LLC?

14     A.   I don't remember.  I think -- I don't

15  know.  I don't know.  I probably did, indirectly or

16  directly.  I would have had some kind of ownership

17  interest, but I don't know if it was directly an LLC,

18  or if it was all through holdings.  I don't remember

19  the corporate structure.

20     Q.   What is Sargeant Trading Limited?

21     A.   Sargeant Trading Limited was a

22  company -- a company based out of the Bahamas, I

23  believe.  And it was used for trading asphalt.

24     Q.   Did you have an ownership interest in that

25  entity?

```
 1         A.    I did, yes.

 2         Q.    And what was that ownership interest?

 3         A.    Here again, I think it was about 25

 4   percent.

 5         Q.    And were you an officer of that entity?

 6         A.    Here again, I don't remember.

 7         Q.    Were you an employee?

 8         A.    I don't remember if I got a paycheck from

 9   them or not.  I don't remember.

10         Q.    What about Sargeant Bulktainers, Inc.,

11   what was that?

12         A.    That was a company which moved high heat

13   products and tank containers, mostly through the

14   Caribbean.  I believe it was a U.S. company, based in

15   Florida, when I was familiar with it.

16         Q.    Did you have an ownership interest in

17   that?

18         A.    I believe I did.

19         Q.    And what was that interest?

20         A.    Here again, I think it was around 25

21   percent.

22         Q.    Were you an officer?

23         A.    I -- I don't remember.

24         Q.    Were you an employee?

25         A.    Here again, I might have been an employee
```

```
 1    Do you see that?

 2         A.    Yes, sir.

 3         Q.    So at the time of this settlement

 4    agreement, you did have an ownership interest of 25

 5    percent in LAIL, correct?

 6         A.    Correct.

 7         Q.    And then -- and by virtue of this

 8    agreement, you relinquished that ownership interest?

 9         A.    That's correct.

10         Q.    Why did you do that?

11         A.    It was part of the settlement agreement.

12         Q.    LAIL, then, became owned by other members

13    of your family, rather than yourself, correct?

14              MR. COLEMAN:  Object to the form.

15              THE WITNESS:  I don't know who took

16         ownership of LAIL after -- after I settled with

17         them.

18         Q.    (By Mr. Ho)  Okay.  In the last sentence

19    of that same paragraph, the agreement reads, "Harry,

20    III further agrees not to make any future claim of

21    direct, indirect, or beneficial ownership interest in

22    or to any of the Sargeant entities."  Do you see

23    that?

24         A.    Yes, sir.

25         Q.    What did you understand that agreement to
```

```
 1         A.    I don't think -- I don't know if there's

 2   more than five, no.  I don't believe -- there could

 3   be, I don't know.

 4         Q.    And do you recall anything about the

 5   corporate structure of the Global Oil Management

 6   companies?

 7         A.    Here again, you know, it's a family

 8   business.  You just kind of -- you're an owner of the

 9   company, one of the owners.  You exercise -- you

10   know, do everything you can to assist and help the

11   business.  You know, at Sargeant, it was called

12   Sargeant, not just Sargeant Marine, Inc., we

13   never -- we never really -- you know, we're not

14   Exxon, so we're not like -- it was a very

15   entrepreneurial type business, which was more -- that

16   went from, like I told you, $40,000 a year in sales

17   in -- call it '87 to -- as you look at all the

18   enterprises, you know, and we had grown to, you know,

19   right -- right about the time of the financial

20   meltdown, you know, we were doing over a billion

21   dollars in sales.

22              Some of those, the family owned, I didn't

23   own.  Some of them, we all owned together.  Some of

24   them, I just owned.  But we kind of operated as one

25   big team.  And we -- the roles, like you might see at
```

```
 1    Chevron, or Exxon, or a corporation that's not a
 2    family business -- aren't as clearly defined, you
 3    know, in a family business as you would see in a
 4    Fortune 100 oil company, so --
 5         Q.   Do you have a title with respect to any
 6    Global Oil Management company?  President, CEO,
 7    something like that?
 8         A.   Here again, I'm not sure exactly what my
 9    title might be for each and every company, whether
10    I'm on the board --
11         Q.   Do you know your title --
12              MR. COLEMAN:  Let him finish answering,
13         please.
14              THE WITNESS:  -- whether I'm a board
15         member, whether I'm just an owner.  I'm not sure
16         of those things, no.
17         Q.   (By Mr. Ho)  You don't know whether
18    you're -- you have any title with respect to any of
19    the Global Oil Management companies?
20         A.   I probably do, but off the top of my head,
21    you know, I don't want to guess.
22         Q.   Do you know the specific names of any of
23    the Global Oil Management companies?
24         A.   There's Global -- I know there's one that
25    runs a wastewater business.  I think it's called
```

