# Defendant's Exhibit 85:

# Excerpts of Deposition of Daniel Sargeant



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 18-cv-8748-ALTMAN/Reinhart

DANIEL HALL, BURFORD CAPITAL, LLC,
and DUNDROD INVESTMENTS, LTD.,

      Plaintiffs,

vs.

HARRY SARGEANT, III,

      Defendant.

_____/

VIDEOTAPED DEPOSITION OF
DANIEL SARGEANT

VOLUME 01
(Pages 1 through 144)

Wednesday, June 26, 2019
9:06 a.m. - 12:35 p.m.

Berger Singerman, LLP
One Town Center Road
Suite 301
Boca Raton, Florida  33486

Stenographically Reported By:
Tosha S. Seaney, CCR, GRL

Page 2

```
 1   APPEARANCES:

 2
     On behalf of the Plaintiffs Daniel Hall,
 3      Burford Capital, LLC, and Dundrod Investments, Ltd.:

 4      KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
        1615 M Street, N.W.
 5      Suite 400
        Washington, D.C.  20036
 6      (202) 326-7945
        BY: ANDREW E. GOLDSMITH, ESQUIRE
 7      agoldsmith@kellogghansen.com

 8
     On behalf of Defendant Harry Sargeant, III:
 9
        McCABE RABIN, P.A.
10      1601 Forum Place
        Suite 505
11      West Palm Beach, Florida  33401
        (561) 659-7878
12      BY: RYON M. McCABE, ESQUIRE
        mccabe@mccaberabin.com
13
        FOLEY & LARDNER LLP
14      106 East College Avenue
        Suite 900
15      Tallahassee, Florida 32301-7732
        (850) 222-6100
16      BY: JOSHUA M. HAWKES, ESQUIRE
            MELISSA COFFEY, ESQUIRE (Telephonically)
17      jhawkes@foley.com
        mcoffey@foley.com
18

19      CRITTON, LUTTIER & COLEMAN, LLP
        303 Banyan Boulevard, Suite 400
20      West Palm Beach, Florida 33401
        (561) 842-2820
21      BY: GREGORY W. COLEMAN, ESQUIRE
        gcoleman@lawclc.com
22

23

24

25
```

```
 1    APPEARANCES:   (Continued)

 2
      On behalf of the Witness Daniel Sargeant:
 3
          BERGER SINGERMAN, LLP
 4        350 East Las Olas Boulevard
          Suite 1000
 5        Fort Lauderdale, Florida  33301
          (954) 525-9900
 6        BY: JEFFREY S. WERTMAN, ESQUIRE
          jwertman@bergersingerman.com
 7

 8
      ALSO PRESENT:
 9
          David Parra, Videographer
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                         Page 4
 1                      I N D E X

 2                                                        PAGE

 3    Examination of Daniel Sargeant:
          Direct By Mr. McCabe                              6
 4
      Certificate of Oath                                 140
 5    Certificate of Reporter                             141
      Read and Sign Letter                                142
 6    Errata Sheet                                        143

 7

 8                    E X H I B I T S

 9    EXHIBIT      DESCRIPTION                            PAGE

10      59    Email chain from Robert Capper               98
              To Alex MacInnes-Ostrouch and others
11            Bates BUR-0003480-003483

12      61    Email chain from Edward Davis, Jr.          109
              to Ivonne Herrar and others
13            Bates BUR-003572-003573

14      91    Text Message chain, HS3_0012873             78

15      97    Email chain from Jeffrey Balk to
              Andrew Preston, Bates HS3_001520-001523     85
16
        98    Email chain from Dan Sargent to Andrew
17            Preston, Bates HS3_0002904-002785           90

18     110    Email from Patrick Mooney to Dan
              Sargeant, Bates HS3_0004398-0004443        130
19
       111    Email from Andrew Preston to Patrick
20            Mooney, HS3_0004445-0004446                134

21

22

23

24

25
```

1    The following proceedings began at 9:06 a.m.:

2         THE VIDEOGRAPHER:  We're now on the record.

3    The time is 9:06 a.m.  This is the video deposition

4    of Daniel Sargeant in the matter of Daniel Hall vs.

5    Harry Sargeant, III.  This deposition is being held

6    in Boca Raton, Florida on June 26, 2019.

7         The videographer is David Parra, and the

8    court reporter is Tosha Seaney, both in association

9    with Phipps Reporting.  Will counsel please

10   announce their appearances for the record?

11        MR. GOLDSMITH:  Andrew Goldsmith from

12   Kellogg, Hansen, Todd, Figel & Federick for the

13   plaintiffs.

14        MR. McCABE:  Ryon McCabe, McCabe Rabin for

15   the defendant, Harry Sargeant, III.

16        MR. HAWKES:  Joshua Hawkes, Foley and Lardner

17   for the defendant.

18        MR. COLEMAN:  Greg Coleman, Critton,

19   Luttier & Coleman for Harry Sargeant, III.

20        MR. WERTMAN:  Jeffrey Wertman from Berger

21   Singerman for the witness.

22        THE STENOGRAPHER:  Can I get you to raise

23   your right hand for me, please?

24        Do you solemnly swear or affirm the testimony

25   you are about to give in this cause will be the

```
 1        truth, the whole truth and nothing but the truth so

 2        help you God?

 3               THE WITNESS:  Yes.

 4               THE STENOGRAPHER:  Thank you, sir.

 5                        DANIEL SARGEANT,

 6        having been first duly sworn or affirmed, was

 7         hereinafter certified, testified as follows:

 8                        DIRECT EXAMINATION

 9    BY MR. McCABE:

10        Q.   Good morning, sir.  Could you please state

11    your name for the record?

12        A.   Daniel Sargeant.

13        Q.   And, Mr. Sargeant, have you ever given a

14    deposition before?

15        A.   Yes, I have.

16        Q.   How many times, approximately?

17        A.   Ten.

18        Q.   All right.  Let me remind you -- you probably

19    know these rules already, but let me remind you just

20    so our day goes more smoothly.  If at any time you

21    don't understand any of my questions, feel free to ask

22    me.  If at any time you need a break, feel free to

23    ask.

24               And you must answer all of the questions with

25    words so that the court reporter can record them.  As
```

1  opposed to nodding your head and whatnot.  All of that

2  fair?

3      A.   Understood.

4      Q.   What did you do to get ready for this

5  deposition today, sir?

6      A.   I prepared with Jeff Wertman.

7      Q.   Okay.  And without telling me anything that

8  you and Jeff spoke about, how many times did you meet?

9      A.   One time.

10      Q.   And I understand you flew in from London?

11      A.   Yes, I did.

12      Q.   You -- when did you arrive?

13      A.   Monday evening.

14      Q.   And did you look at any documents in

15  preparation for this deposition?

16      A.   No documents.

17      Q.   How about did you look at documents

18  separately?  Apart from your meeting with Mr. Wertman,

19  I mean.

20      A.   No.

21      Q.   Did you talk to any of the -- do you know who

22  Daniel Hall is?

23      A.   Yes.

24      Q.   When's the last time you talked to him?

25      A.   I would have to say 7 -- some time in 2017.

Page 8

 1      Q.   Okay.  I take it that you didn't talk to him

 2   in preparation for this deposition?

 3      A.   No, I did not.

 4      Q.   Did you talk to any of his lawyers?

 5      A.   No, I did not.

 6      Q.   You know who Derek Poe is?

 7      A.   Never heard that name.

 8      Q.   How about Mr. Goldsmith, who's seated over

 9   here?

10      A.   Never met him before.

11      Q.   Okay.  The first time you've ever seen him is

12   today?

13      A.   Yes.

14      Q.   All right.  I'm going to be asking you some

15   questions today about your brother, Harry Sargeant,

16   III.  And I may refer to him as "Harry 3" or "HS3."

17   And if I use those terms, will you understand that to

18   mean your brother, Harry Sargeant, III?

19      A.   Yes, I will.

20      Q.   When's the last time you talked to him?

21      A.   No idea.

22      Q.   Years?

23      A.   I would say years, yes.

24      Q.   Okay.  Is it fair to say that there -- you

25   have a relationship of hostility with him right now?

Page 9

1      A.   I wouldn't characterize it as hostility.  We

2   just have no relationship at all.

3      Q.   Okay.  You're aware that he's suing you right

4   now, correct?

5      A.   Yes.

6      Q.   And in the past, you've sued him, correct?

7      A.   Yeah.

8      Q.   Multiple times, correct?

9      A.   I don't recall how many times.

10      Q.   And he's sued you multiple times, correct?

11      A.   Yes.

12      Q.   And when you say you have no relationship at

13   all, what do you mean by that?

14      A.   You described him as a brother.  I have no

15   brotherly relationship with him.

16      Q.   Okay.  How about your other brother, James

17   Sargeant, do you have a good relationship with him?

18      A.   Yes.

19      Q.   And when's the last time you talked to him?

20      A.   Probably a couple of weeks ago.

21      Q.   All right.  Did you talk to him about this

22   case?

23      A.   No.

24      Q.   Have you ever talked to him about this case?

25      A.   No.

1      Q.    Sure.  Did you ever trade Harry's sex videos

2   in order to get information from somebody else?

3      A.    I gave Daniel Halls (sic) Harry's sex videos

4   after he gave me information on Ruperti.

5      Q.    Why did you do that, sir?

6      A.    Because Daniel Halls and I had a

7   relationship.  And he asked me for the videos.  And I

8   really didn't think it was a big deal.  So many people

9   had seen the videos from Harry.  They were out there.

10  And so many people had seen them.  I really didn't

11  think it was that big of a deal.  I mean, Harry knew

12  the videos existed, and never asked for them back.

13     Q.    When you say he knew the videos existed, why

14  do you say that?

15     A.    I mean he filmed -- he shot them.  He filmed

16  them.  He showed them to people.  So, he had to know

17  they were there.

18     Q.    Did he -- you're saying that Harry knew that

19  the videos were on -- were in the files at Sargeant

20  Marine?

21     A.    I mean, you shoot a video with a company

22  phone, and you pulled it up on your email in the

23  office before, you should know that it's on a server

24  somewhere.

