**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-80748-ALTMAN/Reinhart**

DANIEL HALL,
BURFORD CAPITAL LLC, and
DUNDROD INVESTMENTS LTD.,

    Plaintiffs,

    v.

HARRY SARGEANT, III,

    Defendant.
_____/

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Daniel Hall, Burford Capital LLC ("Burford Capital"), and Dundrod Investments Ltd. ("Dundrod"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Southern District of Florida Local Rule 56.1, hereby file their Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment and state as follows:

## I. THE SARGEANT FAMILY BUSINESSES

### A. HS3's Employment with Sargeant Marine

1. In 1984, Harry Sargeant, Jr. ("HS2") founded Sargeant Marine, Inc. ("Sargeant Marine"), an asphalt trading and shipping company based in Boca Raton, Florida. Decl. of Andrew E. Goldsmith in Supp. of Pls.' Mot. for Partial Summ. J. (filed concurrently herewith) ("Goldsmith Decl.") Ex. 1 (HS2 Tr. at 11:20-12:4).

2. Sargeant Marine became the flagship company for several companies ("Sargeant Family Businesses") co-owned by HS2, his wife, and two of their three sons, Daniel and James Sargeant. Goldsmith Decl. Ex. 1 (HS2 Tr. at 11:2-11:9). These companies included Sargeant Bulktainers, Inc. ("Sargeant Bulktainers"). Goldsmith Decl. Ex. 1 (HS2 Tr. at 18:19-19:7).

3. From 1987 or 1988 to early 2013, HS2's other son, Defendant Harry Sargeant, III ("HS3" or "Defendant"), was an employee of Sargeant Marine, Goldsmith Decl. Ex. 2 (HS3 Tr. at 56:10-12), but HS3 never served as an officer and never possessed any ownership interest in the company, *id* at 57:3-4; *id.* at 59:5-13; Goldsmith Decl. Ex. 1 (HS2 Tr. at 24:18-21); Goldsmith Decl. Ex. 3 (Daniel Sargeant Tr. ("D. Sargeant Tr.") at 272:23-273:2); *id.* at 273:14-16; Goldsmith Decl. Ex. 4 (HS3's Ans. to Pls.' Second Set of Reqs. for Admis. ("HS3 Ans. 2d RFAs") at 24, No. 129).

4. Since the early 2000s, Daniel Sargeant has served as President of Sargeant Marine. Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 274:1-19); *id.* at 299:21-24; Goldsmith Decl. Ex. 5 (Sargeant Marine 2013 Annual Report at 1 ("2013 Annual Rep.")).

### B. Sargeant Marine's E-mail and Computer Systems & Policies

5. Sargeant Marine owned and maintained computer servers at its headquarters in an office building at 3020 Military Trail in Boca Raton, Florida, which it used to store company files and host employee email accounts on its "sargeant.net" domain. Goldsmith Decl. Ex. 1 (HS2 Tr. at 46:7-15); Goldsmith Decl. Ex. 6 (E. Daniel Rivas Tr. ("Rivas Tr.") at 146:2-9); *id.* at 51:23; Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 2, No. 34).

1

6. Since at least 1999, Sargeant Marine continuously maintained a written companywide policy regarding employee use of company email accounts and computer systems. Goldsmith Decl. Ex. 10 (Pls.' Dep. Ex. 18 at 1 ("IT Policy")); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 272:23-273:16); Goldsmith Decl. Ex. 1 (HS2 Tr. at 57:3-57:4); *id.* at 59:5-59:23; Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 75:19-75:20); *id.* at 297:20-23; Goldsmith Decl. Ex. 6 (Rivas Tr. at 5:1-7:25); *id.* at 166:8-16. The other Sargeant Family Businesses, including Sargeant Bulktainers, maintained similar written IT policies. Goldsmith Decl. Ex. 7 (Pls.' Dep. Ex. 7 at 1); Goldsmith Decl. Ex. 8 (Pls.' Dep. Ex. 33 at 1); Goldsmith Decl. Ex. 9 (Pls.' Dep. Ex. 34 at 1).

7. The Sargeant Marine IT Policy provides that the company's computer and email systems are "company property," and "all messages or files composed, sent, or received on these systems are and remain the property of the company." Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 298:11-14 ███████████████████████████ ███████████████████████████████)); Goldsmith Decl. Ex. 6 (Rivas Tr. at 167:3-7); *id.* at 103:20-25, 105:9-11. The policy expressly states that any such messages or files "are not the private property of any employee." Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 6 (Rivas Tr. at 105:9-11) ("███████████████ ███████████████████████).

8. The Sargeant Marine IT Policy also provides that "[t]he company reserves and intends to exercise the right" to "review," "intercept," "access," and "disclose" any email messages or files created or exchanged on the company's systems. Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 299:10-20); Goldsmith Decl. Ex. 6 (Rivas Tr. at 103:18-25); *id.* at 170:2-6.

9. Further, the policy explains that "[t]he confidentiality of any message or file should not be assumed," "the use of passwords for security does not guarantee confidentiality," and "[a]ll passwords must be disclosed to the company or they are invalid and cannot be used." Goldsmith Decl. Ex. 10 (IT Policy at 2); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 300:11-24).

10. Under the Sargeant Marine IT Policy, employees may use the company's computer and email systems solely for business purposes absent written approval. Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 6 (Rivas Tr. at 170:23-171:2). The policy prohibits using the computer or email systems to create "offensive or disruptive content,"

including "any messages or files which contain sexual implications." Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 6 (Rivas Tr. at 172:6-11).

11.     The Sargeant Marine IT Policy is and always has been posted in the company's office kitchen, where Daniel Sargeant testified that he saw HS3 "███████████████████ ███████" Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 233:11-234:1); *id.* at 236:13-17, 296:10-14; Goldsmith Decl. Ex. 1 (HS2 Tr. at 53:25-54:7).

12.     Sargeant Marine's owners, including HS2 and Daniel Sargeant, have authority to direct the company's system administrator, E. Daniel Rivas, to grant or deny access to the company's computer and email systems. Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 278:2-13); *id.* at 299:25-300:8; Goldsmith Decl. Ex. 6 (Rivas Tr. at 145:6-21).

