**DANIEL HALL,**
**BURFORD CAPITAL LLC, and**
**DUNDROD INVESTMENTS LTD.,**

       *Plaintiffs,*

v.

**HARRY SARGEANT, III,**

       *Defendant.*

_____/

**<u>OMNIBUS ORDER</u>**

Before the Hon. Roy K. Altman:

     Al-Saleh won a big money verdict against Harry Sargeant III ("HS3") in state court. HS3 refused to pay. Al-Saleh hired Hall, a private investigator, to find HS3's money; Dundrod, a lender, financed the operation; and Burford supervised Hall's work. Tired of running, HS3 signed a settlement agreement with Al-Saleh. As part of that agreement, HS3 promised not to sue Burford, Dundrod, and (arguably) Hall. As the settlement was being negotiated, however, Hall traded for HS3's private emails, which included some of his sex tapes. Some time later, HS3 discovered the trade and sued Hall in federal court to recover the tapes. After an unfavorable ruling, HS3 voluntarily dismissed his federal case. Two weeks later, Hall, Dundrod, and Burford sued HS3 here for breaching the settlement agreement and for perpetrating a malicious prosecution against Hall. At the end of a long, hard-fought litigation, the parties filed their motions for summary judgment. This Order follows.

## THE POSTURE

The Defendant, HS3, has filed his Motion for Summary Judgment ("HS3 Mot.") [ECF No. 320], the Plaintiffs[1] responded ("Pls. Opp.") [ECF No. 339], and HS3 replied ("HS3 Reply") [ECF No. 350]. The Plaintiffs have likewise filed their Motion for Partial Summary Judgment ("Pls. Mot.") [ECF No. 321], HS3 responded ("HS3 Opp.") [ECF No. 341], and the Plaintiffs replied ("Pls. Reply") [ECF No. 353]. The Court held a hearing on November 21, 2019, at which the parties presented their oral arguments. For the reasons that follow, the Motions are **GRANTED in part** and **DENIED in part**.

## THE FACTS

In 2008, Mohammad Al-Saleh ("Al-Saleh") sued his then-business partner, HS3, for the unlawful diversion of Al-Saleh's share of the partnership's profits. *See* HS3's Statement of Undisputed Material Facts ("HS3 SOF") [ECF No. 323] ¶ 9. In 2010, Al-Saleh entered into an agreement with Dundrod, a Burford affiliate, to fund the litigation. *See* Plaintiffs' Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment ("Pls. SOF") [ECF No. 324] ¶ 32. On July 27, 2011, a Florida jury returned a verdict in Al-Saleh's favor and directed HS3 to pay Al-Saleh $28.8 million in damages, plus costs and post-judgment interest. HS3 SOF ¶ 11; Pls. SOF ¶ 31. Although the Florida Supreme Court rejected HS3's appeal and affirmed the judgment, HS3 refused to pay. Pls. SOF ¶ 33.

As part of his efforts to collect the unpaid judgment, Al-Saleh filed lawsuits all over the world. *Id.* ¶ 34. In 2014, to help locate HS3's assets, Al-Saleh hired Focus Investigations Ltd. ("Focus"), an investigations firm co-owned by the Plaintiff, Hall. *Id.* ¶ 35. In 2015, a second

---

[1] The Plaintiffs are Daniel Hall ("Hall"), Burford Capital LLC ("Burford"), and Dundrod Investments Ltd. ("Dundrod").

Burford affiliate, Burford Capital (UK) Ltd. ("Burford UK")—not a party to this litigation—bought Focus, making Hall a Burford UK employee, *id.* ¶¶ 36–37. During his time with Burford UK, Hall continued to work on the Al-Saleh investigation under the supervision of Aviva Will, a Burford lawyer. *Id.* ¶ 38.

In January of 2015, Hall met Daniel Sargeant—HS3's brother and former business partner—and learned that, after HS3 left the Sargeant Family Business in February of 2013, his emails remained on the business' server ("the Sargeant Server"). HS3 SOF ¶¶ 61, 67. After Hall expressed an interest in these emails, Charles Lichtman, Daniel Sargeant's English lawyer, gave Hall the first of what would be two batches of HS3's emails from that server. *Id.* ¶ 69. According to Hall, he and his team scanned these emails for information that might prove relevant to the location of HS3's assets. Pls. SOF ¶ 39. In August of 2016, Hall asked Daniel Sargeant for more of HS3's emails. *Id.* ¶ 40. On October 14, 2016, Hall met with Annette Perez, one of Daniel Sargeant's employees, and received a second batch of HS3's emails. *Id.* ¶ 41. Among the 168,158 emails in this second batch were several hundred private photographs, messages, and sex videos (the "HS3 Personal Materials"). *Id.*; HS3 SOF ¶¶ 88, 90, 125.

Al-Saleh and HS3 began their settlement discussions in September of 2016, HS3 SOF ¶ 12, which culminated in a settlement agreement that took effect on October 4, 2016, *see* Complaint for Declaratory Judgment, Injunctive Relief, and Damages ("Complaint") [ECF No. 1], Ex. A ("Settlement Agreement") [ECF No. 1-1]. In the Settlement Agreement, HS3 acknowledged that the total amount he owed Al-Saleh was $39.6 million, plus $7 million in attorneys' fees and costs. *See id.* at 1, 8–9. Al-Saleh, in turn, agreed to accept $33 million, which HS3 would pay as follows: an immediate payment of $20 million, followed by nine periodic payments—the last to take place on June 30, 2017. *Id.* at 8–9.

The Settlement Agreement also called for Al-Saleh, Burford, and Dundrod "to execute a release . . . in favor of the SA Parties," *id.* at 8—and for HS3, in turn, to execute releases in favor of Al-Saleh, Burford, and Dundrod, *id.* at 7. In January of 2017, Al-Saleh and HS3 delivered their respective releases with an effective date of October 28, 2016. *See* Complaint, Ex. C (the "Release") [ECF No. 1-3] at 2–4. They also executed an amendment to the Settlement Agreement, through which Al-Saleh and HS3 memorialized their exchange of documents (releases, judgments, and dismissal paperwork), and by which Al-Saleh agreed that, upon HS3's payment of the remaining balance, HS3 "will have fully performed [his] obligations pursuant to the Settlement Agreement." Complaint, Ex. B (the "Amendment") [ECF No. 1-2] at 2.

Unfortunately, after the Settlement Agreement was signed, HS3 discovered Hall's trade for the HS3 Personal Materials. HS3 SOF ¶¶ 94, 110. HS3 sued in federal court and, on February 20, 2018, filed his Second Amended Complaint (the "SAC") [ECF No. 1-4]. *See Harry Sargeant, III v. Maroil Trading, Inc., et al.*, 17-CV-81070-BB (S.D. Fla.) (the "Related Federal Action"); Pls. SOF ¶ 51. In the SAC, HS3 brought three conspiracy claims against Hall—all premised on the alleged agreement between Hall and Daniel Sargeant to access HS3's emails through the Sargeant Server. Pls. SOF ¶ 51. Specifically—and as relevant here—Count II of the SAC averred that Hall had conspired to violate the federal Computer Fraud and Abuse Act ("CFAA"), while Count VIII alleged that Hall had conspired both to violate Florida's Computer Abuse and Data Recovery Act ("CADRA") and to invade HS3's privacy. *Id.* The Honorable Beth Bloom referred the defendants' Motion to Dismiss the SAC to Magistrate Judge Bruce R. Reinhart, who, on May 30, 2018, recommended that Counts II and VIII be dismissed without prejudice. *See* Complaint, Ex. E (the "SAC R&R") [ECF No. 1-5]. HS3 voluntarily dismissed the SAC on June 4, 2018. HS3 SOF ¶ 148. On June 21, 2018, HS3 refiled the two state claims he had asserted in the SAC in a

new state-court action. *See Sargeant v. Sargeant*, No. 2018-CA-007932XXXXMB (15th Jud. Cir. Fla.) ("Related State Action"). HS3 did not refile his federal CFAA claim. *See generally id.*

Approximately two weeks after HS3 dismissed the SAC, the Plaintiffs filed their Complaint in this case. *See generally* Complaint. The Complaint levies three claims against HS3: Count I makes a claim for declaratory relief; Count II alleges that, by filing the SAC, HS3 breached his contractual obligations to the Plaintiffs; and Count III asserts that the SAC constituted a malicious prosecution against Hall.[2] *Id.* at ¶¶ 1, 47–50, 53–58, 60–66. On April 18, 2019, the Court **dismissed as moot** the Plaintiffs' claim for declaratory relief, leaving only Counts II and III. *See* [ECF Nos. 186].[3]

HS3 now moves for summary judgment on the two remaining counts. The Plaintiffs, for their part, seek only partial summary judgment on the liability aspects of Counts II and III. At a hearing on November 21, 2019, the Court challenged Burford and Dundrod's standing, *see* Transcript of Motion Hearing ("Mot. Hrg.") [ECF No. 388] at 59—a challenge to which both sides responded with supplemental briefing, *see* Plaintiffs' Supplemental Brief Regarding Standing ("Pls. Supp.") [ECF No. 378]; HS3's Supplemental Briefing Regarding Standing ("HS3 Supp.") [ECF No. 376]. Here, we now stand.

---

[2] The Court has dismissed Burford's separate malicious-prosecution claim, which had been included in Count III. *See* Order Adopting Magistrate Judge's Report and Recommendations [ECF No. 51].

[3] In a counterclaim he filed in this case, HS3 reasserted one of the state-law claims he had voluntarily dismissed in the Related Federal Action. *See* Answer and Counterclaim [ECF No. 54] at 12–30; Am. Counterclaim [ECF No. 68] at 15–21. After the parties consented to magistrate judge jurisdiction over the Plaintiffs' Motion to Dismiss HS3's Amended Counterclaim, *see* [ECF No. 103], Magistrate Judge Reinhart dismissed the Amended Counterclaim *with prejudice. See* Mar. 26, 2019 Order [ECF No. 155].

## THE LAW

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a).[4] In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable factfinder to rule for the non-moving party. *Id.*

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See, e.g.*, *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda*

---

[4] Unless otherwise noted, emphasis has been added and internal citations, page numbers, and quotation marks have been omitted.

*v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). Notably, assessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). The Court must analyze the record as a whole—and not just the evidence the parties have singled out for consideration. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987). If there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

## ANALYSIS

### I. Burford and Dundrod's Standing

The Constitution expressly limits the "judicial power of the United States" to the adjudication of "Cases" and "Controversies." U.S. Const. art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). A "federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises." *Fitzgerald v. Seaboard Sys. R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985). It is thus the Court's responsibility to "zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001). Notably, the Court must address this threshold requirement "prior to and independent of the merits of a party's claims." *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017) (quoting *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009)).

At an "irreducible constitutional minimum," a plaintiff must show that he: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547. The plaintiff bears the burden of establishing each of these three elements. *Id.*

**A. "Injury in Fact"**

To establish an "injury in fact," a plaintiff must demonstrate "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Burford and Dundrod contend that, in the Release, HS3 promised each releasee that he would not sue *any* releasee—a covenant that, they say, constitutes "a legally protected interest." Pls. Supp. at 4–5. The Release makes clear that Burford and Dundrod are releasees. *See* Release at 1–2 ("'RELEASEES' means: (a) Al-Saleh, (b) Burford Capital, LLC, and (c) Dundrod Investments Ltd., and all persons or entities for whose acts or omissions the foregoing would or could be derivatively or vicariously liable or to whom the foregoing could or would owe indemnification."). But HS3 never sued Burford or Dundrod. So, Burford and Dundrod claim that HS3 invaded their "legally protected interest" when he sued Hall—who, they insist, is also a releasee. Pls. Supp. at 4–5. The standing inquiry, then, turns on the answers to three interrelated questions: *First*, is Hall a releasee? *Second*, does the Release create a covenant not to sue? *Third*, if the Release does constitute a covenant not to sue, did HS3 promise not to sue *any* of the releasees?

"[W]hen standing is raised at the summary judgment stage, the plaintiff can no longer rest on mere allegations." *Bischoff v. Osceola County, Fla.*, 222 F.3d 874, 878 (11th Cir. 2000).[5]

_____

[5] This is true even when, as here, the Court raises the standing question *sua sponte*. *See id.* at 882 n.8 (when the court raises standing *sua sponte* at the summary judgment phase, it must make its

Instead, the plaintiff must "set forth by affidavit or other evidence specific facts, . . . which for purposes of the summary judgment motion will be taken to be true." *Id*. In deciding standing questions at summary judgment, the district court may "not make credibility determinations based solely on the contents of a plainly conflicting paper record," *id*. at 876, and must construe all "disputed facts . . . in the light most favorable to the plaintiff," *id.* at 878 (quoting *Haase v. Sessions*, 835 F.2d 902, 904 (D.C. Cir. 1987)).

Construing all disputed facts, drawing all reasonable inferences, and making all credibility choices "in the light most favorable to the [Plaintiffs]," the answer to our first two standing questions is—as the Court explains in more detail below, *see infra* Sections II.A. & II.B.2—yes. Put simply, the Plaintiffs have adduced enough evidence at this stage of the case to establish *both* that Hall is a releasee and that the Release created a covenant not to sue.[6]

The answer to the third standing question is somewhat more straightforward and can be addressed relatively quickly here: Through the Release, HS3 assured each releasee that he would not sue *any of the other* releasees. *See* Release at 1 ("[E]ach of the RELEASORS . . . forever discharge[s] RELEASEES . . . from any and all manner of actions, causes of action, suits, . . . which against *any one or more* of the RELEASEES, any RELEASOR ever had or now has[.]"). The plain meaning of these words is unmistakable: The Release protects any individual releasee from any suit HS3 might bring against any other releasee. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012) ("The ordinary-meaning rule is the most

---

"ultimate conclusion regarding standing as if it were made in response to a motion for summary judgment").

[6] The district court must "resolve disputed factual issues [regarding standing] either at a pretrial evidentiary hearing or at trial." *Id*. at 879. Thus, for example, if the fact-finder at trial concludes that Hall is *not* a releasee, Burford and Dundrod's claims must be dismissed *for lack of standing*.

fundamental semantic rule of interpretation.”). The answer to the third standing question, then, is also yes.

This reading of the Release—that it shielded each releasee from suits against *any other* releasee—finds further support in other, unrelated provisions of the Release. *See Cruz v. Green*, 2019 WL 2743211, at *4 (S.D. Fla. July 1, 2019) (quoting *Paddock v. Bay Concrete Indus., Inc.*, 154 So. 2d 313, 315–16 (Fla. 2d DCA 1963) (“[T]o ascertain the intent of the parties, the court will regard the total instrument and not particular provisions nor disjointed parts.”)). When referring to the releasors, for instance, the Release speaks “on behalf of *each* of the RELEASORS and *each* of his or her current and former officers.” Release at 1. The parties, in other words, well understood how to distinguish between an individual and the broader group to which he belongs. And yet, in describing the scope of the Release, they elected to describe the releasees, not individually (as they did with the releasors), but as a collective. In any case, even if the scope of the Release were somehow ambiguous on this point, the result would be the same because the Release must “be broadly construed in favor of the RELEASEES.” *Id* at 2.

This interpretation of the Release is also consistent with the intentions the parties expressed in the Settlement Agreement. By that Agreement, the parties meant to “fully and finally resolve any and all disputes and to settle any litigation between them.” Settlement Agreement at 1. And each releasee had a compelling interest in the execution of this intention because a lawsuit by HS3 against any releasee would very likely embroil every Releasee. This, in fact, is precisely what happened here. Days after he filed the SAC, HS3 served Burford with a Subpoena. *See* Declaration of Aviva O. Will in Support of Plaintiffs’ Supplemental Brief Regarding Standing (“Will Dec.”)

[ECF No. 378-2], Ex. A (the "Subpoena").[7] Since the Subpoena sought documents from both Burford and Dundrod, both entities spent considerable amounts of time and money responding to it. *See* Will Dec. at 1–2 (detailing the Subpoena's costs, in time and money, to Burford and Dundrod); *see also Pedro*, 868 F.3d at 1280 ("lost time" qualified as concrete injury for standing purposes); *accord Progressive Emu Inc. v. Nutrition & Fitness Inc.*, 785 F. App'x 622, 630 (11th Cir. 2019) (party suffered "injury in fact" when subpoena issued to third party sought the party's documents).