1          A.    They -- they could have been e-mails --

2    some might have been from 2013.  I'm not sure.  I

3    didn't really look at it.

4          Q.    Did you see any e-mails that were from any

5    time period after -- later than 2013?

6          A.    I didn't really study the dates.

7          Q.    You mentioned, I think, that some of the

8    e-mails related to business ventures; is that right?

9          A.    I think there were some -- I don't

10   remember exactly what they were.  There was some

11   stuff in there, I think, about one of my employees at

12   a trade show in Dubai with Hydra.  There was some

13   innocuous e-mails about some other stuff, but I

14   don't -- I don't remember what all the e-mails were.

15         Q.    What is Hydra?

16         A.    It's a steam generating machine.

17         Q.    And was that something you were working on

18   at some point in time?

19         A.    Still are.

20         Q.    At what point in time did you begin

21   working on Hydra?

22         A.    I think maybe -- I'm not sure, but some

23   time in -- you know, maybe 2010-ish, plus or minus a

24   few years.

25         Q.    And you mentioned a trade show in Dubai.

```
 1    be disconnected, today.  Sorry, but are my orders,

 2    you have to use BTB Refining from now on."  Do you

 3    see that?

 4         A.    Yes.

 5         Q.    And that was from Mr. Rivas back to

 6    Mr. Rahman?

 7         A.    Correct.

 8         Q.    And did you see that at the time?

 9         A.    Yes.  And then we - then we called

10    Mr. Rivas, when we got -- went to lunch.  It was

11    still -- you know, it was -- we were six hours ahead,

12    so it was still early in the morning in Florida.

13         Q.    You called him after you received that --

14         A.    Yeah.

15         Q.    -- text that I just read or --

16         A.    When we got -- yeah, when we got done with

17    the lunch, I don't know -- I don't know if this

18    is -- you know, what -- what time this -- whether

19    this is 12:21 East Coast time, or what it is.  But,

20    yeah, when we got done with the lunch, we went

21    back -- we were on our way back to the hotel.  And we

22    called -- Ali called Mr. Rivas.

23         Q.    And what did Mr. Rivas say?

24         A.    Well, we asked him just to forward all our

25    e-mails to -- you know, that senior had said that,
```

```
 1    you know, our e-mails were going to be destroyed,

 2    that we were cut off.  Same with HIV.  They cut

 3    off -- I think they cut off my son, Garrett, the same

 4    day.  They cut my wife off that day.  I think even my

 5    wife's phone got shut down.  I think my phones might

 6    have been paid by IOTC, so I think they were still

 7    working.  I think Ali had one phone -- he had two

 8    phones with him.  I think one of his was working, and

 9    one wasn't.

10           I had no clue why they had, you know,

11    cancelled Garrett.  In 2013, he was probably 14 -- 13

12    years old.  And Rivas just said, senior said destroy

13    everything, don't forward it, and that's it.

14       Q.   Just to be clear, did you personally speak

15    to Mr. Rivas or did Mr. Rahman?

16       A.   Mr. Rahman was speaking, but he -- we were

17    on the -- what do you call it -- the speaker phone.

18    And I go, Rivas, really?  Now, I knew -- I knew it

19    had to do with the family feud that was coming, but

20    this was -- this was the first time I kind of

21    realized -- well, it was -- it was evident that my

22    father had taken sides, you know, on the fight

23    between Dan and I.

24           And I'm assuming he took sides, mainly

25    'cause I think maybe around that time -- you know,
```

```
 1    'cause Dan was the first one to file a suit against

 2    me.  And that must have been about the time that we

 3    would have countersued.  And I think when I

 4    countersued, you know, maybe -- maybe it came

 5    out -- he found out that day, or around that day.

 6    And that's when he said, you know, shut him down, and

 7    destroy all their e-mails, and move on.

 8         Q.   So your testimony is that Mr. Rivas told