25     Q.    Why do you say that?

1     A.   I think anybody in their right mind would

2   know that emails don't just disappear.  That they're

3   lodged somewhere.  And once you pull them up on your

4   company computer, they're probably still there.

5     **Q.   Do you know whether or not -- well, let me**

6   **back this up.**

7          **When you gave these sex videos to Daniel**

8   **Hall, in what format did you give them to him?**

9          MR. WERTMAN:  Objection to form.  You can

10     answer.

11     A.   I actually did not personally give them to

12   him.

13   BY MR. McCABE:

14     **Q.   That's a good point.  Did you -- you**

15   **instructed Annette Perez to do that?**

16     A.   I instructed Annette Perez to give Daniel

17   Halls the videos.

18     **Q.   All right.  Can you tell me about the**

19   **conversation you had with Annette?**

20     A.   Just told her take a -- take some of the

21   photos and videos, put them on a flash drive, and send

22   them over to Daniel.

23     **Q.   And when you gave her that instruction, where**

24   **did you understand the photos and the videos to be?**

25     A.   I believe she was going to make a copy of the

1      A.   I don't recall.  I threw it all away.  It was

2   more or less stuff that you could find online if you

3   did a little digging.  They were in bankruptcy, and we

4   had a judgment against them.  And I didn't see any of

5   the information as useful, so I threw it away.

6      **Q.   And what did he give you about Wilmer**

7   **Ruperti?**

8      A.   Just various settlement agreements about a

9   claim that Wilmer Ruperti had settled that we may or

10   may not have had some interest in.  And some -- just

11   other information.  Bank account information.  Just

12   things like that.

13      **Q.   Did you ask him?**

14      A.   No, I never asked him for the information.

15   He just gave it to me.  And I just figured out this is

16   garbage, and I will throw it away.  And I looked at

17   it, and said:  Wow, he's right.  Ruperti did settle

18   the claim on our behalf, and never told us about it.

19      **Q.   Well, let me break that down.  So, you**

20   **said -- so, Daniel Hall was right.  Wilmer settled the**

21   **claim, and never told you about it.  What do you mean**

22   **by that?**

23      A.   Well, he had a joint venture companied called

24   LAIL.  And that's when you asked me earlier about

25   Sargeant Marine, it Wasn't Sargeant Marine.  It was

1   LAIO.  Anyway, LAIL had a one-third ownership in a

2   couple of ships.  And that -- that shipping company

3   with three partners had a claim against PDVSA.  And

4   Ruperti settled the claim with PDVSA, but did not tell

5   the other two owners, ourself or Fahad Tamimi (sic)

6   that he settled the claim on behalf of the company.

7   And took the proceeds from the claim and -- well,

8   never shared them with his other partners until we

9   were able get that information.

10      **Q.   This company -- the two ships, by the way,**

11   **one was named the Leander; is that correct?**

12      A.   Correct.

13      **Q.   And the other was named Hero?**

14      A.   Correct.  And there was actual one other ship

15   involved called the Polar.

16      **Q.   So, am I correct that there was a dispute**

17   **between LAIL and PDVSA about certain monies that PDVSA**

18   **owed to LAIL, correct?**

19      A.   It was not between LAIL and PDVSA.  It was

20   between the owning company and PDVSA.  The owning

21   company was made up of three shareholders.

22      **Q.   Who were the three shareholders?**

23      A.   LAIL, Wilmer Ruperti and Maroil, and Fahid

24   Tamami.  And I believe his company was called Ocean

25   something or other.

Page 53

```
 1        Q.   Am I correct that LAIL also had owners, one
 2   of whom was you, correct?
 3        A.   Correct.
 4        Q.   And one of them was your brother, Harry 3,
 5   correct?
 6        A.   He was not an owner at that point.
 7        Q.   All right.  At some point, was he?
 8        A.   He was at some point, yes.
 9        Q.   When was -- at what point did Harry 3 stop
10   being an owner of LAIL?
11        A.   Harry 3 stopped being an owner of LAIL during
12   the -- at some point during the settlement agreement
13   between Trigeant and the family and Harry, and all
14   that sort of stuff.
15        Q.   All right.  So -- and that's in 2015,
16   correct?
17        A.   Correct.
18        Q.   So, let's -- I'm going to focus on the time
19   period before 2015.  And just so the record's clear,
20   in 2015, you entered into a settlement agreement with
21   your brother, Harry 3, and numerous other parties
22   whereby Harry 3 gave up his ownership interest in a
23   number of family businesses, right?
24        A.   Correct.
25        Q.   And in exchange, Harry 3 was paid
```

1    approximately 56 million dollars, correct?

2        A.   Correct.

3        Q.   And it's your testimony today that after that

4    settlement agreement, Harry 3 was no longer one of the

5    owners of LAIL?

6        A.   Correct.

7        Q.   So I want to focus before that happened.

8    Before that 2015 agreement, Harry 3 was an owner of

9    LAIL, right?

10       A.   Yes.

11       Q.   And so, Harry 3 was an owner of LAIL while

12   LAIL had this dispute with PDVSA?

13       A.   For a portion of the time, yes.

14       Q.   Correct.  And it -- isn't it true that at

15   some -- at some point, there was a -- an arbitration

16   proceeding was actually filed in the United Kingdom

17   regarding this PDVSA dispute, correct?

18       A.   Correct.

19       Q.   And when that arbitration proceeding was

20   filed, Harry 3 was still a part owner of LAIL,

21   correct?

22       A.   Correct.

23       Q.   Right?

24       A.   Correct.

25       Q.   And at some point, you made efforts to remove

1  Harry 3 as one of the directors of LAIL, correct?

2      A.   Yep.  At some point, yes.

3      Q.   And that happens before the 2015 settlement

4  agreement?

5      A.   I believe so, yes.

6      Q.   And when you made these efforts to remove him

7  as a director, you didn't tell him, correct?

8      A.   Yes, we gave him notification, yes.

9      Q.   How did you give him notification?

10     A.   Through the lawyers.  It was all documented.

11     Q.   And you're confident that Harry 3 received

12  that notification?

13     A.   Sure, he did.  He showed up in the office for

14  a board meeting, yeah.

15     Q.   Was -- Harry 3 was also removed as a director

16  of the Joint venture, correct?

17     A.   I'm not certain.

18     Q.   You remember the name of the joint venture?

19     A.   No, I don't remember.

20     Q.   So, you don't remember, as you sit here

21  today, whether Harry 3 was removed as a director of

22  the joint venture?

23     A.   I don't.  I don't recall the exact way that

24  it happened, no.  I don't remember.

25     Q.   Isn't it true that you-all removed Harry as a

Page 56

```
 1    director of the joint venture without letting him

 2    know?

 3         A.   No.

 4         Q.   Once -- after Harry was removed as a

 5    director, isn't it true that the joint venture

 6    authorized Wilmer Ruperti to handle the litigation of

 7    PDVSA?

 8         A.   Ask the question again, please.

 9         Q.   Sure.  After Harry 3 was removed --

10         A.   After Harry 3 was removed.

11         Q.   Yes.  From -- from his position as a director

12    of the joint venture.  Are you with me?

13         A.   Yes.

14         Q.   Well, I -- let me --

15         A.   Continue with your question.

16         Q.   Okay.  Didn't the joint venture appoint

17    Wilmer Ruperti to handle negotiations with PDVSA?

18         A.   Part of your question is correct.

19         Q.   Um-hum.

20         A.   But part of your question is wrong.

21         Q.   Okay.  Tell me which is correct.

22         A.   The correct part is the joint venture did

23    appoint Wilmer Ruperti to handle negotiations with

24    PDVSA.  But that was long before Harry was ever

25    removed.
```

1     Q.   Long before he was removed from LAIL or from

2  the joint venture?

3     A.   Either/or.  Whichever he was removed from, it

4  was long before.

5     Q.   All right.  Was -- to your knowledge, was

6  Harry aware that Wilmer Ruperti had been given this

7  appointment?

8     A.   Yes.

9     Q.   And how -- how do you know that?

10    A.   Because Harry, Fahad Tamini, and Wilmer

11  agreed on it.

12    Q.   Were you there?

13    A.   I believe I was present, yes.  They were

14  running the company.

15    Q.   Now, why was the decision made to give

16  this -- and I will call it an appointment.  Do you

17  understand what I mean by that?

18    A.   Yeah.

19    Q.   Why was this decision made to give this

20  appointment to Wilmer Ruperti?

21    A.   Because Wilmer was Venezuelan, and Wilmer was

22  the one who originally put the contract together with

23  PDVSA.  So, he would be the most logical choice.  And

24  then we also had one gentleman who was working for the

25  joint venture, and he was to oversee the settlement

1  discussions with Wilmer Ruperti.

2      Q.   That was Patrick Mooney?

3      A.   Correct.

4      Q.   Now, we got into this line of questioning

5  when you said that Daniel Hall gave you some

6  information that Wilmer Ruperti settled without you

7  knowing, right?

8      A.   Correct.

9      Q.   Am I correct then that he used that

10  appointment to settle this claim with PDVSA, and

11  didn't tell you?

12      A.   Yeah.  I would say it was something along

13  those lines, yeah.

14      Q.   And how did you find out about that?

15      A.   How did we find out about what?

16      Q.   That Wilmer Ruperti had settled this claim

17  without telling you?

18      A.   When I saw the -- when I opened the file that

19  Daniel gave me, and I looked at the settlement.  When

20  I walked back to my office, and looked at it.

21  Luckily, I didn't throw it in the trash.

22      Q.   Were you suspicious of Wilmer Ruperti before

23  Daniel Hall gave you this information?

24      A.   We're always suspicious of Wilmer Ruperti,

25  yes.

Page 59

1    Q.   Had you been given any information that led

2  you to believe Wilmer Ruperti might have settled that

3  PDVSA claim?

4    A.   No.

5    Q.   Do you remember a TradeWinds article?  You

6  know the magazine TradeWinds?