13.     When an employee is terminated or otherwise leaves employment with Sargeant Marine, it is company practice that the former employee is immediately blocked from accessing his or her company email account, his or her passwords are changed, and his or her email messages and files are archived and moved to dedicated folders on the company's file servers. Goldsmith Decl. Ex. 6 (Rivas Tr. at 52:6-2); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 75:22-24); *id.* at 276:18-277:7, 277:13-20, 278:2-13.

### C.     HS3's Use of Sargeant Marine's Email and Computer Systems

14.     While HS3 was an employee of Sargeant Marine, the company provided him with an email account with the email address "████████████████████" Goldsmith Decl. Ex. 2 (HS3 Tr. at 84:8-14); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 27:1-6); *id.* at 276:9-12.

15.     HS3 testified that, throughout this time period, he always used the same password for all of his email accounts: "████████████." Goldsmith Decl. Ex. 2 (HS3 Tr. at 89:14-16); *id.* at 90:2-8, 90:23-24 (testifying that "S███████████" was "██████ ████████████████████").

16.     HS3 gave his password to his email account and computer to other employees at Sargeant Marine, including Rivas and Daniel Sargeant, and regularly asked them to access his email account and office computer. Goldsmith Decl. Ex. 6 (Rivas Tr. at 149:5-11); *id.* at 150:11-14; Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 291:22-292:19); *id.* at 292:22-24, 293:2-23.

17.     HS3 regularly viewed pornography on his office computer, in violation of the Sargeant IT Policy. Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 36:18-20).

3

18. Also in violation of that policy, HS3 used his hsargeantjr@sargeant.net account to correspond with women with whom he engaged in extramarital affairs, including two women known in this case as "Jane Doe 1" and "Jane Doe 2." Aff. of Michael F. McGowan (filed concurrently herewith) ("McGowan Aff.") at Ex. A, Report of Forensic Analysis of Michael F. McGowan (July 12, 2019) ("McGowan July 12 Rep."), Ex. B, Summ. of HS3_005 Produc. Info.).

19. HS3's email correspondence with Jane Doe 1 included messages that attached photographs and videos that depict Jane Doe 1, including photographs and videos which HS3 described as "███████." Goldsmith Decl. Ex. 2 (HS3 Tr. at 146:2-146:11); *id.* at 148:13-25, 183:15-16.

20. HS3's extramarital relationship with Jane Doe 1 was widely known to friends, colleagues, and business acquaintances, from fraternity brothers to fellow former Marines to the former Governor of Florida. Goldsmith Decl. Ex. 2 (HS3 Tr. at 146:1-5 (testifying that "███ ███" in his "███████" were aware of HS3's extramarital relationship with Jane Doe 1 and "████████████████████████████████████"); *id.* at 142:7-16, 145:10-13, 156:19-23 (testifying that Deborah Sargeant, HS3's wife, knew that he was "██████" and that they do not speak about his extramarital relationships); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 309:12-15) (██████████████████████████████████████████████████████████████████").

21. It was "commonplace" for HS3 to show sexually-explicit photographs and videos to friends, colleagues, and other acquaintances. Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 31:16-18); *id.* at 35:16-22, 36:18-20; Goldsmith Decl. Ex. 2 (HS3 Tr. at 225:14-226:8); *id.* 135:2-136:9, 137:4-16, 137:24-138:3, 149:9-14; Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 9, No. 59).

22. Throughout his 15-year relationship with Jane Doe 1, HS3 routinely brought her to social functions with friends and business acquaintances, which HS3 testified was common in the oil and shipping industry. Goldsmith Decl. Ex. 2 (HS3 Tr. at 144:2-7) (██████████████████████████████████"); *id.* ████████████████████████████████████████████████████████████████████████████████████████████████████████████).

### D. The Sargeant Family Ousts HS3 From the Sargeant Family Businesses

23. In the mid-to-late 2000s, HS3's relationship with his family began to strain as his family grew frustrated by HS3's management style, reckless pursuit of independent business ventures, and improper looting of family assets for his own purposes. Goldsmith Decl. Ex. 1 (HS2 Tr. at 28:1-5); *id.* at 23:20-21, 24:4-8, 28:10-20, 34:9-15; Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 19:17-20:21). In early 2013, these disputes came to a head and HS3 left Sargeant Marine. Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 13:21-24, 79:16-18); Goldsmith Decl. Ex. 2 (HS3 Tr. at 57:1-9).

24. Within days of HS3's termination, HS2 directed Rivas to block HS3's access to his company email account. Goldsmith Decl. Ex. 1 (HS2 Tr. at 78:17-78:20); *id.* at 79:10-79:14. In February 2013, HS3 unsuccessfully attempted to access his email account and asked one of his business acquaintances to communicate with Rivas via text message to ask whether Rivas had changed his password. Goldsmith Decl. Ex. 48 (Pls.' Dep. Ex. 21 at 1); Goldsmith Decl. Ex. 2 (HS3 Tr. at 159:3-162:12). Rivas responded: "[B]y senior's order, had to be disconnected, today. Sorry, but are my orders, you have to use BTB Refining from now on." Goldsmith Decl. Ex. 48 (Pls.' Dep. Ex. 21 at 1). HS3 testified that Rivas later told him that "█████████ ██████████████████████████████████████████." Goldsmith Decl. Ex. 2 (HS3 Tr. at 164:20-25). Subsequent to being cut off, HS3 never asked HS2 or Daniel Sargeant to provide him with access to his email account. Goldsmith Decl. Ex. 2 (HS3 Tr. at 171:9-13); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 81:22-25). HS3's email account was not live on the server in October 2016. Goldsmith Decl. Ex. 6 (Rivas Tr. 196:7-24).