In his Supplemental Brief Regarding Standing, HS3 never addresses this argument for Burford and Dundrod's standing—probably because the Plaintiffs had never raised it before. *See generally* HS3 Supp. Even so, HS3's earlier reliance on *Miccosukee Tribe of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1230 (11th Cir. 2000), in support of his contention that Burford and Dundrod suffered no Article III "injury" is unavailing. *See* HS3 Opp. at 2 n.5. In that case, the Florida Boxing Commission, trying to displace the Miccosukee Tribe's rival boxing commission, began taxing "non-Indian boxing promoter[s] on revenues gained from a boxing match conducted on the Tribe's reservation." *Miccosukee Tribe of Fla.*, 226 F.3d at 1230. The district court dismissed the Tribe's complaint for lack of standing, but the Eleventh Circuit reversed. Although the court acknowledged the Supreme Court's admonition that, "[a]bsent exceptional circumstances, a third party does not have standing to challenge injury to another party," the court held that the Tribe had "a legitimate basis for standing—that the state's tax on boxing promoters infringes upon the Tribe's sovereignty." *Id*. As in *Miccosukee*, Burford and Dundrod's claims here

---

[7] By its terms, the Subpoena defined "Burford" as "Burford Capital, LLC, as well as any of Your agents, representatives, employees, attorneys, subsidiaries, and affiliates, including without limitation . . . Dundrod Investments Limited." *See* Subpoena at 10. For all practical purposes, in other words, Dundrod was also served with the Subpoena.

hinge, not on any "injury to another party," but on the very real injury *they* suffered when HS3 sued Hall in violation of the covenants he made to Burford and Dundrod in the Release.

In addition, Burford and Dundrod argue that they are third-party beneficiaries to the Settlement Agreement—and that they therefore have standing to enforce *its* terms. Pls. Supp. at 4–5. "The question of whether, for standing purposes, a non-party to a contract has a legally enforceable right therein is a matter of state law." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981 (11th Cir. 2005). Florida courts recognize three categories of third-party beneficiaries: (1) donee beneficiaries; (2) creditor beneficiaries; and (3) incidental beneficiaries. *Id.* While the first two categories are classified as "intended" beneficiaries and may sue to enforce the contract, the third category—known as "incidental beneficiaries"—have no enforceable rights under the contract. *Id.* Ultimately, "[a] party has a cause of action as a third-party beneficiary to a contract if the contracting parties express an intent primarily and directly to benefit that third party (or a class of persons to which that third party belongs)." *Vencor Hosps. v. Blue Cross Blue Shield of R.I.*, 169 F.3d 677, 680 (11th Cir. 1999) (citing *Daniel v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 718 So. 2d 936, 937 (Fla. 3d DCA 1998)).

Burford and Dundrod are intended third-party beneficiaries to the Settlement Agreement. Section 22 of that Agreement provides as follows:

> Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person *other than . . . the Burford Entities*[8] and their respective heirs, personal representatives, legal representatives, successors and assigns, any rights or remedies under or by reason of this Agreement.

Settlement Agreement at 20. And Section 2.1 specifically requires that a release "in favor of Burford Capital, LLC and Dundrod Investments Ltd." be executed and "annexed to this Agreement

---

[8] The Settlement Agreement defines the "Burford Entities" as Burford and Dundrod. *See* Settlement Agreement at 7.

. . . and made part hereof," *id.* at 7—a curious provision if Burford and Dundrod were not "intended" third-party beneficiaries to the Agreement.[9] *See Morgan Stanley DW, Inc. v. Halliday*, 873 So. 2d 400, 403 (Fla. 4th DCA 2004) ("A non-party is the specifically intended beneficiary" when "the parties to the contract actually and expressly intended to benefit the third party[.]"). As intended third-party beneficiaries, Burford and Dundrod have standing to enforce the Agreement's terms, which, as we will soon see, HS3 arguably breached when he sued Hall—a breach that inevitably caused Burford and Dundrod harm.

To summarize: Whether under the Settlement Agreement or the Release, HS3's decision to sue Hall—viewed "in the light most favorable to" the Plaintiffs—caused Burford and Dundrod to suffer an "injury in fact."

### B. Traceability

The injuries Burford and Dundrod suffered—the violation of their contractual rights (that no other releasee be sued) and the discovery burdens the Subpoena imposed—are "fairly traceable" to HS3's actions. HS3, after all, both filed the offending SAC and issued the costly Subpoena. *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes.").

---

[9] As we will see, since the Release is expressly incorporated—and "made part" of—the Settlement Agreement, *see id.* at 7, a breach of the Release is tantamount to a breach of the Settlement Agreement. In any case, this express incorporation of the Release into the Settlement Agreement disposes of HS3's argument that "Plaintiffs' claim is founded upon the purported inclusion of the Release within Section 13(b), not specifically, but through an ambiguous incorporation by reference." HS3 Opp. 2 n.4.

**C. Redressability**

Finally, a favorable decision by this Court would redress Burford and Dundrod's injuries. If HS3's suit against Hall violated Burford and Dundrod's rights under either the Release or the Settlement Agreement—and if they are authorized to enforce the Settlement Agreement's terms— they can recover money damages to compensate them for the breach. That Burford and Dundrod may ultimately lose on the merits is, of course, irrelevant to the standing inquiry. *See Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017) ("[A] party to a breached contract has a judicially cognizable interest for standing purposes, regardless of the merits of the breach alleged.").

Burford and Dundrod thus have standing to pursue their breach-of-contract claim.

**II. The Breach of Contract**

The parties each move for summary judgment on Count II—the breach-of-contract claim. *See* Pls. Mot. at 12–21; HS3 Mot. at 2–16. In an action for breach of contract, Florida law requires a plaintiff to show: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)). When the terms of a contract are clear and unambiguous, the court must interpret that contract in accordance with its plain meaning. *See Rigel v. Nat'l Casualty Co.*, 76 So. 2d 285, 286 (Fla. 1954). In determining whether a contractual provision is ambiguous, a court should give the words their natural and ordinary meaning. *See Emergency Assocs. v. Sassano*, 664 So. 2d 1000, 1003 (Fla. 2d DCA 1995). But the mere fact that a contract requires interpretation does not mean it is ambiguous. *See Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996).

"[T]rivial noncompliance and minor failings do not constitute material breaches." *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th

DCA 2015). Instead, a material breach occurs only when the breaching party "fail[s] to perform a duty that goes to the essence of the contract and is of such significance that it relieves the injured party from further performance of its contractual duties." *Id.*

### A. Covenant Not To Sue

The parties agree that the Release is a contract. *See* Pls. Mot. at 12; HS3 Mot. at 5. The Release, after all, acknowledges that its bargains are "contractual in nature." Release at 1. The parties disagree, however, about whether the Release constitutes a covenant not to sue. In HS3's view, the Release cannot constitute such a covenant because—to put it simply—it does not include the words "covenant not to sue." HS3 Mot. At 5. But, as the Plaintiffs correctly note, the Florida Supreme Court has rejected the "magic words" approach HS3 embraces here. *See, e.g.*, *Atl. Coast Line R. Co. v. Boone*, 85 So. 2d 834, 842 (Fla. 1956) (the use of special words is "not determinative of whether a specific document is a release or a covenant not to sue"). This abnegation of the "magic words" approach flows naturally from the well-accepted principle that "[e]very contract includes not only its written provisions, but also the terms and matters which, though not actually expressed, are implied by law, and these are as binding as the terms which are actually written or spoken." *First Nationwide Bank v. Fla. Software Servs., Inc.*, 770 F. Supp. 1537, 1542 (M.D. Fla. 1991); *accord Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999). "Thus, a contract may have legal effect beyond its actual words, resultant upon its wording and purpose and may embody obligations which legally are to be implied from its words and the relationship of the parties." *Nautica Int'l, Inc. v. Intermarine USA, L.P.*, 5 F. Supp. 2d 1333, 1340 (S.D. Fla. 1998); *see also Heredia v. Safeway Trails, Inc.*, 369 So. 2d 418, 420 (Fla. 3d DCA 1979).

Fairly read, the Release *is* a covenant not to sue. Florida courts recognize the "deeply rooted principle of Florida law that the intent of the parties controls interpretations of their releases."

*Wachovia Ins. Services, Inc. v. Toomey*, 994 So. 2d 980, 986 (Fla. 2008). As the Florida Supreme Court has explained—and as the Eleventh Circuit has oft-repeated—*the words* of a contract provide the best evidence of the parties' intent. *See Key*, 90 F.3d at 1548–49 (citing *McGhee Interests, Inc. v. Alexander Nat'l Bank*, 102 Fla. 140, 135 (Fla. 1931)).

As relevant here, the Release provides that "each of the RELEASORS . . . remise, release, acquit, satisfy, and *forever discharge* RELEASEES . . . from any and all manner of *actions*, *causes of action*, *suits*, . . . *claims and demands* whatsoever, regardless of whether known or unknown[.]" Release at 1.[10] A party that releases, and *forever* discharges, *both* "suits" and "claims"—whether known or unknown—has contractually agreed never to sue. *See, e.g.*, *In re W.B. Care Ctr., LLC*, 419 B.R. 62, 72–73 (Bankr. S.D. Fla. 2009) (noting the "significant body of case law" holding that "mutual releases do involve prospective performance" and concluding that "a waiver of the right to sue is a covenant not to sue, and that this is an ongoing obligation").

HS3 criticizes *W.B. Care* for its reliance on an Eleventh Circuit case, *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749 (11th Cir. 1997), which involved releases in the context of licensing agreements. *See* HS3 Opp. at 9. In HS3's view, *Veeck* stands "for the uncontroversial position that when one grants a license, he is agreeing not to sue the grantee for infringement"—"logic" that HS3 says does not apply here. *Id*. But HS3 does not explain why a releasor who promises to "forever discharge" the releasee "from any and all manner of actions, causes of action, suits, . . . claims and demands whatsoever, regardless of whether known or unknown," should be any more

---

[10] Both sides offer some seemingly-compelling—and contradictory—pieces of extrinsic evidence in support of their respective readings. *See* Pls. Mot. at 15–17; HS3 Mot. at 5–7. But, as HS3 acknowledges, "if a contract provision is 'clear and unambiguous,' a court may not consider extrinsic or 'parol' evidence to change the plain meaning set forth in the contract." HS3 Mot. at 5 (quoting *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 52 (Fla. 1st DCA 2005)). Because the Release unambiguously constitutes a covenant not to sue, the Court will not consider either side's parol evidence.

free than the releasing licensor to sue his counterparty. HS3, in short, is right when he identifies differences between the rights each is acquiring—the right to use the license in the one case, the right to "fully and finally resolve any and all disputes" in the other, *see* Settlement Agreement at 1. But he is wrong to assume that these distinctions are anything more than different paths to the same end: a promise not to sue.

Either way, HS3 does nothing to distinguish the many other federal cases from this Circuit that have interpreted similar releases as constituting a covenant not to sue. *See, e.g.*, *Atlas One Fin. Grp., LLC v. Alarcon*, 2015 WL 1191211, at *2–3 (S.D. Fla. Mar. 16, 2015) (when a releasor releases a releasee "from any and all claims, demands, causes of action, suits, obligations and liabilities of whatever kind or nature, whether known or unknown," the releasor is "barred . . . *from filing* a claim against [the releasee]"); *Gregoire v. Lucent Techs., Inc.*, 2005 WL 1863429, at *3 (M.D. Fla. Aug. 5, 2005) ("The VTO Plaintiffs argue that they did not breach the VTO by filing suit against Agere for benefits under the MOA and/or the EFCP because the VTO does not contain an express promise by the VTO Plaintiffs that they would not sue Agere for those benefits. . . . The VTO Plaintiffs' argument simply cannot be supported."); *Rinks v. Courier Dispatch Grp., Inc.*, 2002 WL 32093321, at *4 (N.D. Ga. July 17, 2002) ("Plaintiff has, *by filing the instant suit*, breached the terms of the separation agreement. The contract clearly states that . . . Plaintiff releases Defendant 'from any and all claims, demands, causes of action, suits, . . . of any nature whatsoever. . . .'"), *aff'd*, 77 F. App'x 504 (11th Cir. 2003).[11]

---

[11] Georgia law—like Florida law—recognizes that "[t]here is a distinction between a release and a covenant not to sue." *Miller v. Grand Union Co.*, 512 S.E. 2d 887, 888 (Ga. 1999). In Georgia, as in Florida, while "a release extinguishes the entire cause of action," a covenant not to sue "prevents the institution of a civil action against the party named therein." *Id.*

One final note on the Release: HS3 expends considerable energy on the undisputed proposition that a "release" is not necessarily a "covenant." HS3 Mot. at 4–5. As HS3 points out, a party in possession of a release, without more, cannot sue the breaching releasor who has sued him. *Id*. Instead, the releasee can raise the release as an affirmative defense to the releasor's complaint. *See id*. at 4 (citing *Bukuras v. Mueller Grp., LLC*, 592 F.3d 255, 266 (1st Cir. 2010) ("A release is an affirmative defense; it does not supply a defendant with an independent claim for breach of contract."); *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 797 (7th Cir. 2005) ("The Release does not result in breach upon the filing of a suit. Instead, it provides [defendant] with an effective affirmative defense should a claim be raised."); *Boudinot v. Shrader*, 2013 WL 1481226, at *8 (S.D.N.Y. Apr. 10, 2013) ("[T]his Court finds more persuasive the view of the First Circuit, which held that [a] release is an affirmative defense; it does not supply a defendant with an independent claim for breach of contract.")). But this distinction is inapposite when, as here, the Release operates simultaneously as a release *and* a covenant not to sue.

In any case, given the parties' firmly expressed desire to "fully and finally resolve any and all disputes and to settle any litigation between them," Settlement Agreement at 1, HS3's interpretation would, for two reasons, make little sense here. *First*, as HS3 conceded at oral argument, his construction would have permitted him, on the day after the Releases were exchanged, to sue Al-Saleh, *see* Mot. Hrg. at 110–11—something HS3 has previously admitted the Release specifically forbids, *see* Pls. SOF ¶ 49 (quoting Transcript of Deposition of HS3 ("HS3 Tr.") [ECF No. 333-2] at 243:6–9) ("I never sued him [Al-Saleh]. . . . Never sued Mohammad Al-Saleh.").[12] *Second*, it is not at all clear that HS3's reading—which would require the releasee to

---

[12] HS3 suggests that, had he truly "committed himself to a covenant not to sue, he would not be 'done'" with Al-Saleh—as he testified that he was, *see* HS3 Tr. at 240:17–21—"because he would have a continuing, executory obligation to Al-Saleh." HS3 Opp. at 6 n.9. This argument misses

spend enormous amounts of time and money defending itself against an unnecessary lawsuit—would do all that much to achieve the permanent peace each side thought it was buying when it signed the Settlement Agreement in the first place. After all, federal district courts routinely deny motions to dismiss that—as HS3 proposes Hall should have done—simply attack the complaint with an affirmative defense of release. *See, e.g.*, *Krush Commc'ns, LLC v. Network Enhanced Telecom, LLP*, 2014 WL 12625758, at *2 (M.D. Fla. Apr. 29, 2014). In these cases, then, the released party will have to defend itself *at least* through summary judgment—a needlessly expensive undertaking. HS3's "limited-release" interpretation, in short, cannot be what the parties—who were at all times represented by sophisticated counsel—meant when they "fully and finally resolve[d] any and all disputes and . . . settle[d] any litigation between them," Settlement Agreement at 1.

The Release, in other words, created a covenant not to sue. For all these reasons, the Court **GRANTS** the Plaintiffs' Motion for Summary Judgment—and **DENIES** the Defendant's Motion—on this initial question. *See* FED. R. CIV. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.").

---

the point. In his deposition, HS3 justified his decision to sue Hall—but not Al-Saleh—by opining that the Settlement Agreement prevented him from suing Al-Saleh. Pls. SOF ¶ 49 (HS3 Tr. at 243:6–9). Far from preventing HS3 from being "done" with Al-Saleh, then, the covenant not to sue cemented the parties' understanding that they were not thereafter free to sue each other for "any matter, cause, or thing whatsoever relating to the relationship between RELEASORS and RELEASEES, from the beginning of the world to [October 28, 2016]." Release at 1.

## B. Breach

The Plaintiffs' claim that HS3 breached his contractual obligations *to them* turns on the answers to three subsidiary questions: (1) whether an "Actionable Event" occurred within the meaning of Section 13 of the Contract; (2) whether Hall is a "Releasee"; and (3) whether the SAC asserted "released" claims.

### 1. "Actionable Event"

In Section 13 of the Settlement Agreement, an "Actionable Event" is defined, in relevant part, to include any situation where:

> (b) Any of the SA Parties or any of the SA Release Parties defaults in the performance of this Agreement . . . or the provision of any of the Settlement Documents; or

> (c) Any payment due under this Agreement or any of the Settlement Documents, whether the Initial Payment or any Periodic Payment, is not paid when due.