 9    you that your father said that your e-mails were

10    going to be cut off?

11         A.   Yes.

12         Q.   And did he actually use the words

13    "destroyed"?

14         A.   They were -- they were gone.  Gone.

15    Toast.

16         Q.   Well, what -- tell me in as

17    specific -- tell me as specifically as you can, what

18    words Mr. Rivas actually said to you when you were

19    talking to him on the phone?

20         A.   He said, your e-mails -- your e-mails are

21    gone, you have no access to them, and they're going

22    to be destroyed.  Now, we had all -- remember, it

23    wasn't like -- it wasn't a crisis, because I had all

24    of my e-mails, every e-mail up to that second that he

25    cut them off on my -- my laptop.  The same with Ali.
```

```
1    got every right to pick up your kid's T-ball stuff.

2    Now, I'm not saying these videos are T-ball.  If they

3    weren't, we wouldn't be here.

4         Q.    What did your father say when you asked

5    him to give back some of your personal e-mails?

6         A.    He did.  It got boxed up and I got it

7    back.

8         Q.    Did you ask him for -- to return personal

9    e-mails as well?

10        A.    Yeah, they said they were destroyed.

11        Q.    Your father said that when you talked to

12   him?

13        A.    I don't know if he said they were

14   destroyed, but he said he had Rivas take care of it,

15   something like that.  I don't think he's a very IT

16   guy either, just like I'm not.

17        Q.    And you're -- you think that conversation

18   happened at his condo.

19        A.    I'm pretty sure it was -- it was either at

20   his condo or at a restaurant.  I remember -- I can't

21   remember if it was a restaurant or his condo.  I

22   remember, you know, we had that -- we had

23   brief -- brief conversation.  It was about the time,

24   you know -- and I know that there was another time

25   when I talked to my mother, who was -- whatever she
```

```
 1    father and son.

 2         Q.    Where is Mr. Rahman today?

 3         A.    Today, specifically?

 4         Q.    Not today, specifically, but do you know

 5    where he lives currently?

 6         A.    He's -- he lives in -- he lives

 7    in -- between New York and D.C.

 8         Q.    And is he still employed by any of the

 9    Sargeant companies?

10         A.    Yeah, he's still -- he's still employed by

11    one of my companies.

12         Q.    And what does he do?

13         A.    Still, you know, business development,

14    legal -- legal -- small legal stuff that you don't

15    want to send outside.

16         Q.    Have you spoken with him recently about

17    this -- any of the issues in this lawsuit?

18         A.    No.

19         Q.    Did you tell anybody else that your

20    e-mails had been destroyed -- your sargeant.net

21    e-mails had been destroyed?

22         A.    Well, I think -- you know, like I said,

23    my -- my son Harry, IV was -- his -- his e-mails were

24    cut off the same day.  Garrett, my 13 year old, used

25    to use the server.  My wife used to use the server.
```

 1   I know my brother's wife used to use it.  I mean, it

 2   was common policy that all the family members could

 3   use the -- use the server for their personal e-mail.

 4           I mean, my wife didn't work there at all.

 5   And I don't think she even knows what we did,

 6   but -- other than ship asphalt.  And, you know,

 7   so -- you know, I don't think -- she might have -- I

 8   don't think she -- she wouldn't have had anything on

 9   there that -- you know, 'cause all of their e-mails

10   would have been on their personal stuff.

11           So they didn't really care, 'cause they're

12   not there for a business reason.  And I'm not -- I'm

13   not -- I don't really remember if anybody else talked

14   to senior.  I know Rivas said they were destroyed.

15       Q.   I'm asking whether you ever talked to

16   anybody else about being told by Mr. Rivas and/or by

17   your father that your e-mails had been destroyed?

18       A.   Yeah, Ali was in the car with me.

19       Q.   Did you ever tell Jane Doe Number 1 that

20   your e-mails had been destroyed?