7    A.   Yes.

8    Q.   Do you remember being given an article by

9  Andrew Preston that featured Wilmer Ruperti in the

10  magazine TradeWinds?

11   A.   I recall something about it, yes.

12   Q.   Did that arouse your suspicion at all?

13   A.   No.

14   Q.   Do you know what Sovcomflot is?

15   A.   Yes.

16   Q.   What is that?

17   A.   A Russian shipping company.

18   Q.   And that's a company that Ruperti also had a

19  dispute with, correct?

20   A.   Yes.

21   Q.   And at some point, did you come to realize

22  that Wilmer Ruperti had paid some debt to Sovcomflot?

23   A.   I just know what I read in the papers, like

24  everybody else.

25   Q.   All right.

Page 60

```
 1      A.    I don't know if it's true or not, but I --

 2      Q.    Well, didn't you travel to Switzerland, sir,

 3  in 2015, and meet with Wilmer Ruperti about whether or

 4  not he had settled the PDVSA claim?

 5      A.    I traveled on a few occasions to see Wilmer

 6  Ruperti.  I don't remember the exact dates.  I do

 7  remember I was in Switzerland.  I do remember I was in

 8  Paris.  And I talked to him about settlement.  And he

 9  made no progress.

10      Q.    All right.  So, whether it was in Paris or

11  Switzerland, you -- and you're not sure of the time.

12  But you do remember meeting with him at some point,

13  and asking him about the PDVSA negotiations, right?

14      A.    Yes.

15      Q.    And he told you no progress, correct?

16      A.    No progress.

17      Q.    And are you later learned that he was lying

18  to you?

19      A.    Yeah, we later learned, yeah.

20      Q.    And the way you learned that was from

21  documents Daniel Hall gave you?

22      A.    Correct.

23      Q.    All right.  So let's -- let's go back to how

24  and why Daniel Hall gave you those documents.  Did

25  you -- did you ever ask Daniel Hall for documents
```

Page 61

1    about Wilmer Ruperti?

2        A.   Initially, no.  But after the fact, I may

3    have, yes.  After I saw the initial batch of

4    documents, I may have.  But prior to, no.  I didn't

5    even know he had documents about Wilmer Ruperti.

6        Q.   So, am I correct that Daniel Hall gave you

7    two separate batches of documents about Wilmer

8    Ruperti, correct?

9        A.   No, he gave me one.

10       Q.   Do you recall meeting with him twice in

11   London?

12       A.   Two or three times, yeah.

13       Q.   And you think he only delivered documents to

14   you on one occasion?

15       A.   Correct.

16       Q.   Did he deliver the documents in a paper

17   format, or on a zip drive, or how did he do it?

18       A.   Paper.

19       Q.   And when you went to meet with -- it was an

20   in-person meeting, I take it?

21       A.   Yes.

22       Q.   Do you remember the place where you-all met?

23       A.   We met at the Grosvenor Hotel.

24       Q.   And how was the meeting set up?

25       A.   Just set up between Dan and I on our phones,

Page 62

 1    on text messages.

 2        Q.   Did he tell you why -- who asked for the

 3    meeting?

 4        A.   I don't recall.

 5        Q.   And before you got to that meeting, you had

 6    no idea that Daniel Hall was going to bring you

 7    documents about Ruperti?

 8        A.   No idea.

 9        Q.   What did he say at the meeting?

10        A.   He said:  Here's some documents about Ruperti

11    and Better Roads.  You might be able to use these to

12    help yourself out because I believe Ruperti settled

13    your case with PDVSA.

14             And I said, "Nonsense."  And -- and I didn't

15    look at the documents in the meeting.  And I went back

16    to my office, and looked at the documents.  And I

17    said, "Shit.  I think he's right."

18        Q.   So when you're at the -- at the meeting, you

19    didn't even bother to read what the documents were?

20        A.   Did not.  Did not look at them.

21        Q.   But you said you expressed skepticism that

22    this could have happened?

23        A.   Yeah.

24        Q.   Did you ask Daniel Hall, "Why do you believe

25    this happened?"

```
 1        A.   Well, the meeting was very short.  Maybe 15,

 2   20 minutes.   And so, I looked at the documents.

 3        Q.   Did Daniel Hall request anything from you?

 4        A.   He asked me -- he said, "Hey, I would like to

 5   see the pictures that you guys said existed."  And I

 6   said, "Okay."

 7        Q.   How did Daniel Hall know that there were

 8   pictures that existed?

 9        A.   I don't know.  I don't know.  You know,

10   Daniel Hall's a pretty clever guy.  He talked to a lot

11   of people in south Florida.  So, you know, I don't

12   know if he heard it from Jeff Leggett or Greg Lawrence

13   or Charlie Christ, or, you know, who he heard it from,

14   but --

15        Q.   Well, didn't you tell him this?

16        A.   Tell him what?

17        Q.   That there was sex videos --

18        A.   No.

19        Q.   -- and pictures involving Harry 3?

20        A.   No.  He asked me for them.  But I didn't tell

21   him that they existed.

22        Q.   All right.  Isn't it --

23        A.   I mean, I don't know if the lawyers told each

24   other that there were sex videos.  You would have to

25   ask the lawyers that.  I don't know.
```

1    A.   I don't recall exactly when it was, but it

2   was some time in '16.  Yes.

3    **Q.   All right.  Well, regardless of the exact**

4   **date, Daniel Hall was contacting you for a specific**

5   **reason of trying to obtain sex videos, right?**

6    A.   I wouldn't say that was the sole reason why

7   Daniel was contacting me.  He was contacting me to get

8   together, and talk about common people.

9    **Q.   Well, I'm trying to understand was sex videos**

10  **one of the things that he was asking you about?**

11   A.   Yeah, sure.

12   **Q.   And you don't know how it is that he learned**

13  **of the existence of these sex videos?**

14   A.   I -- no, I don't know.  I can't tell you

15  exactly how he learned of the existence of the sex

16  videos, no.

17   **Q.   But it wasn't from you, correct?**

18   A.   I don't believe so.

19   **Q.   And as far as you know, it wasn't from any of**

20  **your lawyers?**

21   A.   I don't believe so.

22   **Q.   Did you ever ask him:  How do you know about**

23  **the sex videos?**

24   A.   I don't believe so, no.  It was -- the sex

25  videos were just -- in my opinion were commonplace.  A

```
 1                        CERTIFICATE OF OATH

 2

 3

 4    THE STATE OF FLORIDA )

 5    COUNTY OF PALM BEACH )

 6

 7

 8

 9

10          I, the undersigned authority, certify that

11    DANIEL SARGEANT, personally appeared before me and was

12    duly sworn on the 26th day of June, 2019.

13          Signed this 1st day of July, 2019.

14

15

16

17          _____
            TOSHA S. SEANEY, CCR, GRL
18          Notary Public, State of Florida
            My Commission # GG 105516
19          My Commission Expires:  May 17, 2021

20

21

22

23

24

25
```

Page 141

1                    CERTIFICATE OF REPORTER

2

3     THE STATE OF FLORIDA )

4     COUNTY OF PALM BEACH )

5

6          I, TOSHA S. SEANEY, Certified Court Reporter,

7     do hereby certify that I was authorized to and did

8     stenographically report the foregoing deposition of

9     DANIEL SARGEANT; that a review of the transcript was

10    requested; and that the foregoing transcript, pages 1

11    through 138, is a true and complete record of my

12    stenographic notes.

13         I FURTHER CERTIFY that I am not a relative,

14    employee, attorney, or counsel of any of the parties,

15    nor am I a relative or employee of any of the parties'

16    attorney or counsel connected with the action, nor am

17    I financially interested in the action.

18

19         DATED this 1st day of July, 2019.

20

21

22    _____

                TOSHA S. SEANEY, CCR, GRL
23              Certified Court Reporter
                Georgia Realtime License
24

25

Page 142

1    July 1, 2019

2
     DANIEL SARGEANT
3    c/o Jeffrey Wertman, Esquire
     Berger Singerman, LLP
4    350 East Las Olas Boulevard
     Suite 1000
5    Fort Lauderdale, Florida  33301

6    IN RE:  Daniel Hall vs. Harry Sargeant, III
     CASE NO.:  18-cv-8748-ALTMAN/Reinhart
7
     Please take notice that on the June 26, 2019, you gave
8    your deposition in the above cause.  At that time, you
     did not waive your signature.  The transcript is now
9    available for your review.

10   Please call (888) 811-3408 or e-mail
     production@phippsreporting.com between the hours of
11   9:00 a.m. and 4:00 p.m., Monday through Friday, for
     access to a read-only PDF transcript via computer.
12
     Please execute the PDF-fillable Errata Sheet which
13   will be forwarded to you by Phipps Reporting.  The
     Errata Sheet can also be downloaded from
14   www.phippsreporting.com.  Once completed, please
     print, sign, and return to us for distribution to all
15   parties.

16   If you do not read and sign the deposition within a
     reasonable amount of time, the original, which has
17   already been forwarded to the ordering attorney may be
     filed with the Clerk of the Court.

18
     If you wish to waive your signature now, please sign
19   your name in the blank at the bottom of this letter
     and return to the address listed below.
20   _____

21   Tosha S. Seaney, CCR, GRL
     Phipps Reporting
22   1551 Forum Place, Suite 200-E
     West Palm Beach, Florida  33401
23   (888) 811-3408

24   I hereby waive my signature.

25   _____
     Daniel Sargeant

```
                                                      Page 143
 1                         ERRATA SHEET
           DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 2              IN RE: Daniel Hall vs. Harry Sargeant, III
                CASE NO. 18-CV-8748-ALTMAN/REINHART
 3      WITNESS:  DANIEL SARGEANT          TAKEN: 06/26/2019

 4      PAGE     LINE          CHANGE          REASON FOR CHANGE

 5      _____

 6      _____

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____
        Under penalties of perjury, I declare that I have read
23      my deposition, and that it is true and correct subject
        to any changes in form or substance entered here.
24
        SIGNATURE OF DEPONENT: _____
25        DATE: _____
```



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 18-cv-8748-ALTMAN/Reinhart

DANIEL HALL, BURFORD CAPITAL, LLC,
and DUNDROD INVESTMENTS, LTD.,

       Plaintiffs,

vs.