### E. James Sargeant Sends HS3 and HS3's Family Photos from His Email Account on Christmas in 2013

25. On Christmas Day, 2013, HS3's other brother, James Sargeant, sent a series of text messages containing three photographs of HS3 and Jane Doe 1 to HS3's wife, son, and daughter-in-law. Goldsmith Decl. Ex. 11 (Pls.' Dep. Ex. 1 ("Police Rep.") at 3-4). These photographs are among the photos contained in the "HS3 Material" that HS3 later alleged in his claims against Hall that Daniel Sargeant obtained by accessing his Sargeant Marine email account and the Sargeant Marine computer server in October 2016. Goldsmith Decl. Ex. 11 (Police Rep. at 3-4); Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 8-9, Nos. 56-58); Goldsmith Decl. Ex. 45 (Ltr. from M. Coffey to A. Cordoves (May 17, 2019)).

5

26. In one of James Sargeant's text messages, he threatened to send sexually explicit videos of HS3 and Jane Doe 1. Goldsmith Decl. Ex. 11 (Police Rep. at 4). The videos described in that text message are among the videos contained in the HS3 Material. Goldsmith Decl. Ex. 2 (HS3 Tr. at 184:13-187:17).

27. HS3 helped HS4 report the incident to the police, which entailed sending the text messages – including the photos of HS3 and Jane Doe 1 – to the police. Goldsmith Decl. Ex. 47 (HS4 Tr. at 27:20-29:15); Goldsmith Decl. Ex. 11 (Police Rep. at 1-14). This made the text messages and images available to the public. Goldsmith Decl. Ex. 11 (Police Rep. at 3-4).

28. HS3 sought advice from attorneys at Foley & Lardner LLP ("Foley") regarding criminal charges that could be brought against James Sargeant based on the text messages. *Id.* at 9-14); Goldsmith Decl. Ex. 2 (HS3 Tr. at 193:1-10). Foley subsequently sent an email to HS3 with the subject line, "FOR LAW ENFORCEMENT," and listing three criminal statutes, including Florida Statute § 815.06, Goldsmith Decl. Ex. 46 (Pls. Dep. Ex. 38 at 1-4), which Foley said makes it a felony to engage in the "unauthorized taking of electronically stored information." Fla. Stat. § 815.06. HS3 forwarded that email to the police. Goldsmith Decl. Ex. 11 (Police Rep. at 9-14).

**F.** **HS3 Relinquishes His Interest in the Sargeant Family Businesses**

29. After HS3's ouster in early 2013, the Sargeant Family and HS3 engaged in extensive litigation, with each side filing lawsuits against the other. *Sargeant v. Maroil Trading, Inc.,* No. 17-cv-81070 (S.D. Fla. Sept. 25, 2017) ("Related Action"), ECF No. 93-2 ("Sargeant Settlement") § 2.11 (listing cases).

30. On April 18, 2015, the Sargeant Family and HS3 entered into a settlement agreement to resolve their litigation and other disputes (the Sargeant Settlement). *Id.* In the Sargeant Settlement, HS3 formally acknowledged that he had no "present ownership interest" in Sargeant Marine and relinquished any "direct, indirect, or beneficial ownership interest in or to any of the Sargeant entities." *Id.* § 7.1; Goldsmith Decl. Ex. 2 (HS3 Tr. at 69:5-73:25); Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 25, Nos. 130-32). Accordingly, as of the Sargeant Settlement, HS3 no longer had any ownership interest in, or right to control access to, the computer servers owned and maintained by the Sargeant Family Businesses.

**II.** **THE AL-SALEH LITIGATION**

    **A.** **A Florida Jury Finds That HS3 Defrauded Mohammed Al-Saleh Out of Tens of Millions of Dollars**

6

31.     In 2011, a Florida jury found that HS3 had defrauded his business partner, Mohammed Al-Saleh, and awarded Al-Saleh $28.8 million in damages, plus costs and post-judgment interest.  Final J. on the Verdict, *Al- Saleh v. Sargeant*, No. 502008CA010187 (15th Jud. Cir. Fla. Sept. 19, 2011) ("Florida Judgment"); Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 11-12, Nos. 65-70).

32.     Prior to the Florida Judgment, in October 2010, Mohammed Al-Saleh had entered into an agreement with Plaintiff Dundrod, an affiliate of Burford Capital, to obtain funding for his litigation against HS3.  Goldsmith Decl. Ex. 51 (BUR_0003660).

33.     Notwithstanding an unsuccessful appeal to the Florida Supreme Court, HS3 refused to pay Al-Saleh and proceeded to divert his assets to evade enforcement of the judgment.  Goldsmith Decl. Ex. 2 (HS3 Tr. at 27:19-25); *id.* at 32:14-33:11 (███████████████████ ██████████████████████████████████████████); *see also id.* at 32:3-9, 43:4-14; Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 10-11, Nos. 63, 64).  HS3 testified that refusing to pay was "████████████," and that the resulting litigation was "███████████████" Goldsmith Decl. Ex. 2 (HS3 Tr. at 27:4-28:23, 38:17-39:25).  HS3's brother Daniel Sargeant testified that HS3 is "████████████," the type of person who "████████ █████████████████████" and "██████████████████████████," having learned early in his career that "██████████████████████."  Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 282:8-282:21, 286:10-287:8).

34.     To collect the unpaid judgment, Al-Saleh commenced seven separate proceedings supplementary to execution in Florida state court, *Al- Saleh v. Sargeant*, Case No. 50 2008 CA 010187 (15th Jud. Cir. Fla. Apr. 10, 2008), as well as a variety of actions and proceedings in courts across the globe, including in Texas, Delaware, Canada, the Bahamas, and the United Kingdom.  ECF No. 1-1 ("Settlement Agreement"), Recitals E-JJ; Goldsmith Decl. Ex. 4 (HS3's Ans. 2d RFAs at 13-19, Nos. 76-107).

**B.     After HS3 Refuses To Pay the Florida Judgment, Al-Saleh Retains Hall to Assist His Judgment Enforcement Efforts**

35.     In September 2014, Al-Saleh's counsel retained Focus Investigations Ltd. ("Focus"), an asset-tracing and investigations firm co-owned by Plaintiff Daniel Hall, to help locate HS3's assets and assist with judgment enforcement efforts.  Goldsmith Decl. Ex. 12 (Davis Decl. ¶ 4); Goldsmith Decl. Ex. 13 (BUR_0003703 ("Engagement Letter")).