Settlement Agreement at 17. The Plaintiffs contend that an "Actionable Event" occurred because HS3 "default[ed] in the performance of this Agreement" when he violated the Release's covenant not to sue—which, in turn, is incorporated into the Settlement Agreement. Pls. Mot. at 20–21.

HS3 argues that an Actionable Event "could occur only prior to full payment of the Settlement Amount." HS3 Opp. at 3. But that limitation finds no support in the language of Section 13. *See, e.g.*, *City of Pompano Beach v. Beatty*, 222 So. 3d 598, 600 (Fla. 4th DCA 2017) ("[T]he court's task is to apply the parties' contract as-written, not 'rewrite' it under the guise of judicial construction."). In any event, it contradicts the Release, in which HS3 "forever discharge[d]" his claims against the releasees, *see* Release at 1. The Court cannot credit a construction that "would negate the operation" of a contractual provision. *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000).

HS3 denounces the Plaintiffs' reading as "lead[ing] to absurd and incongruous results." HS3 Opp. at 4–5. In HS3's view, it "makes no practical or legal sense" for Al-Saleh to be permitted—today—to assert a claim for "a material inaccuracy in any representation or warranty made by [HS3]" or "the filing of a bankruptcy action by [HS3]." *Id*. at 4. But, as the Plaintiffs point out, there is nothing "absurd" or "incongruous" about the Settlement Agreement's belt-and-suspenders approach to "a billionaire with a history of evading his lawful debts." Pls. Reply at 5. Put another way, if Al-Saleh discovered today that HS3 had made materially inaccurate representations or warranties to induce Al-Saleh to sign the Settlement Agreement, there is nothing "absurd" about a provision that would hold him accountable for that misconduct. In fact, such material misrepresentations might well justify a claim for rescission. *See Anchor Bank, S.S.B. v. Conrardy*, 763 So. 2d 360, 361 (Fla. 4th DCA 1998) (affirming rescission of contract based on defendant's material misrepresentations).

Similarly, if HS3 were to trigger an "Actionable Event"—say, by lying or refusing to pay—there is nothing "absurd" about imposing a high price on any effort he might make to evade his debts by filing for bankruptcy. And the fact that some of the Agreement's remedies might not apply *in every case*, *see* HS3 Opp. at 4–5, does not render the Court's construction "absurd" or otherwise preclude the Plaintiffs from pursuing remedies that may well apply *here*. *See Swan Landing Dev., LLC v. Fla. Capital Bank, N.A.*, 19 So. 3d 1068, 1073 (Fla. 2d DCA 2009) ("[W]hen competent parties agree in a valid contract to pursue various available remedies through differing means, [the courts] will not 'second guess' the reasonableness of that decision."); *see also Famiglio v. Famiglio*, 279 So. 3d 736, 740 (Fla. 2d DCA 2019) ("[I]t is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties, . . . or, in the guise of interpretation, relieve a contracting party from the consequences of a bad bargain[.]").

HS3's principal argument, then, is that no "Actionable Event" could have occurred because Al-Saleh signed an Amendment to the Settlement Agreement, in which he "agree[d] that upon receipt of the Remaining Settlement Amount the SA Parties will have fully performed their obligations pursuant to the Settlement Agreement *and no Actionable Event will have occurred*." HS3 Mot. at 3–4 (quoting Amendment at 2)). But only Al-Saleh, HS3, and Abu Naba'a signed the Amendment, only they received consideration for its promises, and only they exchanged its stipulations. *See generally* Amendment. As the Plaintiffs correctly note, these three men were not authorized to extinguish—or otherwise modify—the rights of the Settlement Agreement's third-party beneficiaries. *See* RESTATEMENT (SECOND) OF CONTRACTS § 311(3) (AM. LAW INST. 1981) (contracting parties may not modify the obligations owed to third-party beneficiaries "when the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee").

The Eleventh Circuit has adopted this rule in a case applying Florida law. *See Vencor Hosps.*, 169 F.3d 677. Vencor, a hospital, was a third-party beneficiary to certain contracts between Blue Cross Blue Shield ("BCBS") and its insured. After the insured's stay at the hospital, BCBS agreed to accept from the insured only a fraction of what Vencor was allegedly owed. Vencor sued, and the district court granted BCBS's motion for summary judgment, but the Eleventh Circuit reversed. BCBS's agreement with the insured could have "no effect on Vencor's rights" under the original policy, because "[a] third-party beneficiary contract creates a contractual relationship between the beneficiary and the promisor." *Id.* at 682 & n.13. Thus, "for any accord and satisfaction to affect [a third-party beneficiary's] rights," that third party "would have to be a party to the accord." *Id.*; *see also Travelers Ins. Co. v. Perez*, 384 So. 2d 971, 972 (Fla. 3d DCA

1980) ("Ms. Perez is a third party beneficiary of the contract between Travelers and its insured. As such, she has the right to bring a direct action against Travelers alleging the insurer's bad faith as grounds for an excess judgment. Ms. Perez's right to bring a direct action for bad faith against the insurer vested in or accrued to her at the same time she became entitled to sue the insured. Once Ms. Perez obtained the right to proceed against the insurer she could not be divested of that right by the actions of the insured or the insurer without her consent."); *Auer v. Kawasaki Motors Corp., U.S.A.*, 830 F.2d 535, 539 (4th Cir. 1987) ("While a releasee may consent to the recreation of a cause of action against it, two parties to a release may not recreate a discharged cause of action against a third party without the third party's consent."); *Burns v. Gen. Motors Corp.*, 950 F. Supp. 137 (D. Md. 1996) ("Plaintiffs argue that they were free to amend the release absent additional consideration because Defendant is a third party beneficiary and as such is only protected from the effects of such amendment if it can prove that the parties intended for the contract to benefit Defendant. However, in the *Auer* case, the Fourth Circuit explicitly held to the contrary. . . . Maryland law therefore bars such amended releases from modifying the benefit afforded to Defendant by the original releases.").

The Plaintiffs argue that Al-Saleh could not extinguish their rights under Sections 14 or 36 of the Settlement Agreement because they "justifiably relied on th[e] promise" HS3 made in the Release. Pls. Mot. at 15. Fortunately, the Court need not address this disputed factual assertion because Burford and Dundrod unambiguously "manifest[ed] assent to" that promise when they signed the Release. *See* RESTATEMENT (SECOND) OF CONTRACTS § 311(3).[13]

---

[13] Hall, of course, never signed the Release. Whether *he* "justifiably relied on [HS3's] promise" is a question of fact that should be resolved at trial.

At oral argument, HS3 for the first time suggested that the Release authorized Al-Saleh to modify its terms all on his own. *See* Mot. Hrg. at 132. The Release does provide that it "may not be changed except with the express prior written consent of Al-Saleh." Release at 2. Since the parties to the Release were always free to contract around the common-law rights of third-party beneficiaries—and given that Al-Saleh signed the Amendment—HS3 says that Burford and Dundrod's signatures were unnecessary. But a party cannot rely on arguments it never raised in its initial summary judgment briefing. *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *see also Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). Either way, the Release does not support HS3's reading here.

Had the parties wished to give the "express prior written consent" clause the meaning HS3 ascribes to it, they could have easily done so—by, for instance, allowing the Release to be "changed with only [or "just" or "nothing more than"] the express prior written consent of Al-Saleh." *See* SCALIA & GARNER at 182 ("The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here."). But the parties chose not to use this simple, unambiguous phrasing precisely because, fairly read, the "express prior written consent" clause means, not that Al-Saleh can bind all third parties *without their consent*, but only that, however many people might sign a subsequent amendment to the Release, Al-Saleh must be one of them.

And we know that this reading of the Release is the correct one because HS3's (awkward) construction would conflict with Section 31 of the Settlement Agreement, which requires that "modifications of this Agreement that would be binding upon a Party that is not a natural person

require affirmative written consent of a Senior Official of such Party and the execution of a formal written document executed by all of the Parties hereto . . . ." Settlement Agreement at 21. Since Burford and Dundrod are not "natural person[s]"—and because, in HS3's view, the Amendment purports to "bind[]" them—Section 31 required the "written consent" of one of their "Senior Official[s]." *See* Thomas M. Cooley, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 58 (1868) ("[O]ne part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together."); SCALIA & GARNER at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

At oral argument, HS3 argued that Hall's (more natural) reading would render the "express prior written consent" clause superfluous. Mot. Hrg. at 132. It does not. It simply requires that Al-Saleh be one of the people who signs any amendment to the Release. And, while the law is clear that a contract cannot be modified without the consent of the parties to that contract, there is—as we have seen—nothing to prevent a litigant from claiming that, for one reason or another, a modification was lawful even though a party to the original contract was excluded from its emendation. This, after all, is precisely what HS3 has asked the Court to find with respect to the Amendment here, which HS3 says abrogated whatever rights the Plaintiffs may have had in the Settlement Agreement—all without their consent. Far from constituting some meaningless act of superfluity, therefore, the "express prior written consent" clause ensures that Al-Saleh cannot be excluded from any subsequent modification to the Release.[14]

---

[14] In any case, courts must sometimes render certain phrases superfluous to avoid constructions that would do violence to the plain meaning of the text. *See* SCALIA & GARNER at 176–77 ("Put to a choice . . . a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage. So like all other canons, this one must be applied with . . . careful regard to context. It cannot always be dispositive because . . . the underlying proposition is not *invariably* true.

The Amendment, in short, does not preclude the Plaintiffs' claims.[15] As we will now see, however, there are genuine disputes of material fact as to whether the SAC triggered an "Actionable Event." The parties' Motions for Summary Judgment on this issue are therefore **DENIED**.

### 2. Hall as a "Releasee"

The Release defines "RELEASEES" as: "(a) Al-Saleh, (b) Burford Capital, LLC, and (c) Dundrod Investments Ltd., and all persons or entities for whose acts or omissions the foregoing *would or could* be derivatively or vicariously liable or to whom the foregoing *could or would* owe indemnification." Release at 1–2. Since Hall was the only Plaintiff HS3 sued in the Related Federal Action, the question here is whether one of the named releasees "*would or could* be derivatively or vicariously liable" for Hall's work or whether any named releasee "*could or would* owe [Hall] indemnification."

A principal is responsible for the wrongful acts of its agent if the agent was acting either "(1) within the scope of its authority, or (2) during the course of the agency and to further a purpose

---

Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentable common belt-and-suspenders approach.") (emphasis in original).

[15] This conclusion—that the Amendment does not bar the Plaintiffs' claims—necessarily moots (in part) HS3's Third, Fourth, and Fifth Affirmative Defenses (Novation, Payment, and Accord & Satisfaction, respectively). In these Affirmative Defenses, HS3 averred that the Amendment—and the payments he made towards the Settlement Amount—effected a total discharge of any contractual obligations he may have owed the Plaintiffs. *See* Answer at 8–9; HS3 Opp. at 24–25 & n.43. This, as the Court has explained, the Amendment did not do. While the Amendment may have discharged the obligations HS3 owed *Al-Saleh*, it could not vitiate whatever rights Burford and Dundrod may have had, either through the Settlement Agreement or via the Release. Burford and Dundrod's Motion for Summary Judgment on these three Affirmative Defenses is therefore **GRANTED**. But, as the Court has noted, *see supra* n.13, there remains an outstanding factual dispute over whether Hall "justifiably relied on [HS3's] promise" such that his rights under the Settlement Agreement could not be abrogated. Hall's Motion for Summary Judgment on HS3's Third, Fourth, and Fifth Affirmative Defenses is therefore **DENIED**.

or interest of the principal." *Trevarthen v. Wilson*, 219 So. 3d 69, 72 (Fla. 4th DCA 2017). A principal is also liable for "the acts of its agent which were outside the scope of the agent's authority if the principal subsequently ratifies the actions." *Id.* (citing *McDonald v. Hamilton Elec., Inc. of Fla.*, 666 F.2d 509, 514 (11th Cir. 1982)). "A principal may ratify an agent's actions which would have otherwise been outside the scope of its authority by accepting the benefit of the agent's actions." *Id.*

To establish an agency relationship, then, a plaintiff must show: "(1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Banco Espirito Santo Int'l, Ltd. v. BDO Int'l, B.V.*, 979 So. 2d 1030, 1032 (Fla. 3d DCA 2008). "Unless the alleged agency relationship is to be proven exclusively by analysis of the contract between the principal and agent (in which case the question is an issue of law), the relationship is generally a question of fact and should be analyzed by looking at the totality of the circumstances." *Id.* (citing *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853–54 (Fla. 2003)).

There is more than enough evidence in the record from which a reasonable fact-finder "could" conclude that, in conducting his asset-trace investigation, Hall was acting as Burford's agent—and that, as such, Burford (a named releasee) "would or could be derivatively or vicariously liable" for Hall's work. So, for instance, Aviva Will, Burford's lawyer, testified that Hall obtained the HS3 Personal Materials "as part of a larger group of documents which were useful, could have been useful and, in fact, I think were in connection with asset tracing that involved a large collection of E-mails and other information that he was hoping to use as part of the investigative work." Transcript of Deposition of Aviva O. Will ("Will Tr.") [ECF No. 333-7] at 161. And Hall, for his part, attested that he "obtained [a] USB stick as part of [his] collection

efforts against Harry Sargeant, III . . . pursuant to [his] work in the Al-Saleh case[.]" Transcript of Deposition of Daniel Hall ("Hall Tr.") [ECF No. 333-8] at 95–96.

Will also testified that she supervised Hall's work in the Al-Saleh enforcement investigation *on Buford's behalf*. Will Tr. at 179 ("[W]hile I was involved in *supervising the investment generally*, . . . ."). Hall likewise testified that Will oversaw his work in the Al-Saleh matter, and that she was his supervisor. Hall Tr. at 468 ("I think for the purposes of this discussion I would have classed Aviva as one of—as a supervisor in the sense that she was in a senior position to me at the company, and she was the one most knowledgeable about the Al-Saleh investment, generally speaking."). This supervisory authority lends further support to the Plaintiffs' claim that Hall was working for Buford. *See Villazon*, 843 So. at 853 (in assessing a claim of agency, courts should consider "the right to control, rather than actual control"). In fact, even HS3 agreed that Buford, "through Aviva Will, had contemporaneous knowledge of Hall's conduct," HS3 Mot. at 13—the natural inference being that Hall was keeping Buford apprised in real-time *because* he was Buford's agent. There is, in short, plenty of evidence from which a reasonable fact-finder could find "(1) acknowledgement by [Buford] that [Hall] will act for [it], (2) [Hall's] acceptance of the undertaking, and (3) control by [Buford] over the actions of [Hall]." *Banco Espirito*, 979 So. 2d at 1032.

Moreover, if the Court were to interpret the Release in accordance with UK law, there likewise would be enough evidence for a reasonable fact-finder to find that Buford "*could or would* owe [Hall] indemnification." Release at 1–2. Of course, the Court need not, at this stage, choose between Florida and UK law because, to resolve HS3's Motion, it is sufficient for the Court to conclude only that UK law "could" apply. And, given the hard-to-dispute possibility that UK

law *might* govern,[16] the Plaintiffs have submitted the report of Jasbir Dhillon Q.C.,[17] an English lawyer whose expert opinion on the application of UK law the Court has admitted over HS3's *Daubert* challenge. *See* Order Granting in Part and Denying in Part Motion to Strike [ECF No. 372] at 2. In his Report, Mr. Dhillon specifically explained that, based on well-settled principles of English law, Burford "'would' have a right to an implied contractual indemnity from Mr. Al-Saleh, Burford and Dundrod in respect of any liability incurred by Mr. Hall to Mr. Sargeant as alleged in the Complaint and, in any event, Mr. Hall certainly 'could' have such a right from Mr. Al-Saleh, Burford and Dundrod." Dhillon Report ¶ 10.

HS3 has adduced precious little in support of his contention that Mr. Dhillon is wrong. *See* Expert Report of David Reade, Q.C. ("Reade Report") [ECF No. 323-69]. Indeed, the Court struck most of the Reade Report. *See* Order Granting in Part and Denying in Part Motion to Strike at 1. And those portions of the Reade Report that survive do not bear in any meaningful way on this all-important question of the application of UK indemnity law. *See generally* Reade Report ¶¶ 1–7, 10–21.

Against all this, HS3 advances five arguments.

*First*, he claims that only Hall's employer—Burford UK[18]—can be vicariously liable for Hall's conduct because, he says, Florida law extends vicarious liability *only* to employers. *See* HS3 Mot. at 7–12. In saying so, HS3 mischaracterizes Florida law. In fact, as we have seen, Florida law regularly extends vicarious liability outside the employment context—including, as relevant here,

---

[16] "Vicarious liability may also be imposed . . . under the local law of the state where the relationship between the one sought to be held liable and the tortfeasor is centered." *Stallworth v. Hosp. Rentals, Inc.*, 515 So. 2d 413, 416 (Fla. 1st DCA 1987). Hall lives and works in the UK. *See* Compl. ¶ 8 (lives in UK); Def's Answer ¶ 8 (admitting this); Hall Dep. [ECF No 333-8] at 35 (works in the UK).