21       A.   No.

22       Q.   You laugh, but you knew at the time that

23   there were, you know, pictures and videos of her on

24   your e-mail account, right?

25       A.   Like I told you earlier, I wasn't sure how

```
 1    activities.  And -- but I didn't know, at that point,
 2    it was really -- you know, the name of the
 3    investigator.  Pat started giving me information on
 4    it.
 5             And then so it could have been Pat Mooney
 6    sometime in late 2015 that told me about Mr. Hall,
 7    and his horrible things that he had done.  And, you
 8    know, so I would say late 2015, maybe sometime early
 9    2016.
10        Q.    And just to be clear, did Sheikh Tamimi
11    have a conversation with you about Mr. Hall or was it
12    only Pat Mooney?
13        A.    No, he told me about -- he told me that
14    pornographic videos were taken -- were taken -- that
15    my brother had copies of pornographic videos, and had
16    given them to an investigator.  I don't believe
17    Tamimi knew his name at that time.
18        Q.    And how did Mr. Tamimi know that?
19        A.    Because he was part of -- he was part of
20    the -- he -- he was part of the lawsuit against
21    Ruperti.  And -- and they -- Mr. Hall exchanged the
22    pornographic material for the settlement documents
23    between Ruperti, PDVSA, and some other sensitive
24    financial information or something.  I don't know
25    exactly what they exchanged.  But that's
```

```
 1    that?
 2         A.    I see that.
 3         Q.    And wouldn't you agree with me,
 4    Mr. Sargeant, that nothing in what I just read
 5    refers, in any way, to accessing your e-mail account?
 6         A.    Well, the accessing the e-mail account
 7    from -- came from numerous people.  It came from
 8    Sheikh Tamimi in the meeting in 2017, that my brother
 9    had breached my e-mail account, and somehow still had
10    the e-mails that were supposedly destroyed.  It also
11    came from Pat Mooney, 'cause in December of 2014 or
12    '15, whatever the date was -- I can't
13    remember the -- hear again, I could be a year or so
14    off without going through all the facts.
15              Mooney, you know, testified and he e-mail
16    showing where Dan Sargeant spent a full day with
17    Hall, came back to the bar, and told Mooney
18    that -- that he had, you know, breached the e-mail
19    account.  I didn't find that out until after I hooked
20    back up with Mooney in 2017.
21              But it all flows in here.  I mean,
22    basically, what happened is my brother took -- took
23    photo -- pornographic material off the server.  Your
24    man, Hall, despicable act, unprofessional, for a
25    trained solicitor to be going after that kind of
```

1    the interrogatory, we'll do it.  Interrogatory answer

2    number 8.

3         A.    Mr. Ho, which one am I in, please.  I'm

4    not --

5         Q.    Interrogatory number 8, the one we were

6    just talking about.

7         A.    This one (indicating)?

8               (Discussion off the record.)

9               THE WITNESS:  Mine says PL 39.

10        Q.    (By Mr. Ho)  Yes, it's Plaintiffs' Exhibit

11   39.

12              MR. COLEMAN:  Page 6.

13        Q.    (By Mr. Ho)  Your counsel has directed you

14   to the last sentence of the answer to interrogatory

15   number 8, which reads, and I'm quoting, "Patrick

16   Mooney confirmed prior conversations between Hall and

17   Daniel Sargeant had revealed that Daniel Sargeant

18   disclosed details of his ability to access the HS3

19   e-mail account to Hall."  Do you see that?