HARRY SARGEANT, III,

       Defendant.

_____/

VIDEOTAPED DEPOSITION OF
DANIEL SARGEANT

VOLUME 02
(Pages 144 through 266)

Wednesday, June 26, 2019
1:16 p.m. - 4:15 p.m.

Berger Singerman, LLP
One Town Center Road
Suite 301
Boca Raton, Florida  33486

Stenographically Reported By:
Tosha S. Seaney, CCR, GRL

Page 145

```
 1    APPEARANCES:

 2
      On behalf of the Plaintiffs Daniel Hall,
 3        Burford Capital, LLC, and Dundrod Investments, Ltd.:

 4        KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
          1615 M Street, N.W.
 5        Suite 400
          Washington, D.C.  20036
 6        (202) 326-7945
          BY: ANDREW E. GOLDSMITH, ESQUIRE
 7        agoldsmith@kellogghansen.com

 8
      On behalf of Defendant Harry Sargeant, III:
 9
          McCABE RABIN, P.A.
10        1601 Forum Place
          Suite 505
11        West Palm Beach, Florida  33401
          (561) 659-7878
12        BY: RYON M. McCABE, ESQUIRE
          mccabe@mccaberabin.com
13
          FOLEY & LARDNER LLP
14        106 East College Avenue
          Suite 900
15        Tallahassee, Florida 32301-7732
          (850) 222-6100
16        BY: JOSHUA M. HAWKES, ESQUIRE
              MELISSA COFFEY, ESQUIRE (Telephonically)
17        jhawkes@foley.com
          mcoffey@foley.com
18

19        CRITTON, LUTTIER & COLEMAN, LLP
          303 Banyan Boulevard, Suite 400
20        West Palm Beach, Florida 33401
          (561) 842-2820
21        BY: GREGORY W. COLEMAN, ESQUIRE
          gcoleman@lawclc.com
22

23

24

25
```

Page 146

```
 1   APPEARANCES:   (Continued)

 2
     On behalf of the Witness Daniel Sargeant:
 3
         BERGER SINGERMAN, LLP
 4       350 East Las Olas Boulevard
         Suite 1000
 5       Fort Lauderdale, Florida  33301
         (954) 525-9900
 6       BY: JEFFREY S. WERTMAN, ESQUIRE
         jwertman@bergersingerman.com
 7

 8
     ALSO PRESENT:
 9
         David Parra, Videographer
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                         Page 147
 1                          I N D E X

 2                                                       PAGE

 3     Examination of Daniel Sargeant
            Direct By Mr. McCabe (continued)             148
 4
       Certificate of Oath                               265
 5     Certificate of Reporter                           265
       Read and Sign Letter                              266
 6     Errata Sheet                                      267

 7
                              EXHIBITS
 8
        EXHIBIT        DESCRIPTION                        PAGE
 9
       25    Email from Angela Marino to TZaccaro         228
10           BUR_0315505-0315506

11     29    Extraction Report, BUR_0003460-003461        153

12     33    May 3, 2017 Correspondence from Quinn
             Emanuel to Burford Capital Limited           213
13
       34    Email Chain from Daniel Hall to Michael
14           Redman, BUR_0003250-0003255                  215

15     62    First Affidavit of Andrew Preston            185
             Bates BUR_0003046
16
       68-A  Documents provided to Daniel Sargeant
17           From Daniel Hall, LAIL001308-LAIL001326      183

18     68-B  Commission Agreement, HS3_0005891-
             0005893                                      183
19
       68-C  Agreement PDVSA, LAIL001380-1382             183
20
       71    Exhibit AJP3 in the case of LAIL vs.
21           Oceanic Trans Shipping, HS3_0006966-
             0007045                                      201
22
       77    Extraction Report, BUR_0003792-3797         201
23
       112   Claim Form, HS3_0006790-0006935             208
24

25
```

Page 148

1        The following proceedings began at 1:16 p.m.:

2            THE VIDEOGRAPHER:  We're back on the record.

3        The time is 1:16 p.m.

4                        DANIEL SARGEANT,

5        having been first duly sworn or affirmed, was

6         hereinafter certified, testified as follows:

7                        DIRECT EXAMINATION

8    BY MR. McCABE:

9        Q.   Okay.  We're back on the record.

10   Mr. Sargeant, I have a series of questions here that I

11   want to ask you about an investigation known as "Lava

12   Jato."  And my understanding is that your attorney is

13   going to instruct you not to answer these questions.

14   But I am just going to proffer them for the record.

15            MR. McCABE:  Is that correct, Jeff?

16            MR. WERTMAN:  Yes.

17   BY MR. McCABE:

18       Q.   All right.  My proffered questions are as

19   follows:  Are you aware of an investigation in Brazil

20   known as Lava Jato?

21            Do you know a person in Brazil named Candido

22   Vaccarezza, V-A-C-C-A-R-E-Z-Z-A?

23            Have you ever met that person?

24            If so, what were the circumstances of those

25   meetings?

Page 150

```
 1    in turn be used to bribe officials in Brazil?
 2            Are you aware of an email dated January 6th,
 3    2011 sent by Mr. Finocchi to an email -- to an
 4    employee at Sargeant Marine requesting expediting
 5    payment of the $929,000?
 6            Were you the recipient of that email?
 7            If not, who was?
 8            Have you in any way been involved in paying
 9    bribes to officials in the country of Brazil?
10            MR. McCABE:  Those are my questions.
11            MR. WERTMAN:  We'll object on a number of
12        grounds, including, but not limited to, relevance,
13        not reasonably calculated to lead to the
14        discovery -- discoverability of admissible
15        evidence, intended to harass the nonparty witness,
16        confidentiality, and an ongoing investigation.
17            We will also ask that this portion of the
18        deposition be deemed confidential.  And we can move
19        on.
20    BY MR. McCABE:
21        Q.   Sir, throughout this deposition, we've used
22    the term "zip drive," as well as the term "USB drive."
23    Do you understand those two things to be synonymous?
24        A.   Yes.
25        Q.   The same thing with the words "pen drive" and
```

1    "flash drive," do you understand those things to be

2    synonymous?

3        A.   Yes.

4        Q.   So, throughout the deposition where we've

5    used those various terms, we understand that they're

6    interchangeable, correct?

7        A.   Correct.

8        Q.   As to the Sargeant server, is it your

9    understanding that Sargeant Marine, Inc. still has a

10   server to this day, correct?

11       A.   Yes.

12       Q.   And it's still in that same building on

13   Military Trail?

14       A.   Yes.

15       Q.   And do you believe that the email account of

16   Harry 3 is still on that server right now?

17       A.   I believe so.

18       Q.   So if we went there today, from this

19   deposition room, we would still find the HS3 email

20   account?

21       A.   Possibly.

22            MR. WERTMAN:   Objection.

23   BY MR. McCABE:

24       Q.   Does -- does Daniel Revis still work for

25   Sargeant Marine, Inc.?

Page 152

```
 1      A.   Yes.

 2      Q.   Are there any other IT employees who work for

 3   Sargeant Marine, Inc.?

 4      A.   No.

 5      Q.   I think when we left off, we were in the 2015

 6   time period when you saw that TradesWind -- TradeWinds

 7   article.  I want to ask you what is the next contact

 8   you remember having with Daniel Hall after the time

 9   period when that TradeWinds article?

10      A.   I don't remember.  I don't recall.

11      Q.   Did you ever meet with him in the United

12   Kingdom?

13      A.   Yes.

14      Q.   And how many times do you think you met with

15   him?

16      A.   I think three.

17      Q.   Did you text him?

18      A.   Yes.

19      Q.   How many times do you think you've texted

20   him?

21      A.   Fifteen.

22      Q.   So, I'm going to show you some text exchanges

23   that happened in August 2016, and from thereon.  To

24   get a time frame, though, my question is going to be:

25   Do you think you had communication with Daniel Hall
```

Page 153

```
 1   before August of 2016?

 2       A.   No.

 3       Q.   So, in between when you met him at Sargeant

 4   Marine in January of 2015, and these text exchanges,

 5   you don't think you had any communication with Daniel

 6   Hall?

 7       A.   Best of my recollection, no.

 8       Q.   How about anyone who worked with Daniel Hall?

 9       A.   No.

10       Q.   Lawyers, for instance, Ed Davis, anyone like

11   that?

12       A.   I said earlier there may have been some other

13   Ed Davis calls in there, but --

14            (Defendant's Exhibit 29 was marked for

15       identification.)

16   BY MR. McCABE:

17       Q.   All right.  Let me show you the document I'm

18   going to label 29.  Try this one.  Is that one better?

19       A.   Yeah, it actually is, yeah.

20       Q.   All right.  So, I'm looking at a document

21   labeled Exhibit 29.  Have you ever seen this before?

22       A.   I've never seen the document, no.

23       Q.   Take a minute to look at it, and I will ask

24   you:  Do the texts themselves look familiar to you?

25       A.   Was it oldest to newest, or newest to oldest?
```

```
 1        Q.    It appears to be chronological order, so --
 2        A.    Okay.  Newest to oldest.
 3        Q.    Other way, oldest to newest.
 4        A.    Oh, yeah.  Okay.  Got you.
 5        Q.    So -- and your lawyer can correct me if I'm
 6   wrong, but I think if you look, the date appears in
 7   the upper right.  So, the first one, for instance, is
 8   August 19 --
 9        A.    August 19, yeah.
10        Q.    -- 2016, using the European style of dating.
11   And -- and the very first text appears to be from
12   Daniel Hall.  But I want you to read it and confirm
13   that.  It might be helpful to understand how to read
14   the documents.
15        A.    Yeah.
16        Q.    Doesn't help that you're both named Dan.
17        A.    True.  Yeah, okay.  I see it.  Go ahead.
18        Q.    All right.  So, first question.  I want to
19   draw your attention to the very first text, which
20   appears to be August 9, 2016.  As you sit here today,
21   do you remember these texts?
22        A.    I remember we were texting.  I don't remember
23   exactly what they say.
24        Q.    Okay.  The first one says, "Dan, are you back
25   yet?  Let me know if you want to meet up next week.  I
```

Page 155

```
 1    have some Wilmer stuff for you.  And I'd love the
 2    other stuff we discussed."
 3         A.   Yeah.
 4         Q.   Do you see that?
 5         A.   Yeah.
 6         Q.   That appears to be a text from Dan Hall to
 7    you, do you agree?
 8         A.   Yes.
 9         Q.   Was -- did you have any conversations with
10    Dan Hall before this text took place?
11         A.   I -- not that I recall.
12         Q.   In other words, the last line says, "I'd love
13    the other stuff we'd discussed."
14         A.   Yeah.
15         Q.   So, my question to you is:  That implies
16    there was some discussion before the text.  Was there
17    some discussion?
18         A.   I don't recall.
19         Q.   What did you understand "Wilmer stuff" to
20    mean?
21         A.   Documents.
22         Q.   And you don't remember having any
23    conversations with Dan Hall before this text took
24    place about what the Wilmer stuff would be?
25         A.   No.
```

Page 220

1   going back through these emails.  Do you see the one

2   on page 3253, where Dan Hall says, "Further, to our

3   discussion on Friday"?