36. In 2015, Focus was acquired by Burford Capital (UK) Limited ("Burford UK"), another affiliate of Burford Capital. Goldsmith Decl. Ex. 49 (BUR_0504810).

37. After the acquisition, Hall continued his work on behalf of Al-Saleh's judgment enforcement efforts. Goldsmith Decl. Ex. 15 (Hall Tr. at 40:16-42:12).

38. Aviva Will, a lawyer at Burford Capital, supervised Hall in connection with his work on the Al-Saleh matter. Goldsmith Decl. Ex. 14 (Will Tr. at 178:23-179:5); Goldsmith Decl. Ex. 15 (Hall Tr. at 467:7-469:4).

39. As part of his judgment enforcement work on behalf of Al-Saleh, Hall asked numerous people for information about HS3 that could aid in the identification of HS3's assets. Goldsmith Decl. Ex. 15 (Hall Tr. at 80:14-81:2, 82:6-10, 153:25-154:16). In early 2015, Hall met Daniel Sargeant, whom Hall had reason to believe might be willing to provide such information. Goldsmith Decl. Ex. 15 (Hall Tr. at 150:21-152:4). Shortly after that meeting, Daniel Sargeant's lawyer gave Al-Saleh's counsel a set of emails from HS3's Sargeant Marine email account. Goldsmith Decl. Ex. 15 (Hall Tr. at 190:19-194:3). In furtherance of Al-Saleh's judgment enforcement efforts, Hall and his team analyzed those emails for information relevant about HS3 and his assets. Goldsmith Decl. Ex. 15 (Hall Tr. at 200:13-201:2, 201:20-202:16).

40. Later, in August 2016, again in furtherance of Al-Saleh's judgment enforcement efforts, Hall communicated with Daniel Sargeant about the possibility of Daniel Sargeant giving him a USB drive that Hall understood to contain "[redacted]" of HS3's Sargeant Marine email. Goldsmith Decl. Ex. 15 (Hall Tr. at 94:9-96:21, 151:7-153:17, 219:2-222:17); *see also* Goldsmith Decl. Ex. 14 (Will Tr. at 161:12-19).

41. On October 14, 2016, while Hall was in Florida on a combined work/business trip, an employee of Daniel Sargeant's gave Hall a USB drive containing 297 .msg files (i.e., email messages saved individually) and 11 .pst files (i.e., email storage files) that in turn contained 168,158 additional email messages. McGowan July 12 Rep. ¶¶ 23, 30; Goldsmith Decl. Ex. 15 (Hall Tr. at 101:14-102:11; 400:16-401:10).

42. After receiving the USB stick, Hall brought it back to his office in London. There, Burford employees, including case analyst Bianca Beam, spent significant time reviewing the emails in the .pst files, and created a spreadsheet that recorded information for use in the judgment enforcement investigation. Goldsmith Decl. Ex. 16 (Beam Tr. at 138:24-141:22,

8

200:11-212:9); Goldsmith Decl. Ex. 17 (Pls.' Dep. Ex. 24 at 1); Goldsmith Decl. Ex. 18 (BUR_0505319-BUR_0505325); Goldsmith Decl. Ex. 19 (BUR_0505326-BUR_0505330).

43. Hall performed his judgment-enforcement work not only for the benefit of Al-Saleh, but also for the benefit of Burford Capital and Dundrod, which stood to share in any financial recovery from HS3 due to the litigation-funding agreement entered into between them in 2010.  Goldsmith Decl. Ex. 51 (BUR_0003660).

      C.     **HS3 and Al-Saleh Enter into Settlement Agreement**

44. In September and October 2016, counsel for HS3 and Al-Saleh negotiated the terms of a settlement, exchanging drafts of an agreement via email.  Goldsmith Decl. Exs. 20-29 (HS3_0000249, HS3_0000017, HS3_0000226, HS0000203, HS3_0000042, HS3_0000095, HS3_0000067, HS3_0000148, HS3_0000298, HS3_0000270).

45. On October 4, 2016, HS3 and Abu-Naba'a entered into a settlement agreement with Al-Saleh "to fully and finally resolve any and all disputes and to settle any litigation between them subject to the terms and conditions of this Agreement."  ECF No. 1-1 (Settlement Agreement at 1); Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 12, No. 72).  HS3 personally executed the Settlement Agreement with knowledge of its terms.  Goldsmith Decl. Ex. 31 (HS3's Ans. to Pls.' First Set of Reqs. for Admis. ("HS3 Ans. 1st RFAs") at 3-4, Nos. 7-8).

46. The Settlement Agreement required the parties to take several steps after its execution.  Within the next 10 business days each side was to provide releases to the other, and the parties were to work together to have certain enjoined funds released to Al-Saleh.  ECF No. 1-1 (Settlement Agreement §§ 2, 4).  HS3 was to make nine additional payments over the following nine months, and several related litigations were to be resolved.  *Id.* §§ 5-9.

47. Accordingly, Hall continued his judgment enforcement investigation after the execution of the Settlement Agreement.  Goldsmith Decl. Ex. 14 (Will Tr. at 169:12-20); Goldsmith Decl. Ex. 15 (Hall Tr. at 96:16-99:12).

48. In late October, HS3 personally executed a release in favor of Al-Saleh, Burford, and Dundrod, with an Effective Date of October 28, 2016.  Goldsmith Decl. Ex. 32 (Pls.' Dep. Ex. 42 ("Release") at 1).  HS3 executed the Release with knowledge of its terms.  Goldsmith Decl. Ex. 31 (HS3 Ans. 1st RFAs at 5-6, Nos. 14-16).  HS3's counsel delivered the executed

copy of the Release to Al-Saleh's counsel in January 2017. *Id.* at 6, No. 17; *see also* Goldsmith Decl. Ex. 50 (Def.'s Dep. Ex. 3 § 3 ("Am. to Settlement Agreement")).