[17] *See* Expert Report of Jasbir Dhillon Q.C. ("Dhillon Report") [ECF No. 318-6].

[18] Confusingly, Hall's employer was Burford UK—not Burford the Plaintiff. *See* Pls. SOF ¶ 34.

to the relationship between an agent and his principal. *See, e.g.*, *Villazon*, 843 So. 2d at 853–54 (principal liable for actions of independent contractor); *Trevarthen*, 219 So. 3d at 72 (liable for real estate broker); *Banco Espirito*, 979 So. 2d at 1032 (one company liable for actions of another company's employees).

*Second*, HS3 points to several pieces of evidence that, in his view, belie the Plaintiffs' contention that, in obtaining the HS3 Personal Materials, Hall was acting on Burford's behalf. *See* HS3 Mot. at 8–12. So, for instance, HS3 notes that the HS3 Personal Materials consist primarily of salacious videos whose value to Hall's asset-tracing investigation was, at best, *de minimis. Id.* at 8–9. Relatedly, HS3 criticizes Hall for forwarding three sex videos to Will and for suggesting that she "grab a glass of wine and treat [her]self to the 5min of video," HS3 SOF ¶¶ 119–22— presumably for the inference that Will herself perceived the videos as appealing primarily to some prurient, as opposed to investigatory, interest, *see* HS3 Mot. at 10.

But, in the SAC he filed in the Related Federal Action, HS3 specifically averred that "Hall was engaged as an investigator in a bitter, global feud with HS3 seeking recovery of millions of dollars from HS3 *on behalf of a separate Burford client, Mohammed [sic] Al-Saleh. As part of those efforts*, Hall sought information regarding HS3 *that Burford could use* to leverage and/or extort HS3 into a payment or settlement." SAC ¶ 31. Fairly read, the HS3 Personal Materials were the "information" HS3 alleged Hall procured on Al-Saleh and Burford's behalf. HS3, in short, has admitted that Hall traded for the HS3 Personal Materials as part—and in furtherance—of his agency relationship with two named releasees, Burford and Al-Saleh.

At trial, the fact-finder will have the unenviable task of parsing this evidence and deciding which side's agency position to believe. Fortunately, at summary judgment, the Court must construe all genuine factual disputes in favor of the non-moving party. *See Allen*, 121 F.3d at 646.

Ignoring this standard, HS3 asks the Court to disbelieve the (seemingly-consistent) deposition testimony of Will and Hall. HS3 Mot. at 8–12. But assessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment. *See Strickland*, 692 F.3d at 1154.

*Third*, HS3 quotes the affidavit of Andrew Preston—the UK lawyer for Latin American Investments Ltd. ("LAIL"), a business affiliate of Daniel Sargeant's—for his position that Hall was looking for material "of a sensitive personal nature." Affidavit of Andrew Preston ("Preston Aff.") [ECF No. 323-49] ¶ 153; HS3 Mot. at 11. As HS3 notes, "Preston makes no mention at any time of Hall's asset recovery or business motive or purpose." HS3 Mot. at 11. But this "absence of evidence of Hall's business purpose is not the same as evidence of its absence." Pls. Opp. at 14. Even so, this affidavit does little more than (potentially) undercut some of the evidence the Plaintiffs have adduced of Hall's legitimate *business* interest in the HS3 Personal Materials. Again, at summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party.

*Fourth*, HS3 says that, although Hall traded the confidential documents of a separate Burford UK client, Novoship (UK) Ltd. ("Novoship Material"), to Daniel Sargeant for the HS3 Personal Materials, he "never informed Novoship of his actions or anyone else at Burford UK save his subordinates." HS3 Mot. at 11. But Will and Hall testified that Hall *did* tell Burford UK about the HS3 Personal Materials. *See* Hall Tr. at 467; Will Tr. at 170. In fact, as HS3 acknowledges, Hall immediately brought the data he received from Daniel Sargeant—including the HS3 Personal Materials—back to his London office where several Burford UK employees reviewed the data and created a spreadsheet of helpful information. *See* Pls. SOF ¶ 42. More importantly, Hall told Will—his Burford supervisor—about the HS3 Personal Materials. *See* HS3 SOF ¶¶ 119–22.

*Fifth*, HS3 claims that Hall could not have been acting on Al-Saleh's behalf because Hall's deal with Daniel Sargeant could have jeopardized the settlement negotiations. *See* HS3 Mot. at 10. But Will and Hall testified that Hall continued his investigation—despite the negotiations—so that Al-Saleh would not be prejudiced if, during those negotiations, HS3 suddenly reneged on his obligations. *See* Hall Tr. at 97; Will Tr. at 169. On this point, Hall was pellucid: "from the Al-Saleh side there were concerns that the settlement may never actually be consummated or conclude or, more importantly, even if it did technically settle, that [HS3] would not adhere to or honor . . . the settlement agreement." Hall Tr. at 97.

For all these reasons, therefore, HS3's Motion for Summary Judgment on the issue of Hall's "releasee" status is **DENIED**.

We are not done yet, though, because—according to the Plaintiffs—this conclusion in turn *requires* the Court to enter judgment in *their* favor. Noting that the phrase "would or could" is "broad"—and that "the Release expressly states that it is to be broadly construed in favor of the RELEASEES"—the Plaintiffs insist that, "[u]nless Defendant can show it is *impossible* that Al-Saleh, Burford Capital, or Dundrod could have been held vicariously liable for Hall (or been required to indemnify him), Hall is a releasee." Pls. Mot. at 18 (emphasis in original). But, alluring as this logic at first glance appears, it ignores the equal-but-opposite burden the Court must apply to the Plaintiffs' Motion. After all, when adjudicating *the Plaintiffs'* Motion, the Court must draw all reasonable inferences—and resolve all factual disputes—*in HS3's favor*. As we have seen, HS3 has proffered reasonable, alternative explanations for every piece of evidence the Plaintiffs have submitted on the agency issue. He has also levied a series of well-honed attacks on the veracity of

Will and Hall's (admittedly self-serving) testimony, *see* Rebuttal Report of Mark Lanterman (Lanterman Rebuttal Report") [ECF No. 318-8].[19]

In other words, after drawing all reasonable inferences, making all credibility judgments, and resolving all factual disputes *in HS3's favor*, the Court cannot comfortably say that—with whatever evidence Hall has left—any reasonable fact-finder could conclude that one of the named releasees "would or could be derivatively or vicariously liable" for Hall's work or that any named releasee "could or would owe [Hall] indemnification." Accordingly, the Plaintiffs' Motion for Summary Judgment on the issue of Hall's "releasee" status is likewise **DENIED**.[20]

### 3. The Release's Scope

The parties also disagree about whether the SAC asserted "released claims." *See* Pls. Mot. at 17–20; Def. Mot. at 7–8. The SAC alleged that Hall conspired with Daniel Sargeant to obtain the HS3 Personal Materials, which were among the emails and files Hall received on October 14, 2016. *See* SAC ¶¶ 20–22, 33, 53–62, 106–22; Pls. SOF ¶¶ 51–52. In the Plaintiffs' view, because both the alleged conspiracy and Hall's receipt of the HS3 Personal Materials took place before the Release's effective date of October 28, 2016, the Release governs the SAC's claims against Hall. *See* Pls. Mot. at 17–18.

The language of the Release is—as the Plaintiffs note—broad in scope. As relevant here, it applies to claims that HS3:

---

[19] The Court struck Lanterman's Rebuttal Report because it was filed six weeks after the expert-rebuttal deadline. *See* Order Granting in Part and Denying in Part Motion to Strike. But, as the Court explained at the November 21, 2019 motions hearing, to the extent that Lanterman's Rebuttal Report simply summarized facts that were already in the record, HS3 would be permitted, at trial, to extrapolate natural inferences from those facts.

[20] For this same reason, the Plaintiffs' Motion for Summary Judgment on HS3's Ninth Affirmative Defense—in which HS3 avers that Hall was working adversely to Burford's interests, *see* Answer at 10—is **DENIED**. The Court will, of course, review these decisions at trial—after all the evidence is in—if the parties move for judgment under FED. R. CIV. P. 50.

> ever had or now has, upon, by reason of, arising out of, or in connection with any matter, cause, or thing whatsoever, including, but not limited to, any matter, cause, or thing whatsoever relating to the relationship between RELEASORS and RELEASEES, from the beginning of the world to [October 28, 2016].

Release at 1. The parties agree that the pertinent language of both the Settlement Agreement and the Release are unambiguous.[21] *See* HS3 Resp. at 6 n.8; Pls. Reply at 7. By its terms, then, the Release unambiguously precluded HS3 from suing over Hall's October 14, 2016 receipt of the HS3 Personal Materials because Hall's actions constituted "any matter, cause, or thing whatsoever relating to the relationship between RELEASORS and RELEASEES, from the beginning of the world to [October 28, 2016]."

HS3 argues that the Release is inapplicable to the SAC's claims because, in the Settlement Agreement's forbearance clause, "Al-Saleh agrees to forbear from exercising his rights or remedies to enforce the Judgments or assert any claim that arises from conduct or events that occurred prior to [October 4, 2016] and that would be subject to the [R]elease . . . if such [R]elease were effective as of [October 4, 2016]." Settlement Agreement at 12.[22] The Plaintiffs persuasively counter that the forbearance clause precluded Al-Saleh only from "exercising" his "rights and

---

[21] Again, this consensus renders academic HS3's proffered parol evidence of the parties' intentions. *See Haggin v. Allstate Investments, Inc.*, 264 So. 3d 951, 954 (Fla. 4th DCA 2019) ("[I]f the agreement is unambiguous, then the plain language of the contract governs and there is no need for parol evidence of the parties' intent.").

[22] HS3 separately contends that public policy bars the release of intentional torts. *See* HS3 Opp. at 2 n.1. But, as the Eleventh Circuit has held, parties are "only prohibited from contracting against liability for future, not past, intentional wrongdoings. Indeed, the [Florida Supreme Court] in *Cerniglia v. Cerniglia*, 679 So. 2d 1160, 1164–65 (Fla. 1996), enforced a general release . . . despite the party's common law fraud claim based on nondisclosure of financial assets." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 223 F.3d 1275, 1282 (11th Cir. 2000). And it is undisputed that Hall obtained the HS3 Personal Materials on October 14, 2016—*before* the Release's effective date of October 28, 2016. No public policy, in other words, precluded the parties from releasing whatever claims they might have had with respect to the intentional torts at issue here. The Plaintiffs' Motion for Summary Judgment on HS3's Twelfth Affirmative Defense (Public Policy) is therefore **GRANTED**.

remedies" in formal proceedings—not from "[c]onducting factual investigation into [HS3] and his assets." Pls. Opp. at 18.

Either way, the forbearance clause is entirely irrelevant to the specific question at issue here: whether the Release covers the claims HS3 asserted in the SAC. At best, if Al-Saleh violated the forbearance clause by continuing to investigate HS3, HS3 might have a viable breach-of-contract claim against Al-Saleh. But nothing in the forbearance clause purports to delimit the scope of the Release. One thing, in sum, has nothing to do with the other.

Finally, HS3 suggests that, if Hall was in fact acting on Al-Saleh's behalf when he traded for the HS3 Personal Materials, then the Settlement Agreement's forbearance clause would constitute a fraudulent misrepresentation on which HS3 detrimentally relied. *See* HS3 Mot. at 12–14. To the extent that HS3 is asserting a fraudulent inducement defense, genuine disputes of material fact preclude the entry of summary judgment on this issue. Most notably, while the Settlement Agreement does—as the Plaintiffs point out—contain a "No Reliance; No Rescission" clause, that clause does not apply to "statements of fact or promises of future conduct . . . expressly and specifically set forth in this [Settlement] Agreement." Settlement Agreement at 20–21. HS3 says that the forbearance clause's stipulations constituted just such a "statement of fact or promise[] of future conduct[.]" But, again, it will be for the fact-finder to decide whether Hall was acting on Al-Saleh's behalf, *see supra* Section II.B.2—and, if so, whether (1) the Settlement Agreement's forbearance clause constituted a fraudulent "statement of fact or promise[] of future conduct," (2) upon which HS3 detrimentally relied, *see Awodiya v. Ross Univ. Sch. of Med.*, 391

F. Supp. 3d 1098, 1107 (S.D. Fla. 2019) (describing the contours of a fraudulent misrepresentation claim).[23]

The parties' Motions for Summary Judgment on this issue are therefore **DENIED**.

## C. Damages

As damages, the Plaintiffs seek (1) the "Judgment Amount" (roughly $13.6 million) and (2) attorneys' fees and costs. Pls. Mot. at 20–21.[24]

### 1. The Judgment Amount

Section 14 of the Settlement Agreement provides that, in the case of an "Actionable Event":

(a) The SA Parties shall remain, jointly and severally, liable for the Judgment Amount less any payments received by Al-Saleh after the Effective Date as applied under this Agreement. For avoidance of doubt, the Parties agree the Initial Payment and any Periodic Payments shall be applied first to the Judgment Enforcement Costs then to the Base Judgment Amount;

(b) The Forbearance Period shall terminate;

(c) Al-Saleh may exercise all of his rights and remedies under the SA Mortgages, Stock Pledges, Pledged Company Documents, the Additional Pledges; the Aircraft Mortgage, the Counterclaim Withdrawal, and the Solvochem Pledge;

(d) Al-Saleh may exercise all of his rights under the Texas Abatement Pleading, Texas Settlement Stipulation, Texas Consent Judgment, Bahamas Abatement Pleadings, Bahamas Settlement Stipulations, Bahamas Consent Judgments, Delaware Abatement Pleading, Delaware Settlement Stipulation, Delaware Consent Judgment, UK Abatement Pleading, UK Settlement Stipulation, and UK Consent Judgment.

*Id*. at 17–18.

As HS3 points out, *see* HS3 Opp. at 2 n.5, the Plaintiffs "cannot rest [their] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Rather, as third-party beneficiaries, the Plaintiffs are entitled only to those rights and remedies the contract

---

[23] For this same reason, the Plaintiffs' Motion for Summary Judgment on HS3's Tenth Affirmative Defense (Fraud) is **DENIED**.

[24] The Plaintiffs concede that the fact-finder should determine, at trial, the amount of those fees and costs. *Id.* at 21.

gives them. *See Hirshenson v. Spaccio*, 800 So. 2d 670, 674 (Fla. 5th DCA 2001) ("The scope of third party beneficiary rights are generally defined by the contract"); *Civix Sunrise, GC, L.L.C. v. Sunrise Rd. Maint. Ass'n, Inc.*, 997 So. 2d 433, 435 (Fla. 2d DCA 2008) (third-party beneficiary could not invoke attorney's fee provision "because nothing in the lease indicates the parties intended for them to benefit from . . . [that] provision"); 2 WILLISTON ON CONTRACTS § 364A, at 873–74 & n.5 (3d ed. 1959) (collecting cases holding that a third-party beneficiary's rights are limited by the terms of the contract); *Shaffer v. Wells Fargo Guard Servs.*, 528 So. 2d 389, 392 (Fla. 3d DCA 1988) (refusing to allow third-party beneficiary to exercise rights under the contract because, "[a]lthough it can be fairly said that Shaffer was an intended third-party beneficiary of the contract between the bank and Wells Fargo, it cannot be fairly said that the contract contemplated protecting bank employees from hazards totally unconnected to the activities or business of the bank"); *Networkip, LLC v. Spread Enterprises, Inc.*, 922 So. 2d 355, 358 (Fla. 3d DCA 2006) (when it comes to the rights of third-party beneficiaries, the "intention of the contracting parties, gleaned from the contract itself, is determinative").

And the only remedy the Settlement Agreement (arguably) grants to third-party beneficiaries—including (perhaps) Burford, Dundrod, and Hall—is the right to seek attorneys' fees and costs under Section 36.[25] Section 14, by contrast, makes no mention of any third-party beneficiaries, let alone the Plaintiffs. Under the canon of *expressio unius est exclusio alterius*, this omission from Section 14 strongly suggests that, while the Plaintiffs may have rights under Section 36, they have none under Section 14. *See* SCALIA & GARNER at 107–11 (discussing this canon).