20        A.    Yes, sir.

21        Q.    Patrick Mooney had conversations with

22   Daniel Sargeant in early 2015; isn't that correct?

23        A.    I believe so, yes, sir.

24        Q.    He did not have any conversations with

25   Daniel Sargeant in 2016, did he?

```
 1        A.    I don't believe so.

 2        Q.    And so Patrick Mooney would have had no

 3   way to know whether Dan Sargeant accessed your e-mail

 4   account in 2016, would he?

 5        A.    Well, he --

 6              MR. COLEMAN:  Object to -- object to the

 7         form.

 8              THE WITNESS:  He knew for the fact

 9         that -- he knew in 2015, he had already accessed

10         it, because he also told me, which isn't in

11         these pleadings, that he actually was trying to

12         show him the video.  And he said, I don't want

13         to watch it.

14        Q.    (By Mr. Ho)  So your testimony is that

15   Dan -- that Patrick Mooney told you that Dan Sargeant

16   had already accessed your e-mail account by early

17   2015?

18        A.    That's correct.  Yeah, that's my -- that's

19   my belief.

20        Q.    And so that is -- that does not support

21   your allegation that defendants agreed, in August of

22   2016, that Dan Sargeant and LAIL would unlawfully

23   access your e-mail account, does it?

24              MR. COLEMAN:  Object to the form,

25         argumentative.
```

```
 1              THE WITNESS:  I don't understand.  He

 2         probably -- you know, I don't know exactly how

 3         they did it, but he probably accessed it

 4         whenever he wanted.

 5         Q.    (By Mr. Ho)  Did Mr. Mooney tell you that?

 6         A.    Mr. Mooney said that he had accessed my

 7    personal stuff, and he had copies of Jane Doe

 8    Number 1 and myself, yes.

 9         Q.    Now let's turn to interrogatory number 9.

10    You were asked to describe the factual basis for your

11    allegation in paragraph 36 of the second amended

12    complaint, that, and now I'm quoting, "on or about

13    October 6, 2016, and again, on October 28th, 2016,

14    Dan Sargeant and LAIL unlawfully accessed the

15    Sargeant server and the HS3 e-mail account in

16    Florida, and obtained the HS3 material from the HS3

17    e-mail account."  Do you see that?

18         A.    Yes, sir.

19         Q.    So you're alleging in paragraph -- in that

20    paragraph that Dan Sargeant and LAIL actually

21    accessed your e-mail account on two specific dates,

22    October 6th and October 28th of 2016, correct?

23         A.    Those aren't the only dates, but that's

24    what it says here, yes.

25         Q.    Okay.  And your answer points to
```

```
1         understand what the release agreement does.  I

2         know that we've settled.  He's been paid.  He's

3         happy.  We're happy with him.

4         Q.   (By Mr. Ho)  So, in your view, has he

5    violated this agreement in any way?

6              MR. COLEMAN:  Object to the form, legal

7         conclusion.

8              THE WITNESS:  I don't know.  I don't

9         believe he has.  I'm not a lawyer.

10        Q.   (By Mr. Ho)  Do you recall signing a

11   similar release in favor of Mr. Al-Saleh?

12        A.   I don't -- I don't recall the specific

13   document, no.

14             (Plaintiffs' Exhibit 42 was marked

15        for identification.)

16        Q.   (By Mr. Ho)  I'm handing you what's been

17   marked as Plaintiffs' Exhibit 42.  And I'll direct

18   your attention, again, to the first page after the

19   cover letter that you see on page 2.  This is a cover

20   letter from Melissa Coffey to Andre Sandoval.  And

21   after that, there is a document that has the title

22   Release of Al-Saleh, Burford Capital, LLC, and

23   Dundrod Investments Limited by Deborah Sargeant,

24   individually, and Harry Sargeant, III, and Deborah

25   Sargeant, as tenants by the entireties.  Do you see
```

```
 1    account?
 2         A.    I was the only one that should have had
 3    any access to that e-mail account.
 4         Q.    Did you pay for the e-mail account?
 5               MR. COLEMAN:  Object to the form.
 6         Q.    (By Mr. Ho)  Out of your own personal
 7    funds?
 8         A.    I already told you that.  No.
 9               MR. COLEMAN:  Asked and answered.
10         Q.    (By Mr. Ho)  Did you -- did you have a
11    certificate that said that you owned the e-mail
12    account?
13               MR. COLEMAN:  Object to the form.
14               THE WITNESS:  No, sir.
15         Q.    (By Mr. Ho)  So other than your opinion
16    that this was your personal property, I'm asking you
17    in what sense you owned the e-mail account?
18               MR. COLEMAN:  Asked and answered.  Answer
19         it again, Harry.
20               THE WITNESS:  We -- the e-mail account,
21         this one here, hsargeantjr@sargeant.net, was
22         password protected.  The only person that had
23         access to that e-mail was myself.  So that was
24         my property.  To the extent that I was an owner
25         of the company -- of the companies that worked
```

1           out of that address on Military Trail, that that

2           server was, in my opinion, property of numerous

3           companies hosted by Sargeant Marine.