4       A.   Friday being Friday the -- was that like

5   the -- must have been the 3rd.

6       Q.   Well, I think if you look -- if you look at

7   the email on page 3253, it says, from Dan Sargeant,

8   Thursday, 4 of May.

9       A.   Okay.  So 4 of May, okay.

10      Q.   So, Friday would have been May 5th, correct?

11      A.   Correct.

12      Q.   So fair to infer that you-all had this

13  meeting with him on May 5th?

14      A.   Correct.

15      Q.   And then Andrew Preston's answer is coming on

16  May 11th?

17      A.   May 11th, yes.

18      Q.   It all makes sense?

19      A.   Yes.  Now, it does, yeah.

20      Q.   All right.  So during the May 5th meeting, is

21  it true that Dan Hall told you and Andrew Preston that

22  he was facing criticism internally as a result of the

23  provision of documents?

24      A.   Yes.

25      Q.   In other words, Andrew Preston didn't make

1    that up?

2        A.    No.

3        Q.    And it says you have asked for a hold

4    harmless indemnity from Dan.  That's true, correct?

5        A.    Correct.

6        Q.    Dan Hall asked that from you, correct?

7        A.    Correct.

8        Q.    It says, "You suggested that Dan was obliged

9    to do this on the basis that there was a contractual

10   agreement in place between Focus and Dan/LAIL."  Did

11   Dan Hall make that suggestion to you during that May

12   5th meeting?

13       A.    He may have.  He may have said that, but

14   that's not the case.

15       Q.    Right.  You guys disagreed with that,

16   correct?

17       A.    Yes.

18       Q.    But there's no doubt that Dan -- Dan Hall

19   made the suggestion to you that you were somehow

20   contractually obligated to indemnify him?

21       A.    Yeah.

22       Q.    And it was implicit within that agreement

23   that if and to the extent Focus suffered any liability

24   for the provision of that information.  So, my

25   question to you is:  Is it true that Dan Hall during

1    the May 5th meeting discussed with you the potential

2    that he may face liability?

3         A.   Yes.

4         Q.   Because he had provided those documents to

5    you?

6         A.   Yes.

7         Q.   You and your lawyer, Andrew Preston,

8    disagreed that you were obligated to give him any

9    indemnity, of course, correct?

10        A.   Correct.

11        Q.   Next paragraph says:  Dan provided -- well,

12   let me read the first sentence.  "Without going into

13   the history too much, you requested certain

14   information from Dan to assist in your investigations

15   for another client."  That was the HS3 material,

16   correct?

17        A.   Correct.

18        Q.   Dan provided that information, and was

19   prepared to live with the consequences of you using

20   that information in the public domain.  Is it a true

21   statement that you were prepared to live with the

22   consequences of Hall using that information in the

23   public domain?

24        A.   I don't know about the public domain.  But I

25   would say we gave him the information, and whatever

Page 263

```
 1          (A recess was taken beginning at 4:12 p.m.,
 2   and ending at 4:15 p.m.)
 3          THE VIDEOGRAPHER:  Back on the record.  The
 4   time is 4:15 p.m.
 5          MR. GOLDSMITH:  By agreement of the parties
 6   and the witness, we're going to start fresh in the
 7   morning with plaintiff's examination.  We can go
 8   off.
 9          THE VIDEOGRAPHER:  Off --
10          MR. COLEMAN:  Object to the form.
11          THE VIDEOGRAPHER:  Off the record.  Time is
12   4:15 p.m.
13          (Proceedings concluded at 4:15 p.m.)
14                  *    *    *    *    *
15
16
17
18
19
20
21
22
23
24
25
```

Page 264

1                          CERTIFICATE OF OATH

2

3

4    THE STATE OF FLORIDA )

5    COUNTY OF PALM BEACH )

6

7

8

9

10          I, the undersigned authority, certify that

11   DANIEL SARGEANT, personally appeared before me and was

12   duly sworn on the 26th day of June, 2019.

13

14          Signed this 1st day of July, 2019.

15

16

17

18   _____
     TOSHA S. SEANEY, CCR, GRL
19   Notary Public, State of Florida
     My Commission # GG 105516
20   My Commission Expires:  May 17, 2021

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    THE STATE OF FLORIDA )

4    COUNTY OF PALM BEACH )

5

6         I, TOSHA S. SEANEY, Certified Court Reporter,

7    do hereby certify that I was authorized to and did

8    stenographically report the foregoing deposition of

9    DANIEL SARGEANT; that a review of the transcript was

10   requested; and that the foregoing transcript, pages 1

11   through ^ end page, is a true and complete record of

12   my stenographic notes.

13        I FURTHER CERTIFY that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am

17   I financially interested in the action.

18

19        DATED this 1st day of July, 2019.

20

21                    _Tosha Seaney_

22        _____

                     TOSHA S. SEANEY, CCR, GRL
23                   Certified Court Reporter
                     Georgia Realtime License

24

25

Page 266

1    July 1, 2019

2
     DANIEL SARGEANT
3    c/o Jeffrey Wertman, Esquire
     Berger Singerman, LLP
4    350 East Las Olas Boulevard
     Suite 1000
5    Fort Lauderdale, Florida  33301

6    IN RE:  Daniel Hall vs. Harry Sargeant, III
     CASE NO.:  18-cv-8748-ALTMAN/Reinhart
7
     Please take notice that on the June 26, 2019, you gave
8    your deposition in the above cause.  At that time, you
     did not waive your signature.  The transcript is now
9    available for your review.

10   Please call (888) 811-3408 or e-mail
     production@phippsreporting.com between the hours of
11   9:00 a.m. and 4:00 p.m., Monday through Friday, for
     access to a read-only PDF transcript via computer.
12
     Please execute the PDF-fillable Errata Sheet which
13   will be forwarded to you by Phipps Reporting.  The
     Errata Sheet can also be downloaded from
14   www.phippsreporting.com.  Once completed, please
     print, sign, and return to us for distribution to all
15   parties.

16   If you do not read and sign the deposition within a
     reasonable amount of time, the original, which has
17   already been forwarded to the ordering attorney may be
     filed with the Clerk of the Court.

18
     If you wish to waive your signature now, please sign
19   your name in the blank at the bottom of this letter
     and return to the address listed below.

20   _____

21   Tosha S. Seaney, CCR, GRL
     Phipps Reporting
22   1551 Forum Place, Suite 200-E
     West Palm Beach, Florida  33401
23   (888) 811-3408

24   I hereby waive my signature.

25   _____
     Daniel Sargeant

```
 1                          ERRATA SHEET
          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 2            IN RE: Daniel Hall vs. Harry Sargeant, III
               CASE NO. 18-CV-8748-ALTMAN/REINHART
 3     WITNESS:  DANIEL SARGEANT          TAKEN: 06/26/2019
                  (VOLUME 2)
 4     PAGE    LINE        CHANGE        REASON FOR CHANGE

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____
       Under penalties of perjury, I declare that I have read
23     my deposition, and that it is true and correct subject
       to any changes in form or substance entered here.
24
       SIGNATURE OF DEPONENT: _____
25        DATE: _____
```



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 18-cv-8748-ALTMAN/Reinhart


DANIEL HALL, BURFORD CAPITAL, LLC,
and DUNDROD INVESTMENTS, LTD.,

        Plaintiffs,

vs.

HARRY SARGEANT, III,

        Defendant.
_____/



VIDEOTAPED DEPOSITION OF
DANIEL SARGEANT

VOLUME 03
(Pages 268 - 384)



Thursday, June 27, 2019
7:14 a.m. - 10:06 a.m.