49. The agreed purpose and objective of the Settlement Agreement was to be fully and finally finished with any and all disputes between the parties. Goldsmith Decl. Ex. 2 (HS3 Tr. at 240:17-21) ("███████████████████████████████████████████

██████████████████████████████████████"); *id.* at 242:20-243:11 ("██████████████████████████████████"); Goldsmith Decl. Ex. 14 (Will Tr. at 86:7-86:11) ("████████████████████████████

████████████████████████████"); *id.* at 87:12-18 ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████").

50. The Release was central to this objective. Al-Saleh wanted the right to receive the balance of the entire judgment amount if the terms of the releases were breached. Goldsmith Decl. Ex. 14 (Will Tr. at 86:7-11) ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████").

## III. THE SECOND AMENDED COMPLAINT

### A. HS3 Files Second Amended Complaint Against Hall

51. On February 20, 2018, HS3 filed a Second Amended Complaint ("SAC") in the Related Action. ECF No. 1-4 (SAC at 1); Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 2, Nos. 32-33). The SAC alleged two conspiracy counts against Hall, premised on his alleged agreement with Daniel Sargeant that the latter would access HS3's Sargeant Marine-provided email account ("HS3 Email Account") on the company's computer server ("Sargeant Server") and obtain HS3's personal and business files ("HS3 Material"). ECF No. 1-4 (SAC ¶¶ 20-22, 33). Count II of the SAC asserted that Hall conspired with Daniel Sargeant, Daniel Sargeant's company Latin American Investments Ltd. ("LAIL"), and Daniel Sargeant's attorney, Andrew Preston, to violate the federal Computer Fraud and Abuse Act ("CFAA"). *Id.* ¶¶ 53-62. Count VIII of the SAC asserted that Hall, Daniel Sargeant, and Preston also conspired to violate Florida's



Computer Abuse and Data Recovery Act ("CADRA") and to invade HS3's privacy in violation of Florida law. *Id.* ¶¶ 106-122.

52. The HS3 Material was defined in the SAC to consist of 278 .msg files that LAIL had produced to HS3 earlier in the Related Action. *Id.* ¶ 22 & Ex. A. Those .msg files were included among the .msg files on the USB drive that Hall received on October 14, 2016. McGowan July 12 Rep. ¶ 24.

53. HS3 testified that he filed the SAC against Hall because Hall had obtained the HS3 Material, an act that HS3 considered "███████," "███████," "███████," "███████," "███████," "███████," "███████," and "███████." Goldsmith Decl. Ex. 2 (HS3 Tr. at 203:10-11); *id.* at 204:7, 205:16, 217:16-17, 220:22-221:2, 236:22-237:2, 256:24, 268:21-2, 268:1-6, 277:1-277:17); *see also id.* at 267:9-12 (describing Hall as "███████" and "███████").

54. HS3 testified that "███████" was to find out "███████," "███████" and "███████." Goldsmith Decl. Ex. 2 (HS3 Tr. at 236:18-29, 237:1-8). His counsel similarly testified that "███████" Goldsmith Decl. Ex. 44 (Coleman Tr. at 16:5-8).

55. The SAC was filed by HS3's counsel on his behalf and with his authorization. Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 2, Nos. 32, 33).

**B. HS3 Voluntarily Dismisses the SAC After Magistrate Judge Reinhart Recommends that the Claims Against Hall Be Dismissed**

56. On May 30, 2018, Magistrate Judge Bruce E. Reinhart recommended that Counts II and VIII in the Related Action be dismissed without prejudice. ECF No. 1-5 (Compl., Ex. E, ECF No. 1-5 ("R&R")).

57. Although HS3 had until June 13, 2018 to file objections to the R&R, *see* Fed. R. Civ. P. 72(b)(2), he instead voluntarily dismissed the SAC in its entirety. *See* Not. of Voluntary Dismissal, Related Action, ECF No. 196. On June 21, 2018, after Plaintiffs filed this action, HS3 refiled some of the claims he asserted in the SAC in Florida state court. Goldsmith Decl. Ex. 33, Complaint ("State Complaint"), *Sargeant v. Sargeant*, No. 2018 CA 007932XXXXMB (15th Jud. Cir. Fla. June 21, 2019) ("State Action"). HS3's State Complaint, however, omitted his federal claims, including his claim for conspiracy to violate the CFAA. *See id.* at 1.

58. HS3 and his counsel have repeatedly explained that the reason HS3 voluntarily dismissed the SAC and abandoned his CFAA claim rather than object to the R&R or file an

11

amended complaint was that HS3 viewed his CFAA claim as legally untenable in light of the R&R and Judge Reinhart's remarks at a hearing. *See* HS3 Resp. in Opp'n to Mot. for Att'y's Fees at 2-4, Related Action, ECF No. 202 ("HS3 Opp. to 41(d) Mot.") ("Judge Reinhart made quite clear his view that HS3's federal claims were futile. . . . The purpose for the voluntary dismissal was neither mysterious or ill-motivated, as the Court had previously indicated the futility of any federal claims, and suggested the propriety of state court jurisdiction. . . . [A]s noted above, the Court expressed serious doubt as to the viability of HS3's federal claims."); ECF No. 37, Ex. A ("State Action Sept. 18 Tr.") at 17:23-19:12 (statement of Gregory Coleman that Judge Reinhart "made clear that he did not think . . . that no matter how we reshuffled those Federal Law claims, he didn't think that we could establish those claims. . . . [W]e said fine. . . . so we did what he asked us to do.").

59. For these reasons, HS3's counsel stated in open court that HS3 would "stipulate" that he would not be asserting his federal claims again in any forum. State Action Sept. 18 Tr. at 25:24-26:3 (statement of Gregory Coleman); Hr'g Tr. at 12:4-9 (Sept. 20, 2017), ECF No. 40 (statement of Christopher Kise at hearing on HS3's motion to dismiss). HS3's counsel Christopher Kise explained that, following the Court's direction, HS3 viewed his CFAA claim as legally untenable under governing Eleventh Circuit law. Hr'g Tr. at 21:5-14, 25:11-16, Related Action (Sept. 20, 2017), ECF No. 213 (hearing on Hall's Rule 41(d) motion for attorney's fees).