Indeed, read in context, the Plaintiffs' suggestion that Section 14 grants *them*—rather than Al-Saleh—some right to pursue the "Judgment Amount" makes little sense. As the Plaintiffs

---

[25] Much more on this below. *See infra* Section II.C.2.

repeatedly point out, *see* Pls. Mot. at 13–14, Section 14 would, in the case of an "Actionable Event," restore the status quo *ante*—reverting the parties to their positions *before* they signed the Settlement Agreement. At that point, as Section 14 makes clear, the forbearance clause would be dissolved, Al-Saleh would be entitled to seek enforcement of the various judgments and decrees he had obtained all over the world, and—for the cherry on top—HS3 would "remain, jointly and severally, liable for the Judgment Amount less any payments received by Al-Saleh after the Effective Date as applied under this Agreement." Settlement Agreement at 17. Liable to whom? To the only person he was liable to before the Settlement Agreement; the only other person mentioned—either expressly or by reference—in Section 14; the only person whose rights are triggered in each of Section 14's other subsections: Al-Saleh.

Were it otherwise, the liquidated damages provision of Section 14 would be, as HS3 argues, "grossly disproportionate" to the Plaintiffs' claimed litigation expenses—some $3.6 million, *see* Pls. Reply at 6. As the parties acknowledge, a liquidated damages clause is lawful only when it meets both parts of the following two-part test: "First the damages consequent upon a breach must not be readily ascertainable. Second, the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to flow from a breach." *Lefemine v. Baron*, 573 So. 2d 326, 328 (Fla. 1991). Even if, as the Plaintiffs contend, the damages were not, at the time the Settlement Agreement was executed, "readily ascertainable," Pls. Reply at 6, the Judgment Amount would be "grossly disproportionate to any damages that" HS3 would be reasonably expected to owe *these Plaintiffs. See, e.g.*, *Resnick v. Uccello Immobilien GMBH, Inc.*, 227 F.3d 1347, 1352 (11th Cir. 2000) (vacating liquidated damages "because the award is grossly disproportionate to damages reasonably expected to flow from the breach and is solely punitive"); *MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir. 1999)

("Parties may not . . . use such stipulated damages provisions as a way to secure for themselves greater damages in the event of a breach than contract law would normally allow.").

The Plaintiffs' suggestion that "the $13.8 million is not a penalty; it is the remaining Judgment Amount Defendant admitted that he owed," Pls. Reply at 6, would be true *only* if Al-Saleh—the only person HS3 "owed" the Judgment Amount to—were the plaintiff here. But he is not. The Plaintiffs here were not plaintiffs in the underlying partnership dispute between Al-Saleh and HS3—nor did the judgment the jury rendered in that case purport to award the Plaintiffs *any* amount of money. Section 14(a) of the Settlement Agreement—which, as the Plaintiffs note, simply hung the remaining portion of that jury award as a kind of Sword of Damocles over HS3's head—thus apportioned no part of the outstanding $13.8 million as damages HS3 "owed" *to the Plaintiffs*.

The two cases the Plaintiffs cite—*Nippon Credit Bank, Ltd. v. Matthews*, 291 F.3d 738 (11th Cir. 2002), and *Polezoes v. Bartlett*, 921 So. 2d 35 (Fla. 4th DCA 2006)—are inapposite here. Both cases involved a liquidated damages provision that simply incorporated the underlying debt the defendant owed *to the plaintiff*. In neither case did *a third party*—who was not a party to the underlying litigation and to whom the defendant owed no underlying debt—seek to recover the liquidated damages. *See Nippon*, 291 F.3d at 751 ("In *the Intercredit* litigation, Nippon sought to recover the default of $80 million in loans made to Intercredit Corporation. In . . . the settlement agreement *in that action*, Matthews agreed to pay Nippon $8 million. . . . [T]he . . . $8 million . . . represented [a] substantial reduction[] in the amount *sought by Nippon* in the litigation. The settlement agreement upon which the judgment was based was signed by Matthews *both as chief executive officer of Intercredit* and on his own behalf[.]"); *Polezoes*, 921 So. 2d at 37 ("We are unable to find a settlement result to be a penalty when the settlement outcome falls within the

possible outcomes *if the underlying case had gone to trial*."). Because the Plaintiffs were not parties to the underlying Florida case, their recovery of the "Judgment Amount" could never "fall[] within the possible outcomes if the underlying case had gone to trial."

The Plaintiffs' reliance on *Treasure Coast, Inc. v. Ludlum Constr. Co.*, 760 So. 2d 232, 234 (Fla. 4th DCA 2000), fails even under the common logical fallacy it purports to promote. In a nutshell, the argument goes something like this: Because *Treasure Coast* affirmed a liquidated damages award of $65,000 in a case involving only $37,000 of actual damages, so this Court should approve a $13.8 million penalty in a case involving only $3.6 million of damages. But, even if the ratio of actual damage-to-liquidated penalty between the two cases were similar, the disparities between the two monetary amounts in this case are—by more-than-two orders of magnitude—greater than they were in *Treasure Coast*. Put simply, jumping from $1 to $2 is not the same as climbing from $1 million to $2 million. In any event, the ratios are not remotely the same: Whereas the liquidated damages provision in *Treasure Coast* was about 1.7 times the damages amount, the Judgment Amount here is almost four times the Plaintiffs' (claimed) damages.

HS3's Motion for Summary Judgment on the Plaintiffs' claim for the Judgment Amount is therefore **GRANTED**.[26]

### 2. Attorneys' Fees and Costs

The Plaintiffs offer two arguments in support of their separate claim for attorneys' fees and costs. *First*, they say, "Al-Saleh assigned his rights in his judgments against Defendant to Dundrod pursuant to Section 37 of the Settlement Agreement." Pls. Opp. at 19 (citing Assignment [ECF No. 347-6]). Armed with this Assignment, they continue, Dundrod can "invoke Section 36 of the

---

[26] The Plaintiff's Motion on this issue is **DENIED**.

Settlement Agreement, which provides that in the event of a breach the non-breaching party is entitled to its reasonable attorneys' fees and costs in litigation related to the breach." *Id.*

But the Assignment never mentions—or so much as alludes to—the Settlement Agreement. *See generally* Assignment. Instead it purports to assign to Dundrod "all of [Al-Saleh's] right, title, and interest in, to and under" certain "Judgments" Al-Saleh "won" against HS3 "in numerous jurisdictions," including Florida. *See id.* at 1. The Assignment, in short, applies only to the "Judgments" Al-Saleh "won"—and not to the Settlement Agreement the parties signed.

Even if the Assignment did apply to the Settlement Agreement, it would remain ineffectual because it appears to violate Section 37 of the Agreement, which unmistakably provides that any "[s]uch assignment shall not be valid or effective until [an] Acknowledgment has been signed by [Dundrod] and provided to the SA Parties' counsel." Settlement Agreement at 24. Nothing in the record suggests that Dundrod ever signed such an Acknowledgment or delivered it to HS3's counsel.

*Second*, the Plaintiffs ask for attorneys' fees and costs under Section 36 of the Settlement Agreement, which provides that, "if a breach of this Agreement occurs, . . . the non-breaching Party shall be entitled to recover its reasonable Attorneys' Fees and Costs." *Id.* at 23–24. Here, the Settlement Agreement—never a model of absolute clarity—is genuinely ambiguous.

On the one hand, as Section 36 makes plain, only a "Party" to the Settlement Agreement may invoke its fee-shifting provisions. *Id.* And, in its opening paragraph, the Settlement Agreement carefully defines both "Party" and "Parties":

> THIS SETTLEMENT AGREEMENT (the "Agreement"), effective as of October 4, 2016 (the "Effective Date"), is made by and among Mohammad Anwar Farid Al-Saleh ("Al-Saleh"), on the one hand, and Harry Sargeant, III ("Sargeant") and Mustafa Abu-Naba'a ("Abu-Naba'a") (collectively "the SA Parties"), on the other hand, who collectively shall be referred to throughout as the "Parties" and each, individually, as "Party."

*Id.* at 1. In HS3's view, then, because the only "Parties" to the Settlement Agreement are Al-Saleh, Abu-Naba'a, and HS3, the Plaintiffs may not recover attorneys' fees and costs under Section 36.

The Plaintiffs, for their part, deprecate the Settlement Agreement's opening paragraph as mere "prefatory language" and cite *Rose v. M/V "GULF STREAM FALCON"*, 186 F.3d 1345, 1350 (11th Cir. 1999), which—they say—follows the well-established view that "prefatory language" can never bind the contracting parties. *See* Pls. Opp. at 20. But both *Rose* and the Florida decision it relied on, *Johnson v. Johnson*, 725 So. 2d 1209, 1212 (Fla. 3d DCA 1999), involved ordinary "wherefore" clauses that did little more than lay out the factual background of the dispute. Those "wherefore" clauses, however, bear little resemblance to the opening paragraph at issue here, which explicitly defines several important terms that then reappear throughout the document.[27]

Section 22 of the Settlement Agreement reinforces HS3's definition. That paragraph—ironically titled "No Third Party Beneficiaries"—distinguishes between "the Burford Entities" (that is, Burford and Dundrod) and "the Parties to this Agreement"—a curious construction if, as the Plaintiffs suggest, Burford is also a "Party" to the agreement. Settlement Agreement at 7, 20.

On the other hand, Section 31 of the Settlement Agreement provides that "modifications of this Agreement that would be binding upon a Party *that is not a natural person* require affirmative written consent of a Senior Official of such Party." *Id.* at 21. If, as HS3 contends, the

---

[27] Notably, too, the Settlement Agreement's opening paragraph contains no "wherefore" clauses whatsoever and includes none of the aspirational diction that is so often the hallmark of non-binding "prefatory language." *See Cruz*, 2019 WL 2743211, at *11 ("As the Court has explained, the aspirational language of paragraph 2 of the Defendant's Offer *was non-essential*. As such, the Plaintiff's decision not to include it in his Acceptance has no bearing on the agreement's formation.").

only "Parties" to the Agreement are Al-Saleh, Abu-Naba'a, and HS3—three natural persons—this reference to a "Party that is not a natural person" would make little sense.

The Settlement Agreement, in other words, is ambiguous as to whether the Plaintiffs are "non-breaching Parties" who may pursue attorneys' fees and costs under Section 36 of the Settlement Agreement. *Yardum v. Scalese*, 799 So. 2d 382, 383 (Fla. 4th DCA 2001) ("Where a written instrument lends itself to more than one reasonable interpretation, it is ambiguous and therefore summary judgment is improper for either party."); *Langford v. Paravant, Inc.*, 912 So. 2d 359, 360–61 (Fla. 5th DCA 2005) ("[W]hen the content of an agreement is ambiguous and the parties present different interpretations, the issue of proper interpretation becomes one of fact, precluding summary judgment."); *CC-Aventura, Inc. v. The Weitz Co., LLC*, 2007 WL 3343041, at *2 (S.D. Fla. Nov. 8, 2007) (when a contract is "ambiguous as to [p]laintiffs' available damages[,] . . . summary judgment is inappropriate").

One more thing before we close this Section on attorneys' fees and costs: As both parties recognize, Hall's status as a "Party" is more complicated than Burford or Dundrod's because, unlike those two companies, Hall is not specifically identified in Section 22. To recover his fees and costs, then, the Plaintiffs rely on Section 22's residual clause, which grants the Agreement's "rights and remedies" to several individuals and entities, including (as relevant here) "the Burford Entities, and their respective heirs, personal representatives, legal representatives, successors and assigns[.]" Settlement Agreement at 20. The Plaintiffs concede that Hall is not an heir, successor, or assign of the Burford Entities. Nor is he a "personal representative," which typically refers to "[s]omeone who manages the legal affairs of another because of incapacity or death, such as the executor of an estate." *Representative*, Black's Law Dictionary (10th ed. 2014); *cf.* Fla. Stat.

§ 768.21 ("The decedent's personal representative may recover for the decedent's estate the following: . . . .").

But HS3's reliance on *Cimino v. Am. Airlines, Inc.*, 183 So. 3d 1242, 1244 (Fla. 4th DCA 2016), for its position that "legal representative" is coextensive with "personal representative" is misleading. *Cimino* reversed the dismissal of a Florida Civil Rights Act ("FCRA") claim filed by the personal representative of the decedent's estate. *Id*. In so holding, the court noted that "[t]he pertinent statutory language clearly provides that any 'person aggrieved' may file a complaint and that a 'person' *includes* an 'individual' as well as a 'legal representative.' The use of the word 'includes' in a definitional section is usually taken to mean that it may include other things as well." *Id*. The court went on to find that this permissive statutory language authorized suits by a person who did not fit neatly into the technical definition of "legal representative"—for instance, the decedent's "personal representative." *Id*. ("For example, the statute's reference to a 'legal representative,' as well as a joint-stock company, labor union, trustee in bankruptcy, etc., as entities that may be aggrieved parties with standing to file an FCRA claim provides support for conferring standing on a 'personal representative[.]'"). *Cimino*, then, made clear that "personal representative" and "legal representative" are two different things. And *Cimino*'s alternative suggestion that "personal representative" may be subsumed into the definition of "legal representative" does not help HS3 either. After all, even if every "personal representative" is a "legal representative," Hall's point is that not every "legal representative" is a "personal" one.

Unfortunately, on this critical question—whether Hall is a "legal representative"—neither party provides much helpful guidance, so the Court will **DENY** both parties' Motions for Summary Judgment on this issue and allow them to quarrel over it at trial.

### III. Malicious Prosecution

Both sides move for summary judgment on Count III, Hall's malicious-prosecution claim. *See* Pls. Mot. at 21–29; HS3's Mot. at 16–30. To prevail on that claim, Hall must prove the following six elements:

> (1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding.

*Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994).

There is no dispute about the first two elements: HS3, after all, "commenced [the] original . . . civil judicial proceeding [i.e. the Related Federal Action]" against Hall. Nor is there any serious disagreement about the Sixth—damages. HS3 asks the Court to enter judgment against Hall on his malicious-prosecution claim because Burford paid Hall's attorneys' fees and costs—and so, HS3 says, Hall did not "suffer" any damages. HS3 Mot. at 29–30. But Florida's collateral-source rule prohibits "a set-off of collateral source benefits" against a plaintiff's damages. *Hurtado v. Desouza*, 166 So. 3d 831, 836 (Fla. 4th DCA 2015). While the Florida legislature has abrogated that rule by statute in certain specifically-enumerated circumstances—such as disability benefits and insurance payments for medical expenses, *see id*. (citing Fla. Stat. § 768.76)—the common-law rule continues to apply when, as here, a plaintiff receives compensation from a source not listed in the statute. *Id*. at 838 ("[B]ecause unemployment compensation benefits are not specifically listed in section 786.76 and cannot be interpreted as a collateral source under any of

its provisions, the trial court erred in setting off those benefits from the final judgment.").[28] The fact-finder, in short, must decide the extent, if any, of Hall's malicious-prosecution damages. And the Court may not "set off" that award by the amount of any collateral payments Burford might have made towards those fees and costs.

Nevertheless, "[t]he failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution." *Id.* With this framework in mind, the Court now turns to the three remaining elements: bona fide termination; malice; and probable cause.

## A. Bona Fide Termination

A "bona fide termination" is just a "fancy phrase which means that the first suit, on which the malicious prosecution suit is based, ended in a manner indicating the original defendant's (and current plaintiff's) innocence of the charges or allegations contained in the first suit," such that "a court handling the malicious prosecution suit, can conclude with confidence, that the termination of the first suit was not only favorable to the defendant in that suit, but also that it demonstrated the first suit's lack of merit." *Doss v. Bank of Am., N.A.*, 857 So. 2d 991, 994 (Fla. 5th DCA 2003).

---

[28] Relying on a Middle District of Florida case, HS3 argues that "Hall, the sole plaintiff asserting a malicious prosecution claim, cannot establish damages in the form of attorney's fees, which have been voluntarily incurred by Burford US." HS3 Reply at 10 n.14 (citing *Ware v. United States*, 971 F. Supp. 1442, 1470–71 (M.D. Fla. 1997)). *Ware* was a criminal case, in which the indigent defendant—who would become the malicious-prosecution plaintiff—was represented by court-appointed counsel. *Ware*, 971 F. Supp. at 1471. The Court assumed that Ware "did not incur any discernable out-of-pocket expenses to defend himself against federal drug charges" and entered summary judgment against him. *Id.* But this was not true. In fact, Ware would have incurred fees and costs, which the Court would have paid on his behalf from its repository of Criminal Justice Act funds. To the extent, then, that *Ware* conflicts with *Hurtado*, the Court must follow the guidance of Florida's intermediate appellate courts and disregard *Ware*. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir. 2014) ("[W]e are bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise."); *Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992) ("[T]he decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court.").