4           Q.    (By Mr. Ho)  Other people did have your

5     password, correct?

6           A.    The only person that I know had my

7     password was Dan Rivas, as the IT gentleman.

8           Q.    Let me direct your attention to paragraph

9     72 of the counterclaim complaint.  That paragraph

10    alleges "as a direct and predictable result of the

11    actions of Daniel Sargeant and Hall, certain content

12    of the HS3 material has been disseminated to the

13    public in general and/or a large number of persons,

14    including, but not limited to, through the

15    allegations in the publicly filed complaint in

16    Worldspan Marine, Inc. et al. versus Comerica Bank et

17    al., Number 18-21924 (S.D. FLA), at Docket Entry 1,

18    paragraph 221, which had not been made public before

19    that time."  Do you see that?

20          A.    Yes, sir.

21          Q.    Did you review the complaint in the

22    Worldspan Marine, Inc. et al. versus Comerica Bank et

23    al. complaint?

24                MR. COLEMAN:  Object to the form.

25                THE WITNESS:  I probably reviewed it.

```
1              And now he's benefitted with 30 million cash, or

2              thereabouts, I don't know exactly what's been

3              paid or not paid.

4                   I know there was another recent delay from

5              a conversation with Mr. Al-Tamimi, Sheikh

6              Tamimi.  And I think that -- you know, what I

7              really don't understand is why Mr. Hall was part

8              of the conspiracy.  Why he wanted to see this

9              pornographic material so bad.  To me, that

10             was -- you know, that's why I didn't believe, in

11             any way, that Burford was ever involved in this

12             in any way.

13             Q.   (By Mr. Ho)  When was the last time you

14        communicated with -- with your father?

15             A.   It's -- it's been a -- it's been a while.

16        And I deeply regret that.  And I'm hoping to amend

17        that soon.  I don't -- my -- I don't stop my children

18        from talking to my father or my mother.  But it's

19        been a long time, been a while.  But whenever we see

20        each other, whether it's a deposition or a trial

21        thing, we're still very friendly.

22             Q.   When you say a while, more than five

23        years?

24             A.   No.

25             Q.   More than two years?
```

```
 1                    WITNESS NOTIFICATION LETTER

 2      7/9/19

 3      ATTN: HARRY SARGEANT, III
        c/o  MELISSA B. COFFEY, Esq.
 4           Foley & Lardner, LLP
             106 East College Avenue
 5           Tallahassee, Florida  32310
             (850) 222-6100
 6           mcoffey@foley.com

 7           RE:   Daniel Hall vs. Harry Sargeant, III
                   Deposition Date: 7/9/19
 8                 U.S. Legal Support Ref. # 1948335

 9      Dear Sir/Madam:

10      The transcript of the above proceeding is now
        available for witness review, and the following
11      applies:
                    _____The witness is requested to contact
12            our office to make an appointment for review
              purposes.
13                  __X___Counsel above ordered the transcript
              and is requested to facilitate the witness's
14            review from their copy.
                    _____Other: _____
15                                    (Details)

16            We respectfully request that the review be
        completed within 30 days.
17
              The completed errata sheet may be returned
18      to our office at the address listed below for
        distribution.
19
        Sincerely,
20
        Production Department
21      U.S. Legal Support, Inc.
        1819 Peachtree Road NE, Suite 220
22      Atlanta, GA 30309
        Phone: 404-381-1465
23      Email: GAProduction@USLegalSupport.com

24      Letter CC via transcript:
        DEREK HO

25
```

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 18-cv-80748-ALTMAN/Reinhart

DANIEL HALL,
BURFORD CAPITAL LLC, and
DUNDROD INVESTMENTS LTD.,

      Plaintiffs,

      v.

HARRY SARGEANT, III,

      Defendant.

_____/

## ERRATA SHEET

Witness:         HARRY SARGEANT, III

Case:          *Hall et al. v. Sargeant*, Case No. 18-80748 (S.D. Fla.)