Berger Singerman, LLP
One Town Center Road
Suite 301
Boca Raton, Florida  33486



Stenographically Reported By:
Tosha S. Seaney, CCR, GRL

```
 1   APPEARANCES:

 2   On behalf of the Plaintiffs Daniel Hall,
         Burford Capital, LLC, and Dundrod Investments, Ltd.:
 3
         KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
 4       1615 M Street, N.W.
         Suite 400
 5       Washington, D.C.  20036
         (202) 326-7945
 6       BY: ANDREW E. GOLDSMITH, ESQUIRE
         agoldsmith@kellogghansen.com
 7
     On behalf of Defendant, Harry Sargeant, III:
 8
         McCABE RABIN, P.A.
 9       1601 Forum Place
         Suite 505
10       West Palm Beach, Florida  33401
         (561) 659-7878
11       BY: RYON M. McCABE, ESQUIRE
         mccabe@mccaberabin.com
12
         FOLEY & LARDNER LLP
13       106 East College Avenue
         Suite 900
14       Tallahassee, Florida 32301-7732
         (850) 222-6100
15       BY: JOSHUA M. HAWKES, ESQUIRE
             MELISSA COFFEY, ESQUIRE
16       jhawkes@foley.com
         mcoffey@foley.com
17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:  (Continued)

 2

     On behalf of the Witness, Daniel Sargeant:
 3
         BERGER SINGERMAN, LLP
 4       350 East Las Olas Boulevard
         Suite 1000
 5       Fort Lauderdale, Florida  33301
         (954) 525-9900
 6       BY: JEFFREY S. WERTMAN, ESQUIRE
         jwertman@bergersingerman.com
 7

 8   ALSO PRESENT:

 9       David Parra, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           INDEX

                                             PAGE
 2
       Examination of Daniel Sargeant:
 3         Cross By Mr. Goldsmith                  272
           Redirect By Mr. McCabe                  346
 4         Recross By Mr. Goldsmith                377

 5     Certificate of Oath                         381
       Certificate of Reporter                     382
 6     Read and Sign Letter                        383
       Errata Sheet                                384
 7


 8


 9                      E X H I B I T S


10     EXHIBIT    DESCRIPTION                      PAGE


11     P-11     Seconded Amended Complaint         279


12     P-16     Amended Counterclaim               335


13     P-18     Sargeant Marine Company Policy     294
                Regarding Telephone and Emails
14
       P-23     Email String from Harry Sargeant   310
15              to Salvador Juan, Bates
                BUR_0046476
16     P-24     Email string from Jane Doe 2    to 317
                Harry Sargeant, Jr., Bates
17              BUR_0057094-57097.001
       P-25     Email string from Angela Marino to 321
18              TZaccaro, Bates BUR_0315505-315506
       P-26     Email from Angela Marino to        323
19              TZaccaro, Bates BUR-0326427-326428
       P-27     Email from Harry Sargeant, Jr., to 333
20              Jane Doe 1
       P-28     File Listing for SanDisk USB       342
21              Drive, BUR_0003791


22


23


24


25
```

1      The following proceedings began at 7:14 a.m.:

2            THE VIDEOGRAPHER:  We are now on the record.

3       The time is 7:14 a.m.

4                      DANIEL SARGEANT,

5      having been previously duly sworn or affirmed, was

6         hereinafter certified, testified as follows:

7                      CROSS-EXAMINATION

8   BY MR. GOLDSMITH:

9       Q.   Good morning, Mr. Sargeant.

10      A.   Morning.

11      Q.   My name is Andrew Goldsmith.  I represent

12  Daniel Hall, Burford Capital LLC, and Dundrod

13  Investments Limited in this case.

14      A.   Okay.

15      Q.   You testified a bit yesterday about your and

16  other people's roles at Sargeant Marine, Inc.

17      A.   Correct.

18      Q.   And I don't want to repeat those questions,

19  but I want to make sure that we have a couple of the

20  details.  You've worked at Sargeant Marine, Inc.

21  continuously since the late 1980s; is that correct?

22      A.   Correct.

23      Q.   And your brother, Harry Sargeant, III, worked

24  for Sargeant Marine, Inc. continuously from some time

25  before you joined until early to mid 2013; is that

1   correct?

2       A.   Correct.

3       Q.   Did Harry 3 receive compensation from

4   Sargeant Marine, Inc.?

5       A.   Yes.

6       Q.   In what form?

7       A.   Salary.

8       Q.   Do you know what it was?

9       A.   I want to say it was approximately 250,000

10  per year.

11      Q.   Was that what it was at the time of his

12  departure from the company?

13      A.   Yes, I believe so.

14      Q.   Has Harry III ever been an owner in Sargeant

15  Marine, Inc.?

16      A.   No.

17      Q.   And you testified yesterday that he separated

18  from the company in April of 2013.  Do you recall

19  that?

20      A.   I don't recall exactly when it was, but

21  somewhere thereabouts.

22      Q.   Could have been February?

23      A.   Could have been.

24      Q.   At the time of Harris III's separation from

25  the company, what was your position?

Page 274

```
 1        A.    President.
 2        Q.    As president, were you the highest-ranking
 3   officer?
 4        A.    Yes.
 5        Q.    And you're still president today?
 6        A.    Correct.
 7        Q.    Have your duties as president changed since
 8   2013?
 9        A.    No.
10        Q.    What are your duties as president?
11        A.    Well, actually, since 2013, the business has
12   changed a bit.  Because 2016, March, Sargeant Marine
13   formed a joint venture with Vitol, and all of the --
14   all of the asphalt assets were put into the joint
15   venture company.  And Sargeant Marine just became a
16   shareholder in the joint venture, and I took the
17   position as CEO of the joint venture.
18        Q.    Do you still have that position today?
19        A.    Yes.
20        Q.    What is the name of the joint venture?
21        A.    Valt, V-A-L-T.  And actually, the -- the
22   joint venture, we just sold our second half of the --
23   the other half of the joint venture to Vitol in May.
24   But I am still running the asphalt business for Vitol.
25        Q.    But Sargeant Marine, Inc. doesn't own any
```

1    part of Valt anymore?

2        A.   Not as of May, no.

3        Q.   When the joint venture was formed in 2016,

4    Sargeant Marine, Inc. continued as an entity though?

5        A.   Correct.  Yes.

6        Q.   And it continued to employ personnel?

7        A.   Yes, it did.

8        Q.   Continued to own its own assets?

9        A.   Yes.

10       Q.   So, backing up then, to the period when Harry

11   III separated from Sargeant Marine, what were your

12   duties as president then?

13       A.   I was responsible for business development

14   and commercial activities of the company.  General

15   management of the business as well.

16       Q.   Were there any parts of the company that were

17   not within your oversight as president?

18       A.   What period are we talking about?

19       Q.   2013.

20       A.   In Sargeant Marine specifically, or other

21   Sargeant entities?

22       Q.   In Sargeant Marine, Inc.

23       A.   In Sargeant Marine, Inc., no, I -- I saw the

24   entire business.

25       Q.   So, did your authority as president include

1   authority over the company's email system?

2       A.   Yes.

3       Q.   You testified yesterday about -- scratch

4   that.

5            Did your authority over the company --

6   Sargeant Marine, Inc.'s email system continue through

7   the period of the joint venture with Vitol?

8       A.   Yes.

9       Q.   You testified yesterday about Harry III's

10  email account with Sargeant Marine, Inc.  What was his

11  email address?

12      A.   HSargeantJR@sargeant.net.

13      Q.   Why "J-R"?

14      A.   Because he was known as "Junior," which is

15  actually the Third.  And we call my father "Senior,"

16  who was actually Junior.  So, quite confusing.  But,

17  yeah, that's why it was, yeah.

18      Q.   You testified yesterday that the company has

19  retained the content of the email accounts of former

20  employees other than Harry III?

21      A.   Sure.

22      Q.   Did any of those employees leave the company

23  before Harry III did?

24      A.   There were employees that left the company

25  before Harry III, and employees that left after

1    Harry III, so --

2        Q.    And in all cases, the company retained the

3    content of their email account?

4        A.    Yes.

5        Q.    And that was true before Harry III left, and

6    after?

7        A.    Correct.

8        Q.    Do you know whether --

9        A.    And the employees who were transferred to the

10   joint venture.  And the employees who remain now at

11   Vitol post the joint venture, we still have the

12   emails.

13       Q.    Do you know whether during his time at

14   Sargeant Marine, Inc., Harry III was aware that the

15   company retained the content of former employees'

16   email?

17            MR. McCABE:  Form.

18       A.    I don't see any reason he would not know

19   that.  Yeah.  My answer would be yes, he --

20   BY MR. GOLDSMITH:

21       Q.    Was he ever involved in any incident that you

22   can recall in which the company accessed the content

23   of a former employee's email account?

24       A.    Specifically, I don't recall an exact

25   instance.  But over 30 years, I'm sure there's been

Page 278

 1   instances.

 2       Q.   Does your authority as president include

 3   authority over the archives of former employees' email

 4   accounts?

 5       A.   Yes.

 6       Q.   Specifically, since Harry III has left the

 7   company, has your authority in that respect included

 8   authority over the archive of his email account?

 9       A.   Yeah.  I have access to any emails I want to

10   see that are on the company's server, as well as my

11   father.

12       Q.   Your father has that access as well?

13       A.   Access.  Yeah, sure.

14       Q.   You testified yesterday that James Sargeant

15   told you that he sent some pictures via text message

16   to Harry III's in-laws around Christmas 2013.  Do you

17   recall that?

18       A.   I agree.

19       Q.   What did you mean by "in-laws"?

20       A.   I'm not sure exactly who he sent them to.  I

21   don't really know, but I think it was some -- some

22   part of Harry's wife's family.  Some member of Harry's

23   wife's family.

24       Q.   Have you ever discussed that incident with

25   Harry III?

Page 279

1      A.   No.

2      Q.   Do you know if Harry III took any steps to

3  find out how James came to have the photographs that

4  he sent in those text messages?

5      A.   I'm -- don't know if -- I'm not aware of any

6  steps that he took to find out where the photographs

7  came from.

8           (Plaintiff's Exhibit 11 was marked for

9           identification.)

10  BY MR. GOLDSMITH:

11      Q.   Mr. Sargeant, you've been handed a document

12  that's been previously marked as Plaintiff's 11.  Do

13  you recognize that?

14      A.   Yeah, I believe I've seen this before, yeah.

15      Q.   Do you know what this is?

16      A.   This is a lawsuit that Harry filed against

17  various individuals.

18      Q.   Including you?

19      A.   Yes, me personally, and Latin American.

20      Q.   If you look at the markings at the top of

21  each page --

22      A.   Yes.

23      Q.   -- if you turn to about the middle of the

24  exhibit, there's a document labelled 93-2.

25      A.   93-1.  Okay.

1    Q.   And then if you turn within that 93-2 to page

2    10 of 30.  Do you see that in the upper right-hand

3    corner?

4    A.   10 of 30?

5    Q.   Right.

6    A.   Okay.

7    Q.   All right.  Do you recognize the document

8    that begins on that page?

9    A.   Yeah.  That seems to be the -- a settlement

10   agreement.