**C.     The Factual and Legal Basis for Paragraphs 33 and 36 of the SAC**

60. On July 1, 2019, HS3 responded to Plaintiffs' Second Set of Interrogatories, which sought HS3's factual basis at the time of the filing of the SAC for its key allegations and claims. Goldsmith Decl. Ex. 30 (HS3's Resps. to Pls.' Second Set of Interrogs. at 1 ("HS3 Ans. 2d Rogs")); Goldsmith Decl. Ex. 2 (HS3 Tr. at 214:11-25). Following HS3's deposition, HS3 served supplemental responses to Plaintiffs' First and Second Sets of Interrogatories. Goldsmith Decl. Ex. 34 (HS3's Suppl. Ans. to Pls.' First Set of Interrogs.); Goldsmith Decl. Ex. 35 (HS3's Suppl. Resps. to Pls.' Second Set of Interrogs. ("HS3 Suppl. Resp. 2d Rogs")). According to HS3's counsel, these interrogatory responses set forth the complete set of facts on which HS3 and his counsel relied to file the claims against Hall in the SAC. Goldsmith Decl. Ex. 36 (Disc. Hr'g Tr. at 57:7-8 (Aug. 1, 2019)); Goldsmith Decl. Ex. 37 (Email from M. Coffey to D. Ho (July 20, 2019) (representing that aside from opinion work product, HS3 had produced all

12

documents that HS3's counsel "intends to say he or other HS3 counsel relied on for any of the factual allegations for the SAC")).

61.     In his Supplemental Responses to Plaintiffs' Interrogatory Nos. 8 and 9, HS3 stated that he and his counsel relied on four pieces of information for the allegations in the SAC that, "[i]n or about August 2016, the Defendants agreed together that DSargeant and LAIL would unlawfully access the HS3 Email Account, obtain the HS3 Material, and provide the HS3 Material to Hall," ECF No. 1-4 (SAC ¶ 33), and that, "[o]n or about October 6, 2016, and again on or about October 28, 2016, DSargeant and LAIL unlawfully accessed the Sargeant Server and the HS3 Email Account in Florida, and obtained the HS3 Material from the HS3 Email Account," *id.* ¶ 36:

   a.  Preston's affidavit filed on February 24, 2017 in the U.K. High Court of Justice in *LAIL v. Maroil Trading, Inc.*, Goldsmith Decl. Ex. 38 (Pls.' Dep. Ex. 40 ("Preston Affidavit"));

   b.  Documents produced by LAIL in the Related Action: (i) emails regarding discussions between Hall, Preston, and Daniel Sargeant in May and June 2017, and (ii) the HS3 Material itself;

   c.  Conversations with Patrick Mooney, a former business associate of HS3 and Daniel Sargeant, Goldsmith Decl. Ex. 39 (Aff. of Patrick Mooney ¶¶ 6, 8 (Jan. 9, 2019) ("Mooney Aff.")); and

   d.  Conversations with Fahad Tamimi, a business associate of HS3 and Wilmer Ruperti, in Fall 2017.

62.     **The Preston Affidavit.** In his deposition testimony, HS3 could not identify any portion of the Preston Affidavit that supported the allegations in paragraphs 33 or 36 of the SAC. Goldsmith Decl. Ex. 2 (HS3 Tr. at 217:13-25, 218:20-25).  Counsel for HS3 similarly acknowledged that Preston did not suggest that Daniel Sargeant obtained the HS3 Material by accessing HS3's email account or the Sargeant Server.  Goldsmith Decl. Ex. 44 (Coleman Tr. at 47:10-16).

63.     **LAIL Documents.** None of the email messages referenced in HS3's interrogatory responses shows or suggests that Hall and Daniel Sargeant agreed to access the HS3 Email Account to obtain the HS3 Material.  Goldsmith Decl. Ex. 40 (HS3_0013187 through HS3_0013263); Goldsmith Decl. Ex. 44 (Coleman Tr. at 126:24-127:6).  Nor does the HS3 Material itself.  Goldsmith Decl. Ex. 44 (Coleman Tr. at 108:9-21).

64.     **Conversations with Patrick Mooney**.  Mooney had no direct or indirect knowledge of Daniel Sargeant's conduct in 2016.  Mooney testified that he communicated with

Daniel Sargeant in January and February 2015. Goldsmith Decl. Ex. 41 (Mooney Tr. at 30:18-25); *id.* at 33:6-9, 41:18-21, 55:22-25; Goldsmith Decl. Ex. 39 (Mooney Aff. ¶¶ 6, 8). According to Mooney, his relationship with Daniel Sargeant ceased in June 2015. Goldsmith Decl. Ex. 41 (Mooney Tr. at 54:20-55:5). HS3 likewise testified that Mooney's only discussions with Daniel Sargeant occurred in early 2015, Goldsmith Decl. Ex. 2 (HS3 Tr. at 224:21-225:1) ("■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■"; "■■■■■■■■■■■■■■■■■■■■■■■■■■■■"), and HS3's counsel admitted that Mooney did not know of any agreement between Hall and Daniel Sargeant. Goldsmith Decl. Ex. 44 (Coleman Tr. at 195:6-13 ("■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.")).

65. In addition, Mooney and HS3 both testified that Mooney told HS3 that Daniel Sargeant had obtained material from HS3's email account by early 2015. Goldsmith Decl. Ex. 2 (HS3 Tr. at 225:15-18) ("■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■"); Goldsmith Decl. Ex. 41 (Mooney Tr. at 33:6-9) ("■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■").

66. At his deposition HS3 could not explain how Mooney could have informed him about Daniel Sargeant's conduct in August and October of 2016. Goldsmith Decl. Ex. 2 (HS3 Tr. at 226:2-4) ("■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■").