The parties agree that HS3 voluntarily dismissed the Related Federal Action. *See* Pls. Mot. at 22; HS3 Mot. at 17. In Hall's view, this dismissal constituted a bona fide termination of the SAC's claims in his favor. *Id.* At the very least, Hall argues, the SAC's CFAA claim—which HS3 has never refiled—ended resolutely in his favor. Pls. Mot. at 22–23; Pls. Opp. at 21–23.

### 1. A Bona Fide Termination of The Original Proceeding

The parties wrangle over whether there was a "termination" of the Related Federal Action. *See* Pls. Mot. at 22–23; HS3 Mot. at 17–20. HS3's view is that it was never terminated because (1) he brought one of the SAC's "core allegations"[29] in a counterclaim against Hall *in this case*; (2) he has retained his right to appeal *this Court's* dismissal of that counterclaim; and (3) he asserted some—but not all—of the SAC's claims in a *separate proceeding* in state court. *See* HS3 Opp. at 11 n.17 ("It is undisputed that HS3 has continued to pursue his state law claims against Hall in both state court and in his counterclaim in this action. Accordingly, these claims did not 'terminate' upon HS3's voluntary dismissal of the SAC."). But, as this cursory recitation of HS3's arguments makes plain, HS3's efforts to perpetuate the SAC's claims in *other* proceedings—in this Court; in state court; and (one day, perhaps) before the Eleventh Circuit Court of Appeals— does not change the fact that "the original proceeding" was terminated. That Related Federal Action had a case name and number, was assigned to a federal judge, and (for better or worse) was "br[ought] to an end." *See Terminated*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/terminated; *cf. Alamo*, 632 So. 2d at 1355 (malicious-prosecution claim requires "termination of the original *proceeding*"); *Doss*, 857 So. 2d at 994 (a bona fide termination "demonstrate[s] the first *suit's* lack of merit").

---

[29] The Amended Counterclaim did not assert either the CFAA or the CADRA claim. *See generally* Am. Counterclaim. But it did raise the civil conspiracy and intrusion claims. *Id.* at 15–21.

HS3 cites *May v. Fundament*, 444 So. 2d 1171 (Fla. 4th DCA 1984), for the proposition that, "if a multi-counted complaint contains one count that has not been filed maliciously, then a malicious prosecution action cannot lie against that complaint." *Id*. at 1171–72. But this line comes straight from the *trial court's* ruling, which the Court of Appeal affirmed *on different*—and narrower—grounds. *See id*. (quoting *Applegate v. Barnett Bank of Tallahassee*, 377 So. 2d 1150, 1152 (Fla. 1979) ("Even when based on erroneous reasoning, a conclusion or decision of a trial court will generally be affirmed if the evidence or an alternative theory supports it.")).

In *May*, the plaintiff brought a two-count complaint against a doctor and his medical practice. *Id*. at 1172. Count I alleged that the defendants had provided the plaintiff with negligent medical care. *Id*. Count II averred that the defendants had been grossly negligent—thus entitling the plaintiff to punitive damages. *Id*. When the trial court dismissed Count II—but before any adjudication of Count I—the defendants sued the plaintiff for malicious prosecution. *Id*. In dismissing the defendants'-cum-plaintiffs' complaint, the trial court said—in a line HS3 has mistakenly attributed to the appellate court—that, "if a multi-counted complaint contains one count that has not been filed maliciously, then a malicious prosecution action cannot lie against that complaint." *Id*. at 1171–72.

On appeal, the *May* Court "distinguish[ed] other cases involving separate claims," *id*., and observed that:

> The present case portrays the doctor as negligent, then goes on to deeper cuts—that he was reckless and his acts were willful. Nevertheless, it is still the same furrow being plowed—perhaps akin to A alleging B to be not only a fool but a darn fool as well. Some judges could argue—like the physician's attorneys—that as to the allegations involved here, there is a difference in kind, not degree, between those allegations which were stricken and those remaining; but we disagree.

*Id.* at 1173. This, then—that "there [wa]s a difference [not] in kind, [but only in] degree, between those allegations which were stricken and those remaining," *id*.—was the narrow holding in *May*.

Whether the SAC's CFAA and CADRA claims differ in kind or only in degree—and whether *May* would have come out differently if, instead of gross negligence, Count II had alleged some entirely separate tort—are difficult questions that, fortunately, the Court need not reach today. Because *the whole* "original proceeding" (the Related Federal Action, with Case Number 17-CV-81070-BB) has "terminated," *May*'s analysis—of the ripeness, so to speak, of a malicious-prosecution claim when only *a part* of the "original proceeding" has been "terminated"—is inapplicable here.

### 2.  . . . In Favor of the Current Plaintiff

Whether a voluntary dismissal constitutes a "favorable termination" turns on "the total circumstances of the dismissal." *Union Oil of Cal. Amsco Div. v. Watson*, 468 So. 2d 349, 353 (Fla. 3d DCA 1985). "Where dismissal is on technical grounds, for procedural reasons, or any other reason not inconsistent with the guilt of the accused, it does not constitute a favorable termination." *Id.* On the other hand, a voluntary dismissal will be "reflective of the merits . . . where the allegations in the underlying complaint are demonstrated to be false and there is evidence the plaintiff knew they were false[.]" *Cohen v. Corwin*, 980 So. 2d 1153, 1156 (Fla. 4th DCA 2008). In assessing this element of a malicious-prosecution claim, the Florida Supreme Court has admonished lower courts to employ a burden-shifting approach:

> Clearly, as with all of the elements of a malicious prosecution claim, it is the plaintiff's burden to establish that the underlying cause of action was terminated and that such termination was "bona fide." Once a plaintiff submits evidence of a bona fide termination, the burden shifts to the defendant to rebut that the termination was bona fide. . . . and the issue becomes one for a jury to decide.

*Alamo*, 632 So. 2d at 1356.

Hall's principal argument is that, in hearings before Magistrate Judge Reinhart, HS3's counsel "admitted that he voluntarily dismissed the SAC rather than remaining in federal court

because his CFAA claim—the only claim upon which federal jurisdiction was predicated—was without merit." Pls. Mot. at 22–23; *accord* Pls. Opp. at 21–23. So, for instance, Hall quotes HS3's counsel as saying that "Judge Reinhart made quite clear *his view* that HS3's federal claims were futile. . . . The purpose for the voluntary dismissal was neither mysterious or ill-motivated, as the Court had previously indicated the futility of any federal claims, and suggested *the propriety of state court jurisdiction*." Pls. Mot. at 22. Hall also cites to a hearing before the state-court judge—in which HS3's counsel conceded: "[Judge Reinhart] made clear that he did not think . . . that no matter how we reshuffled those Federal Law claims, he didn't think that we could establish those claims. . . . [W]e said fine. . . . so we did what he asked us to do." *Id.* Hall then points to a moment in the state-court proceedings when HS3's counsel promised "not . . . to assert those Federal claims again, Judge." *Id.* Finally, Hall quotes from the transcript of a subsequent hearing before Magistrate Judge Reinhart, at which HS3's counsel candidly observed that:

> I mean, Mr. Sargeant is now, at least according to their argument, to be penalized for asserting his claims, following the Court's direction, which was very, very clear, and frankly, we appreciated your candor. Properly moving to state court as— because as we understood it, both from what Your Honor said at the hearing, from the Eleventh Circuit case law that Mr. Hall's counsel cited and we certainly agreed with, it's not really shopping if you only have one choice. It's not—this isn't, you know, I've got a universe of multiple options, and I can pick one or not pick one. We had one choice.

*Id.* at 23.

But, even taken together, these statements do not conclusively establish that the SAC's allegations were "without merit." *Id.* at 22. To the contrary, a reasonable fact-finder could find, based on these "admissions," that HS3 dismissed the SAC after Magistrate Judge Reinhart "disagree[d] with [HS3's] position that [*United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010)] holds that a person always 'exceeds authorized access' [under the CFAA] if the material being accessed will be used to commit a crime." SAC R&R at 20. HS3's counsel "had a view that

the *Rodriguez* case compelled a particular result; [Magistrate Judge Reinhart] had a different view." Transcript of Motion to Dismiss Hearing ("MTD Hrg.") [ECF No. 40] at 8. As HS3's counsel told Magistrate Judge Reinhart, "it seemed abundantly clear that you told us, in Mr. Coleman's words, take your marbles and leave. You may have a claim in state court, but I don't think you're going to find one here under [the CFAA]." Transcript of Sept. 20, 2018 Motion For Fees and Costs in Related Federal Action ("Fees and Costs Hrg."), Related Federal Action [ECF No. 213] at 20. Indeed, as HS3's counsel explained at his deposition in this case, "Judge Reinhart did not agree with our interpretation of *Rodriguez*. . . . He preferred to rely upon a narrower view [of the CFAA]." First Transcript of Deposition of Gregory W. Coleman ("Coleman Tr. I") [ECF No. 340-17] at 17.

Given Magistrate Judge Reinhart's clearly-stated view, HS3 was faced with two options: (1) object to the Magistrate Judge's "narrower view" of the CFAA and hope to persuade both the District Court Judge and, one day, the Eleventh Circuit Court of Appeals, or (2) abandon the CFAA claim—along with the costs of a protracted appeal—and proceed in state court on a state-court cause of action that, in the end, carried all the same remedies at a much lower cost. HS3 chose the latter course. While this calculation may not turn out to have been the right one, its implementation does not prove that the SAC's allegations were "demonstrated to be false." *Cohen*, 980 So. 2d at 1156.

Nor does the temporal proximity between the dismissal and Magistrate Judge Reinhart's R&R change this result. To the contrary, as Magistrate Judge Reinhart noted, his "R&R is [after the dismissal] a dead letter," and "there was never a final order of any court making a decision on the merits." MTD Hrg. at 54. Indeed, in his Report and Recommendation on HS3's Motion to Dismiss in this case ("MTD R&R") [ECF No. 41], Magistrate Judge Reinhart pointed out that

"[t]he [SAC] R&R recommended giving [HS3] leave to file a Third Amended Complaint, including re-alleging all of the claims against Hall, supported by additional facts." MTD R&R at 20. This recommendation that HS3's claims be dismissed *without prejudice*—and with leave to amend—suggests a technical defect in the SAC (rather than a finding on the merits) and undermines Hall's view that either the R&R or the dismissal were in any way "reflective of the merits" of the SAC. *Cohen*, 980 So. 2d at 1156; *accord Union Oil*, 468 So. 2d at 354 n.4 (dismissal on "technical grounds"—which "includes those taken because of defects in the complaint"—does not constitute a bona fide termination in the malicious-prosecution plaintiff's favor).

Indeed, HS3's counsel's statement—upon which Hall relies for his argument that counsel admitted to the futility of the SAC's averments—lends further support to HS3's position. As counsel noted: "Judge Reinhart made quite clear *his view* that HS3's federal claims were futile. . . . The purpose for the voluntary dismissal was neither mysterious or ill-motivated, as the Court had previously indicated the futility of any federal claims, and suggested *the propriety of state court jurisdiction.*" Pls. Mot. at 22. Here, again, HS3's counsel was simply restating *Judge Reinhart's* view, not that the SAC's allegations were "without merit," but that they were better-suited to a different jurisdiction. And, ironically, it was Hall's counsel who attested that "HS3's voluntary dismissal of the [SAC] does not reflect HS3's abandonment of his claims against Mr. Hall." Declaration of Derek T. Ho ("Ho Dec.") [ECF No. 9-1] ¶ 7.

In his Reply, Hall accuses HS3's counsel of "backtrack[ing] from these concessions" and claims that "counsel's statements are binding judicial admissions," which HS3 is powerless to "contradict." Pls. Reply at 7. That would, of course, be true if Hall's interpretation of those statements were the only reasonable one. But, as HS3 has shown, there is another reading of those statements from which a reasonable fact-finder could find that HS3 dismissed the SAC, not

because he believed its averments were meritless, but because he came to perceive the state-court system as a better, cheaper, and more favorable forum for his claim. As the Florida Supreme Court has said: "Once a plaintiff submits evidence of a bona fide termination, the burden shifts to the defendant to rebut that the termination was bona fide. . . . and the issue becomes one for a jury to decide." *Alamo*, 632 So. 2d at 1356. This dispute, in short, raises "a question for the jury as the finder of fact. . . . to hear the circumstances surrounding the termination and . . . to consider whether the termination was bona fide." *Id.*

### B. Malice

"In an action for malicious prosecution, it is not necessary for a plaintiff to prove actual malice; legal malice is sufficient and may be inferred from, among other things, a lack of probable cause, gross negligence, or great indifference to persons, property, or the rights of others." *Id.* at 1357. "Legal malice, which is also referred to as technical malice or malice in law, 'requires proof of an intentional act performed without justification or excuse.'" *Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. 2d DCA 2007) (quoting *Reed v. State*, 837 So. 2d 366, 368–69 (Fla. 2002)). "Negligence is insufficient to support an inference of malice." *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116 (S.D. Fla. 2019). "The determination of the existence or lack of malice is within the province of the jury." *Posterity v. S/V Knotta Klu*, 2019 WL 249711, at *5 (M.D. Fla. Jan. 17, 2019) (quoting *Azrikan v. O'Brien*, 173 So. 2d 711, 713 (Fla. 3d DCA 1965)).

Hall advances three arguments in support of his view that HS3 filed the SAC with actual or legal malice. All are unpersuasive.

*First*, he says that HS3 was angry at Hall and Burford. *See* Pls. Opp. at 24–25. But HS3's animosity towards the men he viewed as responsible for attempting to extort him with his sex videos—as Hall notes, he called them "despicable," "disgusting," "horrible," "criminal," "illegal,"

"revolting," "unprofessional," and "unethical," *id*. at 24—is as unsurprising as it is irrelevant. Most litigants—perhaps all—experience varying degrees of acrimony towards their adversaries. Some vent that acrimony publicly—at depositions or even before the jury. Hall, to be sure, might persuade the fact-finder that HS3 acted maliciously when he filed the SAC. On the other hand, the fact-finder—acting reasonably—could just as easily conclude that HS3's enmity was justified or that it did not impel him to file a baseless complaint. Either way, HS3's rancor provides no basis for granting Hall's Motion.

*Second*, Hall insists that HS3 filed the SAC for "an improper purpose"—namely, to seek the return of his sex videos. *Id*. at 24–25. In support, he selectively quotes *Bothmann v. Harrington*, 458 So. 2d 1163, 1169 n.8 (Fla. 3d DCA 1984), for the proposition that "'improper purpose' includes "coercion to obtain . . . the surrender of property.'" Pls. Opp. at 24. But Hall conveniently omits from this quotation the only phrase that is relevant here. *See Bothmann*, 458 So. 2d at 1169 n.8 ("The improper purpose usually takes the form of coercion to obtain a collateral advantage, *not properly involved in the proceeding itself*, such as the surrender of property or the payment of money[.]"). As HS3 has explained, the SAC specifically sought the return and deletion of the HS3 Personal Materials. *See* SAC at 23. That form of relief was thus "properly involved in the proceeding itself." *Bothmann*, in sum, does not help Hall either.

*Third*, Hall contends that HS3 filed the SAC without probable cause—which, he says, establishes HS3's malice as a matter of law. *See* Pls. Opp. at 24. As the Court now explains, however, HS3 had probable cause to file the SAC.

### C. Probable Cause

"Probable cause is defined as '[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the

person accused is guilty of the offense with which he is charged.'" *Goldstein v. Sabella*, 88 So. 2d 910, 911 (Fla. 1956) (quoting *Dunnavant v. State*, 46 So. 2d 871, 874 (Fla. 1950)). "Probable cause in the context of a civil suit is measured by a lesser standard than in a criminal suit." *Wright v. Yurko*, 446 So. 2d 1162, 1166 (Fla. 5th DCA 1984). "To establish probable cause, it is not necessary to show that the instigator of a lawsuit was certain of the outcome of the proceeding, but rather that he had a reasonable belief, based on facts and circumstances known to him, in the validity of the claim." *Id.*; *accord Endacott v. Int'l Hospitality, Inc.*, 910 So. 2d 915, 922 (Fla. 3d DCA 2005) ("[I]n instigating an action against the plaintiff, the defendants need only show that they had a reasonable belief that the claim was valid based on the facts and circumstances known to them. . . . The defendants need not be certain of the outcome of the underlying proceeding to have probable cause for bringing the" claim.); *Cohen v. Amerifirst Bank*, 537 So. 2d 1108, 1110 (Fla. 3d DCA 1989) ("To have probable cause to commence or continue an action does not mean that the plaintiff will, or must, ultimately prevail, but only that his commencement or continuance is of an arguably valid cause of action.").[30]

---

[30] As a preliminary matter, Hall (Pls. Opp. at 24) challenges HS3's reliance on *Endacott* for the proposition that "there can be no claim for malicious prosecution where at least part of the counterclaim . . . was asserted with probable cause." 910 So. 2d at 923. As Hall sees it, *Endacott* "addressed only whether malicious prosecution could be asserted where a *single* claim was supported by some *theories* but not others. *Endacott* does not hold that probable cause on one claim is sufficient to support the entire complaint." Pls. Opp. at 24 (emphasis in original). But Hall cites no Florida case for the opposite position. To be fair, as Hall notes, the Fourth District Court of Appeal did quote the California Supreme Court's view that "it would seem almost a mockery to hold that, by uniting groundless accusations with those for which probable cause might exist, the defendants could thereby escape liability[.] Such, we think, is not the law." *May*, 444 So. 2d at 1173 (quoting *Singleton v. Perry*, 289 P.2d 794, 799–800 (Cal. 1955)). That said, the *May* Court never actually adopted the *Singleton* approach—which, it suggested, might be confined to the peculiar facts of that case. *See id.* ("Nevertheless, it is possible that the opinion in *Singleton* is colored by the fact of her arrest and detention *on criminal charges* and her return from a distant place only to have the charges dismissed."). The truth is that no Florida court has taken a firm stand on this question. Either way, because HS3 had probable cause to assert *every* claim in the SAC, it is not a question the Court must decide today.