Deposition Date:    July 9, 2019

U.S. Legal Support Reference # 1948335

| Page | Line | Original | Correction | Reason |
|------|------|----------|------------|--------|
| 30 | 3 | tenent | tenant | Typographical error |
| 39 | 8 | priority to me, and I | priority, and I | Transcription error |
| 45 | 10 | in our | on that | Transcription error |
| 56 | 8 | sales were | sales that year were | Transcription error |
| 88 | 8 | senior | Senior | Transcription error |
| 88 | 8 | junior | Junior | Transcription error |
| 88 | 10 | junior | Junior | Transcription error |
| 89 | 3 | senior | Senior | Transcription error |
| 128 | 21 | Gia | Gio | Typographical error |
| 147 | 25 | seen | sent | Transcription error |
| 151 | 19 | 20 year olds | 20 girls | Transcription error |
| 161 | 25 | senior's | Senior's | Transcription error |
| 162 | 10 | went to | done with the | Transcription error |
| 162 | 25 | senior | Senior | Transcription error |

1

| 163 | 12 | senior | Senior | Transcription error |
|-----|-----|--------|--------|---------------------|
| 165 | 19 | senior's | Senior's | Transcription error |
| 170 | 3 | weren't | were | Typographical error |
| 173 | 14 | senior | Senior | Transcription error |
| 205 | 13 | | Use "Jane Doe 1" IAW page 11 of deposition | Misspoke |
| 205 | 21 | late '16, September | 2017 | Misspoke |
| 220 | 13 | hear | here | Transcription error |

## Acknowledgement of Deponent

Under penalties of perjury, I declare that I have read the foregoing document and that the facts Stated in it are true with the inclusion of the foregoing corrections in the attached errata sheet.

HARRY SARGEANT, III

August 15, 2019

Date

```
 1                    D I S C L O S U R E

 2

 3

       STATE OF GEORGIA      )      DEPOSITION OF
 4
       HENRY COUNTY          )      HARRY SARGEANT, III
 5

 6

 7         Pursuant to Article 10.B of the Rules and
       Regulations of the Board of Court Reporting of the
       Judicial Council of Georgia, I make the following
 8     disclosure:

 9         I am a Georgia Certified Court Reporter.  I am
       here as a representative of US Legal.
10
           US Legal was contacted by the offices of
11     Kellogg, Hansen to provide court reporting services
       for this deposition.  US Legal will not be taking
12     this deposition under any contract that is prohibited
       by O.C.G.A. 9-11-28 (c).
13
           US Legal has no contract or agreement to provide
14     court reporting services with any party to the case,
       or any reporter or reporting agency from whom a
15     referral might have been made to cover the
       deposition.
16
           US Legal will charge its usual and customary
17     rates to all parties in the case, and a financial
       discount will not be given to any party in this
18     litigation.

19

20                      F. Renee Finkley

21

22              F. Renee Finkley, RPR, RMR, CRR, CLR
                Georgia CCR-B-2289
23

24

25
```

```
 1                     C E R T I F I C A T E

 2    STATE OF GEORGIA:
      COUNTY OF HENRY:
 3


 4          I, F. Renee Finkley, a Certified Court
      Reporter in and for the State of Georgia, do hereby
 5    Certify:

 6          That prior to being examined, the witness
      named in the foregoing deposition was by me duly
 7    sworn to testify to the truth, the whole truth, and
      nothing but the truth.
 8          That said deposition was taken before me
      at the time and place set forth and was taken down by
 9    me in shorthand and thereafter reduced to
      computerized transcription under my direction and
10    supervision, and I hereby certify the foregoing
      deposition is a full, true and correct transcript of
11    my shorthand notes so taken.
            I further certify that I am not of kin or
12    counsel to the parties in the case, and I am not in
      the regular employ of counsel for any of the said
13    parties, nor am I in any way financially interested
      in the result of said case.
14          IN WITNESS WHEREOF, I have hereunto
      subscribed my name this 9th day of July, 2019.

15

16

17

18

19          _____
            F. Renee Finkley, RPR, RMR, CRR, CLR
20          Georgia CCR-B-2289

21

22

23

24

25
```