11   Q.   What settlement agreement is that?

12   A.   Must be the settlement agreement that was --

13   must be the -- as I refer to it as the family

14   settlement agreement.

15   Q.   Turn for a second to page 26 of 30.  Whose

16   signature is on that page?

17   A.   That's my signature.

18   Q.   Turn two more pages to 28 of 30.

19   A.   Okay.

20   Q.   Whose signature is on that page?

21   A.   That would my brother, H3.

22   Q.   How are you familiar with his signature?

23   A.   I just recognize it from being around.

24   Q.   Seeing it a number of times over the years?

25   A.   Seen it, yes.

Page 281

 1     Q.    If you turn paragraph 2.11 of the agreement.

 2     A.    Going back the other way?

 3     Q.    Yeah, right.  Which is on page 13 of 30.

 4     A.    Page 13, did you say?

 5     Q.    Page 13 of 30.

 6     A.    Oh, I'm looking at --

 7     Q.    I know they're different pages.

 8     A.    There are different numbers at top and

 9  bottom, yeah.

10     Q.    Okay.  Got it?

11     A.    Yes.

12     Q.    That defines pending litigation?

13     A.    Yes.

14     Q.    Which is 14 lawsuits that are listed there.

15  Do you see that?

16     A.    Okay, yeah.

17     Q.    Did any of those lawsuits involve Harry III

18  suing you?

19     A.    Let's see here.  Me personally?

20     Q.    You personally.  Let's start with you

21  personally, yeah.

22     A.    I believe.  I don't -- you know, I -- I

23  believe so, yes.

24     Q.    Did any of them involve Harry III suing

25  companies that you're affiliated with?

1      A.   Yes.

2      Q.   **Based on your experience, and the knowledge**

3  **of the events, did those claims that Harry III brought**

4  **against you have merit?**

5      A.   No.

6           MR. McCABE:  Form to the last one.

7  BY MR. GOLDSMITH:

8      Q.   **In your opinion, why did he file those claims**

9  **against you?**

10          MR. McCABE:  Form.

11     A.   Harry will file lawsuits for many different

12 reasons.  You know, I -- I don't know why he does what

13 he does, but --

14 BY MR. GOLDSMITH:

15     Q.   **When you say "many different reasons," what**

16 **reasons do you have in mind?**

17     A.   Well, I mean, I think some people use

18 litigation as a form of business practice, and you try

19 and make a living through litigation.  So, rather than

20 doing straightforward business.  So, I would put him

21 in that category of a career litigator, let's say.

22     Q.   **Turn forward in the agreement, please, to**

23 **paragraph 7.1.**

24     A.   Yes.

25     Q.   **Just take a minute to review that.  I'm**

1   actually going to ask you a part about --

2       A.   On the first --

3       Q.   On the first page.

4       A.   Okay.

5       Q.   What -- as you understand it, and I

6   understand you're not a lawyer, but I'm just looking

7   for your understanding.  What is the import of this

8   paragraph with respect to Sargeant Marine, Inc.?

9       A.   That he had nothing to do with Sargeant

10  Marine, Inc., and the moment this was signed, he was

11  out of Sargeant Marine, Inc., and nothing to do with

12  it going forward.

13      Q.   Did he ever have an ownership interest in

14  Sargeant Marine, Inc.?

15      A.   No.

16      Q.   When did you acquire your ownership interest

17  in it?

18      A.   Would have been some time -- some time prior

19  to -- prior to this, I believe.

20      Q.   Was it prior to Harry III's departure from

21  the company?

22      A.   I don't believe so.  Not certain on that.

23  I'd have to check.

24      Q.   Do you know whether Harry III is aware that

25  you have an ownership interest in the company?

Page 284

```
 1      A.   I don't know.
 2      Q.   All right.  Turning back to the start of this
 3   exhibit.  You said that this is a lawsuit that
 4   Harry III filed against you and others?
 5      A.   Yes.
 6      Q.   If you see at the very top, it is filed on
 7   February 20th, 2018.  Do you see that?
 8      A.   February 20th, 2018?  No.
 9           MR. WERTMAN:  (Indicating).
10      A.   Oh, sorry.
11   BY MR. GOLDSMITH:
12      Q.   That's okay.  Is that consistent with your
13   recollection?
14      A.   Yes.
15      Q.   Could you describe your relationship with
16   Harry III, please, in the period just leading up this?
17   Say 2017, and the first couple of months of 2018.
18      A.   Nonexistent.  No contact.
19      Q.   Did you have any -- receive any warning from
20   Harry III, or anyone else that this would be filed?
21      A.   I received a warning from -- I believe I
22   received a warning from Chuck Lichtman, yeah.
23      Q.   Why do you think that Harry III filed this
24   lawsuit?
25           MR. McCABE:  Form.
```

Page 285

1    A.   I believe that he filed this lawsuit because

2    he found out about the Ruperti deal, and the

3    documents.  And he was upset that he felt that he was

4    not going to get his share of the deal, which he had

5    already given up in the settlement agreement.  So, he

6    felt like he needed to sue over it.

7    **Q.   You said the Ruperti deal, and the documents.**

8    **Which documents?**

9    A.   The documents that are in question, the

10   documents we reviewed yesterday that Daniel gave me in

11   order to lead to the Ruperti deal.  So --

12   **Q.   What -- what leads you to your -- to that**

13   **view that you just expressed about why you felt that**

14   **he filed the lawsuits?**

15   A.   He's my brother.  I know.

16   **Q.   Dealt with him over many years?**

17   A.   Yeah.  I know his style.  I know who he's

18   learned his legal tactics from.  And -- and I've

19   seen -- been around him enough to know, you know, his

20   legal tactics.  Yeah.

21   **Q.   Who has he learned his legal tactics from?**

22   A.   I would say the first person he learned from

23   was a older gentleman in the business named Sanford

24   Brass, who was the father of AJ Brass.  And he was --

25   he was a career litigator as well.  You know, he just

1   was either being sued or suing people at all times.

2   And you know, Harry had a, you know, a close

3   relationship with him, and I believe that's where he

4   got his ideas from.

5       Q.   How do you know that Harry had a close

6   relationship with him?

7       A.   I -- I mean, it was -- it was known in the

8   industry.  I mean, we actually wound up buying the

9   Trigeant refinery from Sanford Brass at one point.

10      Q.   You've been present at meetings that included

11  both Harry III and Sanford Brass?

12      A.   Yeah, I was.  But there was one case between

13  Sanford Brass and Dan Murphy, which Dan Murphy --

14  Sanford Brass owned the refinery in south Texas.  And

15  Dan Murphy owned an asphalt terminal in south Texas

16  next to the refinery.  So, Dan Murphy was buying the

17  asphalt from Sanford Brass that came out of the

18  refinery next door.  So they had some sort of

19  commercial off-take agreement or commercial agreement.

20          Well, Sanford Brass and Dan Murphy wound up

21  selling to each other, or breaking -- suing each

22  other, and the deal broke up.  Somehow Harry was

23  involved in the deal.  I don't understand how or what

24  he was exactly doing.  But somehow, he managed to

25  extract a million dollars out of Sanford Brass to

1   testify one way in the lawsuit.

2           And that was the first thing I ever saw is:

3   How do you take a million dollars from somebody to

4   testify one way?  Isn't that, you know, wrong?  But

5   evidently, it worked out for him.  But that was the

6   start of it, you know.  And then I think it -- my

7   personal opinion is at that moment, he felt, oh, you

8   can make money litigating.

9       Q.   In that situation that you describe, who was

10  it who testified?

11      A.   H3.

12      Q.   And your belief was that he was paid by

13  Sanford Brass?

14      A.   No, I know he got the million dollars.  He

15  showed me when he got it.  I mean -- and that would

16  have been in the early '90s.  A million dollars is a

17  lot of money to a young kid, you know.

18      Q.   Is it your belief that what Harry III

19  testified to in that case wasn't true?

20      A.   I remember discussions around it.  And he

21  told Sanford, "I can testify one way or the other."

22  And -- now, whether it was true or untrue, I don't

23  know.  But I do remember him saying, "I will testify

24  one way or the other."  So, the way I saw it was

25  either pay me, or I'm going to testify for the other

Page 288

1  guy.

2      Q.   If you turn, please, in that second-amended

3  complaint to paragraph 5, which is on the second page.

4      A.   Okay.

5      Q.   That paragraph talks about Daniel Hall?

6      A.   Um-hum.

7      Q.   Who you've testified about already --

8      A.   Um-hum.

9      Q.   -- in this deposition.

10     A.   Yeah.

11     Q.   Have you ever discussed Mr. Hall with

12  Harry III?

13     A.   No.

14     Q.   That paragraph also refers to Burford

15  Capital, LLC.  Do you see that?

16     A.   Yes.

17     Q.   Have you ever discussed Burford Capital, LLC,

18  or any related entity with Harry III?

19     A.   No.

20     Q.   Have you discussed Dundrod Limited with

21  Harry III?

22     A.   I don't know who that is.  And no, I've never

23  discussed it.

24     Q.   You testified a bit yesterday about a man

25  named Mohammed Al-Sulaiti.

Page 289

1    A.   Correct.

2    **Q.   Have you ever discussed him with Harry III?**

3    A.   No, I don't believe I have.  Other than in a

4    previous deposition that Harry was present at.

5    **Q.   So in that deposition, you talked about**

6    **Mr. Al-Sulaiti?**

7    A.   Yeah.  Under questioning.  Yes.

8    **Q.   And Harry III was in the room?**

9    A.   Yes.

10   **Q.   What case was that in?**

11   A.   Too many to tell you exactly which one, but I

12   would have said it had to do something around that

13   whole time of the Trigeant bankruptcy, family

14   settlement.  So, I don't know.  Probably a better

15   question for Berger Singerman.

16   **Q.   So, apart from that incident, have you ever**

17   **discussed Mr. Al-Sulaiti with Harry III?**

18   A.   No.  Post -- post -- post breakup, no.  Prior

19   breakup, yes.