67. **Conversations with Fahad Tamimi.** On July 9, 2019, HS3 asserted for the first time that his allegations and claims in the SAC were supported by discussions HS3 and his counsel allegedly had with Fahad Tamimi in New York in late 2017. Goldsmith Decl. Ex. 35 (HS3 Suppl. Resp. 2d Rogs at 1-2, Nos. 8, 9). According to HS3, Tamimi purportedly told him "■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■." Goldsmith Decl. Ex. 2 (HS3 Tr. at 209:5-25). Yet HS3 acknowledges that Tamimi had no basis to know how Daniel Sargeant obtained the HS3 Material. Goldsmith Decl. Ex. 2 (HS3 Tr. at 212:18-20) ("■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■"). Further,

14

HS3 testified that he could not recall whether Tamimi told HS3 about the basis for the knowledge he did purport to have. Goldsmith Decl. Ex. 2 (HS3 Tr. at 207:1-25).

68. HS3 testified that he did not take notes, send emails, or otherwise document the meeting, nor has HS3 produced any evidence establishing that counsel documented the occurrence or subject-matter of the alleged meeting with Tamimi. Goldsmith Decl. Ex. 2 (HS3 Tr. at 208:1-25). HS3's counsel testified that he is not aware of notes of the meeting. Goldsmith Decl. Ex. 44 (Coleman Tr. at 25:18-23, 39:2-12).

69. Defendant's counsel has since admitted that Tamimi only informed Defendant about the existence of the Preston Affidavit and that Tamimi's information did not independently support any allegations in the SAC. Goldsmith Decl. Ex. 44 (Coleman Tr. at 40:18-24).

### D. Forensic Evidence Establishes the HS3 Material Was Removed from the HS3 Email Account in August 2013.

70. Email messages in a live email account are held in an Exchange mailbox; they are saved as .msg files only outside of a mailbox. McGowan Aff., Ex. B (Second Expert Report of Michael F. McGowan (July 19, 2019) ("McGowan July 19 Rep.") ¶ 11); Goldsmith Decl. Ex. 42 (Expert Report of Mark Lanterman (July 12, 2019) ("Lanterman July 12 Rep.") at 5). The metadata field Date Last Modified provides the date that an .msg file was created from another format. *See* McGowan July 12 Rep. ¶¶ 21-22; Goldsmith Decl. Ex. 42 (Lanterman July 12 Rep. at 5).

71. For each of the 278 .msg files that LAIL produced to HS3 in the Related Action and that HS3 cited in the SAC, the Date Last Modified was August 28, 2013. McGowan July 12 Rep. ¶ 18; Goldsmith Decl. Ex. 43 (Lanterman Tr. at 16:5-17:22). The experts retained by Plaintiffs and HS3 agree that it is not possible that the .msg files that LAIL produced to HS3 were created from the live Exchange mailbox at any time after that date. McGowan July 19 Rep. ¶ 12; Goldsmith Decl. Ex. 43 (Lanterman Tr. at 19:21-25, 59:7-12, 143:3-20). HS3's counsel knew that when they filed the SAC. Goldsmith Decl. Ex. 44 (Coleman Tr. at 103:13-14 ███████████████████████████████ ")).

### E. HS3 Abandons His Assertion That Hall and Daniel Sargeant Agreed to Access the HS3 Email Account.

72. HS3 filed counterclaims in this action that repeated the assertion that "Daniel Sargeant and Hall then planned and agreed to access the HS3 Email Account and obtain the HS3 Material." ECF No. 54, Countercl. Compl. ¶ 44. Immediately afterward, McCabe Rabin, P.A.,

15

joined the team of counsel representing HS3. *See* ECF Nos. 55-57. Hall moved to dismiss the counterclaims, simultaneously serving HS3's counsel with a Rule 11 letter. *See* ECF No. 63 at 1. Rather than opposing the motion, HS3 filed amended counterclaims signed by McCabe Rabin (as well as Foley) that omitted any allegation of an agreement between Daniel Sargeant and Hall to access HS3's email account. *See* ECF No. 68.

### F. The Factual Basis for Other Allegations in the SAC

#### i. "On or about October 28, 2016 . . . Daniel Sargeant and LAIL provided the HS3 Material to Hall . . . ."

73. The SAC alleges that, "[o]n or about October 28, 2016, DSargeant and LAIL provided the HS3 Material to Hall in exchange for the remainder of the Ruperti Material." ECF No. 1-4 (SAC ¶ 37); *see id.* ¶¶ 56, 57, 109. HS3 could not identify any evidence supporting these allegations. Goldsmith Decl. Ex. 2 (HS3 Tr. at 231:20-232:7) ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id.* at 232:8-23 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). HS3 has produced no documents that he claims he or his counsel relied upon which show or even suggest that Daniel Sargeant and LAIL provided the HS3 Material to Hall on or about October 28, 2016. Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 25, Nos. 132, 133) (stating HS3 lacks sufficient information to admit or deny that Daniel Sargeant or LAIL provided the HS3 Material to Hall on October 28, 2016).

#### ii. "[O]n or about October 28, 2016, and thereafter, Hall further publicized the HS3 Material . . . ."

74. The SAC alleges "[u]pon information and belief" that, "on or about October 28, 2016, and thereafter, Hall further publicized the HS3 Material to others within Burford, and to an unknown number of other persons, through electronic and/or other means." ECF No. 1-4 (SAC ¶ 101); *id.* ¶ 111. HS3 admitted that he had no evidence at the time he filed the SAC that Hall disseminated the HS3 Material to any particular person and that the reason for the lawsuit was to discover the very fact that he alleged to be true. Goldsmith Decl. Ex. 2 (HS3 Tr. at 137:9-25) ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id.* at 253:24 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Goldsmith Decl. Ex. 4 (HS3 Ans. 2d RFAs at 27, No. 140).

16

### iii. "Hall is [an] . . . employee of Burford Capital."

75. The SAC alleges that "Hall is [an] . . . employee of Burford Capital, LLC." ECF No. 1-4 (SAC ¶ 5). HS3 could not identify any evidence that supported this allegation, which is false. Goldsmith Decl. Ex. 2 (HS3 Tr. at 200:17-21) ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id.* at 202:6-202:13 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Goldsmith Decl. Ex. 15 (Hall Tr. at 34:18-35:22).