"What facts and circumstances amount to probable cause is a pure question of law. Whether they exist or not in any particular case is a pure question of fact. The former is exclusively for the court; the latter for the jury." *City of Pensacola v. Owens*, 369 So. 2d 328, 330 (Fla. 1979). The parties agree that the salient facts are undisputed and that the only question here is what those facts "amount to"—a question only the Court can decide. *See* Pls. Mot. at 24; HS3. Mot. at 20–21 & n.15; Mot. Hrg. at 46.

### 1. CFAA

The CFAA punishes anyone "[w]ho[] . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer[.]" 18 U.S.C. § 1030(a)(2); *see also* 18 U.S.C. § 1030(a)(4) ("Whoever . . . knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . . shall be punished[.]"). While the CFAA was designed as a criminal statute to punish computer hacking, *see Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1289–90 (M.D. Fla. 2012), it does allow private civil actions in a narrow set of circumstances. *See* 18 U.S.C. § 1030(g).

A CFAA claim has four elements: (1) a defendant intentionally accessed a protected computer; (2) without authorization or exceeding authorized access; and the defendant (3) thereby obtained information; and (4) the plaintiff suffered damage or loss of at least $5,000.00. *Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307, 1313 (S.D. Fla. 2018) (citing 18 U.S.C. § 1030(g)). In the SAC, HS3 alleged that Hall had participated in a conspiracy to violate the CFAA. *See* SAC at 11–12. The CFAA makes it a crime for anyone to "conspire[] to commit or attempt[]

to commit an offense" in violation of the statute. 18 U.S.C. § 1030(b). Hall argues that HS3 lacked

probable cause as to any of the CFAA's four elements.

### a. Computer

Under the CFAA,

> the term 'computer' means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device.

18 U.S.C. § 1030(e)(1). The CFAA defines "protected computer" to include, in relevant part, "a

computer . . . which is used in or affecting interstate or foreign commerce or communication,

including a computer located outside the United States that is used in a manner that affects

interstate or foreign commerce or communication of the United States." 18 U.S.C.

§ 1030(e)(2)(B).

There is no reasonable dispute that the HS3 Personal Materials—the computer files at issue

in the SAC—were stored within HS3's email account ("the HS3 Email Account"), which (at some

point) was physically located on the Sargeant Server. *See* Pls. Resp. SOF [ECF No. 337] ¶ 48. The

Sargeant Server, in turn, fits comfortably into the CFAA's definition of a "computer" because it is

both an "electronic . . . data processing device performing logical, arithmetic, or storage functions"

and a "data storage facility or communications facility directly related to or operating in

conjunction with such device." 18 U.S.C. § 1030(e)(1); *accord* Expert Report of Mark Lanterman

("Lanterman Report") [ECF No. 340-19] at 4 (noting that the Sargeant Server is a "computer

system" responsible for tasks such as "recording the last modified date/timestamps of the email

files"). The Sargeant Server is also a "protected computer" within the meaning of the CFAA

inasmuch as it is used to send, receive, and store emails and other communications, which are always "in or affecting interstate or foreign commerce." 18 U.S.C. § 1030(e)(2)(B).

According to Hall, when HS3 filed the SAC, the HS3 Personal Materials' metadata "show[ed] conclusively" that the files had been taken from the Sargeant Server no later than August of 2013. Pls. Mot. at 25–26. Because Hall and Daniel Sargeant did not meet until 2015, *see* Hall Tr. at 150–51, Hall says, the two men could not have conspired to remove the files from the server in 2013. But, as both sides' computer forensic experts agreed, the metadata proved only that the relevant files were segregated *within the server* in August of 2013—not that they were *removed* from the server at that time. *See* Transcript of Deposition of Michael McGowan ("McGowan Tr.") [ECF No. 340-18] at 52–53 ("Nothing in the metadata tells . . . where [the files] were stored next. . . . It doesn't tell . . . how many times the MSG files were copied between 2013 and 2016."); *accord* Lanterman Report at 7 ("The last modified date/timestamps of the HS3 Material do not show that the data was taken from HS3's systems in August of 2013, instead, it only shows that someone undertook efforts to specifically identify and segregate the material at that time."); *see also* Transcript of Deposition of Mark Lanterman ("Lanterman Tr.") [ECF No. 340-20] at 132–33 (attesting that nothing in the HS3 Personal Materials' metadata disproves HS3's theory that the HS3 Email Account was accessed through the Sargeant Server in 2016).

Notably, the metadata on the USB drive Hall received from Daniel Sargeant—which contained the HS3 Personal Materials—"included October 14, 2016 as file creation date, indicating it had been copied to the USB Drive on October 14, 2016." HS3 SOF ¶ 142; *see* Pls. Resp. SOF ¶ 142 (admitting this fact as undisputed); Expert Report of Michael McGowan ("McGowan Report"), Ex. A [ECF No. 325-3] at 1–8. Based on this evidence, HS3 "reasonably could have believed" that his private emails were segregated into a separate, discrete folder on the

Sargeant Server in August of 2013, and that, in 2016, Daniel Sargeant—at Hall's urging or with his knowledge—copied those emails onto a USB drive, which he then delivered to Hall on October 14, 2016.

But Hall offers a second piece of evidence to bolster his view that the SAC's claims were false. As Hall sees it, HS3 knew—from salacious text messages a second HS3 brother, James Sargeant, had disseminated in December of 2013—that the HS3 Personal Materials had been removed from the Sargeant Server in 2013, long before Hall entered the picture. *See* Pls. Mot. at 25–26. But, as HS3 points out, James Sargeant's Christmas missives included only "three innocuous photos," not videos—and those photos were (apparently) from *different* files than the HS3 Personal Materials at issue here. *See* Second Transcript of Deposition of Gregory W. Coleman ("Coleman Tr. II") [ECF No. 323-72] at 161–62; *accord* HS3 Tr. at 178. Moreover, these Christmas files, as HS3 has explained, came from his cell phone—not, like the HS3 Personal Materials, from his Email Account. *See* Coleman Tr. II at 161–63; HS3 Tr. at 187–89; First Declaration of HS3 ("HS3 Dec. I") [ECF No. 323-12] ¶¶ 40–41 (noting that the HS3 Email Account "was the only possible source for the HS3 [Personal Material[s]"). HS3 "reasonably could have believed" that James Sargeant stole *only* the 2013 photographs when he was, for a short time, in possession of HS3's cellphone earlier that year. *See* HS3 Tr. at 188–89.[31] The James Sargeant fiasco thus does not, as Hall insists, prove that HS3 "knew" the Personal Materials had been compromised in 2013.

Even if the emails were removed from the Sargeant Server in August of 2013, HS3 "reasonably could have believed" that the Email Account itself—which Daniel Sargeant's

---

[31] Hall does not contest any of these basic facts. To the contrary, both sides have stipulated to the facts and have told the Court that the issue of probable cause now turns only on the Court's analysis of the remaining questions of law. *See* Pl. Mot. at 24; HS3 Mot. at 20–21 & n.15; Mot. Hrg. at 46.

employee, Annette Perez, copied onto a USB drive on October 14, 2016[32]—constituted a "protected computer" under the CFAA. To be fair, the Email Account itself *may not* qualify as a "protected computer" because it is not, technically speaking, a "device" or "facility."[33] *See Device*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/device ("a thing made or adapted for a particular purpose, especially a piece of mechanical or electronic equipment"); *Facility*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/facility ("a place, amenity, or piece of equipment provided for a particular purpose"). But at least one federal judge has suggested that Yahoo! and Facebook accounts *may* qualify as "protected computer[s]" under the CFAA. *See Mahoney v. DeNuzzio*, 2014 WL 347624, at *5 (D. Mass. Jan. 29, 2014). And these online accounts are, for our purposes, indistinguishable from the Email Account at issue here. It was thus not unreasonable for HS3 to believe that his Email Account—standing alone—constituted a "protected computer" within the meaning of the statute.

In short, HS3 had probable cause to assert this first element of his CFAA claim.

### b. Without Authorization

While he was working with his family's business, HS3 owned and controlled access to the HS3 Email Account. *See* HS3 Tr. at 254–55; Second Declaration of HS3 ("HS3 Dec. II") [ECF

---

[32] *See* HS3 SOF ¶ 90 ("[O]n October 14, 2016, Perez texted to Hall, 'Made a copy for you to keep. It's pretty nasty. Lol.'"); Pls. Resp. SOF ¶ 90 (admitting this fact); *see also* [ECF No. 323-68] at 5 (text log containing this message).

[33] Hall never raised this argument in his briefs. And, while he did mention it in response to the Court's questions at the November 21st hearing, Mot. Hrg. at 73–76, a party cannot rely on arguments it made for the first time at oral argument. *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *see also Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

No. 340-8] ¶¶ 6–8. After HS3 left, the business' IT specialist assured him that his Email Account had been deactivated, and that its contents had been destroyed. *See* HS3 Tr. at 162–64; HS3 Dec. I ¶ 21. This turned out not to be true. When he filed the SAC, HS3 knew that sensitive information from his Email Account had been disseminated, and he had reasonable grounds to believe that Hall had obtained this information with Daniel Sargeant's assistance. *See* HS3 Dec. I ¶¶ 40–41 (describing how HS3 learned, in early 2018, that the HS3 Email Account had not been destroyed, because that account "was the only possible source for the HS3 Material").

The question, then, is whether HS3 reasonably believed that Daniel Sargeant accessed either the Sargeant Server or the HS3 Email Account "without authorization." 18 U.S.C. § 1030(a)(2). In the Related Federal Action, HS3's theory on this element relied heavily on *United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010). *See* SAC R&R at 16–20. Based on *Rodriguez*, HS3 argued that, although Daniel Sargeant—another Sargeant Family Business owner—had *general* authority to access the Sargeant Server, "even a person with dominion and control over a protected computer may not exercise that power to access information on the computer if the person's intention is to use the information to commit a crime." *Id.* at 16. Although Magistrate Judge Reinhart ultimately disagreed with HS3 on this issue, he did so only after "closely analyz[ing]" *Rodriguez* and its progeny. *Id.* at 17–21.[34]

On this record, the Court cannot say that HS3 lacked a reasonable belief in the merits of his position. To the contrary, he presented a colorable legal argument on a complicated issue of

---

[34] Hall contends that Magistrate Judge Reinhart's R&R establishes the absence of probable cause. *See* Pls. Mot. at 26–27. But the R&R was a recommendation—not an order. *See* MTD Hrg. at 54 ("R&R is [after the dismissal] a dead letter," and "there was never a final order of any court making a decision on the merits."). Either way, the R&R recommended that the SAC be dismissed *without prejudice* and with leave to amend, MTD R&R at 20—which, again, strongly undermines Hall's view that it constituted a finding *on the merits* of HS3's claims.

first impression within this Circuit. In other words, he had probable cause with respect to this second element of his CFAA claim.

### c. Obtained Information

There is little dispute that Hall obtained the information at issue in this case—viz. the HS3 Personal Materials. *See* Pls. Resp. SOF ¶ 88 (admitting that Hall "viewed a few salacious materials" on the USB drive and "transmitted, by electronic means, a few salacious materials to certain Burford personnel and two close friends"). Moreover, by the time HS3 filed the SAC, he had reason to believe that Hall obtained that information through a conspiracy with Daniel Sargeant. *See generally* Preston Aff. According to Preston, Daniel Sargeant agreed to exchange the HS3 Personal Materials for information Hall had about a separate Burford UK client (the "Novoship Material"). As Preston explained:

> [H]aving reviewed the documents Mr Hall had provided to him, [Daniel] Sargeant contacted Mr Hall and explained that he was particularly looking for copies of [additional Novoship Material]. Mr Hall stated that he did have such documents. At the same time, Mr Hall maintained his request for copies of the personal material relating to [HS3]. [Daniel] Sargeant made arrangements to provide that material to Mr Hall which, [Daniel] Sargeant informs me, is of a sensitive personal nature . . . .

*Id.* ¶ 153.

Hall challenges HS3's reliance on the Preston Affidavit because it does not specifically allege that Daniel Sargeant conspired with Hall to access either the Sargeant Server or the HS3 Email Account. *See* Pls. Mot. at 24. But, in addition to linking Hall and Daniel Sargeant in a conspiracy to disseminate the HS3 Personal Materials, the affidavit described in detail each side's motivations. And, while it does not provide technical details about who specifically accessed the emails, how many megabytes they comprised, what software was used, which day of the week or month it was—all details that would be beyond Preston's personal knowledge (and, perhaps, interest) in any event—the affidavit is more than sufficient to justify HS3's reasonable belief that

Hall and Daniel Sargeant agreed, without HS3's consent, to "obtain [sensitive] information" from HS3's Email Account and to trade it for the Novoship Material.

HS3 thus had probable cause to assert this third element of his CFAA claim.

### d. Loss

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

As the Eleventh Circuit has explained, § 1030(e)(11) identifies two *separate* types of loss:

> (1) reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program system, or information to its condition prior to the violation; and (2) any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. The statute is written in the disjunctive, making the first type of loss independent of an interruption of service. . . . "Loss" includes the direct costs of responding to the violation in the first portion of the definition, and consequential damages resulting from interruption of service in the second.

*Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017). In saying so, the court rejected the narrow interpretation of the statute that would require that "any loss under the CFAA be the result of an interruption of service." *Id*. A CFAA plaintiff, in other words, "may allege losses related to costs incurred in responding to the violation, assessing its damage, and restoring data and systems to their condition prior to the alleged violation, without having suffered an interruption of services." *Id.*; *accord Global Physics Solutions, Inc. v. Benjamin*, 2017 WL 6948721, at *3 (S.D. Fla. June 26, 2017) ("loss" included the direct costs of responding to the violation, as well as consequential damages flowing from an interruption of services); *TEC Serv, LLC v. Crabb*, 2013 WL 12177342, at *3 (S.D. Fla. Jan. 14, 2013) (recognizing two ways for a CFAA plaintiff

to show "loss": (1) lost revenues and costs as a result of interruption of services, and (2) costs incurred in responding to a CFAA violation).

HS3 hired a computer forensic analyst to help him "respond[] to [the] violation" and "assess[] the damage done." HS3 Resp. SOF ¶ 82 (citing HS3 Dec. II ¶ 19 ("I spent in excess of $5,000 on a computer forensic analyst as well as attorneys' fees in investigating and responding to the access to my HS3 Email Account that was the basis for the Original Proceeding.")). That is more than enough to show "loss" under the statute.

### 2. CADRA

Under CADRA,

A person who knowingly and with intent to cause harm or loss: (1) Obtains information from a protected computer without authorization and, as a result, causes harm or loss; (2) Causes the transmission of a program, code, or command to a protected computer without authorization and, as a result of the transmission, causes harm or loss; or (3) Traffics in any technological access barrier through which access to a protected computer may be obtained without authorization, is liable to the extent provided in s. 668.804 in a civil action to the owner, operator, or lessee of the protected computer, or the owner of information stored in the protected computer who uses the information in connection with the operation of a business.

Fla. Stat. § 668.803. The SAC's CADRA conspiracy claim proceeded on the first of these three theories. *See* SAC ¶¶ 107–108.

By its terms, a CADRA claim premised on this first theory requires a plaintiff to prove the same four elements as a CFAA claim: (1) obtaining information; (2) from a protected computer; (3) without authorization; and (4) with intent to cause loss or harm. In fact, Judge Reinhart addressed the SAC's CFAA and CADRA conspiracy claims together, R&R at 27–28, and Hall concedes that the elements of a CADRA conspiracy claim mirror those of a CFAA conspiracy, Pls. Mot. at 4. In other words, because HS3 had probable cause to assert his CFAA conspiracy claim, he likewise had probable cause to levy his CADRA conspiracy claim.