20   **Q.   Okay.  What did -- when did you talk to him**

21   **about Mr. Al-Sulaiti prior to breakup?**

22   A.   He -- you know, you -- you know, he was going

23   through a trial with Al-Sulaiti in West Palm Beach.

24   And, you know, I knew of his jet fuel deal.  I knew of

25   the people involved in the jet fuel deal.  I knew of

```
 1    the dispute that eventually came with Al-Sulaiti.  I

 2    knew about not paying ABN Amro.  I knew about the

 3    discrepancy in the fuel receipts.  You know, was I

 4    involved?  No.  But did I know it was going on?  Yeah.

 5            And like I said yesterday, I testified

 6    normally we're in a large group, sitting around

 7    discussing all sorts of business activities.  So,

 8    yeah, I was privy to information.  You know, I knew

 9    about the whole Al-Sulaiti thing, the king, the

10    cut-off, the brother-in-law.  Because the

11    brother-in-law was running around in Paris with the

12    mistress.  So they didn't pay the brother-in-law

13    because the king told them.  So, yeah, I've heard the

14    whole story.  But -- yeah.

15            So, I knew about Al-Sulaiti.  But it wasn't a

16    one-time deal that I spoke to him about Al-Sulaiti.

17    It was over, you know, a couple-of-year period.

18        Q.   Based on your conversations with Harry III,

19    what was his attitude with respect to Mr. Al-Sulaiti?

20        A.   I would say in the beginning, they were

21    probably all -- it was -- you know, it was probably a

22    happy partnership between the three players, as I saw

23    it.  But as time went on, that partnership eventually

24    soured.  And, you know, I got to imagine it got pretty

25    bad there when they were in Palm Beach.  But that's
```

1    how Harry's relation -- business relationships go.

2    He's been in a lawsuit with every partner he's ever

3    had other than Abu Naba, including his family.  And

4    we'll see.

5         **Q.   Do you recall anything in particular that**

6    **Harry III said that you thought revealed his attitude**

7    **toward Mr. Al-Sulaiti?**

8         A.   Oh, they used to call him "Crazy Mo," and say

9    he was on drugs, and he was out of control.  And he

10   was dealing in stolen diamonds or -- what's the black

11   market diamonds?  The -- whichever they all are.  You

12   know, I just heard all sorts of -- you know, and that

13   was always being in that environment of being around

14   the people.

15        **Q.   When you said "they used to say that," were**

16   **those things that Harry III said?**

17        A.   Yeah, mainly Harry or Mustafa, or that inner

18   circle of IOTC people.

19        **Q.   We're going to come back to this document,**

20   **but you can put that aside for a second.**

21        A.   Okay.

22        **Q.   During the period when Harry III was working**

23   **with Sargeant Marine, Inc., working for Sargeant**

24   **Marine, Inc., did he ever ask you to access his email**

25   **account?**

1     A.   Yes.  For sure.

2     Q.   **Did you do that more than once?**

3     A.   Yeah.  He rarely came into the office.  So,

4  he would -- he would tell me to go into his office.

5  My office was next door to him.  Log into his

6  computer.  And either forward something, or sign -- I

7  would sign a lot of documents for Harry as well.

8          You know, so, it would either be log in, and

9  forward something, or send something, or respond

10  something.  But yeah, I used to access his computer on

11  his desk.

12     Q.   **About how often did that happen that he asked**

13  **you to do that?**

14     A.   Oh, I would say at least a couple of times a

15  month.  Like I said, he didn't come to the office very

16  often, or he was out traveling.

17     Q.   **What time period are you referring to?**

18     A.   That's a long time period.  Yeah.  Many, many

19  years.

20     Q.   **Up until the time that he left the company?**

21     A.   Yes.

22     Q.   **Do you recall what his password was for his**

23  **email account?**

24     A.   It was -- I believe it was 1-2-3-4-5-6.

25     Q.   **Did it ever change that you recall?**

1   correct?

2        A.   Yeah.

3        Q.   Wasn't there a company phone that he used?

4        A.   Yeah.

5        Q.   So, we can go back and look at the policy

6   again, but I believe it applies not just to emails,

7   but also to --

8        A.   Phone, yeah.

9        Q.   -- company equipment, correct?

10       A.   Um-hum.

11       Q.   So, fair to say that if this policy really

12   existed, you were aware that Harry 3 violated it for

13   years?

14       A.   I can tell you that the policy existed.  That

15   much, I will agree with it.

16       Q.   Okay.  Will you agree that you were aware

17   that Harry 3 was violating this policy for years?

18       A.   Well, hindsight, he was violating the policy.

19       Q.   And you agree that neither you or anyone else

20   did anything to enforce the policy?

21       A.   No, I couldn't really enforce that policy on

22   Harry.

23       Q.   When your father testified, he said that the

24   policy was loosely enforced.  Will you agree with

25   that?

```
 1               MR. WERTMAN:  I object.  You can answer.
 2        A.   I don't -- I don't know.
 3   BY MR. McCABE:
 4        Q.   You can't agree one way or the other with
 5   your father's testimony?
 6        A.   I don't know -- I don't know what he means by
 7   "loosely."  But I wouldn't say we were the most strict
 8   people on emails, no.
 9        Q.   Okay.
10        A.   I mean, we don't have -- we don't have a
11   compliance department that, you know, has automatic
12   flag words, and photographs, and you know, photograph
13   detection.  We're just a mom-and-pop business.  We're
14   not Exxon.
15        Q.   I understand.  Let me take out the fact that
16   your father said it.  "Yes" or "no," do you agree that
17   Sargeant Marine loosely enforced its email policy?
18        A.   I would say we enforced it when -- when
19   necessary.
20        Q.   Can you give me an answer as to whether or
21   not you agree the policy was loosely enforced?
22               MR. GOLDSMITH:  Objection.
23               MR. WERTMAN:  I think he just did.
24        A.   If you want to call it "loosely," it was
25   loosely enforced.
```

Page 380

1          MR. WERTMAN:  We'll read.

2          THE STENOGRAPHER:  Are you ordering?

3          MR. McCABE:  Definitely.  Right?

4          MS. COFFEY:  Yes, we are, and the video.

5          THE STENOGRAPHER:  Do you need a copy of the

6    transcript?

7          MR. McCABE:  Yes.  Whatever.  Do we have a

8    standard order on file?

9          THE STENOGRAPHER:  I can contact your office

10   and see what you want.

11         MR. McCABE:  Thank you.

12         (Proceedings concluded at 10:06 a.m.)

13                   *     *     *     *     *

14

15

16

17

18

19

20

21

22

23

24

25

Page 381

1                        CERTIFICATE OF OATH

2

3

4      THE STATE OF FLORIDA )

5      COUNTY OF PALM BEACH )

6

7

8

9

10            I, the undersigned authority, certify that

11     DANIEL SARGEANT, personally appeared before me and was

12     duly sworn on the 27th day of June, 2019.

13            Signed this 1st day of July, 2019.

14

15

16

17     _____

18     TOSHA S. SEANEY, CCR, GRL
       Notary Public, State of Florida
       My Commission # GG 105516
19     My Commission Expires:  May 17, 2021

20

21

22

23

24

25

Page 382

1            CERTIFICATE OF REPORTER

2

3    THE STATE OF FLORIDA )

4    COUNTY OF PALM BEACH )

5

6            I, TOSHA S. SEANEY, Certified Court Reporter,

7    do hereby certify that I was authorized to and did

8    stenographically report the foregoing deposition of

9    DANIEL SARGEANT; that a review of the transcript was

10   requested; and that the foregoing transcript, pages

11   268 through 384, is a true and complete record of my

12   stenographic notes.

13           I FURTHER CERTIFY that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am

17   I financially interested in the action.

18

19           DATED this 1st day of July, 2019.

20

21

22   _____
     TOSHA S. SEANEY, CCR, GRL
23   Certified Court Reporter
     Georgia Realtime License

24

25

1   July 1, 2019

2

   DANIEL SARGEANT
3   c/o Jeffrey Wertman, Esquire
   Berger Singerman, LLP
4   350 East Las Olas Boulevard
   Suite 1000
5   Fort Lauderdale, Florida  33301

6   IN RE:  Daniel Hall vs. Harry Sargeant, III
   CASE NO.:  18-cv-8748-ALTMAN/Reinhart
7
   Please take notice that on the June 26, 2019, you gave
8   your deposition in the above cause.  At that time, you
   did not waive your signature.  The transcript is now
9   available for your review.

10   Please call (888) 811-3408 or e-mail
   production@phippsreporting.com between the hours of
11   9:00 a.m. and 4:00 p.m., Monday through Friday, for
   access to a read-only PDF transcript via computer.
12
   Please execute the PDF-fillable Errata Sheet which
13   will be forwarded to you by Phipps Reporting.  The
   Errata Sheet can also be downloaded from
14   www.phippsreporting.com.  Once completed, please
   print, sign, and return to us for distribution to all
15   parties.

16   If you do not read and sign the deposition within a
   reasonable amount of time, the original, which has
17   already been forwarded to the ordering attorney may be
   filed with the Clerk of the Court.
18
   If you wish to waive your signature now, please sign
19   your name in the blank at the bottom of this letter
   and return to the address listed below.
20   _____
21   Tosha S. Seaney, CCR, GRL
   Phipps Reporting
22   1551 Forum Place, Suite 200-E
   West Palm Beach, Florida  33401
23   (888) 811-3408

24   I hereby waive my signature.

25   _____
   Daniel Sargeant

```
 1                          ERRATA SHEET
            DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 2             IN RE: Daniel Hall vs. Harry Sargeant, III
                 CASE NO. 18-CV-8748-ALTMAN/REINHART
 3     WITNESS:  DANIEL SARGEANT          TAKEN: 06/27/2019
                     (VOLUME 3)
 4     PAGE    LINE         CHANGE          REASON FOR CHANGE

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____
       Under penalties of perjury, I declare that I have read
23     my deposition, and that it is true and correct subject
       to any changes in form or substance entered here.
24
       SIGNATURE OF DEPONENT: _____
25        DATE: _____
```