### iv. "HS3 did not provide [his] password . . . to any of the Defendants or their representatives or agents"; "HS3 never explicitly or implicitly authorized . . . the Defendants to Access the HS3 Email Account"; "The Sargeant Family Businesses had no official or procedures authorizing the Defendants . . . to access the HS3 Email Account."

76. The SAC alleges that "HS3 did not provide the password associated with the HS3 Email Account to any of the Defendants or their representatives or agents," ECF No. 1-4 (SAC ¶ 21); that "HS3 never explicitly or implicitly authorized any of the Defendants to access the HS3 Email Account," *id.* ¶¶ 25, 92, and that "[t]he Sargeant Family Businesses had no official or unofficial policies or procedures authorizing the Defendants, or anyone else, to access the HS3 Email Account," *id.* ¶¶ 26, 91.

77. HS3 admitted in his deposition, however, that he knew that he had given his password to Rivas, an employee and agent of Sargeant Marine and its owner Daniel Sargeant. Goldsmith Decl. Ex. 2 (HS3 Tr. at 255:3-7); *id.* at 91:5-8; Goldsmith Decl. Ex. 6 (Rivas Tr. at 149:5-11); *id.* at 150:11-14.

78. Further, witness testimony and documentary evidence show that Sargeant Marine continuously maintained a companywide policy regarding employee use of company email accounts and computer systems. Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 272:23-273:16); Goldsmith Decl. Ex. 1 (HS2 Tr. at 57:3-4); *id.* at 59:5-23; Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 75:19-20); *id.* at 297:20-23; Goldsmith Decl. Ex. 6 (Rivas Tr. at 5:1-7:25); *id.* at 166:8-16.

79. The Sargeant Marine IT Policy expressly provides that "[t]he company reserves and intends to exercise the right" to "review," "intercept," "access," and "disclose" any email

17

messages or files created or exchanged on the company's systems and "[t]he contents of these systems properly obtained for legitimate business purposes, may be disclosed within the company without the permission of the employee."  Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 299:10-20); Goldsmith Decl. Ex. 6 (Rivas Tr. at 103:18-25); *id.* at 170:2-6.  In addition, under the express terms of the Sargeant Marine IT Policy, "the use of passwords for security does not guarantee confidentiality," and "[a]ll passwords must be disclosed to the company or they are invalid and cannot be used."  Goldsmith Decl. Ex. 10 (IT Policy at 2).

80. HS3 testified that Sargeant Marine "███████████████."  Goldsmith Decl. Ex. 2 (HS3 Tr. at 92:16); *id.* at 93:1-3, 94:19-20, 94:25-95:3.  HS3 also testified, however, that he did not know whether his own companies, including Sargeant Bulktainers, have IT polices, that he has "never paid attention" to that issue, and would not know what such a policy says if there is one.  Goldsmith Decl. Ex. 2 (HS3 Tr. at 82:24-83:1 ("███████████████████████████████████████████████████████")).

      v.      "HS3 is the owner of the HS3 Material . . . ."

81. The SAC alleges that HS3 is "the owner of the HS3 Material."  ECF No. 1-4 (SAC ¶ 73).  The Sargeant Marine IT Policy states that company-provided computers and email accounts are "company property" and "all messages or files composed, sent, or received on these systems are and remain the property of the company."  Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 3 (D. Sargeant Tr. at 298:11-14 ("█████████████████████████████████████████████████")); Goldsmith Decl. Ex. 6 (Rivas Tr. at 167:3-167:7); *id.* at 103:20-25, 105:9-11.  The policy expressly states that any such messages or files "████████████████████████████"  Goldsmith Decl. Ex. 10 (IT Policy at 1); Goldsmith Decl. Ex. 6 (Rivas Tr. at 105:9-11) ("█████████████████████████████████████").

      vi.      "HS3 has suffered damage . . . including, but not limited to, lost profits, economic damages, and reputational harm."

82. The SAC alleges that HS3 "suffered damage" as a result of Hall and the other defendant's conduct, "including, but not limited to, lost profits, economic damages, and reputational harm."  ECF No. 1-4 (SAC ¶ 117); *see also id.* ¶¶ 95, 104.  HS3 admitted that he had no evidence that he ever lost any business opportunities due to Hall's alleged conduct.  Goldsmith Decl. Ex. 2 (HS3 Tr. at 238:18-20) ("█████████████████████████████

18

███████████████████████████████████████████.”); *id.* at 263:24-25

("█████████████████████████████████████████████████████████████

█████████████████████.").

### G. HS3 and Counsel Fails to Conduct Any Meaningful Pre-Filing Investigation

83. Defendant's counsel admitted that not even a minimal effort was undertaken to corroborate the information provided by Tamimi or Mooney, nor did counsel do anything to verify any of the statements in the Preston Affidavit. Goldsmith Decl. Ex. 44 (Coleman Tr. at 41:20-42:6, 44:21-45:9, 55:2-56:11, 57:9-22, 58:12-59:2, 73:18-74:2, 138:2-139:4, 169:5-197:17). Similarly, Defendant and his counsel conducted no investigation to determine whether the photos that James Sargeant sent via text message in 2013 were among the HS3 Material. *Id.* at 154:24-155:5).

DATED: August 19, 2019

Respectfully submitted,

/s/   Samuel A. Danon
Samuel A. Danon (FBN 892671)
Armando Cordoves, Jr. (FBN 112425)
HUNTON ANDREWS KURTH LLP
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Tel.: (305) 810-2500
Email: sdanon@HuntonAK.com
Email: acordoves@HuntonAK.com

Derek T. Ho (*pro hac vice*)
Andrew E. Goldsmith (*pro hac vice*)
Minsuk Han (*pro hac vice*)
Christine A. Bonomo (*pro hac vice*)
Jan E. Messerschmidt (*pro hac vice*)
KELLOGG, HANSEN, TODD
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Email: dho@kellogghansen.com
Email: agoldsmith@kellogghansen.com
Email: mhan@kellogghansen.com
Email: cbonomo@kellogghansen.com
Email: jmesserschmidt@kellogghansen.com

*Counsel for Plaintiffs Daniel Hall, Burford Capital LLC, and Dundrod Investments Ltd.*

19