### 3. Conspiracy to Invade Privacy

#### a. The Invasion of Privacy

Florida law recognizes the tort of invasion of privacy by "intrusion—physically or electronically intruding into one's private quarters." *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003) (quoting *Agency for Health Care Admin. v. Assoc. Indus. of Fla., Inc.*, 678 So. 2d 1239, 1252 n.20 (Fla. 1996)). To prevail on a claim for invasion of privacy by intrusion, a plaintiff "must show that the defendant [1] physically or electronically intruded [2] into his private quarters or affairs and [3] that this intrusion would be highly offensive to a reasonable person." *Stirling Int'l Realty, Inc. v. Soderstrom*, 2015 WL 403318, at *6 (M.D. Fla. Jan. 28, 2015).

#### i. Intrusion

As discussed, when he filed the SAC, HS3 had probable cause to believe that Daniel Sargeant—one of the alleged coconspirators—had accessed the HS3 Email Account, either on the Sargeant Server or elsewhere; that Annette Perez, Daniel Sargeant's employee, had downloaded the HS3 Personal Materials onto a USB drive; and that Perez had then delivered that USB to Hall. *See supra* Section III.C.1. Specifically, before filing the SAC, HS3 had received 278 emails and 200 attachments from the HS3 Email Account ("the LAIL document production"), which included the HS3 Personal Materials. *See* SAC, Ex. A [ECF No. 323-71] at 29–34; Coleman Tr. II at 87–95, 166–67, 247. He had also learned from Patrick Mooney that Daniel Sargeant (1) knew of the material's sensitive nature, (2) had the means to access it on the Sargeant Server, and (3) wanted to use the material to damage HS3. *See* Coleman Tr. II at 65–72. And, as noted, the contents of Preston's Affidavit gave HS3 a reasonable basis to believe that Daniel Sargeant had agreed with Hall—who, as Al-Saleh's private investigator, had a compelling business interest in extorting HS3—to exchange this material for the Novoship Material. *See* Preston Aff. ¶ 153.

HS3, therefore, had "a reasonable belief, based on facts and circumstances known to him," that an electronic intrusion of the HS3 Email Account had occurred.

### ii.    Private Quarters or Affairs

While HS3 worked for the Sargeant Family Business, his Email Account was private. Employees typically do not have a reasonable expectation of privacy in their workplace emails *when* their employer (1) implements a policy that restricts personal email use, and (2) notifies the employees of this policy. *See, e.g.*, *Bingham v. Baycare Health Sys.*, 2016 WL 3917513, at *4 (M.D. Fla. July 20, 2016) ("[T]he majority of courts have found that an employee has no reasonable expectation of privacy in workplace e-mails when the employer's policy limits personal use or otherwise restricts employees' use of its system and notifies employees of its policy."). Although the Sargeant Family Business had a policy restricting employees' personal email use, it was not enforced against HS3, *see* Transcript of Deposition of Daniel Sargeant ("Daniel Sargeant Tr.") [ECF No. 323-42] at 371:21–22 ("I couldn't really enforce that policy on [HS3]."), because he was an owner—not an employee—of the business, HS3 SOF ¶ 46.

Moreover, while he worked at the business, HS3's Email Account was "private" and was treated as his "personal property." HS3 SOF ¶¶ 46, 50–55. The account was password-protected, and he was the only person authorized to access it—except for a system administrator with limited authority to perform technical maintenance or repairs. *See id.* ¶¶ 53–56. HS3, in short, retained a privacy interest in the HS3 Email Account. *See Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 969 (11th Cir. 2016) (acknowledging that individuals have a privacy interest in their personal emails); *see also Woods v. On Baldwin Pond, LLC*, 2014 WL 12625078, at *1 (M.D. Fla. Apr. 2, 2014) ("As the records sought here are directed to Plaintiff's personal . . . email accounts, the Court finds Plaintiff has a privacy interest in his accounts[.]").

Hall contends that HS3 abandoned the HS3 Email Account when he left the business—and that, at that point, its contents were no longer "private." Pls. Mot. at 9. But HS3 cannot be faulted for reasonably relying on the assurances of the system administrator, *see* HS3 SOF ¶¶ 62–64—nor could he have abandoned an email account he believed no longer existed. *See Brown v. Reynolds*, 872 So. 2d 290, 295 (Fla. 2d DCA 2004) ("Abandonment is a question of intent, and the burden of proving it is on the person asserting it."); *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994) (intent, in the Fourth Amendment's parallel abandonment analysis, "may be inferred from acts, words and other objective facts"); *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc) (in assessing abandonment under the Fourth Amendment, courts must consider "[a]ll relevant circumstances existing at the time of the alleged abandonment").[35]

Hall cites no case for his position that, by relying on the assurance that his emails were being destroyed, HS3 evinced the "intent" to relinquish his privacy interest in those communications. Notably, Magistrate Judge Reinhart likewise concluded that "[t]he SAC pleads sufficient facts to establish a plausible claim that [HS3] retained some privacy interest in the HS3 Materials." R&R at 28. HS3 thus "reasonably [] believed" that he could establish this element of his civil conspiracy claim.

### iii. Highly Offensive

HS3 avers—and Hall does not dispute—that the HS3 Personal Materials "included extremely sensitive sex videos and photographs of intimate activity and private, consensual relations involving me and others." HS3 Dec. I ¶ 26. These sexual depictions would likely prove "highly offensive" to any number of people, including, for instance: (1) HS3, his wife, and his

---

[35] Decisions of the former Fifth Circuit issued prior to October 1, 1981 are binding in this Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

children; (2) HS3's other family and friends; and (3) the women whose names and depictions appear in the HS3 Personal Materials—as well as their families and friends.

### b. The Conspiracy

To establish a civil conspiracy, a plaintiff must allege: "[1] an agreement between two or more parties, [2] to do an unlawful act or to do a lawful act by unlawful means, [3] the doing of some overt act in pursuance of the conspiracy, and [4] damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).

### i. Agreement

Again, in his affidavit, Preston attested that Daniel Sargeant had "made arrangements" to swap the HS3 Personal Materials for the Novoship Material. Preston Aff. ¶ 153. And, indeed, before he filed the SAC, HS3 learned that Daniel Sargeant had told Mooney that he "intended to fuck" HS3 by providing embarrassing photos and videos to Hall. *See* Transcript of Deposition of Patrick Mooney ("Mooney Dep.") [ECF No. 323-47] at 37–41. HS3 thus had reasonable grounds to believe that Hall and Daniel Sargeant had entered into an agreement "to fuck" him. How? By taking salacious videos from his Email Account—whether on the Sargeant Server or elsewhere—and extorting him with it.

### ii. Unlawful Act or Unlawful Means

The CFAA makes it a crime for anyone to "conspire[] to commit or attempt[] to commit an offense" in violation of the statute. 18 U.S.C. § 1030(b). Because HS3 had probable cause to believe that Hall and Daniel Sargeant had conspired to violate the CFAA, he likewise had a reasonable belief that they had either (1) engaged in an unlawful act, or (2) committed a lawful act by unlawful means.

### iii. Overt Act

HS3 had reasonable grounds to believe that Hall and Daniel Sargeant—among others—engaged in at least one overt act in furtherance of the conspiracy. The two men met several times and discussed their plans over the phone, *see e.g.*, Pls. Resp. SOF ¶¶ 67–72, 82–84; Perez, at Daniel Sargeant's behest, uploaded the HS3 Personal Materials onto a USB drive, *see id.* ¶ 90; Perez then delivered that USB drive to Hall, *see id.* ¶¶ 88–89; and Hall gave Daniel Sargeant the Novoship Material as payment for the HS3 Personal Materials, *see* Preston Aff. ¶ 153; *see also* HS3 Tr. at 204 ("Because [Fahad Al Tamimi] was part of—he was part of the—he—he was part of the lawsuit against Ruperti [i.e. Novoship]. And—and they—Mr. Hall exchanged the pornographic material for the settlement documents between Ruperti [i.e. Novoship], PDVSA, and some other sensitive financial information or something.").

Each of these was an overt act in furtherance of the conspiracy HS3 had reasonable cause to believe was afoot. *See Berger v. State*, 259 So. 3d 933, 936 (Fla. 5th DCA 2018) (under Florida law, an "overt act" is just "an act toward the commission of the crime," even if it is not the "very last possible act" and even if the crime ultimately was never committed).

### iv. Damages

As the Court has already explained, HS3 established that the conspiracy to trade in his sexual depictions impelled him to hire a forensic analyst who could help him "respond[] to [the] violation" and "assess[] the damage done." HS3 Resp. SOF ¶ 82 (citing HS3 Dec. II ¶ 19). This is sufficient to establish civil conspiracy damages under Florida law.[36]

---

[36] The Court thus need not address whether, as HS3 claimed in the SAC, the conspiracy caused (or could have caused) him some reputational harm, *see* SAC ¶ 117.

### 4. Hall's Final Arguments

Hall advances two final ripostes. *First*, he relies on *Melford* for the proposition that HS3 must have lacked probable cause because he knew that the SAC's claims had been released. *See* Pls. Mot. at 28. *Melford*, however, involved a release that so plainly applied to the claims the bank had asserted in the underlying foreclosure suit that, in the ensuing malicious-prosecution action, the bank conceded the point. *See Melford*, 371 F. Supp. 3d at 1125. Here, by contrast, the parties hotly dispute the Release's application to the claims HS3 asserted in the SAC. That Release, in turn, is just one of several interrelated documents—the Settlement Agreement, the Assignment, the Amendment—whose intertwined meanings are, to put it bluntly, confusing. Indeed, the Court has specifically determined that these contractual instruments—when read together—are ambiguous on the key question presented here: whether Hall was a releasee against whom HS3 could not bring suit. *See supra* Section II.B.2. As we have seen, HS3's contention that Hall was not covered by the Release is a reasonable one in light of all the evidence in this case. *Melford*, in short, is inapposite here.

*Second*, Hall argues that HS3 lacked probable cause because he did not launch additional investigations to confirm the information he had gathered from: the Preston Affidavit; the LAIL document production; and the information provided by Patrick Mooney (an associate of Daniel Sargeant's). *See* Pls. Mot. at 6–8, 28. But HS3 had also hired a sophisticated law firm and, through them, a forensic analyst. The Court cannot say that the many steps HS3 took before he filed suit were insufficient as a matter of law. And, while his team may not, in the end, have reached the right result, "[t]he defendants need not be certain of the outcome of the underlying proceeding to have probable cause[.]" *Endacott*, 910 So. 2d at 922.

For all these reasons, HS3 had probable cause to bring the SAC against Hall. And, since Hall bears the burden of proving a lack of probable cause, he cannot prevail on his malicious-prosecution claim. *See Celotex*, 477 U.S. at 322. HS3's Motion for Summary Judgment on Count III is therefore **GRANTED**.[37]

## IV.     Affirmative Defenses

The Plaintiffs move for summary judgment on all of HS3's remaining affirmative defenses.[38] Pls. Mot. at 29–30. As an initial matter, the Plaintiffs are correct that four of these defenses are not affirmative defenses at all. "A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense." *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988). So, for instance, HS3's First and Second Affirmative Defenses—both of which allege that the Plaintiffs have failed to state a claim—plainly fall into this category. *See K. Hansotia & Co. Inc. v. Einalem LLC*, 2019 WL 7708241, at *2 (S.D. Fla. May 13, 2019) ("failure to state a claim is not an affirmative defense"). The same goes for his Sixth Affirmative Defense (Merger & Integration), which simply challenges the Plaintiffs' proposed interpretation of the Settlement Agreement. *See* Answer at 8–9.

Because "[t]hese affirmative defenses amount to denials that Defendants caused Plaintiff's injuries," they are simply "redundant of denials generally" and thus "are not be stricken." *Najmyar*

---

[37] This conclusion—that HS3 had probable cause to file the SAC against Hall—moots both his Eleventh Affirmative Defense ("Ripeness"), which attacked the favorable-termination element of the malicious-prosecution claim, *see* Answer at 11, and his Motion to Bifurcate Amount of Punitive Damages from Remaining Issues at Trial [ECF No. 398]. The latter, and the Plaintiffs' Motion for Summary Judgment on the former, are therefore **DENIED AS MOOT**. For the same reason, HS3's Renewed Motion for Leave to Amend Answer [ECF No. 393]—by which HS3 hoped to shield himself against Hall's malicious-prosecution claim by raising an advice-of-counsel defense—is likewise **DENIED AS MOOT**.

[38] The Court has already addressed HS3's Third (Novation), Fourth (Payment), Fifth (Accord & Satisfaction), Ninth (Adverse Interest), Tenth (Fraud), Eleventh (Ripeness), and Twelfth (Public Policy) Affirmative Defenses. *See supra* notes 15, 20, 22, 23, 37.

*v. Carnival Corp.*, 2017 WL 7796327, at *1 (S.D. Fla. Aug. 28, 2017); *see also Gilbert v. Eli Lilly Co.*, 56 F.R.D. 116, 123–24 (D.P.R. 1972) ("[A] negative defense [is] one which controverts the plaintiff's claim in his prima facie case; that is, one which tends to disprove one or all of the elements of a complaint. . . . [I]t is a misnomer to speak of a defense, that is in substance a denial, as an affirmative defense. Whenever a denial is erroneously termed an affirmative defense it should, nevertheless, be treated for what it is, a negative defense."); *Florida Plantation Cold Storage, Inc. v. Pac. Ins. Co., Inc.*, 2009 WL 10667538, at *3 (S.D. Fla. Mar. 11, 2009) (collecting cases from multiple districts and noting that affirmative defenses should not be stricken even if they are simply redundant of general denials); *Bluewater Trading LLC v. Willmar USA, Inc.*, 2008 WL 4179861, at *2 (S.D. Fla. Sept. 9, 2008) (refusing to strike an affirmative defense that amounted to a denial and instead treating the defense as a specific denial). The Plaintiffs' Motion for Summary Judgment on these three Affirmative Defenses is therefore **DENIED**; the Court will treat these Defenses *as ordinary denials* at trial.

The parties agree that HS3's Eighth Affirmative Defense, the equitable defense of unclean hands, is now moot. *See* Mot. Hrg. at 52–53. Accordingly, the Plaintiffs' Motion for Summary Judgment on the Eighth Affirmative Defense is **DENIED AS MOOT**.

Finally, the Plaintiffs attack HS3's Seventh Affirmative Defense (Equitable Estoppel). *See* Pls. Mot. at 30. "The elements of equitable estoppel are (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon." *State v. Harris*, 881 So. 2d 1079, 1084 (Fla. 2004).

HS3's "equitable estoppel" defense is premised on his assumption that the "Plaintiffs agreed in January 2017 that the Settlement was fully performed, that no Actionable Events

occurred and, accordingly, satisfactions of all judgments were recorded." Answer at 9. But, as the Court has explained, the Plaintiffs here—Burford, Dundrod, and Hall—were not involved in the January 2017 Amendment, did not sign it, and did not thereby make any promises to HS3. *See supra* Section II.B.1. And, because the Assignment between Al-Saleh and Dundrod transferred no rights under the Settlement Agreement, *see id.*, the commitments Al-Saleh made in the Amendment cannot be attributed to Dundrod. The Plaintiffs' Motion for Summary Judgment on HS3's Seventh Affirmative Defense is therefore **GRANTED**.

***

With the Court's permission, the parties have submitted a number of filings under seal. Those filings shall remain under seal until further order of the Court. But, recognizing that "proceedings in the United States District Court are public and Court filings are matters of public record," *see* S.D. Fla. L.R. 5.4(a), this Order has been filed publicly.

Having carefully reviewed the record and the governing law, the Court hereby

**ORDERS AND ADJUDGES** as follows:

1) HS3's Motion [ECF No. 320] is **GRANTED** as to Count III and **GRANTED in part and DENIED in part** as to Count II;

2) The Plaintiffs' Motion [ECF No. 321] is **DENIED** as to Count III, **GRANTED in part and DENIED in part** as to Count II, and **GRANTED in part and DENIED in part** as to HS3's Affirmative Defenses;

3) HS3's Expedited and Renewed Motion for Leave to Amend Answer to Add an Affirmative Defense [ECF No. 393] is **DENIED AS MOOT**.

4) HS3's Motion to Bifurcate Amount of Punitive Damages from Remaining Issues at Trial [ECF No. 398] is **DENIED AS MOOT**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 30th day of March 2020.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record